# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNDER SEAL, | | Civil Action No. |
| | Plaintiff[s], | |
| | | JURY TRIAL DEMANDED |
| v. | | |
| UNDER SEAL, | | **FILED IN CAMERA AND UNDER** |
| | Defendant[s]. | **SEAL PURSUANT TO 31 U.S.C. § 3730** |

**<u>COMPLAINT</u>**

**<u>SEALED CASE---DO NOT ENTER ON PACER</u>**

# TABLE OF CONTENTS

I. Introduction ..................................................................................................... 1

    A. The Fraudulent Schemes ....................................................................... 2

    B. The Instant Action ................................................................................. 2

II. Jurisdiction and Venue .................................................................................... 3

III. Parties ............................................................................................................. 3

IV. Background ..................................................................................................... 5

    A. The Federal and State False Claims Acts .............................................. 5

    B. The Anti-Kickback Laws of the United States and States ..................... 8

    C. Medicare ............................................................................................. 11

        1. Medicare Part A .......................................................................... 11

        2. Medicare Part B .......................................................................... 13

    D. Medicaid ............................................................................................. 14

    E. Other Government Health Insurance Programs ................................... 16

    F. Reimbursement for Surgery Using Medical Devices ........................... 17

V. Facts and Allegations .................................................................................... 20

    A. Dr. Millett Obtains Royalty Payments Based on His Use and Promotion of Arthrex Products, Rather than any Intellectual Property Contribution ...................... 20

    B. Dr. Millett has no Protectable Intellectual Property In Speedbridge or Suturebridge ........................................................................................ 26

    C. Arthrex Paid Dr. Millett and Others Hundreds of Millions of Dollars in Suspect Royalty Payments Between 2010 and 2018. ................................. 32

    D. Arthrex's Payments to Physicians and Dr. Millett's Solicitation of Royalties Violate The Anti-Kickback Statute and The False Claims Act ................ 36

VI. Claims for Relief ........................................................................................... 42

    Count One - Federal False Claims Act – False Claims ......................... 42

    Count Two - Federal False Claims Act – False Records or Statements ............ 43

    Count Three - Federal False Claims Act – Reverse False Claims ....................... 43

    Count Four - Federal False Claims Act - Conspiracy ......................................... 44

Count Five - Alaska False Claims and Reporting Act ....................................................... 45

Count Six - California False Claims Act......................................................................... 46

Count Seven - Colorado Medicaid False Claims Act ..................................................... 47

Count Eight - Connecticut False Claims Act .................................................................. 49

Count Nine - Delaware False Claims And Reporting Act ............................................... 50

Count Ten - District of Columbia False Claims Act ....................................................... 51

Count Eleven - Florida False Claims Act ....................................................................... 52

Count Twelve - Georgia False Medicaid Claims Act ..................................................... 53

Count Thirteen - Hawaii False Claims Act ..................................................................... 55

Count Fourteen - Illinois False Claims Act..................................................................... 56

Count Fifteen - Indiana Medicaid False Claims and Whistleblower Protection Act ......... 57

Count Sixteen - Iowa False Claims Act .......................................................................... 58

Count Seventeen - Louisiana Medical Assistance Programs Integrity Law ..................... 59

Count Eighteen - Maryland False Health Claims Act...................................................... 60

Count Nineteen - Massachusetts False Claims Act.......................................................... 62

Count Twenty - Michigan Medicaid False Claims Act ................................................... 63

Count Twenty-one - Minnesota False Claims Act ........................................................... 64

Count Twenty-two - Montana False Claims Act ............................................................. 65

Count Twenty-three - Nevada Submission of False Claims Act ...................................... 67

Count Twenty-four - New Jersey False Claims Act ........................................................ 68

Count Twenty-five - New Mexico Medicaid False Claims Act ....................................... 69

Count Twenty-six - New York False Claims Act ............................................................ 70

Count Twenty-seven - North Carolina False Claims Act ................................................ 72

Count Twenty-eight - Oklahoma Medicaid False Claims Act......................................... 73

Count Twenty-nine - Fraudulent Claims to the Government of Puerto Rico Act ............. 74

Count Thirty - Rhode Island False Claims Act ............................................................... 75

Count Thirty-one - Tennessee Medicaid False Claims Act ............................................. 76

Count Thirty-two - Texas Medicaid Fraud Prevention Act ............................................. 77

Count Thirty-three - Vermont False Claims Act............................................................. 79

Count Thirty-four - Virginia Fraud Against Taxpayers Act ............................................ 81

Count Thirty-five - Washington State Medicaid Fraud False Claims Act........................ 82

Count Thirty-six - Wisconsin False Claims for Medical Assistance Act ........................... 83

VII.  Prayers for Relief .................................................................................................. 85

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATES of ALASKA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, WISCONSIN, the COMMONWEALTHS OF MASSACHUSETTS, PUERTO RICO, AND VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel.* JOSEPH B. SHEA, <br><br>          Plaintiffs, <br><br>     v. <br><br> ARTHREX, INC., PETER MILLETT, M.D., and ALM RESEARCH LLC, <br><br>          Defendants. | Civil Action No. <br><br> JURY TRIAL DEMANDED <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL AND STATE FALSE CLAIMS ACTS

## I.    INTRODUCTION

1.     This is an action brought by *qui tam* Plaintiff-Relator Joseph B. Shea on behalf of the United States and certain States (the "States" or "*Qui Tam* States") to recover damages, civil penalties, and other relief for false and/or fraudulent statements, records, and claims made and caused to be made to, and overpayments retained from Government Health Care Programs by the Defendants and/or their agents and employees and subsidiaries in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA" or "Federal FCA") and the state false claims act statutes identified herein ("State *Qui Tam* statutes" or "State FCAs").

A.     **The Fraudulent Schemes**

2.     Since at least 2010, Arthrex has paid physicians hundreds of millions of dollars ostensibly to license intellectual property that Arthrex incorporates into its medical devices. Since 2013, it has paid over $220 million, in some cases paying individual physicians over $20 million annually, for such purposes.

3.     However, as Plaintiff-Relator learned, first as a sales agent selling Arthrex products and later in helping a physician negotiate an Arthrex royalty contract, Arthrex payments do not represent fair market value for licensed intellectual property. Rather, they are a means to disguise kickbacks to induce high capacity and high-profile physicians to utilize and recommend Arthrex products, and Arthrex demands loyalty from these physicians in exchange for lucrative royalty payments.

B.     **The Instant Action**

4.     Based on the Federal FCA provisions, and comparable provisions of the State FCAs, *qui tam* Plaintiff-Relator seeks, through this action, to recover damages and civil penalties arising from the Defendants' knowing fraud against the United States and the States. Defendants have paid millions of dollars in kickbacks and induced billions of dollars in false or fraudulent claims to the Government since at least 2010.

5.     The allegations set forth in this Complaint have not been publicly disclosed within the meaning of the Federal FCA, as amended, 31 U.S.C. § 3730(e)(4), or analogous provisions of the State FCAs. In the alternative, if the Court finds that there was a public disclosure of such allegations, Relator is an "original source" as that term is used in the Federal and State FCAs. *Id.*

6.     This action is filed *in camera* and under seal pursuant to the requirements of the federal and state false claims acts.

## II.     JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has original and supplemental jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence as the claims brought on behalf of the United States under 31 U.S.C. § 3730.

8.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because one or more Defendants can be found in, resides in, or transacts substantial business in this district, including business related to Defendants' misconduct.

9.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1391, and 28 U.S.C. § 1395(a), because Arthrex transacts business in this District by among other things supplying medical devices subject to the fraudulent activities described herein.

## III.    PARTIES

10.     Plaintiffs the United States of America and the *Qui Tam* States are the real parties in interest with respect to the federal and state false claims act *qui tam* claims herein. Plaintiff-Relator Joseph B. Shea is prosecuting this action on the real parties' behalf pursuant to 31 U.S.C. § 3730(b) and comparable provisions of the State FCAs.

11.     Plaintiff-Relator Joseph B. Shea is a citizen of the United States who is familiar with and has knowledge of the Defendants' business operations and the allegations herein. Joseph B. Shea is a resident of Massachusetts.  As explained, *supra*, Mr. Shea is a medical device sales representative and has worked for several companies in the industry and served for many years as the New England regional representative of Arthrex products, including handling the prominent Boston-based teaching hospitals.  In 2010 Dr. Millet contracted with Mr. Shea to

represent him in negotiations with Arthrex regarding a royalty agreement. In the course of that contract, Mr. Shea learned that Arthrex's royalty payments are based on the intent to induce referrals of its products in violation of the federal and state false claims acts.

12. Defendant Arthrex, Inc. ("Arthrex") is a Delaware corporation having its principal place of business at 1370 Creekside Boulevard, Naples, Florida 34108. Arthrex is a medical device manufacturer and supplier primarily to the orthopedic surgery industry. Arthrex is owned nearly entirely by its founder Reinhold Schmieding. Mr. Schmieding is well known for minutely managing every aspect of Arthrex and for ensuring that doctors with whom he has a personal relationship are taken care of. *See, e.g.,* Susan Adams, "The Secretive Sultan Of Sports Medicine: Meet The Billionaire Behind Arthrex," Forbes, https://www.forbes.com/sites/susanadams/2013/09/18/the-secretive-sultan-of-sports-medicine-meet-the-billionaire-behind-arthrex/#7f2e49fa7f80 (Oct 7, 2013).

13. Defendant Peter Millett, M.D. is an individual with a principal residence in Edwards, Colorado, and a primary business address of The Steadman Philipon Clinic, 181 West Meadow Drive, Suite 400, Vail, Colorado. Dr. Millet is an orthopedic surgeon who utilizes Arthrex devices in his procedures.

14. Defendant ALM Research LLC is a limited liability company owned and controlled by Dr. Millett for which he serves as manager. ALM Research was originally organized in Massachusetts in 2004 and was involuntarily dissolved on April 30, 2009. In 2006 Dr. Millet formed ALM Research LLC in Colorado, for which he also serves as manager. ALM Research was formed by Dr. Millett in connection with his research and development efforts related to products developed for Arthrex and otherwise. The royalty money received by ALM Research is controlled exclusively by Dr. Millett.

-4-

IV.     **BACKGROUND**

A.      **The Federal and State False Claims Acts**

15.     The Federal FCA creates liability to the United States for any individual or entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,"  31 U.S.C. § 3729(a)(1)(A); "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,"  31 U.S.C. § 3729(a)(1)(B); "conspires to commit a violation of" the False Claims Act, 31 U.S.C. § 3729(a)(1)(C); and/or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G).

16.     The FCA defines "knowingly" to mean actual knowledge, reckless disregard, and/or deliberate indifference. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

17.     The FCA defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property." 31 U.S.C. § 3729(b)(2). A claim can be "presented to an officer, employee, or agent of the United States"; or it can be "made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  *Id.*

18.    The FCA defines "obligation" to include any "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  In the health care context, such as here, the term "obligation" is further defined as "any overpayment retained by a person" beyond "60 days after the date on which the overpayment was identified…or the date any corresponding cost report is due, if applicable." 42 U.S.C. § 1128J9(d).  *See also* 42 U.S.C. § 1320a-7k(d).

19.    The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

20.    Any person who violates the FCA "is liable to the United States for a civil penalty . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The penalty varies depending on the date of violation: for violations occurring before November 1, 2015, between $5,500 and $11,000 per violation, *see* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, *47103 (1999); and for violations after November 2, 2015, between $11,181 and $22,363 per violation, 28 C.F.R. § 85.5.

21.    Additionally, many States have passed False Claims Act laws, which in most instances closely track the Federal FCA. The State FCAs apply, *inter alia*, to the state portion of Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-state funded Medicaid program and failure to report and return any overpayments therefrom.

22.    The Defendants' acts alleged herein constitute violations of the Alaska False Claims Act, 2016 Alaska Sess. Laws Ch. 25 § 09.58.010, *et. seq*; California False Claims Act, Cal. Govt. Code § 12650, *et seq*.; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. 25.5-4-303.5, *et seq*.; the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274, *et seq*.; the

Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, § 1201, *et seq.*; the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*; the Georgia Medicaid False Claims Act, Ga. Code. Ann. § 49-4-168, *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21, *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1, *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7, *et seq.*; the Iowa False Claims Act, Iowa Code § 685.1, *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1, *et seq.*; the Maryland False Health Claims Act, Md. Code Ann. Health-Gen § 2-601, *et seq.*; the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12 § 5A, *et seq.*; the Michigan Medicaid False Claims Act, Stat. Mich. Comp. Laws Serv. § 400.601, *et seq.*; the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq.*; the Montana False Claims Act, Mont. Code Ann. § 17-8-401, *et seq.*; the Nevada Submission of False Claims to State and Local Government Act, Nev. Rev. Stat. § 357.010, *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1, *et seq.*; the New York False Claims Act, N.Y Fin. Law § 187, *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. § 63-5053, *et seq.*; the Fraudulent Claims to Programs, Contracts, and Services of the Government of Puerto Rico Act, P.R. Laws Ann. tit. 32, § 2934, *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1, *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, *et seq.*; the State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, *et seq.*; the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, *et seq.*; the Wisconsin False Claims For Medical Assistance Act, Wis. Stat. Ann. §

20.931, *et seq*.; and the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.01, *et seq*.

23.     Each of the statutes listed above contains *qui tam* provisions governing, *inter alia*, a relator's right to claim a share of the State's recovery.

**B.     The Anti-Kickback Laws of the United States and States**

24.     The Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions corrupt medical decision-making and can result in goods and services being provided that are unduly costly, medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of government health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare- Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

25.     The Anti-Kickback Statute prohibits any person or entity from making, soliciting, or accepting "any remuneration" to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback). The statute provides, in pertinent part:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

> (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
>
> (B) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

26.     Government regulation defines the term "remuneration" as "anything of value in any form whatsoever." 56 Fed. Reg. 35952, 35958 (1991); *see* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 66 Fed. Reg. 23731, 23734 (May 5, 2003) (Anti-Kickback Statute addresses the offer or payment of "anything of value").

27.     Compliance with the federal and state anti-kickback laws is a precondition to participation and to payment as a health care provider under Medicare and Medicaid.  *E.g., United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011) (Medicare); *State of New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) (Medicaid).

28.     "A claim that includes items or services resulting from a violation of [The AKS]
constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). This
language was intended to clarify "that all claims resulting from illegal kickbacks are considered
false claims for the purpose of civil actions under the [FCA], even when the claims are not
submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

29.     The Anti-Kickback Statute contains safe harbors that exempt certain transactions
from its prohibitions.  *See* 42 U.S.C. § 1320a-7(b)(3). Once the Government has demonstrated
each element of a violation of the Anti-Kickback Statute, the burden shifts to the defendant to
establish that defendant's conduct at issue was protected by such a safe harbor or exception.  The
Government need not prove as part of its affirmative case that defendant's conduct at issue does
not fit within a safe harbor.

30.     Violation of the Anti-Kickback Statute subjects the violator to exclusion from
participation in federal health care programs, civil monetary penalties, and imprisonment of up to
five years per violation.  42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

31.     Many of the named Plaintiff States also have anti-kickback laws similar to the
AKS, which apply to medical providers and entities participating in their Medicaid programs,
including, without limitation, the States of California, Cal. Welf. & Inst. Code § 14107.2;
Delaware, Del. Code. Ann. Tit. 31, § 1005; Florida, Fla. Stat. § 409.920(2)(a)(5); Illinois, 305 Ill.
Comp. Stat. 5/8A; Louisiana, La. Rev. Stat. Ann. § 46:438.2; Massachusetts, Mass. Gen. Laws
ch. 118E, § 41; Michigan, Mich. Comp. Laws § 400.604; New York, N.Y. Soc. Serv. Law § 366-
d; and Virginia, Va. Code Ann. § 32.1-315.

32.     Pursuant to provider agreements and claim forms, providers who participate in a
federal health care program including Medicare Part B generally must certify that they have

-10-

complied with all applicable federal and State rules and regulations, including applicable anti-kickback statutes. *See* discussion, *infra* at ¶¶ 62-66.

### C. Medicare

33. The Health Insurance for the Aged and Disabled Program, known as Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. ("Medicare" or "the Medicare Program"), is a health insurance program administered by the United States Government and funded by taxpayer revenue. The United States Department of Health and Human Services ("HHS"), through its Centers for Medicare and Medicaid Services ("CMS"), oversees Medicare.

34. Medicare is a health insurance program and provides for payment of, among other things, medical services and equipment to persons over 65 years of age and certain others who qualify under Medicare's terms and conditions.

35. The Medicare program has four parts: A-D. Two parts are relevant to this action. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of institutional care, including inpatient hospital services, skilled nursing facilities and home health care. *See* 42 U.S.C. §§ 1395c-1395i-5. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians as well as a variety of "medical and other services." *See* 42 U.S.C. §§ 1395j to 1395w-6.

#### 1. *Medicare Part A*

36. Part A of the Medicare Program authorizes payment for institutional care, including hospitalization, for eligible patients. Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients. The hospital, also called a "provider," is authorized to bill Medicare for that treatment. CMS reimburses hospitals for inpatient Part A services through Medicare Administrative Contractors ("MACs").

37.     MACs are private insurance companies that are responsible for determining the amount of payments to be made to providers. *See* 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006). Under their contracts with CMS, MACs review, approve, and pay Medicare bills, called "claims," received from hospitals. *See* 42 C.F.R. § 421.5(b). Those claims are paid with federal funds.

38.     To get paid, a hospital must complete and submit a claim for payment on a CMS 1450 form (also known as UB-04). This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1450 forms to determine whether the service is payable and what amounts the hospital is owed.

39.     At the end of each fiscal year, a hospital submits to the MAC a form referred to as a "cost report," which may identify any outstanding costs that the hospital is claiming for reimbursement for that year. By auditing and reviewing cost reports, the Medicare Program ensures the accuracy of previously submitted claims and can make adjustments where there is a discrepancy between the hospital's costs and Medicare reimbursements. The Medicare Program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any, the hospital is owed, or what amounts the hospital has been overpaid during the year.

40.     Hospitals are reimbursed under the prospective payment system ("PPS") in which the amount Medicare pays a hospital for treating an inpatient Medicare beneficiary is based on a variety of factors, including the particular condition that led to the patient's admission to, or that was principally treated by, the hospital.

41.     Under PPS, a patient's illness or condition is categorized under a classification system called a diagnostic related group ("DRG"). The DRG is one of the factors used to

determine how much the hospital will be paid under Medicare and reflects the resources the patient's condition or treatment typically requires. The MAC uses the patient specific information (for example, the diagnosis codes) submitted by the hospital on the CMS Form 1450 to determine what DRG is assigned to a certain claim, and hence, what amount will be paid.

42.     Medicare utilizes the DRG information to determine the level of reimbursement the hospital receives for the expected costs related to a beneficiary's hospitalization, including the cost of medical and surgical equipment utilized to care for the patient. The Part A claims submitted by a hospital with an associated beneficiary DRG are intended to compensate the hospital for the costs of any medical devices, where those devices are appropriately used to treat a Medicare beneficiary.

### 2.     *Medicare Part B*

43.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury. Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. In addition to enrollment agreements, the vast majority of health care providers elect to enter into Medicare participation agreements, which allow the beneficiaries' claims to be assigned directly to the provider. Pursuant to Medicare Participation Agreements, payments under Medicare Part B are typically made directly to service providers and practitioners, such as physicians, rather than to the patient/beneficiary. In that case, the physician bills the Medicare Program directly.

44.     The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS. MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

45.     To bill Medicare, a physician must submit an electronic or hard-copy claim form called a CMS 1500 form to the carrier. When the claim is submitted, the physician certifies that he or she is knowledgeable of Medicare's requirements and that the claim complies with applicable laws and regulations, including the AKS.

46.     Physicians wishing to submit the CMS 1500 form electronically must submit a provider enrollment form.

**D.      Medicaid**

47.     The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid" or "the Medicaid Program"), is a health insurance program administered by the United States Government and the States and is funded jointly by state and federal taxpayer revenue. CMS and HHS oversee Medicaid jointly with agencies in each State. Each named Plaintiff State participates in Medicaid.

48.     Medicaid assists participating States in providing medical services, medical equipment, and prescription drugs to needy individuals. The States and United States share reimbursement costs. States directly pay providers, and then obtain the federal contribution from accounts drawn on the United States Treasury. 42 C.F.R. §§ 430.0-*et seq.*  The Federal government's share is referred to as the Federal Medical Assistance Percentage ("FMAP") or Federal Financial Participation ("FFP") and varies depending upon the per capita income of each State. https://aspe.hhs.gov/federal-medical-assistance-percentages-or-federal-financial-participation-state-assistance-expenditures\\\. The FMAP consists of a minimum of 50% up to a maximum of about 75%.

49.     Federal funding for the Medicaid Program includes support for Medicare Savings Programs which help qualifying Medicare beneficiaries pay Part A and B premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs consist of the

Qualified Medicare Beneficiary Program, 42 U.S.C. § 1396d(p)(1), the Specified Low-Income Medicare Beneficiary Program, 42 U.S.C. § 1396a(a)(10)(E)(iii), the Qualifying Individual Program, 42 U.S.C. § 1396a(a)(10)(E)(iv), and the Qualified Disabled and Working Individuals Program, 42 U.S.C. § 1396d(s).

50.     Medicaid may serve as the primary insurer, or in some instances as the secondary insurer (e.g., with Medicare or private insurance providing primary coverage). Medicaid sets forth minimum requirements for state Medicaid programs to meet to qualify for federal funding and each participating state adopts its own state plan and regulations governing the administration of the state's Medicaid program.

51.     The majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). *See* 42 C.F.R. § 430.30.

52.     Claims arising from illegal kickbacks are not authorized to be paid under state Medicaid programs.

-15-

53.     Providers who participate in the Medicaid program must sign enrollment or other participation agreements with their states that certify compliance with the state and federal Medicaid requirements, including the AKS. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

54.     Furthermore, in many states, Medicaid providers must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations.

### E.     Other Government Health Insurance Programs

55.      The Civilian Health and Medical Program of the United States (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. TRICARE pays for, among other things, medical devices and surgeries for its beneficiaries.

56.     CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability, or for those who died from a VA-rated-service-connected disability.

57.     The Federal Employee Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. It pays for, among other things, medical devices and surgeries for its beneficiaries. Under the FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government. As a result, fraud on a patient covered by the FEHBP constitutes fraud on the federal government and the loss of federal funds.

-16-

58.     The federal government operates hospitals, including through its Departments of Defense and VA, and receives and uses federal funds to provide services to patients treated at these facilities and otherwise, as well as outpatient services. A network of already established VA hospitals and services make up the VA health care system.

59.     The Office of Workers' Compensation Programs ("OWCP") of the U.S. Department of Labor ("DOL") administers federal workers' compensation programs under four statutes: (1) the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101, *et seq.*; (2) the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901, *et seq.*; (3) the Federal Black Lung Benefits Act ("FBLBA"), 30 U.S.C. §§ 901, *et seq.*; and (4) the Energy Employees Occupational Illness Compensation Program Act ("EEOIC") (also known as the "Beryllium Exposure Compensation Act"), 42 U.S.C.A. §§ 7384, *et seq.*

60.     The largest of these workers' compensation programs is the FECA program, which provides coverage for approximately three million federal and postal workers for employment-related injuries and occupational diseases. Under the provisions of FECA, OWCP authorizes payment for medical services, and establishes limits on the maximum payment for such services.

61.     Together, Medicare, Medicaid, Other Government Health Care Programs and any other government-funded healthcare programs, are referred to as "Government Health Care Programs."

**F.      Reimbursement for Surgery Using Medical Devices**

62.     Under all Government Health Care Programs, physicians and hospitals enter into Provider Agreements with CMS or the relevant government administrator to establish their eligibility to seek reimbursement. As part of those agreements, the provider must sign a certification such as the following applicable to Medicare:

-17-

I agree to abide by the Medicare laws, regulations and program instructions that apply to [me] . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Form CMS-855I, at 25 (for physicians and non-physician practitioners); *see* CMS-855A, at 48 (similar for institutional providers).

63.     Individual claims submitted by health care providers to Government Health Care Programs contain similar representations and certifications. *See, e.g*., Forms CMS-1500 (paper provider claim form used for Medicare and Medicaid); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the government that the services were delivered in accordance with federal law, including, for example, Government Health Care Program laws and regulations.

64.     Government Health Care Programs require compliance with these certifications as a material condition of payment and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

65.     When submitting a claim for services under Government Health Care Programs, the provider designates a numeric code assigned to that service or procedure by the American Medical Association. These codes are known as Current Procedural Terminology, or CPT codes, and are used by health care providers to represent which services have been provided and for

-18-

which they are seeking reimbursement. In addition, CMS has assigned and published numeric codes for supplies and services that supplement the CPT codes. This coding system is known as the Healthcare Common Procedure Coding System, or HCPCS. HCPCS codes are similarly used by health care providers to represent what services have been provided and for which they are seeking reimbursement.

66.     To submit claims to Government Health Care Programs, providers must include a CPT or HCPCS code on the claim that accurately represents the service provided or the procedure performed.

67.     As discussed above, costs associated with surgery utilizing medical devices are separately billed by the hospitals and surgeons to payors, including Government Health Care Programs.

68.     Hospitals submit claims to Government Health Care Programs for the inpatient costs associated with the surgeries, including the cost of the medical devices.  For Medicare and Medicaid, hospitals utilize CMS 1450 claim forms. Hospital claims identify the DRG associated with the surgery that the program administrator such as CMS uses to determine the payment amount to the hospital, and include payment for the medical devices used during the surgery.

69.     DRG codes are calculated in a manner intended to fairly compensate the hospital for all the costs associated with the surgery, including the medical device costs. DRG rates are recalculated annually based on, among other things, actual claims data.

70.     Relevantly, the hospital typically treats the implantable medical device as a "physician preference" item, meaning surgeons select the particular device to be purchased and used for their surgeries. However, the devices utilized in a surgery are generally purchased by the hospital from the manufacturer.

71.     Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

72.     The CMS Form 2552-10 Hospital Cost Report certification page includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

73.     The cost-report certifier is also required to certify that:

> To the best of my knowledge and belief, this [Hospital Cost Report] and statement are a true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations

74.     The surgeon performing the procedure separately bills the payor such as Medicare Part B or Medicaid for his or her professional services on a CMS 1500 form, identifying the surgical procedure by the appropriate CPT code.

## V.     FACTS AND ALLEGATIONS

### A.     Dr. Millett Obtains Royalty Payments Based on His Use and Promotion of Arthrex Products, Rather than any Intellectual Property Contribution

75.     Dr. Millett and Plaintiff-Relator Mr. Shea first met in 2001 when Dr. Millett was on staff at Brigham and Women's Hospital in Boston, Massachusetts, and Mr. Shea was a sales representative for Arthrex.  At that time Mr. Shea recognized Dr. Millett's potential future value to Arthrex in its marketing efforts.  As a result of that meeting, Arthrex funded a fellowship through the Carter Rowe Foundation specifically to provide a fellow who spent the majority of his or her time assisting Dr. Millett.

76.     In or around 2005, Dr. Millett expressed his belief to Mr. Shea that Arthrex should compensate him with a royalty arrangement.  Mr. Shea was no longer Dr. Millett's Arthrex sales representative at that time because Dr. Millett took a position with the Steadman Hawkins Clinic in Vail, Colorado, and Mr. Shea continued to represent Arthrex products in the New England region.  So, although Dr. Millett would express his desire to be highly compensated by Arthrex, Shea deferred to Arthrex executives that worked with Dr. Millett to work through those matters.

77.     Mr. Shea understands that between 2005 and 2010, Dr. Millett continued to press Arthrex for a royalty arrangement.  Dr. Millett went so far as to engage as a consultant a medical device corporation CEO named Randy Riggs. While Mr. Shea understood at the time that certain high level physicians associated with promoting Arthrex products had already been awarded royalty agreements, Arthrex had refused to do so in Dr. Millett's case.

78.     In or around March of 2010 Dr. Millett told Mr. Shea that he was completely at wit's end with his and Mr. Rigg's efforts to obtain a royalty agreement from Arthrex and asked Mr. Shea to assist him. Dr. Millett told Mr. Shea that he wasn't happy with what he was receiving compared with the other high-paid consultants at Arthrex. Dr. Millett said that he wanted to be "one of the big boys" and wanted to be compensated like the important, crucial physicians.

79.     From his experience in representing Arthrex and in the medical device industry, Mr. Shea understood that Arthrex agreed to pay royalties to physicians, not because they owned protectable intellectual property that Arthrex needed to license, but to induce them to positively impact Arthrex sales.  In particular, Mr. Shea had worked with Reinhold Schmieding closely since 1995 orchestrating the sale of products in his region, and witnessed the means by which

Arthrex achieved its dramatic growth from a company with several thousand square feet of office space and a handful of employees, to by the time Mr. Shea's company Surgi-Care, Inc. ended its sales relationship with Arthrex in 2006-2007, a large corporate campus and thousands of employees.

80.    From his experience, Mr. Shea knew that the standard royalty deal from Arthrex was 2% of a product's revenue and required loyalty on the part of the surgeon.

81.    For example, when Mr. Shea would accompany Mr. Schmieding on sales visits to influential physicians in or around 1995-1996, Mr. Shea was present when Mr. Schmieding told physicians that Arthrex would be willing to pay them 2% of revenue as a royalty.

82.    In exchange, Mr. Schmieding expected the surgeons on large royalty agreements to be loyal to Arthrex products.  Thus these surgeons were expected to speak publicly about, use, and train others on Arthrex medical devices and refrain from speaking publicly about, using, and training others on medical devices manufactured by Arthrex's competitors. As explained, *supra*, hospitals typically treat implantable medical devices as a "physician preference" item, and surgeons are given wide latitude in determining the particular brand of device to be purchased and used for their surgeries; ultimately however, the hospital purchases the devices from the manufacturer.

83.    Likewise, Mr. Shea had conversations with Dr. Brian Cole, an important surgeon in Chicago at a medical conference in Aruba around 2003. Dr. Cole told Mr. Shea that he received 2% of Arthrex's sales on the relevant products – in this case the Arthrex Pushlock suture anchor. Mr. Shea was impressed by Dr. Cole's arrangement in part because Mr. Shea was told that Dr. Cole drove a Bentley with "PushLock" on the license plate that he paid for from Arthrex royalties. Dr. Cole was aware of the influence that he had on Arthrex sales.  Before he

spoke at the conference, Dr. Cole told Mr. Shea that "I'm going to talk about this product, and be ready, you know, talk to customers about it, because they will come out and ask for it."

84.     Mr. Shea knew that Arthrex would not want to lose Dr. Millett's business and influence. By 2006, Dr. Millett served as a permanent staff surgeon at the Steadman Clinic in Vail, Colorado.  The Steadman Clinic is one of the premier shoulder and sports surgery centers in the country. Beyond his direct business, Dr. Millett's was a powerful name to use in marketing and educational efforts to promote Arthrex products.  Even more importantly, Dr. Millett trained seven to eight orthopedic fellows per year at the clinics. These fellows would then typically go into practice and use the products that they were trained to use in fellowship. Thus, Dr. Millett's choice to use and train surgeons on Arthrex's devices or its competitors would have an exponential impact as more and more of Dr. Millett's trainees entered practice and performed surgeries using the devices with which they were comfortable.

85.     Dr. Millet knew the secret to obtaining a lucrative royalty agreement was to convince Arthrex that he was willing to move on from Arthrex to one of its competitors. But Dr. Millett was unsuccessful in convincing Arthrex. Mr. Shea and Dr. Millett agreed that Mr. Shea would approach some Arthrex competitors about opportunities to create leverage that would be used to force Arthrex to place Dr. Millett on a larger royalty deal. He told Mr. Shea that he could not represent himself to other companies to create opportunities, and asked Mr. Shea to represent him with other companies and create these opportunities.

86.     Mr. Shea approached his high-level contacts within the major companies that competed with Arthrex, which he had made as a result of his career experiences, and negotiate deals with them to bring Dr. Millett and his influence to them.

87.     Mr. Shea wanted to establish that a competitor would match the hundreds of thousands of dollars per year that Arthrex paid to the Steadman Clinic to support Dr. Millett's fellows, and potentially be willing to pay a royalty above 2% for any products he was able to invent or develop. Having other options for Dr. Millett on the table would give the parties leverage to go back to Arthrex and Mr. Schmeiding and negotiate a royalty compensation agreement for Dr. Millett. If Arthrex would not agree to do so, it ran the risk that Dr. Millett would bring his talent and influence to a major competitor of Arthrex. Dr. Millett agreed with this strategy and in the spring of 2010, Mr. Shea met with and had numerous conversations with multiple representatives of Smith & Nephew, a chief competitor of Arthrex and other high-level executives in the industry.

88.     Mr. Shea spoke with Joe Darling, the Global President of The Linvatec Corporation, a much smaller competitor to Arthrex to learn about royalty rates. Mr. Shea had a detailed discussion of what Linvatec might pay its collaborating physicians and the rates were higher than the two percentage points that he understood was customary for Arthrex royalty agreements. This information would become very important when Mr. Shea helped Dr. Millett finalize his royalty agreement with Arthrex.

89.     Mr. Shea's conversations with Smith & Nephew included a lengthy dinner meeting with its executives including Jeff Wyman, a former Arthrex executive, who was then Vice President of InVentures at Smith and Nephew; Alain Tranchemontagne, a Senior Vice President of Marketing at Smith and Nephew; and Carl Vause, a Global Vice President of Repair Marketing for Smith and Nephew. These executives were all very eager to bring Dr. Millett onto their team and to put him in a leadership position including providing him with a royalty agreement if Dr. Millett was able to deliver original intellectual property to them. Mr. Wyman

-24-

understood the impact of drawing Dr Millett away from Mr. Wyman's former employer Arthrex. Smith and Nephew represented a real alternative for Dr. Millett because it enjoyed market share comparable to Arthrex and at Smith and Nephew Dr. Millett could become the top consultant for the shoulder market whereas Arthrex was already committed to Dr. Burkhart and Dr. ElAttrache in that role. However, any royalty deal at Smith and Nephew would have to be based on actual new intellectual property, whereas at Arthrex, Dr. Millett could insist on receiving retroactive payments. Importantly, Smith & Nephew also had a significant presence in the Steadman Hawkins Clinic where Dr. Millett worked, a fact of which Reinhold Schmieding was undoubtedly well aware.

90. Mr. Shea reached out to Arthrex's CEO Reinhold Schmieding and Director of North American Sales Andy Stewart on behalf of Dr. Millett. Mr. Shea told Mr. Stewart that there were other opportunities for Dr. Millett if Arthrex couldn't reach a deal. Because of Mr. Shea's previous relationship with Mr. Schmeiding and Arthrex, Mr. Stewart and Mr. Schmieding did not wish to speak with him directly regarding Dr. Millett's potential royalty agreement. They were very unhappy that Mr. Shea had created other opportunities for Dr. Millett and was leveraging them with Arthrex. As a result, Mr. Shea directed Dr. Millett to speak with them, and continued to advise Dr. Millett behind the scenes over the course of Dr. Millett's communications with Arthrex on obtaining a royalty agreement.

91. As a result of these conversations with market competitors, Mr. Shea advised Dr. Millett that he could get more than the standard 2% out of Arthrex and urged Dr. Millett to hold out for 4%. He told Dr. Millett "They want you to stay. They know you will leave. Stick to the four percent. You can get it now that they have a sense that you're going to leave."

-25-

92.     After learning that Dr. Millett might take his business and influence from Arthrex in favor of the competition, in August of 2010 Arthrex agreed to pay Dr. Millett twice the normal royalty stream (4%) that Arthrex would typically pay on a product(s) based royalty agreement. Arthrex not only paid 4% of revenue starting on January 1, 2010 but also retroactively paid 2% of all sales from the date of first sale through December 31, 2009. Notably, as explained *infra*, Dr. Millett had no protectable intellectual property in the Speedbridge and Suturebridge products at all, but he certainly had developed no such IP on or about September 1, 2010, that would justify any royalty, let alone a prospective 4% royalty stream.

**B.      Dr. Millett has no Protectable Intellectual Property In Speedbridge or Suturebridge**

93.     Mr. Shea understands that Dr. Millet's claim to entitlement to a royalty arrangement stemmed from a surgical technique called mattress double anchor that Dr. Millett claims to have invented in 2003. In October 2004, Dr. Millet was listed as a co-author alongside two other physicians of a Technical Note titled "Mattress Double Anchor Footprint Repair: A Novel, Arthroscopic Rotator Cuff Repair Technique," published in the medical journal Arthroscopy: The Journal of Arthroscopic and Related Surgery. Peter J. Millet, Augustus Mazzocca & Carlos A. Guanche, Arthroscopy, "Mattress Double Anchor Footprint Repair: A Novel, Arthroscopic Rotator Cuff Repair Technique," ¶ 875-879 (October 2004). That technical note describes a technique, that "makes use of 2 suture anchors that are placed independently and then connected by a suture loop." *Id.*

94.     Mr. Shea further understands that Dr. Millett has claimed that other surgical device companies market products using technology developed on his technique.

95.     However, Mr. Shea understands that Dr. Millett has no protectable intellectual property in this technique or in the Arthrex Suturebridge, Speedbridge, or competing products

manufactured by other surgical device companies among other reasons because it had been published and was available for physicians at all companies to use.

96. The Arthrex Speedbridge and Suturebridge are packaged sets of suture anchors and sutures required to complete a single procedure. The packages each include several different medical devices. Arthrex identifies the applicable patents for each product, none of which list Dr. Millett as an inventor:

| Product | Patent No | Title | Application Date | Inventor(s) |
|---------|-----------|-------|------------------|-------------|
| Implant Delivery System, Achilles SutureBridge™ and Implant Delivery System, PEEK Achilles SutureBridge™[1] | 6,652,563 | Suture Anchor with internal Suture Loop | May 3, 2002 | Peter J. Dreyfuss |
| | 6,716,234 | High Strength Suture Material | September 13, 2001 | R. Donald Grafton; D. Lawson Lyon; Brian Hallet |
| | 7,029,490 | High Strength Suture with Coating and Colored Trace | June 4, 2002 | R. Donald Grafton; Reinhold Schmieding |
| | 7,329,272 | Graft fixation using a plug against suture | April 4, 2003 | Stephen S. Burkhart; Peter J. Dreyfuss; Neal S. ElAttrache |
| | 8,801,755 | Suture Anchor | January 6, 2014 | Peter J. Dreyfuss; William C. Benavitz |
| | 8,821,541 | Suture anchor with insert-molded rigid member | September 12, 2006 | Peter J. Dreyfuss; William C. Benavitz |
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |
| | 9,526,493 (Achilles SutureBridge™ only) | Suture anchor with insert-molded rigid member | April 28, 2015 | Peter J. Dreyfuss; William C. Benavitz |

---

[1] PEEK Achilles SutureBridge™ also identifies patent 9,526,726, but this patent appears unrelated and is likely meant to refer to Patent 9,526493 and/or 9,549,726.

-27-

| | 9,549,726 (Achilles SutureBridge™ only) | Suture anchor with insert-molded rigid member | August 27, 2014 | Peter J. Dreyfuss; William C. Benavitz |
|---|---|---|---|---|
| Implant System, BioComposite Achilles SpeedBridge™ | 6,544,281 | Graft fixation using a screw or plug against suture or tissue | June 22, 2001 | Neal ElAttrache; Stephen S. Burkhart; Peter Dreyfuss |
| | 6,716,234 | High Strength Suture Material | September 13, 2001 | R. Donald Grafton; D. Lawson Lyon; Brian Hallet |
| | 7,029,490 | High Strength Suture with Coating and Colored Trace | June 4, 2002 | R. Donald Grafton; Reinhold Schmieding |
| | 7,329,272 | Graft fixation using a plug against suture | April 4, 2003 | Stephen S. Burkhart; Peter J. Dreyfuss; Neal S. ElAttrache |
| | 7,892,256 | High strength suture tape | October 22, 2010 | R. Donald Grafton; Stephen S. Burkhart |
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |
| Implant System, PEEK Achilles SpeedBridge™ | 6,716,234 | High Strength Suture Material | September 13, 2001 | R. Donald Grafton; D. Lawson Lyon; Brian Hallet |
| | 7,029,490 | High Strength Suture with Coating and Colored Trace | June 4, 2002 | R. Donald Grafton; Reinhold Schmieding |
| | 7,329,272 | Graft fixation using a plug against suture | April 4, 2003 | Stephen S. Burkhart; Peter J. Dreyfuss; Neal S. ElAttrache |
| | 7,892,256 | High strength suture tape | October 22, 2010 | R. Donald Grafton; Stephen S. Burkhart |
| | 8,430,909 | Knotless graft fixation using an implant having a pointed tip | July 14, 2011 | Peter J. Dreyfuss |

| | | | | |
|---|---|---|---|---|
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |
| Implant System, PEEK Midsubstance SpeedBridge™ Repair | 7,329,272 | Graft fixation using a plug against suture | April 4, 2003 | Stephen S. Burkhart; Peter J. Dreyfuss; Neal S. ElAttrache |
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |
| SpeedBridge™ Implant System with BioComposite SwiveLock® | 6,652,563 | Suture Anchor with internal Suture Loop | May 3, 2002 | Peter J. Dreyfuss |
| | 6,716,234 | High Strength Suture Material | September 13, 2001 | R. Donald Grafton; D. Lawson Lyon; Brian Hallet |
| | 7,029,490 | High Strength Suture with Coating and Colored Trace | June 4, 2002 | R. Donald Grafton; Reinhold Schmieding |
| | 7,329,272 | Graft fixation using a plug against suture | April 4, 2003 | Stephen S. Burkhart; Peter J. Dreyfuss; Neal S. ElAttrache |
| | 7,892,256 | High strength suture tape | October 22, 2010 | R. Donald Grafton; Stephen S. Burkhart |
| | 8,430,909 | Knotless graft fixation using an implant having a pointed tip | July 14, 2011 | Peter J. Dreyfuss |
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |
| SpeedBridge™ Implant System with Bio-SwiveLock® | 7,329,272 | Graft fixation using a plug against suture | April 4, 2003 | Stephen S. Burkhart; Peter J. Dreyfuss; Neal S. ElAttrache |
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |

| SpeedBridge™ Implant System with Bio-SwiveLock® SP | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |
|---|---|---|---|---|
| SpeedBridge™ Implant System with BioComposite SwiveLock® SP | 6,652,563 | Suture Anchor with internal Suture Loop | May 3, 2002 | Peter J. Dreyfuss |
| | 6,716,234 | High Strength Suture Material | September 13, 2001 | R. Donald Grafton; D. Lawson Lyon; Brian Hallet |
| | 7,029,490 | High Strength Suture with Coating and Colored Trace | June 4, 2002 | R. Donald Grafton; Reinhold Schmieding |
| | 8,430,909 | Knotless graft fixation using an implant having a pointed tip | July 14, 2011 | Peter J. Dreyfuss |
| | 9,179,907 | Knotless graft fixation assembly | May 8, 2013 | Neal S. ElAttrache; Stephen S. Burkhart; Peter J. Dreyfuss |

Arthrex Virtual Patent Marking, https://www.arthrex.com/corporate/virtual-patent-marking (January 24, 2020).

97.     Indeed, Dr. Millett does not appear as an inventor on any patent for any implantable medical devices related to arthroscopic procedures until after 2012.

98.     Likewise, neither Augustus Mazzocca nor Carlos A. Guanche, who are listed as co-authors of the mattress double anchor, ever received any royalties from Arthrex.

99.     In August 2011, a competing medical device maker, KFx Medical filed suit against Arthrex claiming that in promoting SutureBridge and SpeedBridge rotator-cuff repair procedures it infringed on a family of KFx patents titled "System and method for attaching soft tissue to bone." KFx Medical Corporation Receives $29 Million Award and a Finding of Willful Infringement by Arthrex Inc. in Patent Infringement Case,

https://www.businesswire.com/news/home/20131009006298/en/KFx-Medical-Corporation-Receives-29-Million-Award (Oct 9, 2013). Those patents describe a procedure for attaching soft tissue to bone that is essentially identical to Dr. Millett's article. Those patents also have a priority date of June 2, 2004, several months earlier than the mattress double anchor note.

100.    In 2013 a jury in that case found that the KFx patents were valid and awarded $29 million in damages for Arthrex's infringement. In 2015, the United States Court of Appeals for the Federal Circuit upheld the judgment of the district court and Arthrex paid KFx $35 million to satisfy the judgment. *KFX Med. Corp. v. Arthrex Inc.*, 589 F. App'x 538 (Fed. Cir. 2015).

101.    The jury's award of $29 million reflects its judgment that 3.43% is the appropriate royalty for the infringement between 2009 and 2013 of a patented method. At trial, the parties disputed the appropriate royalty rate and royalty base, but the jury's verdict established a reasonable royalty rate of 3.4% of infringing revenue. *See* Declaration of George G. Strong In Support of Plaintiff's Motion to Amend Judgement, [Dkt. 304-5 at ¶ 5], *KFx Med. Corp. v. Arthrex Inc.*, No. 11CV1698 DMS (BLM) (Oct 11, 2013) ("3.43%, . . . accounts for the jury's determination of both (1) the percentage of products that should be included in the royalty base and (2) the royalty rate to apply to those products.").

102.    Notably, as part of that suit, Arthrex argued that the KFx's patents were invalid in light of Dr. Millett's technical note.  In particular, Arthrex argued that Millett's "article discloses every limitation of the asserted claims except a knotless second anchor." *KFx Med. Corp. v. Arthrex, Inc.*, No. 11CV1698 DMS (BLM), 2013 WL 12069055, at *3 (S.D. Cal. July 10, 2013), *aff'd*, 589 F. App'x 538 (Fed. Cir. 2015). The jury rejected this argument finding the KFx patents valid and infringed upon by Arthrex Speedbridge and Suturebridge products. *KFx Med.*

*Corp. v. Arthrex Inc.*, No. 11CV1698 DMS (BLM), 2014 WL 11970553, at *2 (S.D. Cal. Feb. 18, 2014), *aff'd*, 589 F. App'x 538 (Fed. Cir. 2015) (rejecting this argument).

103.     Moreover, in 2015 Arthrex was forced to pay $99 million to competitor Smith and Nephew for infringing on patents with its SutureTak, PushLock and Bio-PushLock shoulder repair anchors. *See* Smith & Nephew Receives $99 Million Patent Infringement Payment from Arthrex, https://www.prnewswire.com/news-releases/smith--nephew-receives-99-million-patent-infringement-payment-from-arthrex-300100589.html (June 17, 2015).

**C.     Arthrex Paid Dr. Millett and Others Hundreds of Millions of Dollars in Suspect Royalty Payments Between 2010 and 2018.**

104.      Between 2010 and the second quarter of 2016, Dr. Millett paid Mr. Shea 10% of his Arthrex royalties per their agreement.  Mr. Shea received approximately $600,000 corresponding to royalty payments from Arthrex to Dr. Millett of about $6 million.

105.     As part of the Open Payments program, CMS publishes information regarding manufacturer payments to physicians.  The Open Payments program is a national disclosure program that promotes transparency and accountability by making information about the financial relationships between reporting entities and covered recipients available to the public. Established by the Physician Payments Sunshine Act enacted as part of the Patient Protection and Affordable Care Act in 2010, since the second half of 2013, CMS has maintained a database of payments and other transfers of value made to covered recipients, including royalty payments by medical devices manufacturers.

106.     This system contains additional information regarding Arthrex payments to physicians including Dr. Millett.

107.     Between the first second half of 2013 and 2018, Dr. Millett received 50 royalty payments from Arthrex as summarized below:

| Year | Product Description | Total Payment | Number Payments |
|------|---------------------|---------------|-----------------|
| 2013 | No Description | $6,692.65 | 4 |
| 2013 | ARTHREX PRODUCT LINE ARTHROPLASTY | $209.13 | 2 |
| 2013 | ARTHREX PRODUCT LINE DISTAL EXTREMITY ARTHROSCOPY | $187,143.28 | 2 |
| 2013 | ARTHREX PRODUCT LINE SHOULDER & ELBOW ARTHROSCOPY | $282,359.55 | 2 |
| **2013** | **Total** | **$476,404.61** | **10** |
| 2014 | No Description | $17,590.78 | 5 |
| 2014 | ARTHREX PRODUCT LINE ARTHROPLASTY | $506.51 | 1 |
| 2014 | ARTHREX PRODUCT LINE DISTAL EXTREMITY ARTHROSCOPY | $487,105.79 | 4 |
| 2014 | ARTHREX PRODUCT LINE SHOULDER & ELBOW ARTHROSCOPY | $838,173.30 | 5 |
| **2014** | **Total** | **$1,343,376.38** | **15** |
| 2015 | No Description | $18,456.04 | 4 |
| 2015 | ARTHREX PRODUCT LINE DISTAL EXTREMITY ARTHROSCOPY | $648,829.58 | 4 |
| 2015 | ARTHREX PRODUCT LINE SHOULDER & ELBOW ARTHROSCOPY | $1,111,988.21 | 5 |
| **2015** | **Total** | **$1,779,273.83** | **13** |
| 2016 | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE SPEEDBRIDGE; ARTHROPLASTY IMPLANTS SHOULDER ARTHROPLASTY & FRACTURE REVERS; CAPITAL CONSUMABLES CONSUMABLES BLADES & BURRS SPECIALTY; SHOULDER IMPLANTS SPEEDBRIDGE BIO ANCHORS | $634,122.13 | 1 |
| 2016 | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE SPEEDBRIDGE; SHOULDER IMPLANTS OTHER SUTUREBRIDGE; CAPITAL CONSUMABLES CONSUMABLES BLADES & BURRS SPECIALTY; SHOULDER IMPLANTS SPEEDBRIDGE BIO ANCHORS | $1,838,010.54 | 3 |
| **2016** | **Total** | **$2,472,132.67** | **4** |

| 2017 | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE ACHILLES; SHOULDER IMPLANTS SPEEDBRIDGE BIO ANCHORS; SHOULDER IMPLANTS SPEEDBRIDGE PEEK ANCHORS; ARTHROPLASTY IMPLANTS SHOULDER ARTHROPLASTY & FRACTURE | $681,764.20 | 1 |
|------|---|---|---|
| 2017 | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE ACHILLES; SHOULDER IMPLANTS SPEEDBRIDGE PEEK ANCHORS; ARTHROPLASTY IMPLANTS SHOULDER ARTHROPLASTY & FRACTURE REVERS; SHOULDER IMPLANTS FIBERTAK KNOTLESS | $685,979.56 | 1 |
| 2017 | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE SPEEDBRIDGE; CAPITAL CONSUMABLES CONSUMABLES BLADES & BURRS SPECIALTY; ARTHROPLASTY IMPLANTS SHOULDER ARTHROPLASTY & FRACTURE REVERS; SHOULDER IMPLANTS SPEEDBRIDGE BIO ANCHORS | $752,324.49 | 1 |
| 2017 | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE SPEEDBRIDGE; CAPITAL CONSUMABLES CONSUMABLES BLADES & BURRS SPECIALTY; SHOULDER IMPLANTS SPEEDBRIDGE BIO ANCHORS; ARTHROPLASTY IMPLANTS SHOULDER ARTHROPLASTY & FRACTURE REVERS | $744,456.72 | 1 |
| **2017** | **Total** | **$2,864,524.97** | **4** |
|  | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS | $848,073.14 | 1 |
|  | SHOULDER IMPLANTS SPEEDBRIDGE COMPOSITE ANCHORS; DISTAL EXTREMITIES IMPLANTS SOFT TISSUE ACHILLES; SHOULDER IMPLANTS FIBERTAK KNOTLESS; ARTHROPLASTY IMPLANTS SHOULDER ARTHROPLASTY | $3,138,167.40 | 3 |

| | & FRACTURE REVERS; SHOULDER IMPLANTS SPEEDBRIDGE PEEK ANCHORS | | |
|---|---|---|---|
| 2018 | Total | $3,986,240.54 | 4 |
| 2013-2018 | Grand Total | $12,921,953.00 | 50 |

108.    In 2016, Arthrex changed its reporting format and identified five products with each payment often in a different order or using slightly different descriptions of the product. This makes it difficult to discern the precise bases of these payments.

109.    Notably, Dr. Millett's payments continue to grow without abatement even after 2015, when Arthrex paid the judgment in KFx's suit against it and as part of the verdict, the jury concluded that Dr. Millett's Mattress Double Anchor procedure was covered by KFx's valid patents. *KFx Med. Corp. v. Arthrex Inc.*, No. 11CV1698 DMS (BLM), 2014 WL 11970553, at *2 (S.D. Cal. Feb. 18, 2014), *aff'd*, 589 F. App'x 538 (Fed. Cir. 2015) (rejecting this argument).

110.    Dr. Millett's payments can be compared to the payments to Arthrex's top shoulder physicians Dr. Burkhart and Dr. ElAttrache.  Notably the payments identify many of the same products, however the payments to Dr. Burkhart and ElAttrache, totaling over $110 million and $36 million respectively, dwarf those to Dr. Millett.

111.    Thus, while there is some modest difference in the combination of descriptions that Arthrex applied to each payment, most of the applicable product descriptions are the same and the payments to Drs. Burkhart and ElAttrache dwarf those to Dr. Millett.  Thus, while Mr. Shea was able to leverage Dr. Millett's influence to an outsized 4% of product revenue, Drs. Burkhart and ElAttrache appear to receive dramatically larger shares.

112.    Notably, the payments to Dr. Burkhart and Dr. ElAttrache do not appear to decrease as Dr. Millett's share of royalties increases, nor do they appear to decrease in response to the KFx lawsuit, or the Smith and Nephew settlement described *supra*.

-35-

**D.  Arthrex's Payments to Physicians and Dr. Millett's Solicitation of Royalties Violate The Anti-Kickback Statute and The False Claims Act**

113.    As described *supra*, the Anti-Kickback Statute prohibits a medical device company from paying anything of value to induce or reward physicians for utilizing their devices and for recommending others to do so. In this case, Arthrex's payments to Dr. Millett, and others, constitutes impermissible remuneration paid to induce and reward influential physicians to utilize and recommend Arthrex devices.

114.    Likewise, the Anti-Kickback Statute prohibits a physician from soliciting and accepting remuneration in exchange for utilizing a company's devices and for recommending that others do so.

115.    As the Office of Inspector General of the Department of Health & Human Services ("HHS-OIG") explained:

> Manufacturers, providers, and suppliers of health care products and services frequently cultivate relationships with physicians in a position to generate business for them through a variety of practices, including gifts, entertainment, and personal services compensation arrangements. These activities have a high potential for fraud and abuse and, historically, have generated a substantial number of anti-kickback convictions. There is no substantive difference between remuneration from a pharmaceutical manufacturer or from a durable medical equipment or other supplier--if the remuneration is intended to generate any federal health care business, it potentially violates the anti-kickback statute.

HHS-OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003).

116.    Mr. Shea's experience in establishing and increasing the value of Dr. Millett's royalty to 4% of revenue, establishes that Arthrex's intent in making these payments was to influence referring behavior.  Similarly, Dr. Millett's intent in soliciting these royalties was to obtain remuneration in exchange for his use of Arthrex devices and efforts to influence others to use them.

-36-

117.     None of the potentially applicable safe-harbors would apply here. In particular, the safe harbor for "Personal Services and Management Contracts," 42 C.F.R. § 1001.952(d) requires, *inter alia*, that the aggregate compensation paid to the agent over the term of the agreement is set in advance; covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent; is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties.

118.     Here, Arthrex's royalty agreements did not set in advance the aggregate compensation, but left it to a percentage of future sales; did not cover the educational and promotional activities of the physicians which were compensated separately, and took into account the volume and value of the doctors referrals of Arthrex products as part of the revenue formula.

119.     Most importantly, these agreements were not consistent with fair market value in arms-length transactions.

120.      Sham royalty agreements structured to hide kickbacks have long been a concern of the Department of Justice. In 2007, five competitors of Arthrex that accounted for 95% of the hip and knee surgical implant market agreed to deferred prosecution agreements (DPA) and paid $311 million to avoid criminal prosecution over financial inducements paid to influential surgeons. US Attorney, District of New Jersey, "Five Companies in Hip and Knee Replacement Industry Avoid Prosecution by Agreeing to Compliance Rules and Monitoring," (Sept. 27, 2007), https://www.justice.gov/sites/default/files/usao-nj/legacy/2013/11/29/hips0927.rel.pdf. Each of these companies, Zimmer, Inc., Depuy Orthopedics, Inc., Biomet Inc., Stryker

Orthopedics, Inc., and Smith & Nephew agreed to similar compliance programs as part of the $311 million settlement.

121.    The DPAs included required practices with respect to physician compensation for royalty agreements. These practices while not binding, nevertheless set forth guidelines for the industry (including Arthrex) to follow in setting fair-market value royalty agreements. They are set forth in paragraph 37 of the DPAs and includes:

    a.    "Intellectual Property" includes patents, trade secrets and know-how received by the Company from the Consultant;

    b.    "The Company may pay royalties to a Consultant only for Intellectual Property received by the Company"

    c.    The identity of royalty-bearing products must be reasonable (in light of factors such as the scope of Intellectual Property transferred, the relationship of the Intellectual Property to the products and the burden of administering the royalty arrangement)

    d.    If the Intellectual Property has been patented in the United States, royalty payments may not extend beyond the life of the U.S. patent. If the Intellectual Property has not been patented, royalties may not extend beyond a reasonable period (in light of factors such as the life cycle and commercial advantages of the products and Intellectual Property and the burden of administering the royalty arrangement).

    e.    The aggregate royalties paid per project to all Consultants shall not exceed fair market value expressed as a certain percentage of all domestic and international product sales of the product.

-38-

     f.   The persons responsible for deciding whether Intellectual Property has been provided shall not be involved in sales functions,

     g.   No royalty may be paid to a Consultant that is earned by virtue of the use of the product in question by the Consultant or by any member of a practice group of which the Consultant is a member.

122.    Given the profile of the settlements, Arthrex and Dr. Millett knew or should have known of the practices and that their conduct contravened the Anti-Kickback Statute's fair market valuation rules.

123.    Similarly, industry groups have published nonbinding codes of conduct that govern the fair market valuation of intellectual property agreements. Notably, the Advanced Medical Technology Association ("AdvaMed") of which Arthrex is a member, has published "Codes of Ethics" in 2009 and 2015 that include guidance on fair market valuation of consulting and royalty agreements:

     a.   Consulting arrangements should be entered into only where a legitimate need for the services is identified in advance and documented.

     b.   Compensation paid to a consultant should be consistent with fair market value in an arm's length transaction for the services provided and should not be based on the volume or value of the consultant's past, present or anticipated business.

     c.   A Company should enter into a royalty arrangement with a Health Care Professional only where the Health Care Professional is expected to make or has made a novel, significant, or innovative contribution to, for example, the development of a product, technology, process, or method.

-39-

    d.   A significant contribution by an individual or group, if it is the basis for compensation, should be appropriately documented.

    e.   The calculation of royalties payable to a Health Care Professional in exchange for Intellectual Property should be based on factors that preserve the objectivity of medical decision-making and avoid the potential for improper influence.

AdvaMed Revised and Restated Code of Ethics, VI Consulting Arrangements with Health Care Professionals, Effective July 1, 2009.

124.    A 2015 AdvaMed Illustrative best practices guide provides a decision-tree for appropriately implementing a royalty arrangement. The guide includes the following questions; a "no" answer to any one means that the royalty arrangement is not permitted by the code:

    a.   "Does the Company have a bona fide business need to license the intellectual property?"

    b.   Is the payment consistent with fair market value?

    c.   Is the physician expected to make a novel, significant, or innovative contribution to the development of a product, technology, process, or method?

    d.   Is the contribution appropriately documented?

AdvaMed Illustrative Royalty Best Practices, 2015.

125.    Arthrex and Dr. Millett knew or should have known of these Code of Ethics provisions.

126.    Arthrex knowingly contravened the DPA provisions and the AdvaMed Code of Ethics provisions in its royalty arrangements in order to induce referrals of its products. Without limitation, Arthrex's actions included:

-40-

    a.  Paying Dr. Millett for non-protectable intellectual property, and/or paying far in excess of the fair market value for such property;

    b.  Failing to adjust the royalty payments to Dr. Millett, Dr. Burkhart, and Dr. ElAttrache after courts had determined the intellectual property to be invalid;

    c.  Agreeing to a royalty agreement with a new consultant (Dr. Millett) while failing to reduce the royalties paid to Dr. Burkhart and Dr. ElAttrache therefore increasing the aggregate royalties paid on a given product;

    d.  Extending the life of royalty agreements beyond a reasonable period for unprotectable intellectual property; and

    e.  Involving sales personnel in the determination of the value of royalty payments.

127.    Arthrex and Dr. Millett violated these guidelines for the very reason that they exist: to induce and reward physicians for influencing referrals for its products and to obtain remuneration for influence. Thus, Defendants have knowingly and repeatedly violated these laws in connection with the use and sale of Arthrex's medical device products. These violations have not been incidental, but instead have been central to the Arthrex's sales strategy.

128.    Accordingly, Defendants have knowingly caused the false or fraudulent certification of compliance with these federal and state statutes and regulations.

129.    The submission of false or fraudulent certifications of compliance with these statutes and regulations were material to Government Health Care Programs' decisions to make reimbursements for Arthrex's medical device products. Had the Government Health Care Programs known that the certifications of compliance with the law were false, they would not have made reimbursements for their medical devices.

-41-

130.     Defendants knew that the certifications of compliance with the law that they knowingly caused to be submitted were false, and that the false certifications would cause Government Health Care Programs to make payments for its devices that it otherwise would not have.

## VI.    CLAIMS FOR RELIEF

### Count I

### Federal False Claims Act – False Claims
### 31 U.S.C. § 3729(a)(1)(A) (2009)

131.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

132.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

133.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

134.     The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

135.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

136.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

## Count II

### Federal False Claims Act – False Records or Statements
### 31 U.S.C. § 3729(a)(1)(B) (2009)

137.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

138.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

139.     By and through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

140.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

141.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

142.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

## Count III

### Federal False Claims Act – Reverse False Claims
### 31 U.S.C. § 3729(a)(1)(G) (2009)

143.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

144.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

145.     By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government and they have concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicare and other Government Health Care Program claims for which Defendants knew they were not entitled to and therefore refunds were properly due and owing to the United States.

146.     The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

147.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

148.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

## **Count IV**

### **Federal False Claims Act - Conspiracy**
### **31 U.S.C. § 3729(a)(1)(C) (2009)**

149.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

150.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. as amended.

151.     By and through the acts described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G). Further to Defendants' conspiracy and fraudulent scheme, despite knowing that billions in payments from the federal government have

been received in violation of the False Claims Act and in violation of the Anti-Kickback Statute's prohibition on receipt of payment for services rendered in connection with an improper financial arrangement, Defendants have refused and failed to refund these payments and have continued to submit false or fraudulent claims, statements, and records to the United States.

152.     The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

153.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

154.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 (or other statutory maximum provided for by law) for each and every violation alleged herein.

## Count IV

### Alaska False Claims and Reporting Act
### 2016 Alaska Sess. Laws Ch. 25 § 09.58.010, *et. seq*.

155.     Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

156.     This is a civil action brought by Relator, on behalf of the State of Alaska, against Defendants under the Alaska Medical Assistance False Claims and Reporting Act, 2016 Alaska Sess. Laws Ch. 25 § 09.58.010, *et. seq*. (Alaska FCA), for acts occurring prior to the non-retroactive repeal of that law.

157.     The Alaska FCA, Ak St § 09.58.010(a)(1), creates liability for any medical assistance provider or recipient who "[k]nowingly submit[s], authorize[s], or cause[s] to be submitted to an officer or employee of the state a false or fraudulent claim for payment or

-45-

approval under the medical assistance program." Defendants have violated this provision of the Alaska FCA.

158.    The Alaska FCA, Ak St § 09.58.010(a)(2), creates liability for any medical assistance provider or recipient who "[k]nowingly make[s], use[s], or cause[s] to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim for payment paid or approved by the state under the medical assistance program."  Defendants have violated this provision of the Alaska FCA.

159.    The Alaska FCA, Ak St § 09.58.010(a)(4), creates liability for any medical assistance provider or recipient who "knowingly make[s], use[s], or cause[s] to be made or used, a false record or statement to conceal, avoid, increase, or decrease an obligation to pay or transmit money or property to the medical assistance program."  Defendants have violated this provision of the Alaska FCA.

160.    Defendants have violated each of these provisions of the Alaska FCA, with respect to conduct and claims prior to July 1, 2019.

161.    Pursuant to the Alaska FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Ak St  § 09.58.010(c).

### Count V

**California False Claims Act
Cal. Gov't Code § 12650, *et seq*.**

162.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

163.    This is a civil action brought by Relator, on behalf of the State of California, against Defendants under the California False Claims Act, Cal. Gov. Code § 12652(c).

164.     The California FCA, Cal. Gov. Code § 12651(a)(1), creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the California FCA.

165.     The California FCA, Cal. Gov. Code § 12651(a)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the California FCA.

166.     The California FCA, Cal. Gov. Code § 12651(a)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision." Defendants have violated this provision of the California FCA.

167.     The California FCA, Cal. Gov. Code § 12651(a)(3), creates liability for any person who "[c]onspires to commit a violation of this subdivision." Defendants have violated this provision of the California FCA.

168.     Pursuant to the California FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Cal. Gov. Code § 12651(a)(1).

### Count VI

**Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. § 25.5-4-303.5, *et seq.***

169.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

170.     This is a civil action brought by Relator, in the name of the State of Colorado, against Defendants pursuant to the State of Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306, *et seq.*.

171.     The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(a), creates liability for any person who "[k]nowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval."  Defendants have violated this provision of the Colorado FCA.

172.     The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Colorado FCA.

173.     The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(f), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act', or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act'." Defendants have violated this provision of the Colorado FCA.

174.     The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(g), creates liability for any person who "[c]onspires to commit a violation of paragraphs (a) to (f) of this subsection (1)" Defendants have violated this provision of the Colorado FCA.

175.     Pursuant to the Colorado FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Colo. Rev. Stat. § 25.5-4- 305(1).

### Count VII

### Connecticut False Claims Act
### Conn. Gen. Stat. § 4-274, *et seq.*

176.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

177.     This is a civil action brought by Relator, in the name of the State of Connecticut, against Defendants pursuant to the State of Connecticut False Claims Act, Conn. Gen. Stat. § 4-277.

178.     The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(1), provides that no person shall "[k]nowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program." Defendants have violated this provision of the Connecticut FCA.

179.     The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(2), provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program." Defendants have violated this provision of the Connecticut FCA.

180.     The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(7), provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program." Defendants have violated this provision of the Connecticut FCA.

181.    The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(8), provides that no person shall "[k]nowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program." Defendants have violated this provision of the Connecticut FCA.

182.    The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(3), provides that no person shall "[c]onspire to commit a violation of this section." Defendants have violated this provision of the Connecticut FCA.

183.    Pursuant to the Connecticut FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Conn. Gen. Stat. § 4-275(b).

## Count VIII

### Delaware False Claims And Reporting Act
### Del. Code Ann. Tit. 6 §§ 1201, *et seq*.

184.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

185.    This is a civil action brought by Relator, on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act, Del. Code Ann. Tit. 6, § 1203(b)(1).

186.    The Delaware FCA, Del. Code Ann. Tit. 6, §1201(a)(1), creates liability for any person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Delaware FCA.

187.    The Delaware FCA, Del. Code Ann. Tit. 6, §1201(a)(2), creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement

material to a false or fraudulent claim."  Defendants have violated this provision of the Delaware FCA.

188.    The Delaware FCA, Del. Code Ann. Tit. 6, §1201(a)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  Defendants have violated this provision of the Delaware FCA.

189.    The Delaware FCA, Del. Code Ann. Tit. 6, §1201(a)(3), creates liability for any person who "[c]onspires to commit a violation of" the law. Defendants have violated this provision of the Delaware FCA

190.    Pursuant to the Delaware FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Del. Code Ann. tit. 6, §1201(a).

### Count IX

### District of Columbia False Claims Act
### D.C. Code Ann. §§ 2.381.01, *et seq*.

191.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

192.    This is a civil action brought by Relator, in the name of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

193. The D.C. FCA, D.C. Code Ann. § 2-381.02(a)(1), creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the D.C. FCA.

194. The D.C. FCA, D.C. Code Ann. § 2-381.02(a)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the D.C. FCA.

195. The D.C. FCA, D.C. Code Ann. § 2-381.02(a)(6), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District." Defendants have violated this provision of the D.C. FCA.

196. The D.C. FCA, D.C. Code Ann. § 2-381.02(a)(7), creates liability for any person who "[c]onspires to commit a violation of paragraph." Defendants have violated this provision of the D.C. FCA.

197. Pursuant to the D.C. FCA, Defendants are thus liable to the District for statutorily defined damages sustained because of the acts of Defendants and civil penalties. D.C. Code Ann. § 2-381.02(a).

## Count X

### Florida False Claims Act
### Fla. Stat. § 68.081, *et seq.*

198. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

199. This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act, Fla. Stat. § 68.083(2).

200.     The Florida FCA, Fla. Stat. § 68.082(2)(a), creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."  Defendants have violated this provision of the Florida FCA.

201.     The Florida FCA, Fla. Stat. § 68.082(2)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  Defendants have violated this provision of the Florida FCA.

202.     The Florida FCA, Fla. Stat. § 68.082(2)(g), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."  Defendants have violated this provision of the Florida FCA.

203.     The Florida FCA, Fla. Stat. § 68.082(2)(c), creates liability for any person who "[c]onspires to commit a violation of this subsection."  Defendants have violated this provision of the Florida FCA.

204.     Pursuant to the Florida FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Fla. Stat. § 68.082(2).

## Count XI

### Georgia False Medicaid Claims Act
### Ga. Code Ann. §§ 49-4-168, *et seq*.

205.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

206.     This is a civil action brought by Relator, in the name of the State of Georgia, against Defendants pursuant to the State of Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

207.     The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(1), creates liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Georgia FCA.

208.     The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Georgia FCA.

209.     The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program." Defendants have violated this provision of the Georgia FCA.

210.     The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(3), creates liability for any person who "Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid."  Defendants have violated this provision of the Georgia FCA.

211.     Pursuant to the Georgia FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Ga. Code Ann. § 49-4-168.1(a).

-54-

## Count XII

**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21,** *et seq.*

212.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

213.     This is a civil action brought by Relator, on behalf of the State of Hawaii and its political subdivisions, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-25(a).

214.     The Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(l), creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Hawaii FCA.

215.     The Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Hawaii FCA.

216.     The Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(6), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State." Defendants have violated this provision of the Hawaii FCA.

217.     The Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(8), creates liability for any person who "Conspires to commit any of the conduct described in this subsection." Defendants have violated this provision of the Hawaii FCA.

218.     Pursuant to the Hawaii FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Haw. Rev. Stat. § 661-21(a).

### Count XIII

### Illinois False Claims Act
### 740 Ill. Comp. Stat. §§ 175/1, e*t seq*.

219.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

220.     This is a civil action brought by Relator, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/4(b).

221.     The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(A), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Illinois FCA.

222.     The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(B), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Illinois FCA.

223.     The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(G), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State." Defendants have violated this provision of the Illinois FCA.

224. The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(C), creates liability for any person who "conspires to commit a violation of" the law. Defendants have violated this provision of the Illinois FCA.

225. Pursuant to the Illinois FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. 740 Ill. Comp. Stat. § 175/3(a).

## Count XIV

### Indiana Medicaid False Claims and Whistleblower Protection Act
### Ind. Code § 5-11-5.7, *et seq.*

226. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

227. This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-4(a).

228. The Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Indiana FCA.

229. The Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim." Defendants have violated this provision of the Indiana FCA.

230. The Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or

knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." Defendants have violated this provision of the Indiana FCA.

231.    The Indiana FCA, Ind. Code § 5-11-5.5-2(b)(7), creates liability for any person who "conspires with another person to perform an act described in subdivisions (1) through (6)." Defendants have violated this provision of the Indiana FCA.

232.    Pursuant to the Indiana FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Ind. Code § 5-11-5.5-2(b).

## Count XV

### Iowa False Claims Act
### Iowa Code §§ 685.1, *et seq.*

233.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

234.    This is a civil action brought by Relator, on behalf of the State of Iowa, against Defendants under the State of Iowa False Claims Act, Iowa Code § 685.3(2).a.

235.    The Iowa FCA, Iowa Code § 685.2(1).a, creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Iowa FCA.

236.    The Iowa FCA, Iowa Code § 685.2(1).b, creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Iowa FCA.

237.    The Iowa FCA, Iowa Code § 685.2(1).g, creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or

-58-

knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." Defendants have violated this provision of the Iowa FCA.

238.    The Iowa FCA, Iowa Code § 685.2(1).g, creates liability for any person who "conspires to commit a violation of" the law. Defendants have violated this provision of the Iowa FCA.

239.    Pursuant to the Iowa FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Iowa Code § 685.2(1).

### Count XVI

#### Louisiana Medical Assistance Programs Integrity Law
#### La. Rev. Stat. Ann. §§ 46:437.1, *et seq.*

240.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

241.    This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.A.

242.    The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, provides that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim." Defendants have violated this provision of the Louisiana FCA.

243.    The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.B, provides that "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Louisiana FCA.

-59-

244. The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.C, provides that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs." Defendants have violated this provision of the Louisiana FCA.

245. The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.D, provides that "[n]o person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim." Defendants have violated this provision of the Louisiana FCA

246. Pursuant to the Louisiana FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. La. Rev. Stat. Ann. § 46:438.6.

## Count XVII

### Maryland False Health Claims Act
### Md. Code Ann. Health-Gen. §§ 2-601, *et seq.*

247. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

248. This is a civil action brought by Relator, on behalf of the State of Maryland, against Defendants under the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a)(1).

249. The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(1), provides that a person may not "[k]nowingly present or cause to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Maryland FCA.

250. The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(2), provides that a person may not "[k]nowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Maryland FCA.

251. The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(7), provides that a person may not "[k]nowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State." Defendants have violated this provision of the Maryland FCA.

252. The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(8), provides that a person may not "[k]nowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State." Defendants have violated this provision of the Maryland FCA.

253. The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(9), provides that a person may not "[k]nowingly make any other false or fraudulent claim against a State health plan or a State health program." Defendants have violated this provision of the Maryland FCA.

254. The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(3), provides that a person may not "[c]onspire to commit a violation under this subtitle." Defendants have violated this provision of the Maryland FCA.

255. Pursuant to the Maryland FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Md. Code Ann. Health-Gen. § 2-602(b).

## Count XVIII

### Massachusetts False Claims Act
### Mass. Gen. Laws Ch. 12, § 5a, *et seq.*

256.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

257.    This is a civil action brought by Relator, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Ann. Laws, ch. 12, § 5C(2).

258.    The Massachusetts FCA, Mass. Ann. Laws, ch. 12, § 5B(1), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Massachusetts FCA.

259.    The Massachusetts FCA, Mass. Ann. Laws, ch. 12, § 5B(2), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Massachusetts FCA.

260.    The Massachusetts FCA, Mass. Ann. Laws, ch. 12, § 5B(9), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof." Defendants have violated this provision of the Massachusetts FCA.

261.    The Massachusetts FCA, Mass. Ann. Laws, ch. 12, § 5B(3), creates liability for any person who "conspires to commit a violation of this subsection." Defendants have violated this provision of the Massachusetts FCA.

-62-

262.     Pursuant to the Massachusetts FCA, Defendants are thus liable to the Commonwealth for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Mass. Ann. Laws, ch. 12, § 5B(a).

## Count XIX

### Michigan Medicaid False Claims Act
### Mich. Comp. Laws Serv. §§ 400.601, *et seq*.

263.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

264.     This is a civil action brought by Relator, in the name of the State of Michigan, against Defendants under the State of Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.610a(l).

265.     The Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3), provides that:

"(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit.

(3) A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled."

Defendants have violated each of these provisions of the Michigan FCA.

266.     The Michigan FCA, Mich. Comp. Laws Serv. § 400.607(1), provides that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false." Defendants have violated this provision of the Michigan FCA.

-63-

267.    The Michigan FCA, Mich. Comp. Laws. Serv. § 400.607(3), provides that "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act." Defendants have violated this provision of the Michigan FCA.

268.    The Michigan FCA, Mich. Comp. Laws. Serv. § 400.606(1), provides that "[a] person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws." Defendants have violated this provision of the Michigan FCA.

269.    Pursuant to the Michigan FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Mich. Comp. Laws. Serv. § 400.612.

### Count XX

### Minnesota False Claims Act
### Minn. Stat. §§ 15c.01, *et seq.*

270.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

271.    This is a civil action brought by Relator, on behalf of the State of Minnesota and its political subdivisions, against Defendants under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

272.    The Minnesota FCA, Minn. Stat. § 15C.02(a)(1) creates liability for any person who, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Defendants have violated this provision of the Minnesota FCA.

273.    Minnesota FCA, Minn. Stat. § 15C.02(a)(2) creates liability for any person who "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Minnesota FCA.

274.    Minnesota FCA, Minn. Stat. § 15C.02(a)(7) creates liability for any person who "knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision." Defendants have violated this provision of the Minnesota FCA.

275.    Minnesota FCA, Minn. Stat. § 15C.02(a)(3) creates liability for any person who "knowingly conspires to commit a violation of" the law.  Defendants have violated this provision of the Minnesota FCA.

276.    Pursuant to the Minnesota FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Minn. Stat. § 15C.02(a).

## Count XXI

### Montana False Claims Act
### Mont. Code Ann. §§ 17-8-401, *et seq*.

277.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

278.    This is a civil action brought by Relator, on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act, Mont. Code Ann. § 17- 8-406(1).

279.    The Montana FCA, Mont. Code Ann. § 17- 8-403(1)(a), creates liability for any person who, "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Montana FCA.

280.    The Montana FCA, Mont. Code Ann. § 17- 8-403(1)(b), creates liability for any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Montana FCA.

281.    The Montana FCA, Mont. Code Ann. § 17- 8-403(1)(g), creates liability for any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity." Defendants have violated this provision of the Montana FCA.

282.    The Montana FCA, Mont. Code Ann. § 17- 8-403(1)(c), creates liability for any person who "conspires to commit a violation of this subsection." Defendants have violated this provision of the Montana FCA.

283.    Pursuant to the Montana FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Mont. Code Ann. § 17- 8-403(2).

## Count XXII

### Nevada Submission of False Claims Act
### Nev. Rev. Stat. §§ 357.010, *et seq*.

284.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

285.    This is a civil action brought by Relator, on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.080(1).

286.    The Nevada FCA, Nev. Rev. Stat. § 357.040(l)(a), creates liability for any person who, "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Nevada FCA.

287.    The Nevada FCA, Nev. Rev. Stat. § 357.040(l)(b), creates liability for any person who, "Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent clam." Defendants have violated this provision of the Nevada FCA.

288.    The Nevada FCA, Nev. Rev. Stat. § 357.040(l)(f), creates liability for any person who, "Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision." Defendants have violated this provision of the Nevada FCA.

289.    The Nevada FCA, Nev. Rev. Stat. § 357.040(l)(g), creates liability for any person who, "Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision." Defendants have violated this provision of the Nevada FCA.

290.    The Nevada FCA, Nev. Rev. Stat. § 357.040(l)(i), creates liability for any person who, "Conspires to commit any of the acts set forth in this subsection." Defendants have violated this provision of the Nevada FCA.

291.    Pursuant to the Nevada FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Nev. Rev. Stat. § 357.040(2).

### Count XXIII

**New Jersey False Claims Act**
**N.J. Stat. Ann. §§ 2a:32c-1, *et seq*.**

292.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

293.    This is a civil action brought by Relator, in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-5.b.

294.    The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3(a) creates liability for any person who "[k]nowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the New Jersey FCA.

295.    The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3(b) creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State." Defendants have violated this provision of the New Jersey FCA.

296.    The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3(g) creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement

to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State."
Defendants have violated this provision of the New Jersey FCA.

297.    The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3(c) creates liability for any
person who "[c]onspires to defraud the State by getting a false or fraudulent claim allowed or
paid by the State." Defendants have violated this provision of the New Jersey FCA.

298.    Pursuant to the New Jersey FCA, Defendants are thus liable to the State for
statutorily defined damages sustained because of the acts of Defendants and civil penalties. N.J.
Stat. Ann. § 2A:32C-3.

## Count XXIV

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. §§ 27-14-1, *et seq.*

299.    Relator realleges and incorporates by reference the allegations contained in the
foregoing paragraphs above as though fully set forth herein.

300.    This is a civil action brought by Relator, on behalf of the State of New Mexico,
against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann.
§ 27-14-7.B.

301.    The New Mexico FCA, N.M. Stat. Ann. § 27-14-4(A), creates liability for any
person "presents, or causes to be presented, to the state a claim for payment under the medicaid
program knowing that such claim is false or fraudulent." Defendants have violated this provision
of the New Mexico FCA.

302.    The New Mexico FCA, N.M. Stat. Ann. § 27-14-4(B), creates liability for any
person "presents, or causes to be presented, to the state a claim for payment under the medicaid
program knowing that the person receiving a medicaid benefit or payment is not authorized or is

not eligible for a benefit under the medicaid program." Defendants have violated this provision of the New Mexico FCA.

303.    The New Mexico FCA, N.M. Stat. Ann. § 27-14-4(C), creates liability for any person "makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false." Defendants have violated this provision of the New Mexico FCA.

304.    The New Mexico FCA, N.M. Stat. Ann. § 27-14-4(E), creates liability for any person "makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing that such record or statement is false." Defendants have violated this provision of the New Mexico FCA.

305.    The New Mexico FCA, N.M. Stat. Ann. § 27-14-4(D), creates liability for any person "conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing that such claim is false or fraudulent." Defendants have violated this provision of the New Mexico FCA.

306.    Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

## Count XXV

### New York False Claims Act
### N.Y. Fin. Law §§ 187, *et seq*.

307.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

308.     This is a civil action brought by Relator, on behalf of the State of New York, against Defendants under the State of New York False Claims Act, N.Y. Fin. Law § 190(2).

309.     The New York FCA, N.Y. Fin. Law § 189(1)(a), creates liability for any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the New York FCA.

310.     The New York FCA, N.Y. Fin. Law § 189(1)(b), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the New York FCA.

311.     The New York FCA, N.Y. Fin. Law § 189(1)(g), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government." Defendants have violated this provision of the New York FCA.

312.     The New York FCA, N.Y. Fin. Law § 189(1)(h), creates liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same." Defendants have violated this provision of the New York FCA.

313.     The New York FCA, N.Y. Fin. Law § 189(1)(c), creates liability for any person who "conspires to commit a violation of" the law. Defendants have violated this provision of the New York FCA.

314.     Pursuant to the New York FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. N.Y. Fin. Law § 189(1).

## Count XXVI

### North Carolina False Claims Act
### N.C. Gen. Stat. §§ 1-605, *et seq.*

315.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

316.     This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendants under the State of North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

317.     The North Carolina FCA, N.C. Gen. Stat. § 1-607(a)(1), creates liability for any person "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval." Defendants have violated this provision of the North Carolina FCA.

318.     The North Carolina FCA, N.C. Gen. Stat. § 1-607(a)(2), creates liability for any person "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the North Carolina FCA.

319.      The North Carolina FCA, N.C. Gen. Stat. § 1-607(a)(7), creates liability for any person "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State." Defendants have violated this provision of the North Carolina FCA.

320.     The North Carolina FCA, N.C. Gen. Stat. § 1-607(a)(3), creates liability for any person "[c]onspires to commit a violation of" the law. Defendants have violated this provision of the North Carolina FCA.

321.     Pursuant to the North Carolina FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. N.C. Gen. Stat. § 1-607(a).

## Count XXVII

### Oklahoma Medicaid False Claims Act
### Okla. Stat. §§ 63-5053 (2007), *et seq*

322.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

323.     This is a civil action brought by Relator, in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act, Okla. Stat § 63-5053.2(B).

324.     The Oklahoma FCA, Okla. Stat § 63-5053.1(B)(1), creates liability for any person who "[k]nowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Oklahoma FCA.

325.     The Oklahoma FCA, Okla. Stat § 63-5053.1(B)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state." Defendants have violated this provision of the Oklahoma FCA.

326.     The Oklahoma FCA, Okla. Stat § 63-5053.1(B)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state." Defendants have violated this provision of the Oklahoma FCA.

-73-

327. The Oklahoma FCA, Okla. Stat § 63-5053.1(B)(3), creates liability for any person who "[c]onspires to defraud the state by getting a false or fraudulent claim allowed or paid." Defendants have violated this provision of the Oklahoma FCA.

328. Pursuant to the Oklahoma FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Okla. Stat § 63-5053.1(B).

## Count XXVIII

### Fraudulent Claims to the Government of Puerto Rico Act
### P.R. Laws Ann. Tit 32, § 2934, *et seq*.

329. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

330. This is a civil action brought by Relator, in the name of the Commonwealth of Puerto Rico, against Defendants under the Fraudulent Claims to Programs, Contracts, and Services of the Government of Puerto Rico Act, P.R. Laws Ann. Tit. 32, § 2934a.

331. The Puerto Rico FCA, P.R. Laws Ann. Tit. 32, § 2934(1)(a), creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval of benefits under any Government Program or under a service contract." Defendants have violated this provision of the Puerto Rico FCA.

332. The Puerto Rico FCA, P.R. Laws Ann. Tit. 32, § 2934(1)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under any Government Program or under a service contract." Defendants have violated this provision of the Puerto Rico FCA.

333. The Puerto Rico FCA, P.R. Laws Ann. Tit. 32, § 2934(1)(d), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the Government, or

knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or

transmit money or property, relating to any Government Program or any service contract."

Defendants have violated this provision of the Puerto Rico FCA.

334.     The Puerto Rico FCA, P.R. Laws Ann. Tit. 32, § 2934(1)(d), creates liability for

any person who "[c]onspires to commit a violation of" the law. Defendants have violated this

provision of the Puerto Rico FCA.

335.     Pursuant to the Puerto Rico FCA, Defendants are thus liable to the

Commonwealth for statutorily defined damages sustained because of the acts of Defendants and

civil penalties. P.R. Laws Ann. tit. 32, § 2934.

## Count XXIX

### Rhode Island False Claims Act
### R.I. Gen. Laws §§ 9-1.1-1, *et seq.*

336.     Relator realleges and incorporates by reference the allegations contained in the

foregoing paragraphs above as though fully set forth herein.

337.     This is a civil action brought by Relator, in the name of the State of Rhode Island,

against Defendants pursuant to the State of Rhode Island False Claims Act, R.I. Gen. Laws § 9-

1.1-4(b).

338.     The Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a)(1), creates liability for any

person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for

payment or approval."  Defendants have violated this provision of the Rhodes Island FCA.

339.     The Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a)(2), creates liability for any

person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim." Defendants have violated this provision of the Rhodes Island FCA.

340.    The Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." Defendants have violated this provision of the Rhodes Island FCA.

341.    The Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a)(3), creates liability for any person who "[c]onspires to commit a violation of" the law. Defendants have violated this provision of the Rhodes Island FCA.

342.    Pursuant to the Rhode Island FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. R.I. Gen. Laws § 9-1.1-3(a).

## Count XXX

### Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §§ 71-5-181, *et seq.*

343.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

344.    This is a civil action brought by Relator, in the name of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b)(1).

345.    The Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l)(A), creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for

payment or approval under the medicaid program." Defendants have violated this provision of the Tennessee FCA.

346.    The Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l)(B), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program." Defendants have violated this provision of the Tennessee FCA.

347.    The Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l)(D), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program." Defendants have violated this provision of the Tennessee FCA.

348.    The Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l)(C), creates liability for any person who "[c]onspires to commit a violation of" the law. Defendants have violated this provision of the Tennessee FCA

349.    Pursuant to the Tennessee FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Tenn. Code Ann. § 71-5-182(a).

## Count XXXI

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code § 36.001, *et seq*.

350.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

351.     This is a civil action brought by Relator, in the name of the State of Texas, against Defendants under the State of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.101(a).

352.     The Texas FCA, Tex. Hum. Res. Code § 36.002(1), creates liability for any person who "knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." Defendants have violated this provision of the Texas FCA.

353.     The Texas FCA, Tex. Hum. Res. Code § 36.002(2), creates liability for any person who "knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." Defendants have violated this provision of the Texas FCA.

354.     The Texas FCA, Tex. Hum. Res. Code § 36.002(3), creates liability for any person who "knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received." Defendants have violated this provision of the Texas FCA.

355.     The Texas FCA, Tex. Hum. Res. Code § 36.002(12), creates liability for any person who "knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation

to pay or transmit money or property to this state under the Medicaid program." Defendants have violated this provision of the Texas FCA.

356.    The Texas FCA, Tex. Hum. Res. Code § 36.002(13), creates liability for any person who "knowingly engages in conduct that constitutes a violation under Section 32.039(b)." Defendants have violated this provision of the Texas FCA.

357.    The Texas FCA, Tex. Hum. Res. Code § 36.002(9), creates liability for any person who "conspires to commit a violation" of the law. Defendants have violated this provision of the Texas FCA.

358.    Pursuant to the Texas FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Tex. Hum. Res. Code § 36.052.

### Count XXXII

### Vermont False Claims Act
### 32 V.S.A. Chapter 7, Subchapter 8, *et seq.*

359.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

360.    This is a civil action brought by Relator, in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, § 632(b).

361.    The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(1), provides that no person shall "knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Vermont FCA.

362.    The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(2), provides that no person shall "knowingly make, use, or cause to be made or used, a false record or statement

-79-

material to a false or fraudulent claim." Defendants have violated this provision of the Vermont FCA.

363.    The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(3), provides that no person shall "knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b." Defendants have violated this provision of the Vermont FCA.

364.    The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(4), provides that no person shall "knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn." Defendants have violated this provision of the Vermont FCA.

365.    The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(9), provides that no person shall "knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;." Defendants have violated this provision of the Vermont FCA.

366.    The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(10), provides that no person shall "knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State." Defendants have violated this provision of the Vermont FCA.

367.     The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(11), provides that no person shall "as a beneficiary of an inadvertent submission of a false claim to the State, or as a beneficiary of an overpayment from the State, and who subsequently discovers the falsity of the claim or the receipt of overpayment, fail to disclose the false claim or receipt of overpayment." Defendants have violated this provision of the Vermont FCA.

368.     The Vermont FCA, 32 V.S.A. Chapter 7, Subchapter 8, § 631(a)(12), provides that no person shall "conspire to commit a violation of this subsection." Defendants have violated this provision of the Vermont FCA.

369.     Pursuant to the Vermont FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. 32 V.S.A. Chapter 7, Subchapter 8, § 631(b).

## Count XXXIII

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §§ 8.01-216.1, *et seq*.

370.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

371.     This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

372.     The Virginia FCA, Va. Code Ann. § 8.01-216.3(A)(1), creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Virginia FCA.

373.     The Virginia FCA, Va. Code Ann. § 8.01-216.3(A)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim." Defendants have violated this provision of the Virginia FCA.

374.    The Virginia FCA, Va. Code Ann. § 8.01-216.3(A)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth." Defendants have violated this provision of the Virginia FCA.

375.    The Virginia FCA, Va. Code Ann. § 8.01-216.3(A)(3), creates liability for any person who "conspires to commit a violation of" the law. Defendants have violated this provision of the Virginia FCA.

376.    Pursuant to the Virginia FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Va. Code Ann. § 8.01-216.3(A).

## Count XXXIV

### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.005, *et seq*

377.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

378.    This is a civil action brought by Relator, on behalf of the State of Washington, against Defendants under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1).

379.     The Washington FCA, Wash. Rev. Code § 74.66.020(1)(a), creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants have violated this provision of the Washington FCA.

380.     The Washington FCA, Wash. Rev. Code § 74.66.020(1)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants have violated this provision of the Washington FCA.

381.     The Washington FCA, Wash. Rev. Code § 74.66.020(1)(g), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity." Defendants have violated this provision of the Washington FCA.

382.     The Washington FCA, Wash. Rev. Code § 74.66.020(1)(c), creates liability for any person who "[c]onspires to commit one or more of the violations in this subsection (1)." Defendants have violated this provision of the Washington FCA.

383.     Pursuant to the Washington FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Wash. Rev. Code § 74.66.020(1).

## Count XXXV

### Wisconsin False Claims for Medical Assistance Act
### Wis. Stat. § 20.931, *et seq*.

384.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs above as though fully set forth herein.

385.     This is a civil action brought by Relator, on behalf of the State of Wisconsin,
against Defendants under the State of Wisconsin False Claims for Medical Assistance Act, Wis.
Stat. § 20.931(5)(a), for acts occurring prior to the non-retroactive repeal of that law effective
July 14, 2015.

386.     The Wisconsin FCA, Wis. Stat. § 20.931(2)(a), creates liability for any person
who "[k]nowingly presents or causes to be presented to any officer, employee, or agent of this
state a false claim for medical assistance." Defendants have violated this provision of the
Wisconsin FCA.

387.     The Wisconsin FCA, Wis. Stat. § 20.931(2)(b), creates liability for any person
who "[k]nowingly makes, uses, or causes to be made or used a false record or statement to obtain
approval or payment of a false claim for medical assistance." Defendants have violated this
provision of the Wisconsin FCA.

388.     The Wisconsin FCA, Wis. Stat. § 20.931(2)(g), creates liability for any person
who "[k]nowingly makes, uses, or causes to be made or used a false record or statement to
conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical
Assistance program." Defendants have violated this provision of the Wisconsin FCA.

389.     The Wisconsin FCA, Wis. Stat. § 20.931(2)(c), creates liability for any person
who "[c]onspires to defraud this state by obtaining allowance or payment of a false claim for
medical assistance, or by knowingly making or using, or causing to be made or used, a false
record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or
property to the Medical Assistance program." Defendants have violated this provision of the
Wisconsin FCA.

390.     Defendants have violated each of these provisions of the Wisconsin FCA, with respect to conduct and claims prior to July 14, 2015.

391.     Pursuant to the Wisconsin FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and civil penalties. Wis. Stat. § 20.931(2).

## VII.     PRAYERS FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.     That Defendants are enjoined from violating the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and the State FCAs;

B.     That judgment be entered against Defendants and in favor of the United States and the Relator in an amount equal to three times the amount of damages caused by Defendants' misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount;

C.     That judgment be entered against Defendants and in favor of the *Qui Tam* States and the Relator in the amount of the damages sustained by the *Qui Tam* States multiplied as provided for in the State FCAs, plus civil penalties in the ranges provided by the State FCAs;

D.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

E.     That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees permitted under 31 U.S.C. § 3730(d), and comparable provisions of the State FCAs;

F.     That Relator be awarded the maximum amount permitted under 31 U.S.C. § 3730(d), and comparable provisions of the State FCAs; and,

H.     That the Court award such other relief as the Court deems proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Relator requests a jury trial.


February 4, 2020                                    Respectfully submitted,



 /s/ *Suzanne E. Durrell*                       
Suzanne E. Durrell (BBO #139280)
Email: suzanne@thomasdurrell.com
Robert M. Thomas, Jr. (BBO #645600)
Email: bob@thomasdurrell.com
David W.S. Lieberman (BBO #673803)
Email: david@thomasdurrell.com
WHISTLEBLOWER LAW COLLABORATIVE LLC
20 Park Plaza, Suite 438
Boston, MA  02116-4334
Tel: (617) 366-2800
Fax: (888) 676-7420

David R. Suny (BBO #600326)
McCormack Suny LLC
100 Cambridge Street, 14th Floor
Boston, MA  02114
Telephone: 857-220-9296
Facsimile:  857-308-4623
Email: dsuny@mccormacksuny.com

*Counsel for Plaintiffs-Relators*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| U.S. et al. ex rel. Joseph B. Shea | Arthrex, Inc., Peter Millett, M.D., and ALM Research LLC |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Collier (Florida)
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Suzanne E. Durrell; Whistleblower Law Collaborative LLC; 20 Park Plaza, Suite 438; Boston, MA; (617) 366-2800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. section 3729

Brief description of cause:
Qui Tam Action Pursuant to the False Claims Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 2/4/2020

SIGNATURE OF ATTORNEY OF RECORD
Suzanne E. Durrell

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) U.S. et al. ex rel. Joseph B. Shea, et al. v. Arthrex, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ☐ I. 160, 400, 410, 441, 535, 830*, 835*, 850, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐ II. 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   ☑ III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐  NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
   YES ☐  NO ☑
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐  NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐  NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐  NO ☑

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☐   Central Division ☐   Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☑   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐  NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Suzanne E. Durrell; Whistleblower Law Collaborative, LLC
ADDRESS 20 Park Plaza, Suite 438; Boston, MA 02116-4334
TELEPHONE NO. (617) 366-2800

(CategoryForm1-2019.wpd )