## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

ARTHREX, INC.

      Plaintiff,

v.                                    Case No. 2:22-cv-00748

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA. AND
FEDERAL INSURANCE COMPANY

      Defendants.

_____

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Arthrex, Inc. ("Arthrex"), by and through its undersigned attorneys, hereby files this Complaint against Defendants National Union Fire Insurance Company of Pittsburgh, Pa. ("AIG") and Federal Insurance Company ("Chubb") (collectively with AIG, the "Defendant Insurers"), and in support thereof, avers as follows:

## NATURE OF THE CASE

1. This is an insurance coverage action in which Arthrex seeks the full $20 million policy limits of its private corporation director' and officers' insurance ("D&O") policies after the Defendant Insurers wrongly denied coverage for Arthrex's legal fees and costs incurred in defense and settlement of claims alleging violations of the federal False Claims Act and state equivalents.

2. Arthrex purchased primary and excess D&O insurance policies respectively from the Defendant Insurers for the policy period April 26, 2019, to April 26, 2020 (collectively, the "Subject Policies," as more fully defined below).

3. Among other types of coverage, the Subject Policies insure Arthrex for loss, including both defense costs and liability amounts, arising from certain claims deemed made against Arthrex and/or Arthrex's directors and officers (collectively, "Insureds") during the Defendant Insurers' policy period.

4. Arthrex brings this action seeking: (1) damages resulting from the Defendant Insurers' breach of their contractual obligations under the Subject Policies by refusing to pay Arthrex's insured Loss resulting from the defense and resolution of the now-dismissed *qui tam* lawsuit styled *United States, et al. ex rel. Joseph B. Shea v. Arthrex, Inc., et al.*, Civil Action No. 1:20-cv-10210 (D. Mass.), and (2) pre-judgment and post-judgment interest, attorneys' fees, costs, and such other further relief as the Court may deem just and proper.

## THE PARTIES

5. Plaintiff Arthrex, Inc. is a Delaware corporation with its principal place of business in Naples, Florida.

6. Defendant National Union Fire Insurance Company of Pittsburgh, Pa. is an insurance company incorporated in Pennsylvania with its principal place of business in New York, New York. National Union Fire Insurance Company of Pittsburgh, Pa is licensed to do and does transact substantial business in the States of Delaware and Florida.

7. Defendant Federal Insurance Company is an insurance company incorporated in Indiana with its principal place of business in Whitehouse Station, New Jersey. Federal Insurance Company is licensed to do and does transact substantial business in the States of Delaware and Florida.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

9. This matter was originally filed in the United States District Court for the District of Delaware, which had personal jurisdiction over AIG because AIG is licensed to do and does transact business in the State of Delaware and is subject to personal service in this state. Jurisdiction over AIG also exists pursuant to 10 Del. Code § 3104 because AIG contracted to insure risks to Arthrex and its insured persons in Delaware and under Delaware corporation law.

10. The Delaware Court had personal jurisdiction over Chubb because Chubb is licensed to do and does transact business in the State of Delaware and is subject to personal service in this state. Jurisdiction over Chubb also exists pursuant to 10 Del. Code § 3104 because Chubb contracted to insure risks to Arthrex and its insured persons in Delaware and under Delaware corporation law.

11. Although this case was transferred to this Court in November, 2022, this Court has personal jurisdiction over AIG because AIG is licensed to do and does transact business in the State of Florida and is subject to personal service in this state. Jurisdiction over AIG also exists pursuant to Fla. Stat. § 48.193(1)(a) because AIG contracted to insure Arthrex, which is located, among other places, in Florida.

3

12.     Although this case was transferred to this Court in November, 2022, this Court has personal jurisdiction over Chubb because Chubb is licensed to do and does transact business in the State of Florida and is subject to personal service in this state. Jurisdiction over Chubb also exists pursuant to Fla. Stat. § 48.193(1)(a) because Chubb contracted to insure Arthrex, which is located, among other places, in Florida.

13.     Venue was proper in the District of Delaware pursuant to 28 U.S.C. § 1391(b)(1) because both AIG and Chubb reside in the State of Delaware and this district for the same reasons they are "subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2).

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because both AIG and Chubb reside in the State of Florida and this district for the same reasons they are "subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2).

## THE SUBJECT POLICIES

15.     AIG sold a PrivateEdge Plus Policy No. 01-340-76-97, to Arthrex for the policy period April 26, 2019, to April 26, 2020 ("AIG Policy").

16.     A true and correct copy of the AIG Policy is attached hereto as **Exhibit A**.

17.     Chubb sold a Directors and Officers Liability and Reimbursement Excess Policy No. 8240-1243, to Arthrex for the policy period April 26, 2019, to April 26, 2020 ("Chubb Policy").

18.     A true and correct copy of the Chubb Policy is attached hereto as **Exhibit B**.

19.     Collectively, the AIG Policy and Chubb Policy are referred to as the "Subject Policies."

## FACTUAL BACKGROUND

20.     Founded by Reinhold Schmieding in 1981, Arthrex is a global medical device company and leader in new product development and medical education in orthopedics.

21.     Arthrex has pioneered the field of arthroscopy and develops more than 1,000 innovative products and procedures each year.

22.     As part of its development of cutting-edge products and procedures, Arthrex partners with doctors and innovators who are then paid license and royalty fees for their substantial contribution to the intellectual property in the products Arthrex sells.

### The AIG Policy

23.     On or about April 26, 2019, Arthrex purchased the AIG Policy, which provides a $10 million aggregate Limit of Liability subject to four separate Insuring Agreements.  Ex. A, D&O Coverage Section, Section 1.

24.     Specifically, the AIG Policy provides coverage for amounts that Arthrex incurs on its own behalf subject to the following insuring agreement:

> This **D&O Coverage Section** shall pay the **Loss** of the **Company** arising from a . . . (i) **Claim** made against the **Company** . . . for any **Wrongful Act**, but, in the case of

5

Coverage B(ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such **Loss**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

*Id.*, D&O Coverage Section, Section 1.(Coverage B(i)).

25.   The AIG Policy also provides coverage for amounts that Arthrex indemnifies its directors and officers subject to the following insuring agreement:

This **D&O Coverage Section** shall pay the **Loss** of the **Company** arising from a . . . (ii) **Claim** made against an **Individual Insured**, for any **Wrongful Act**, but, in the case of Coverage B(ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such **Loss**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

*Id.* (Coverage B(ii)).

26.   The AIG Policy defines "**Loss**" as, in relevant part:

damages, judgments, settlement, pre-judgment and post-judgment interest, . . . and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; or (iv) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. Notwithstanding the foregoing subparagraph (iv), the **Insurer** shall not assert that, in a **Securities Claim** alleging violation of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the portion of any amounts incurred by **Insureds** which is attributable to such violations constitutes uninsurable loss and shall treat that portion of all such settlements, judgments and **Defense Costs** as constituting **Loss** under this policy. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs

6

(u)(i) through (u)(iv) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **D&O Coverage Section**, including, but not limited to, exclusions 4(a), 4(b) and 4(c) of this **D&O Coverage Section**, punitive, exemplary and multiple damages. . . .    The enforceability of this first sentence of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

Punitive, exemplary and multiplied damages are only insurable to the extent (1) such damages are insurable under the law of any jurisdiction other than Florida that has a substantial relationship to the **Insureds**, the **Claim**, the **Insurer**, or this policy and is most favorable to the insurability of such damages and (2) that this policy is construed by a court of competent jurisdiction, or an arbitrational panel, pursuant to the laws of any jurisdiction other than Florida.

*Id.*, D&O Coverage Section, Section 2.(u), as amended by Endorsement Nos. 1 & 4.

27.    The AIG Policy defines "**Defense Costs**" as, in relevant part, "the reasonable and necessary fees, costs and expenses consented to by the Insurer . . . resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**." *Id.* D&O Coverage Section, Section 2.(k).

28.    The AIG Policy defines "**Company**" as, in relevant part, "the **Named Entity**." *Id.*, General Terms and Conditions, Section 2.(b).

29.    The AIG Policy defines "**Named Entity**" as "the entity listed in Item 1 of the Declarations." *Id.*, General Terms and Conditions, Section 2.(i).

30.    Item 1 of the AIG Policy's declarations lists "Arthrex, Inc." as the **Named Entity**. *Id.*, Declarations, Item 1.

31.   The AIG Policy defines "**Claim**" as, in relevant part:

(i)   a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations);

(ii)   a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:
    (1) service of a complaint or similar pleading;
    (2) return of an indictment, information or similar document (in the case of a criminal proceeding); or
    (3) receipt of filing of a notice of charges; or

(iii)   a civil, criminal, administrative or regulatory investigation of an **Individual Insured**:
    (1) once such **Individual Insured** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition 2(b)(ii) may be commenced; or
    (2) in the case of an investigation by the Securities Exchange Commission ("**SEC**") or a similar state or foreign governmental authority, after:
        (a) the service of a subpoena upon such **Individual Insured**; or
        (b) the **Individual Insured** is identified in a written "Wells" or other notice from the **SEC** or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Individual Insured**.

*Id*. D&O Coverage Section at Section 2.(b), as amended by Endorsement No. 29.

32.   The AIG Policy defines "**Individual Insured**" to mean, among other individuals, any "**Executive**" or "**Employee**" of Arthrex. *Id.*, D&O Coverage Section, Section 2.(s), as amended by Endorsement No. 10.

33.   The AIG Policy defines "**Executive**" to mean, among other things, "any past, present or future duly elected or appointed director, officer, management

8

committee member or member of the Board of Managers." *Id.*, D&O Coverage Section, Section 2.(n).

34.    The AIG Policy defines "**Wrongful Act**" as, in relevant part, "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a Company." *Id.*, D&O Coverage Section, Section 2.(cc)(ii).

35.    The AIG Policy contains an "Advancement of Defense Costs – 90 Days" provision, which requires that when "the **Insurer** has not assumed the defense of a Claim . . . the **Insurer** nevertheless shall advance on a current basis, at the written request of the **Insured**, covered **Defense Costs** no later than ninety (90) days after receipt by the **Insurer** of such defense bills." *Id.*, D&O Coverage Section, Section 7, as amended by Endorsement 4, § II(7).

36.    The AIG Policy contains a "Dispute Resolution Process" provision, mandating non-binding mediation of any "disputes or differences which may arise under or in connection with this policy[.]" *Id.*, General Terms and Conditions, Section 14, as amended by Endorsement 4.

37.    The AIG Policy requires that the mediator in the required mediation "shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated in the construction or interpretation of the provisions of this policy." *Id.*

38.    If the requisite non-binding mediation is unsuccessful, the AIG Policy prescribes a "cooling off" period before the commencement of litigation: "[N]o such

judicial or arbitration proceeding shall be commenced until at least sixth (60) days after the date the non-binding mediation shall be deemed concluded or terminated." *Id.*

**The Chubb Policy**

39.     On or about April 26, 2019, Arthrex purchased the Chubb Policy, which provides a $10 million aggregate Limit of Liability in excess of the AIG Policy.  Ex. B, Declarations.

40.     The Chubb Policy provides coverage for amounts that Arthrex incurs subject to the following lone insuring agreement:

> The Company shall provide the **Insureds** with insurance during the Policy Period excess of the **Underlying Insurance**. Coverage hereunder shall attach only after all such **Underlying Insurance** has been exhausted by payment of claim(s) and shall then apply in conformance with the terms, conditions, exclusions and endorsements of the **Primary Policy**, together with all limitations, restrictions or exclusions contained in or added by endorsements to any other **Underlying Insurance**, except as specifically set forth in the terms and conditions and endorsements of this policy. In no event shall this policy grant broader coverage than would be provided by any of the exhausted **Underlying Insurance**.

*Id.*, Section 1.

41.     Therefore, the Chubb Policy is what is commonly referred to as a "follows form" excess policy, meaning that it fully incorporates the terms and conditions of the Primary Policy unless those terms and conditions are expressly modified or deleted by the Chubb Policy.

42.     The Chubb Policy defines "**Primary Policy**" as "the policy scheduled in Item 4(A) of the Declarations."  *Id.*, Section 13.

43.     Item 4(A) of the Chubb Policy's Declarations lists the AIG Policy as the "Primary Policy." *Id.*, Declarations, Item 4(A).

44.     The Chubb Policy defines "**Insureds**" as "those persons or organizations Insured under the **Primary Policy**." *Id.*, Section 13.

45.     The Chubb Policy defines "**Underlying Insurance**" as "all those policies scheduled in Item 4 of the Declarations." *Id.*, Section 13.

46.     No policies other than the AIG Policy are listed in Item 4 of the Chubb Policy's Declarations.

47.     The Chubb Policy's "Maintenance of Underlying Insurance" provision states:

> All of the underlying Policy(ies) scheduled in item 4 of the Declarations shall be maintained during the Policy Period in full effect and affording coverage at least as broad as the **Primary Policy**, except for any reduction of the aggregate limit(s) of liability available under the **Underlying Insurance** solely by reason of payment of losses thereunder. Failure to comply with the foregoing shall not invalidate this policy but the Company shall not be liable to a greater extent than if this condition had been complied with.

*Id.*, Section 2.

48.     The Chubb Policy's "Depletion of Underlying Insurance" provision states:

> In the event of the depletion of the limit(s) of liability of the **Underlying Insurance** solely as the result of payment of losses thereunder, this policy shall, subject to the Company's limit of liability and to the other terms of the policy, continue to apply for subsequent losses as excess insurance over the amount of insurance remaining under such **Underlying Insurance**. In the event of the exhaustion

of all of the limit(s) of liability of such **Underlying Insurance** solely as a result of payment of losses thereunder, the remaining limits available under this policy shall, subject to the Company's limit of liability and to the other terms of this policy, continue for subsequent losses as primary insurance and any retention specified in the **Primary Policy** shall be imposed under this policy; otherwise no retention shall be imposed under this policy.

*Id.*, Section 3.

49.     Item 5 of the Chubb Policy's Declarations lists the Chubb Policy as incepting on April 26, 2019, and expiring on April 26, 2020, which is consistent with the policy period of the AIG Policy.  *Id.*, Declarations, Item 5.

**The Underlying Proceedings**

50.     On or about February 4, 2020, a *qui tam* complaint was filed, under seal, against Arthrex on behalf of the United States government and certain states by Joseph B. Shea ("Relator"), in an action styled *United States, et al. ex rel. Joseph B. Shea v. Arthrex, Inc., et al.*, Civil Action No. 1:20-cv-10210 (D. Mass.).

51.     In conformance with 31 U.S.C. § 3730(b)(2), the *qui tam* complaint was served on the United States government in or about February 2020.

52.     A copy of the now unsealed *qui tam* complaint is attached as **Exhibit C**.

53.     The *qui tam* complaint alleges that the various governments on whose behalf the action was commenced suffered actual damages as a result of allegedly false and/or fraudulent statements, records, and claims made by the defendants in violation of the FCA and various analogous state statutes.  Ex. C at ¶ 4.

54.     As alleged in the complaint, "[n]o proof of specific intent to defraud is required" in order to assert a colorable claim under the FCA.  *Id.* at ¶ 16.

55.     The *qui tam* complaint alleges that Arthrex paid a co-defendant, Dr. Peter Millet, tens of millions of dollars in royalties ostensibly to license intellectual property that Arthrex had incorporated into its medical device products. *See id.* at ¶¶ 2, 107.

56.     The *qui tam* complaint alleges that those royalty payments were in excess of fair market value for the licensed intellectual property, and were allegedly intended as "a means to disguise kickbacks to induce high capacity and high-profile physicians to utilize and recommend Arthrex products."  *Id.* at ¶ 3.

57.     The *qui tam* complaint alleges that Relator learned of these alleged violations of the FCA through his prior position as "a sales agent selling Arthrex products and later in helping a physician negotiate an Arthrex royalty contract."  *Id.*

58.     As part of its responsibilities to investigate Relator's allegations, the United States Department of Justice propounded multiple subpoenas ("Subpoenas") on Arthrex.

59.     True and correct copies of the Subpoenas are attached hereto as **Exhibit D** and **Exhibit E**.

60.     Both Subpoenas seek documents and information from Arthrex as well as any of its "present or former officers, directors, representatives, employees, attorneys, consultants, contractors, or agents." Exs. D & E, Instructions D.

61.     Both Subpoenas were issued as:

*necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses, defined in 18 U.S.C. § 24(a) to mean violations of, or conspiracies to violate: 18 U.S.C. §§ 669, 1035, 1347, or 1518; and 18 U.S.C. §§ 287,371, 664, 666, 1001, 1027, 1341, 1343, or 1954 if the violation or conspiracy relates to a health care benefit program (defined in 18 U.S.C. § 24(b)).*

Exs. D & E.

62.     The first Subpoena was issued on January 8, 2020.

63.     The second Subpoena was issued on February 7, 2020.

64.     The second subpoena included a document request specifically naming Reinhold Schmieding, Arthrex's founder and CEO, and John Schmieding, Arthrex's Senior Vice President and General Counsel.  Ex. E, at 5.

65.     Both Subpoenas therefore requested documents in the personal possessions of Reinhold and John Schmieding, with the second Subpoena identifying them by name.

66.     The *qui tam* complaint, the Subpoenas, and the associated government investigation are collectively referred to herein as the "Underlying Proceedings."

**The Defense and Settlement of the Underlying Proceedings**

67.     In consultation with the Defendant Insurers, Arthrex retained Sidley Austin LLP to defend the company in connection with Underlying Proceedings.

68.     Reinhold Schmieding retained counsel, first Quinn Emanuel Urquhart & Sullivan, LLP, and subsequently Willkie Farr & Gallagher LLP, to represent his personal interests with regard to the Underlying Proceedings.

14

69.     John Schmieding similarly retained Ropes & Gray LLP to represent his personal interests with regard to the Underlying Proceedings.

70.     Therefore, Arthrex has been required to pay the legal fees and costs of Sidley Austin on its own behalf as well as Willkie Farr and Ropes & Gray through its indemnification obligations to Reinhold and John Schmieding.

71.     Additional legal fees were incurred by other regular counsel for Arthrex, including Blank Rome LLP who represents Arthrex in connection with its intellectual property rights.

72.     After extensive settlement discussions between Arthrex and the United States government, a $16 million settlement ("Settlement Agreement") was announced publicly on November 8, 2021, including an acknowledgement that a *qui tam* lawsuit existed.

73.     A true and correct copy of the Settlement Agreement is attached as **Exhibit F**.

74.     Although the *qui tam* complaint was first filed and served in February 2020—i.e., during the Subject Policies' policy periods, it was not unsealed until November 17, 2021.

75.     Arthrex paid the $16 million settlement amount, plus interest, to the United States government on November 9, 2021.

**The Subject Policies Insure Arthrex for Loss Arising from the Underlying Proceedings**

76.     As the "Named Entity" listed in the Declarations of the AIG Policy, Arthrex is the insured "Company" under the AIG Policy.

77.     Arthrex was named as a defendant in the *qui tam* complaint, which demanded an injunction enjoining Arthrex "from violating the Federal False Claims Act" and a judgment, among other things, "in an amount equal to three times the amount of damages caused by Defendants' misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount."

78.     The *qui tam* complaint therefore constitutes a "written demand for monetary, non-monetary or injunctive relief" against Arthrex.

79.     Because the *qui tam* complaint was served on the United States government in or around February 2020, it also constitutes a "a civil . . . proceeding for monetary, non-monetary or injunctive relief which is commenced by . . . service of a complaint."

80.     For both of these reasons, the *qui tam* complaint constitutes a "Claim" made against Arthrex under the AIG Policy.

81.     As already noted, the *qui tam* complaint alleges that Arthrex violated the federal False Claims Act and state-equivalent statutes.

82.     The *qui tam* complaint therefore constitutes a Claim against Arthrex "for a Wrongful Act" under the AIG Policy.

83.     The Subpoenas demand that documents and other information be provided by Arthrex, as well as Reinhold and John Schmieding, to the United States government.

84.     Reinhold and John Schmieding are both officers of Arthrex.

85.     Reinhold and John Schmieding are each therefore both "Executives" of Arthrex and "Individual Insureds" under the AIG Policy.

86.     The Subpoenas carried the force of law and stated that:  "Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district Court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience."

87.     The Subpoenas are therefore "written demand[s] for . . . non-monetary relief," which in turn means they each constitute a "Claim" made against Arthrex as well as Reinhold and John Schmieding under the AIG Policy.

88.     The Subpoenas assert "Wrongful Acts," because they each assert that the United States government is investigating potential "Federal health care offenses."

89.     The Subpoenas were issued on January 8, 2020, and February 7, 2020, respectively, which is within the Subject Policies' Policy Periods.

90.     Arthrex indemnified both Reinhold and John Schmieding in connection with the Underlying Proceedings.

91.     The legal fees and costs Arthrex incurred, on its own behalf and on behalf of Reinhold and John Schmieding, in defense of the Underlying Proceedings thereafter

constitute reasonable and necessary "Defense Costs" insured defending "Claims" for "Wrongful Acts" under the AIG Policy.

92.    The settlement paid by Arthrex in order to resolve the Underlying Proceedings was a reasonable and necessary "settlement" insured under the AIG Policy.

93.    Accordingly, the "Defense Costs" and "settlement" amounts incurred by Arthrex defending and resolving the Underlying Proceedings are covered "Loss" under Insuring Agreements B(i) and B(ii) of the AIG Policy, subject solely to its $10 million Limit of Liability.

94.    Because the Chubb Policy "follows form" to the AIG Policy, Arthrex's "Loss" defending and settling the Underlying Proceedings is also covered under the Chubb Policy, subject solely to its $10 million excess Limit of Liability.

95.    Arthrex paid in full the required insurance premiums for the Subject Policies.

96.    Arthrex satisfied in full all the terms and conditions of the Subject Policies.

97.    The Subject Policies were in full force and effect at all pertinent times.

**The Coverage Dispute**

98.    On or about February 4, 2020, Arthrex, through its insurance broker Aon Financial Services Group ("Aon"), provided timely written notice of the first Subpoena to the Defendant Insurers.

18

99.     On or about February 18, 2020, Arthrex, through Aon, provided timely written notice of the second Subpoena to the Defendant Insurers.

100.    In response to those notices, AIG issued a declination letter dated April 17, 2020, in which it wrongly argued that the Subpoenas did not constitute a "a written demand for monetary, non-monetary or injunctive relief" (i.e., a "Claim") or a "Pre-Claim Inquiry."

101.    The AIG Primary Policy extends coverage for a "Pre-Claim Inquiry" through endorsement.

102.    The "Pre-Claim Inquiry" definition can be summarized, as relative to this dispute, as a pre-Claim "verifiable request for an Individual Insured . . . to appear at a meeting or interview" or "produce documents" to a government authority.  Ex. A, Endorsement No. 26.

103.    Other than a generalized reservation of rights, the April 17, 2020 letter does not raise any other potentially applicable coverage defenses.

104.    A true and correct copy of AIG's April 17, 2020 letter is attached as **Exhibit G**.

105.    Notwithstanding the denial of coverage, Arthrex requested consent to the retentions of Sidley Austin, Willkie Farr, and Ropes & Gray as defense counsel, and AIG did so in a letter dated July 9, 2020, subject to "a rate cap of $1000/hour for all attorneys on this matter."

106.    A copy of the July 9, 2020 email is attached as **Exhibit H.**

107.   Individuals representing Arthrex, Aon, Sidley Austin, and the Defendant Insurers, including each sides insurance coverage counsel, then engaged in numerous communications and conference calls.

108.   During such communications, including in communications between both client representatives and coverage counsel, Arthrex repeatedly explained to the Defendant Insurers that the entire investigation, including the Subpoenas, almost certainly originated from a *qui tam* complaint—i.e., another Claim under the Policies—that remained under seal at that time.

109.   Subsequent to such communications, on March 1, 2021, AIG issued a letter amending its prior declination of coverage.

110.   In the March 1, 2021 letter, AIG agreed that the second Subpoena's request for documents in the possession of Reinhold and John Schmieding and a request from the government to interview John Schmieding collectively constituted a "Pre-Claim Inquiry" under the AIG Primary Policy.

111.   A true and correct copy of the March 1, 2021 letter is attached as **Exhibit I**.

112.   In response to AIG's partial acceptance of coverage, Arthrex submitted to AIG for reimbursement invoices from Willkie Farr and Ropes & Gray (i.e., counsel for the Individual Insureds).

113.   In an email dated April 26, 2021, AIG asserted that only $154,603.00, a small fraction of the total fees and costs, allegedly constituted covered Pre-Claim

Inquiry Costs, in part because the invoices from Ropes & Gray were significantly redacted.

114.    Taking into account the satisfaction of the AIG Policy's $50,000.00 retention, AIG agreed to pay only $104,603.00 toward the invoices that had been submitted.

115.    A true and correct copy of the April 26, 2021 email is attached as **Exhibit J**.

116.    AIG ultimately only paid $103,603.00, or $1,000.00 less than the amount even AIG agreed was owed.

117.    AIG still refuses to pay the outstanding $1,000.00 that it agreed to pay, and has never explained the shortfall or its continued reticence to pay.

118.    AIG's refusal to pay, or even explain the basis for its refusal to pay, the balance of the invoices submitted as Pre-Claim Inquiry Costs was an indefensible, arbitrary, and capricious abdication of AIG's express and implied contractual responsibilities under the AIG Policy, and represents unreasonable reticence and delay in handling Arthrex's claim for insurance coverage.

119.    On June 2, 2021, Arthrex submitted additional Willkie Farr invoices to AIG.

120.    Pursuant to common interest privilege and confidentiality agreements with each of the Defendant Insurers, additional invoices from Sidley Austin, Willkie Farr and Ropes & Gray were provided to the Defendant Insurers on November 18, 2021.

121.    However, despite the submission of the additional invoices on June 2, 2021 and November 18, 2021, AIG has made no additional payment of either Pre-Claim Inquiry Costs or Loss.

122.    AIG never explained its arbitrary decision to pay some legal fees and costs as Pre-Claim Inquiry Costs and not others, particularly with regard to the additional invoices submitted on June 2, 2021.

123.    AIG's refusal to pay, or even explain the basis for its refusal to pay, any portion of the invoices submitted on June 2, 2021 was another indefensible, arbitrary, and capricious abdication of AIG's express and implied contractual responsibilities under the AIG Policy, and represents unreasonable reticence and delay in handling Arthrex's claim for insurance coverage.

124.    Moreover, AIG's failure to pay, even in part, such invoices violates the AIG Policy's "Advancement of Defense Costs – 90 Days" provision, which requires AIG to "advance on a current basis, at the written request of the **Insured**, covered **Defense Costs** no later than ninety (90) days after receipt by the **Insurer** of such defense bills."   AIG Policy, D&O Coverage Section, Section 7, as amended by Endorsement 4, § II(7).

125.    Throughout this time period, Arthrex continued to explain to the Defendant Insurers that the government's investigation, including the Subpoenas that even AIG agreed constituted a Pre-Claim Inquiry, almost certainly originated from a sealed *qui tam* complaint.

126.    Later, as directed by the United States government, the Defendant Insurers were informed by Arthrex and its counsel that the existence of a *qui tam* complaint could no longer be discussed.

127.    However, despite all of this information, the Defendant Insurers refused to modify their coverage position or pay any additional amounts toward Arthrex's covered "Loss" and/or "Pre-Claim Inquiry Costs."

128.    On February 18, 2021, another conference call was held with the Defendant Insurers in which Arthrex's defense counsel explained that the United States government had made an oral offer to settle the Underlying Proceedings.

129.    On that same day, Arthrex made a written request for the Defendant Insurers to either consent to a potential settlement with the government or waive lack of consent as a coverage defense.

130.    Counsel for AIG responded the next day that AIG was maintaining its position that a Claim had not been made, and "[c]onsequently, AIG cannot consent, withhold consent, or agree to waive lack of consent to any settlement offer that Arthrex may be contemplating."

131.    A true and correct copy of the February 18-19 email exchange is attached as **Exhibit K.**

132.    Chubb never responded to Arthrex's February 18 request regarding consent or waiver of lack of consent as a coverage defense.

133.    Based on the Defendant Insurers' continued wrongful denial of coverage and breach of the Subject Policies, Arthrex acted as if it were a reasonable uninsured

23

and commenced negotiations with the government to mitigate its potential liability in the Underlying Proceedings.

134.    On March 8, 2021, Arthrex emailed the Defendant Insurers to inform them that a "preliminary agreement" had been reached with the United States government to settle the underlying matter for $16 million.

135.    In the same communication, Arthrex reiterated its request that the Defendant Insurers inform Arthrex "if they have any objection to the settlement."

136.    A true and correct copy of the March 8, 2021 email is attached as **Exhibit L**.

137.    Neither of the Defendant Insurers noted any objection to the proposed settlement.

138.    Following Arthrex's settlement with the United States government, the *qui tam* complaint was unsealed.

139.    The Defendant Insurers did not respond to the unsealing of the *qui tam* complaint other than to agree to the scheduling of a mediation pursuant to the dispute resolution provisions of the Subject Policies.

140.    That mediation was held on February 8, 2022, with JAMS.

141.    The mediator declared an impasse between the parties the same day.

142.    To date, Arthrex has been wrongly required to carry the burden without contribution from the Defendant Insurers for all Loss arising from the defense and resolution of the Underlying Proceedings both on its own behalf and on behalf of Reinhold and John Schmieding.

143.    The Defendant Insurers have refused to pay any of Arthrex's Loss arising from the defense and resolution of the Underlying Proceedings.

144.    The total amount of Loss incurred by Arthrex exceeds the combined limits of liability of the Subject Policies.

145.    To date, Defendant Insurers' sole basis for denying coverage has been that no "Claim" has been made against Arthrex or either Reinhold or John Schmieding.

146.    In doing so, Defendant Insurers have not raised or asserted the applicability of any exclusion or other limitation of coverage in the Subject Policies.

147.    Consistent with the Defendant Insurers' coverage communications, no exclusions or other limitations of coverage in the Subject Policies, other than the combined $20 million limit of liability, apply to bar or limit coverage for the Defense Costs incurred defending the Underlying Proceedings or the settlement payment made pursuant to the Settlement Agreement.

148.    The Defendant Insurers' position that neither the Subpoenas nor the *qui tam* complaint constitute a "Claim" under the Subject Policies is unreasonable, unsupportable, and a clear violation of the Subject Policies, applicable Delaware law, and the duty of good faith and fair dealing implied in the Subject Policies.

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT AGAINST ALL DEFENDANTS)

149.    Arthrex restates and re-alleges the foregoing paragraphs of this complaint as though fully set forth herein.

150.    Arthrex has fully complied with all terms and conditions of the Subject Policies with regards to the Underlying Proceedings.

151.    The *qui tam* complaint constitutes a covered "Claim . . . for a[] Wrongful Act" under the operative insuring agreements and definitions of the Subject Policies.

152.    Each of the Subpoenas also constitutes a covered "Claim . . . for a[] Wrongful Act" under the operative insuring agreements and definitions of the Subject Policies.

153.    AIG admits that the Subpoena dated February 7, 2020, constitutes a covered Pre-Claim Inquiry under the Subject Policies.

154.    AIG has wrongfully refused to pay all but $103,603.00 of its $10 million share of Arthrex's Loss and/or Pre-Claim Inquiry Costs associated with the defense and resolution of the Underlying Proceedings.

155.    Chubb has refused to pay its separate $10 million share of Arthrex's Loss and/or Pre-Claim Inquiry Costs associated with the defense and resolution of the Underlying Proceedings.

156.    AIG has also separately breached the "Advancement of Defense Costs – 90 Days" provision when it has repeatedly missed the deadline to pay what it deems to be Arthrex's Pre-Claim Inquiry Costs (or even provide an explanation for its failure to do so).

157.    AIG's and Chubb's denial of coverage and refusal to pay constitutes a material breach of their obligations under the Subject Policies.

158. The Defendant Insurers' breaches of the Subject Policies have proximately caused Arthrex harm for which Arthrex is entitled to damages according to proof, but in any event at least the remaining balance of the Subject Policies' $20 million limits of liability, exclusive of interest, attorneys' fees, and costs.

159. By reason of the foregoing, the Defendant Insurers are each liable to Arthrex for its damages sustained as a result of the Defendant Insurers' breach of their respective contracts.

## PRAYER FOR RELIEF

**WHEREFORE**, Arthrex respectfully requests an order as follows:

a.      Awarding Arthrex compensatory and consequential damages as a result of the Defendant Insurers' breaches of their express contractual obligations to timely and fully pay Arthrex's Loss under the Subject Policies in an amount to be determined at trial but in any event exceeding $5,000,000 for each Defendant Insurer and $10,000,000 in the aggregate;

b.      Awarding Arthrex its attorneys' fees and costs of this suit;

c.      Awarding Arthrex pre-judgment and post-judgment interest; and

d.      Awarding Arthrex any other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Arthrex hereby demands that this matter be heard before a jury on all issues so triable.

Dated: March 23, 2023                           **BLANK ROME LLP**

                                                *s/ Michael R. Esposito*
                                                Michael R. Esposito
                                                Florida Bar No.: 37457
                                                201 E. Kennedy Blvd., Ste. 520
                                                Tampa, FL 33602
                                                Telephone: 813-255-2324
                                                Facsimile: 813-433-5352
                                                michael.esposito@blankrome.com

                                                Justin F. Lavella (*pro hac vice*)
                                                Alexander H. Berman (*pro hac vice*)
                                                1825 Eye Street, N.W.
                                                Washington, D.C.  20006
                                                Telephone: (202) 420-4834
                                                Facsimile: (202) 379-9046
                                                justin.lavella@blankrome.com
                                                alex.berman@blankrome.com

                                                *Counsel for Plaintiff Arthrex, Inc.*