# EXHIBIT A

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)



## National Union Fire Insurance Company of Pittsburgh, Pa.®

A capital stock company

## PrivateEdge Plus

POLICY NUMBER: *01-340-76-97*          REPLACEMENT OF POLICY NUMBER: *01-335-06-00*

### Management Liability, Professional Liability, Crime Coverage and Kidnap And Ransom/Extortion Coverage for Private Companies
### DECLARATIONS

---

**NOTICES**

[THESE NOTICES ARE APPLICABLE TO ALL COVERAGE SECTIONS OTHER THAN THE CRIME COVERAGE SECTION AND KIDNAP AND RANSOM/EXTORTION COVERAGE SECTION]

COVERAGE WITHIN THIS POLICY IS GENERALLY LIMITED TO LOSS FROM CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD AND REPORTED TO THE INSURER AS THE POLICY REQUIRES.  DEFENSE COSTS REDUCE THE LIMITS OF LIABILITY (AND, THEREFORE, AMOUNTS AVAILABLE TO RESPOND TO SETTLEMENTS AND JUDGMENTS) AND ARE APPLIED AGAINST APPLICABLE RETENTIONS.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND UNLESS SUCH COVERAGE IS EXPRESSLY PROVIDED WITHIN A COVERAGE SECTION.  WHERE THE INSURER HAS NO DUTY TO DEFEND, IT WILL ADVANCE DEFENSE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS OF THIS POLICY PRIOR TO THE FINAL DISPOSITION OF A CLAIM. PLEASE REFER TO THE COVERAGE SECTIONS PURCHASED FOR DEFENSE RELATED DETAILS.

PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER TO DETERMINE WHAT IS AND WHAT IS NOT COVERED.

---

| ITEMS | | | |
|---|---|---|---|
| 1 | **NAMED ENTITY:** | (the "Named Entity") | *ARTHREX, INC.* |
| | | MAILING ADDRESS: | *1370 CREEKSIDE BLVD NAPLES, FL 34108-1945* |
| | | STATE OF INCORPORATION/FORMATION: | *Delaware* |
| 2 | **POLICY PERIOD:** | Inception Date: *April 26, 2019* | Expiration Date: *April 26, 2020* |
| | | 12:01 A.M. at the address stated in Item 1 | |

*1361360*

95862 (9/07)                                        1                          ® All rights reserved.

ITEMS (continued)

**3** | **COVERAGE SUMMARY**

| Liability Coverage Section | | Separate Limit of Liability | Shared Limit of Liability | Retention/ Deductible* | Continuity/ Retroactive Date | Premium |
|---|---|---|---|---|---|---|
| D&O | D&O Coverage Section | $10,000,000 | Inapplicable | $50,000 | Continuity: 01/31/2003 | $42,040 |
| EPL | Employment Practices Coverage Section | $10,000,000 | Inapplicable | $250,000 | Continuity: 01/31/2003 | $82,195 |
| FLI | Fiduciary Liability Coverage Section | $10,000,000 | Inapplicable | $0 | Continuity: 03/01/2008 | $14,450 |
| MPL | Miscellaneous Professional Liability Coverage Section | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased |
| | Professional Services: | | | | | |
| CCP | Employed Lawyers Coverage Section | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased |
| Crime | Crime Coverage Section | See Section 5: | None | See Section 5: | N/A | $16,008 |
| KRE | Kidnap And Ransom/ Extortion Coverage Section | See Section 6: | None | See Section 6: | N/A | Coverage Section Not Purchased |
| *With respect to the D&O, EPL, FLI and CCP Coverage Sections only, no Retention amount is applicable to Non-Indemnifiable Loss. *No Retention is applicable to Costs of Investigation for Company Shareholder Derivative Investigation, Crisis Management Events, Voluntary Compliance Loss and HIPAA Penalties. | | | | | | N/A |

**4** | **TOTAL PREMIUM $154,693**

*1361360*

© All rights reserved.

ITEMS (continued)

*Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act, as amended (TRIA):$0 included in policy premium. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula as follows:81% of TRIA Losses in excess of the insurer deductible mandated by deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.*

*A copy of the TRIA disclosure sent with the original quote is attached hereto.*

**5** | **CRIME LIMITS OF LIABILITY AND DEDUCTIBLES**

| Insuring Agreement | Per Occurrence Limit of Liability | Deductible |
|---|---|---|
| Insuring Agreement 1.A.: "Employee Theft" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.B.: "Forgery or Alteration" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.C.: "Inside the Premises - Theft of Money or Securities" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.D.: "Inside the Premises - Robbery or Safe Burglary of Other Property" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.E.: "Outside the Premises" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.F.: "Computer Fraud" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.G.: "Funds Transfer Fraud" Loss | $3,000,000 | $50,000 |
| Insuring Agreement 1.H.: "Money Orders and Counterfeit Paper Currency" Loss | $3,000,000 | $50,000 |

If "Not Covered" is inserted above opposite any specific Insuring Agreement, such Insuring Agreement in the Crime Coverage Section and any other reference thereto in this policy is hereby deleted.

**CANCELLATION OF PRIOR CRIME INSURANCE:** By acceptance of the Crime Coverage Section of this Policy, you give us notice of cancellation for the prior Policy Nos: *01-335-06-00*. Such cancellation shall be effective at the time the Crime Coverage Section of this Policy becomes effective.

*1361360*

® All rights reserved.

ITEMS (continued)

**6** | **KRE LIMITS OF INSURANCE \ INSURED PERSON(S)**

| Loss Component: | Each Loss Component Limit | Annual Aggregate Limit |
|---|---|---|
| A. Ransom Monies: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| B. In-Transit/Delivery: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| C. Expenses: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| D. Consultant Expenses: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| E. Judgments, Settlements and Defense Costs: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| F. Death or Dismemberment: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |

| Each Insured Event Limit: | *Coverage Section Not Purchased* |
|---|---|
| Coverage Section Aggregate: | *Coverage Section Not Purchased* |
| Deductible (Each Loss): | *Coverage Section Not Purchased* |

Insured Person(s):   *Coverage Section Not Purchased*

**7** | **OTHER LIMITS OF LIABILITY**

| | |
|---|---|
| **(a) POLICY AGGREGATE LIMIT OF LIABILITY (For all coverages combined other than the Crime and the KRE Coverage Sections:** | *$30,000,000* |
| **(b) Crisis Management Fund For D&O:** | *$50,000* |
| **(c) Punitive Damages Sublimit of Liability for D&O and/or EPL Coverage Sections:** <br> ☐ D&O Punitive Damages Sublimit of Liability: <br> ☐ EPL Punitive Damages Sublimit of Liability: <br> ☐ Shared Punitive Damages Sublimit of Liability (D&O and EPL): <br> ☒ No Punitive Damages Sublimit of Liability for D&O or EPL | <br> *$0* <br> *$0* <br> *$0* <br> *Full Limit* |
| **(d) Costs of Investigation Coverage Sublimit for D&O:** | *$150,000* |
| **(e) Voluntary Compliance Loss Sublimit of Liability for FLI:** | *$250,000* |
| **(f) HIPAA Penalties Sublimit of Liability for FLI:** | *$1,500,000* |

**8** | **DISCOVERY PROVISIONS (Inapplicable to Crime and KRE Coverage Sections)**

| | |
|---|---|
| **(a) Percentage of Full Annual Premium for; 1 Year:** | *TBD* |
| **(b) 2 Years:** | *TBD* |
| **(c) 3 Years:** | *TBD* |
| **(d) 4 Years:** | *TBD* |
| **(e) 5 Years:** | *TBD* |
| **(f) 6 Years:** | *TBD* |
| **(g) Percentage of Full Annual Premium for unlimited duration:** | *TBD* |

*1361360*

℗ All rights reserved.

ITEMS (continued)

**9(a)** | **NAME AND ADDRESS OF INSURER**

*National Union Fire Insurance Company of Pittsburgh, Pa.*
*175 Water Street*
*New York, NY 10038-4969*

This policy is issued only by the insurance company indicated in this Item 9(a).

**9(b)** | **NOTICE OF CLAIMS AND CIRCUMSTANCES SEND TO:**

*AIG, Financial Lines Claims*
*P.O. Box 25947*
*Shawnee Mission, KS 66225*

**Reference:**   *01-340-76-97*

PRODUCER:   *AON RISK SERVICES CENTRAL INC*
PRODUCER LICENSE NO.: *On File with Carrier*
ADDRESS:   *1650 MARKET STREET*
       *SUITE 1000*
       *PHILADELPHIA, PA 19103*

*1361360*

95862 (9/07)                    5                    Ⓡ All rights reserved.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

_____                                        _____
PRESIDENT                                                                         SECRETARY

                            _____
                            AUTHORIZED REPRESENTATIVE


_____   _____   _____
COUNTERSIGNATURE          DATE                     COUNTERSIGNED AT

*1361360*

95862 (9/07)

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

### COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *ARTHREX, INC.*

Policy Number: *01-340-76-97*
Policy Period Effective Date From: *April 26, 2019*       To: *April 26, 2020*

© 2015 National Association of Insurance Commissioner

96555 (1/15)

**FLORIDA ADDENDUM TO THE DECLARATIONS**

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**AIG**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**



# National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

## PRIVATE EDGE PLUS

### General Terms and Conditions

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

**1. TERMS AND CONDITIONS**

These **General Terms and Conditions** shall be applicable to all **Coverage Sections** except: (i) the **KRE Coverage Section**; and (ii) the **Crime Coverage Section**. Terms appearing in these **General Terms and Conditions** which are defined in a **Coverage Section** shall have the meaning provided for such terms in such **Coverage Section** for purposes of coverage provided under such **Coverage Section**. Any reference in these **General Terms and Conditions** to "all **Coverage Sections**" shall not refer to the **KRE Coverage Section** or the **Crime Coverage Section**. The terms and conditions set forth in each **Coverage Section** shall only apply to that particular **Coverage Section** and shall in no way be construed to apply to any other **Coverage Section** of this policy.

**2. DEFINITIONS**

(a) "**Application**" means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy, employment practices liability policy, professional liability policy, employed lawyers policy or crime policy issued by the **Insurer**, or any of its affiliates, of which this policy is in whole or part a renewal or replacement or which it succeeds in time.

(b) "**Company**" means the **Named Entity** and any **Subsidiary** thereof. In the event a bankruptcy proceeding shall be instituted by or against a **Company**, the term "**Company**" shall also mean the resulting debtor-in-possession (or equivalent status outside the United States of America), if any.

(c) "**Continuity Date**" means the date set forth in Item 3 of the Declarations with respect to each **Coverage Section**.

(d) "**Coverage Section**" means each **Coverage Section** that is purchased by the **Insured** as indicated in Item 3 of the Declarations.

(e) "**Discovery Period**" means **Discovery Period**, as that term is defined in Clause 8 of these **General Terms and Conditions**.

(f) "**Domestic Partner**" means any natural person legally recognized as a domestic or civil union partner under: (i) the provisions of any applicable federal, state or local law; or (ii) the provisions of any formal program established by the **Company**.

(g) "**Insurer**" means the insurance company indicated in the Declarations.

(h) "**Management Control**" means: (i) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (ii) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation, the management committee of a joint venture or partnership, or the management board of a limited liability company.

GENERAL TERMS AND CONDITIONS
© All rights reserved.

(i) **"Named Entity"** means the entity listed in Item 1 of the Declarations.

(j) **"Policy Aggregate Limit of Liability"** means the **Policy Aggregate Limit of Liability** stated in Item 7(a) of the Declarations.

(k) **"Policy Period"** means the period of time from the inception date stated in Item 2 of the Declarations to the earlier of the expiration date stated in Item 2 of the Declarations or the effective date of cancellation of this policy.

(l) **"Related Wrongful Act(s)"** means **Wrongful Act(s)** which are the same, related or continuous, or **Wrongful Act(s)** which arise from a common nucleus of facts. **Claims** can allege **Related Wrongful Act(s)** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.

(m) **"Separate Limit of Liability"** means the applicable **Separate Limit of Liability**, if any, stated in Item 3 of the Declarations.

(n) **"Shared Limit of Liability"** means the applicable **Shared Limit of Liability**, if any, stated in Item 3 of the Declarations, which limit of liability shall be shared between all of the **Coverage Sections** which are listed below such **Shared Limit of Liability** in the Declarations.

(o) **"Subsidiary"** means:

(i) any for-profit entity, whose securities are not publicly traded, of which the **Named Entity** has or had **Management Control** (**"Controlled Entity"**) on or before the inception date of the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**;

(ii) any for-profit entity, whose securities are not publicly traded, of which the **Named Entity** acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**; and

(iii) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by a **Company**.

Notwithstanding the foregoing, coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** or any **Individual Insureds** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that the **Named Entity** obtained **Management Control** of such **Subsidiary** and prior to the time that such **Named Entity** ceased to have **Management Control** of such **Subsidiary**.

3. **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from any **Claim** made against: (i) the estates, heirs, or legal representatives of deceased **Individual Insureds**, and the legal representatives of **Individual Insureds** in the event of incompetency, insolvency or bankruptcy, who were **Individual Insureds** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; or (ii) the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) or **Domestic Partner** of an **Individual Insured** for all **Claims** arising solely out of his or her status as the spouse or **Domestic Partner** of an **Individual Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Individual Insured** and the spouse or **Domestic Partner**, or property transferred from the **Individual Insured** to the spouse or **Domestic Partner**; provided, however, this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** of the spouse or **Domestic Partner**, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Individual Insured**, subject to the policy's terms, conditions and exclusions.

GENERAL TERMS AND CONDITIONS
© All rights reserved.

**4. LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)**

The **Policy Aggregate Limit of Liability** is the maximum limit of the **Insurer's** liability for all **Loss** under all **Coverage Sections** combined arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Each **Separate Limit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Each **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 6(b) or 6(c) of these **General Terms and Conditions** is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** and subject to any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. Amounts incurred for **Defense Costs** shall be applied against the Retention.

**5. RETENTION CLAUSE**

The Retentions stated in the Declarations are separate Retentions pertaining only to the **Coverage Section** for which they are stated in the Declarations. The application of a Retention to **Loss** under one **Coverage Section** shall not reduce the Retention under any other **Coverage Section**.

In the event a **Claim** triggers a Retention in multiple **Coverage Sections**, then the following shall apply:

(a) with regard to **Loss** which is payable under any **Coverage Section** which is subject to a **Separate Limit of Liability**, the Retention applicable to such **Loss** pursuant to the Retention Clause of such **Coverage Section** (or pursuant to any applicable endorsement) shall apply separately to such **Loss**, and the applicable Retention for such **Coverage Section** shall not be reduced by payments of **Loss** made towards the Retention required under any other **Coverage Section**; and

© All rights reserved.

(b) with regard to **Loss** which is payable under any **Coverage Sections** which are subject to a **Shared Limit of Liability**, the highest applicable Retention shall be deemed the Retention applicable to **Loss** arising from such **Claim**.

## 6. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the addressee and at the address identified in Item 9(b) of the Declarations. Notice shall include and reference this policy number as indicated in the Declarations, as well as the **Coverage Sections** under which the **Claim** is being noticed. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

The following shall apply:

(a) The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** or a **Crisis Management Event** as soon as practicable after: (i) the **Company's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (ii) the **Crisis Management Event** commences, but in all events a **Claim** must be reported no later than either:

(i) anytime during the **Policy Period** or during the **Discovery Period** (if applicable); or

(ii) within ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 6(a) above, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged in the **Claim** of which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

(d) Any matter which could involve the payment of **Voluntary Compliance Loss** under the **FLI Coverage Section** shall be reported to the **Insurer** in the same manner as a **Claim** under Clause 6(a)(i) and 6(a)(ii) above.

## 7. CANCELLATION CLAUSE

This policy or any individual **Coverage Section** may be canceled by the **Named Entity** at any time by mailing prior written notice to the **Insurer** stating which **Coverage Sections** are to be canceled or that the entire policy is to be canceled and when thereafter such cancellation shall be effective, or by surrender thereof to the **Insurer** or its authorized agent. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the policy or applicable **Coverage Sections**.

This policy may be canceled by or on the behalf of the **Insurer** only in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by

GENERAL TERMS AND CONDITIONS
© All rights reserved.

the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified or other first class mail, at the **Named Entity's** address as stated in Item 1 of the Declarations, written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy or any **Coverage Section** shall be canceled by the **Named Entity**, the **Insurer** shall retain the pro rata proportion of the applicable premium herein. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

If the period of limitation relating to the giving of notice as set forth above is also set forth in any law controlling the construction thereof, the period set forth above shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

8. **DISCOVERY CLAUSE**

If the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy or any **Coverage Section**, then, solely with regard to the policy or **Coverage Section** which was canceled or nonrenewed, the **Named Entity** shall have the right, upon payment of the applicable "**Additional Premium Amount**" described below, to a period of up to six (6) years or of unlimited duration following the effective date of such cancellation or nonrenewal (herein referred to as the "**Discovery Period**"), in which to give the **Insurer** written notice of **Claims** first made against any **Insured** during said **Discovery Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by the canceled or nonrenewed policy or **Coverage Section**, as applicable. The rights contained in this Clause 8 shall terminate, however, unless written notice of such election together with the **Additional Premium Amount** due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or nonrenewal.

The **Additional Premium Amount** for the elected **Discovery Period** shall be the "**Full Annual Premium**" (as defined below) multiplied by the applicable percentage amount indicated in Item 8 of the Declarations for the length time of elected for the **Discovery Period**. If the applicable subsection of Item 8 of the Declaration states "to be determined", then the **Additional Premium Amount** for such **Discovery Period** shall be an amount determined by the **Insurer** in its sole and absolute discretion.

As used herein, "**Full Annual Premium**" means:

(a) with regard to a canceled or nonrenewed policy, the total annual premium charged for this policy; or

(b) with regard to a canceled or nonrenewed **Coverage Section**, the total annual premium charged for such **Coverage Section**.

In the event of a **Transaction**, as defined in Clause 9 of these **General Terms and Conditions**, the **Named Entity** shall have the right, within thirty (30) days before the end of the **Policy Period**, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**) for a period of up to six (6) years or for such longer or shorter period as the **Named Entity** may request. The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions and premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

© All rights reserved.

The **Discovery Period** is not cancelable, except that the **Insurer** may cancel the **Discovery Period** for non-payment of premium. This Clause 8 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

## 9. CHANGE IN CONTROL OF NAMED ENTITY

If during the **Policy Period**:

(a) the **Named Entity** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(b) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

(either of the above events herein referred to as the "**Transaction**"),

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**.

This policy and any purchased **Coverage Section** may not be canceled after the effective time of the **Transaction**. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 8 of these **General Terms and Conditions**.

The **Named Entity** shall give the **Insurer** written notice of the **Transaction** as soon as practicable, but not later than thirty (30) days after the effective date of the **Transaction**.

## 10. SUBROGATION

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to each **Insured's** rights of recovery thereof, and each **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit in the name of the **Insured**. In no event, however, shall subrogation be had against any **Individual Insured** under this policy, unless such **Individual Insured** has been convicted of a criminal act, or been determined by a final adjudication to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or determined by a final adjudication to have obtained any profit or advantage to which such **Individual Insured** was not legally entitled.

In the event that the **Insurer** shall for any reason pay **Indemnifiable Loss** on behalf of an **Individual Insured**, the **Insurer's** subrogation rights shall include, but not be limited to, the assertion of indemnification or contribution rights with respect to any such payments it makes or advances. Additionally, upon the **Insurer** making any payment of **Loss** within the Retention, the **Insurer** shall have a direct contractual right under this policy to recover from the **Company**, or in the event of the bankruptcy of the **Company**, from the debtor-in-possession (or equivalent status outside the United States) such **Loss** which was paid within the Retention. Such direct contractual right of recovery against the **Company** shall be in addition to and independent of the **Insurer's** subrogation right pursuant to this Clause 10 and any other rights the **Insurer** may have under applicable law.

## 11. OTHER INSURANCE

With respect to all **Coverage Sections**, other than the **EPL Coverage Section**, such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is expressly written to be excess over the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** provided by this policy. This policy specifically shall be excess of any other policy

GENERAL TERMS AND CONDITIONS
© All rights reserved.

pursuant to which any other **Insurer** has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

Such insurance as is provided by the **EPL Coverage Section** shall be primary unless expressly written to be excess over other applicable insurance.

With respect to all **Coverage Sections**, in the event of a **Claim** against an **Insured** arising out of his or her service as an **Outside Entity Executive**, or a **Claim** against an **Insured** for the **Insured's** liability with respect to a leased **Employee** or independent contractor **Employee** as described in the definition of "**Employee**" in the applicable **Coverage Section**, coverage as is afforded by this policy shall be specifically excess of any: (i) indemnification provided by such **Outside Entity** or leasing company; and (ii) any other insurance provided to such **Outside Entity**, leasing company or independent contractor.

Further, in the event other insurance is provided to the **Outside Entity**, leasing company or independent contractor referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the **Insurer** or any member company of AIG Property Casualty Inc. ("**AIG**") (or would be provided but for the application of the Retention, exhaustion of the limit of liability or failure to submit a notice of a **Claim**), then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in part or in whole, by this policy and such other insurance policy issued by **AIG**, shall not exceed the greater of (i) the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** of this policy, or (ii) the limit of liability of such other **AIG** insurance policy.

## 12. NOTICE AND AUTHORITY

Except for the giving of a notice of **Claim**, which shall be governed by the provisions of Clause 6 of these **General Terms and Conditions**, all notices required under this policy to be given by the **Insured** to the **Insurer** shall be given in writing to the **Insurer** at the address stated in Item 9(a) of the Declarations. It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and all **Insureds** with respect to the giving of notice of a **Claim**, the giving and receiving of notice of cancellation and nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** to the **Insurer** and the exercising or declining to exercise any right to a **Discovery Period**.

## 13. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**, which consent shall be in the sole and absolute discretion of the **Insurer**.

## 14. DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, must first be submitted to the non-binding mediation process as set forth in this Clause.

The non-binding mediation will be administered by any mediation facility to which the **Insurer** and the **Named Entity** mutually agree, in which all implicated **Insureds** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the American Arbitration Association's ("**AAA**") then-prevailing Commercial Mediation Rules. The parties shall mutually agree on the selection of a mediator. The mediator shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator shall also give due consideration to the general principles of the law of

GENERAL TERMS AND CONDITIONS
© All rights reserved.

the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy. In the event that such non-binding mediation does not result in a settlement of the subject dispute or difference:

(a)  either party shall have the right to commence a judicial proceeding; or

(b)  either party shall have the right, with all other parties consent, to commence an arbitration proceeding with the **AAA** that will be submitted to an arbitration panel of three (3) arbitrators as follows: (i) the **Insured** shall select one (1) arbitrator; (ii) the **Insurer** shall select one (1) arbitrator; and (iii) said arbitrators shall mutually agree upon the selection of the third arbitrator. The arbitration shall be conducted in accordance with the **AAA's** then prevailing Commercial Arbitration Rules.

Notwithstanding the foregoing, no such judicial or arbitration proceeding shall be commenced until at least ninety (90) days after the date the non-binding mediation shall be deemed concluded or terminated. Each party shall share equally the expenses of the non-binding mediation.

The non-binding mediation may be commenced in New York, Atlanta, Georgia, Chicago, Illinois, Denver, Colorado or in the state indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**. The **Named Entity** shall act on behalf of each and every **Insured** in connection with any non-binding mediation under this Clause, the selection of arbitration or judicial proceeding or the selection of mediators or arbitrators.

## 15.  ACTION AGAINST INSURER

Except as provided in Clause 14 above, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against the **Insured** or the **Company** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by the **Insured** or the **Company** or their legal representatives. Bankruptcy or insolvency of the **Company** or any **Insured** or of their estates shall not relieve the **Insurer** of any of its obligations hereunder.

## 16.  WORLDWIDE TERRITORY

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.

## 17.  HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

GENERAL TERMS AND CONDITIONS
© All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

### PrivateEdge Plus

### Directors, Officers and Private Company Liability Insurance
### ("D&O Coverage Section")

**Notice**: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this D&O Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this D&O Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

### 1. INSURING AGREEMENTS

With respect to Coverage A, B and D and the Defense Provisions, solely with respect to **Claims** first made during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this **D&O Coverage Section** affords the following coverage:

#### COVERAGE A: INDIVIDUAL INSURED INSURANCE

This **D&O Coverage Section** shall pay the **Loss** of an **Individual Insured** of the **Company** arising from a **Claim** made against such **Individual Insured** for any **Wrongful Act** of such **Individual Insured**, except when and to the extent that the **Company** has indemnified such **Individual Insured**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

#### COVERAGE B: PRIVATE COMPANY INSURANCE

This **D&O Coverage Section** shall pay the **Loss** of the **Company** arising from a:

(i) **Claim** made against the **Company**, or

(ii) **Claim** made against an **Individual Insured**,

for any **Wrongful Act**, but, in the case of Coverage B(ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such **Loss**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

#### COVERAGE C: CRISISFUND® INSURANCE

This **D&O Coverage Section** shall pay the **Crisis Management Loss** of a **Company** solely with respect to a **Crisis Management Event** occurring during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, up to the amount of the **Crisis Management Fund**; provided that payment of any **Crisis Management Loss** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this **D&O Coverage Section** or at law. This Coverage C shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the **Claim** being first made.

#### COVERAGE D: COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND

This **D&O Coverage Section** shall pay the **Costs of Investigation** of the **Company** arising from a **Company Shareholder Derivative Investigation** in response to a **Derivative Demand**,

1                                           D&O COVERAGE SECTION
© All rights reserved.

up to the amount set forth in Item 7(d) of the Declarations. Payment of **Costs of Investigation** to a **Company** shall be made in accordance with and subject to Clause 8 of this **D&O Coverage Section**.

**DEFENSE PROVISIONS**

The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the **Insurer** the defense of a **Claim** for which coverage is provided by this **D&O Coverage Section** in accordance with and subject to Clause 7 of this **D&O Coverage Section**. Regardless of whether the defense is so tendered, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition. Selection of counsel to defend a **Securities Claim** shall be made in accordance with Clause 9 of this **D&O Coverage Section**.

With respect to Coverage D above, it shall be the duty of the **Company** and not the duty of the **Insurer** to conduct, investigate and evaluate any **Company Shareholder Derivative Investigation** against its own **Executives**; provided, however, that the **Insurer** shall be entitled to effectively associate in the investigation and evaluation of, and the negotiation of any settlement of, any such **Company Shareholder Derivative Investigation**.

2. **DEFINITIONS**

(a) "**Affiliate**" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

(b) "**Claim**" means:

(i) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

(ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(1) service of a complaint or similar pleading;

(2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

(3) receipt or filing of a notice of charges; or

(iii) a civil, criminal, administrative or regulatory investigation of an **Individual Insured**:

(1) once such **Individual Insured** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition 2(b)(ii) may be commenced; or

(2) in the case of an investigation by the Securities Exchange Commission ("**SEC**") or a similar state or foreign government authority, after:

(a) the service of a subpoena upon such **Individual Insured**; or

(b) the **Individual Insured** is identified in a written "Wells" or other notice from the **SEC** or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Individual Insured**.

The term "**Claim**" shall also include any **Securities Claim** and any **Derivative Demand**.

(c) "**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

**D&O COVERAGE SECTION**
© All rights reserved.

(d) "**Company Shareholder Derivative Investigation**" means the investigation by the **Company** or, on behalf of the **Company** by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), as to whether or not the **Company** should bring the civil proceeding demanded in a **Derivative Demand**.

(e) "**Costs of Investigation**" means the reasonable and necessary costs, charges, fees and expenses consented to by the **Insurer** (including but not limited to attorney's fees and expert's fees but not including any settlement, judgment or damages and not including any compensation or fees of any **Individual Insured**) incurred by the **Company** or its board of directors (or any equivalent management body), or any committee of the board of directors (or any equivalent management body), solely in connection with a **Company Shareholder Derivative Investigation**.

(f) "**Crisis Management Event**" means **Crisis Management Event**, as that term is defined in Appendix D attached to this policy.

(g) "**Crisis Management Fund**" means the dollar amount set forth in Item 7(b) of the Declarations.

(h) "**Crisis Management Loss**" means **Crisis Management Loss**, as that term is defined in Appendix D attached to this policy.

(i) "**Crisis Management Services**" means **Crisis Management Services**, as that term is defined in Appendix D attached to this policy.

(j) "**D&O Punitive Damages Sublimit of Liability**" means the **D&O Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(k) "**Defense Costs**" means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**, but excluding compensation of any **Individual Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(l) "**Derivative Demand**" means a written demand by shareholders upon the board of directors (or equivalent management body) of a **Company** requesting that it file, on behalf of the **Company**, a civil proceeding in a court of law against any **Executive** of the **Company** for a **Wrongful Act** of such **Executive** in order to obtain relief from damages arising out of such **Wrongful Acts**.

(m) "**Employee**" means any past, present or future employee, other than an **Executive** of a **Company**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, volunteer, seasonal and temporary employee. An individual who is leased to the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such leased individual in the same manner as is provided to the **Company's** employees. Any other individual who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as that provided to the **Company's** employees, pursuant to a written contract.

(n) "**Executive**" means:

(i) any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers;

© All rights reserved.

(ii)   any past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (n)(i); or

(iii)   any past, present or future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

(o)  **"Financial Insolvency"** means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii), as to both (i) or (ii), any equivalent events outside the United States of America.

(p)  **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

(q)  **"Foreign Policy"** means the **Insurer's** or any other company of AIG Property Casualty Inc.'s (**"AIG"**) standard executive managerial liability policy (including all mandatory endorsements, if any) approved by **AIG** to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this **D&O Coverage Section**. If more than one such policy exists, then **"Foreign Policy"** means the standard basic policy form typically offered for sale in that **Foreign Jurisdiction** for comparable risks by the **Insurer** or any other company of **AIG**. The term **"Foreign Policy"** shall not include any partnership managerial, pension trust or professional liability coverage.

(r)  **"Indemnifiable Loss"** means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(s)  **"Individual Insured"** means any:

(i)   **Executive** of a **Company**;

(ii)   **Employee** of a **Company**; or

(iii)   **Outside Entity Executive**.

(t)  **"Insured"** means:

(i)   an **Individual Insured**; or

(ii)   a **Company**.

(u)  **"Loss"** means damages, judgments, settlements, pre-judgment and post-judgment interest, **Crisis Management Loss** and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; or (iv) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (u)(i) through (u)(iv) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **D&O Coverage Section**, including, but not limited to, exclusions 4(a), 4(b) and 4(c) of this **D&O Coverage Section**, punitive, exemplary and multiple damages. As more fully set forth in Clause 5. "LIMIT OF LIABILITY" of this **D&O Coverage Section**, coverage under this **D&O Coverage Section** for punitive, exemplary and multiple damages is subject to any applicable **D&O Punitive Damages Sublimit of Liability** or **Shared Punitive Damages Sublimit of Liability**. The enforceability of the first sentence of this paragraph shall be

**D&O COVERAGE SECTION**
© All rights reserved.

governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

(v) **"Non-Indemnifiable Loss"** means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

(w) **"Outside Entity"** means:

(i) any not-for-profit organization; or

(ii) any other corporation, partnership, joint venture or other organization listed as an **"Outside Entity"** in an endorsement to this **D&O Coverage Section**.

(x) **"Outside Entity Executive"** means any: (i) **Executive** of the **Company** serving in the capacity as director, officer, trustee or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Company**; or (ii) any other person listed as an **Outside Entity Executive** in an endorsement to this **D&O Coverage Section**. It is understood and agreed that, in the event of a disagreement between the **Company** and an individual as to whether such individual was acting "at the specific request or direction of the **Company**," this **D&O Coverage Section** shall abide by the determination of the **Company** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** is first reported to the **Insurer** pursuant to the terms of the policy. In the event no determination is made within such period, this **D&O Coverage Section** shall apply as if the **Company** determined that such **Individual Insured** was not acting at the **Company's** specific request or direction.

(y) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. **"Waste"** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(z) **"Securities Claim"** means a **Claim** made against any **Insured**:

(i) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell securities which is:

(1) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of a **Company**; or

(2) brought by a security holder of a **Company** with respect to such security holder's interest in securities of such **Company**; or

(ii) brought derivatively on the behalf of a **Company** by a security holder of such **Company**.

(aa) **"Shared Punitive Damages Sublimit of Liability"** means the **Shared Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(bb) **"Third Party Violation"** means any actual or alleged harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise) or unlawful discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability), or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Individual Insured** or applicant for employment with the **Company** or an **Outside Entity**.

(cc) **"Wrongful Act"** means:

5

© All rights reserved.

(i) with respect to any **Executive** or **Employee** of a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** or **Employee** in their respective capacities as such, or any matter claimed against such **Executive** or **Employee** of a **Company** solely by reason of his or her status as an **Executive** or **Employee** of a **Company**;

(ii) with respect to a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a **Company**; or

(iii) with respect to service on an **Outside Entity**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by an **Outside Entity Executive** in his or her capacity as such.

## 3. WORLDWIDE EXTENSION

For **Claims** made and maintained in a **Foreign Jurisdiction** for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claims** the provisions of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to such **Insured** in the **Foreign Jurisdiction**; provided however, that this paragraph shall apply only to provisions more favorable by virtue of insuring clauses, extensions, definitions, exclusions, pre-authorized securities or other defense counsel, discovery or extended reporting period, notice and authority, dispute resolution process or order of payments provisions, if any, of the **Foreign Policy** when compared to the same or similar clauses of this **D&O Coverage Section**. This paragraph shall not apply to excess provisions or policy provisions that address non-renewal, duty to defend, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

All premiums, limits, retentions, **Loss** and other amounts under this **D&O Coverage Section** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this **D&O Coverage Section** (subject to the terms, conditions and limitations of this **D&O Coverage Section**) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

## 4. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to: (i) the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law if any final adjudication establishes that such Section 16(b) violation occurred; or (ii) the payment to any **Insured** of any remuneration without the previous approval of the stockholders of the **Company**, if any final adjudication establishes such payment was illegal;

(c) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal, deliberate fraudulent or dishonest act or willful violation of statute, rule or law was committed;

95727 (9/07)        6

D&O COVERAGE SECTION
© All rights reserved.

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **D&O Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act(s)** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) with respect to an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if any **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **D&O Coverage Section**.

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company**, or as an **Outside Entity Executive** of an **Outside Entity**;

(h) for any **Wrongful Act** arising out of an **Individual Insured** serving in a capacity as an **Outside Entity Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or any **Executive** thereof; or which is brought by any security holder of the **Outside Entity**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the **Outside Entity**, the **Company**, or any **Executive** of the **Outside Entity** or the **Company**; provided, however, this exclusion shall not apply to:

  (i) any **Claim** brought by an **Executive** of an **Outside Entity** in the form of a cross- claim or third- party claim for contribution or indemnity which is part of and results directly from a **Claim** that is covered by this **D&O Coverage Section**;

  (ii) in any bankruptcy proceeding by or against an **Outside Entity**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Outside Entity**;

  (iii) any **Claim** brought by any past **Executive** of an **Outside Entity** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an **Outside Entity** for at least four (4) years prior to such **Claim** being first made against any person; or

  (iv) any **Claim** brought by an **Executive** of an **Outside Entity** formed and operating in a **Foreign Jurisdiction** against any **Outside Entity Executive** of such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(i) which is brought by or on behalf of a **Company** or any **Individual Insured**, other than an **Employee** of a **Company**; or which is brought by any security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Company** or any **Executive** of a **Company**; provided, however, this exclusion shall not apply to:

  (i) any **Claim** brought by an **Individual Insured** in the form of a cross- claim or third- party claim for contribution or indemnity which is part of and results directly from a **Claim** which is covered by this policy;

© All rights reserved.

(ii) in any bankruptcy proceeding by or against a **Company**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Company**;

(iii) any **Claim** brought by any past **Executive** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for a **Company** for at least four (4) years prior to such **Claim** being first made against any person; or

(iv) any **Claim** brought by an **Executive** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Company** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(j) alleging, arising out of, based upon or attributable to any public offering of securities by a **Company**, an **Outside Entity** or an **Affiliate** or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, this exclusion will not apply to:

(i) any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; provided, however, the **Named Entity** shall give the **Insurer** written notice of any public offering exempted pursuant to Section 3(b), together with full particulars and as soon as practicable, but not later than thirty (30) days after the effective date of the public offering;

(ii) any public offering of securities (other than a public offering described in subparagraph 4(j)(i) above), as well as any purchase or sale of such securities subsequent to such public offering, in the event that within thirty (30) days prior to the effective time of such public offering: (1) the **Named Entity** shall give the **Insurer** written notice of such public offering together with full particulars and underwriting information required thereto; and (2) the **Named Entity** accepts such terms, conditions and additional premium required by the **Insurer** for such coverage. Such coverage is also subject to the **Named Entity** paying when due any such additional premium. In the event the **Company** gives written notice with full particulars and underwriting information pursuant to subpart 4(j)(ii)(1) above, then the **Insurer** must offer a quote for coverage under this paragraph; or

(iii) any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the **Insured's** preparations to commence an initial public offering ("**IPO**") and which occurred at any time prior to 12:01 a.m. on the date the initial public offering commences ("**IPO Effective Time**"), including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however that the coverage otherwise afforded under this subparagraph (iii) shall be deemed to be void *ab initio* effective the **IPO Effective Time**; provided further, however, that coverage shall not be deemed void *ab initio* if (1) the **Claim** is first made and reported pursuant to Clause 6(a) of the **General Terms and Conditions** prior to the **IPO Effective Time**, and (2) a public company D&O policy is not applicable to such **Claim**;

(k) alleging, arising out of, based upon or attributable to the purchase by a **Company** of securities of a "**Publicly Traded Entity**" in a transaction which resulted, or would result, in such entity becoming an **Affiliate** or a **Subsidiary** of a **Company**; provided, however, this exclusion shall not apply in the event that within thirty (30) days prior to it becoming an **Affiliate** or **Subsidiary**, the **Named Entity** gives written notice of the transaction to the **Insurer** together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this **D&O Coverage Section**

© All rights reserved.

required by the **Insurer** relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to the transaction. An entity is a **Publicly Traded Entity** if any securities of such entity have previously been subject to a public offering;

(l) for bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to **Securities Claims**;

(m) for emotional distress or mental anguish, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any **Securities Claim**;

(n) for: (i) any actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply to:

    (1) **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**; or

    (2) **Loss** in connection with a **Securities Claim**, other than **Loss** constituting **Clean-up Costs**;

(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law;

(p) alleging, arising out of, based upon or attributable to the ownership, management, maintenance or control by the **Company** of any captive insurance company or entity, including, but not limited, to any **Claim** alleging the insolvency or bankruptcy of the **Named Entity** as a result of such ownership, operation, management or control;

(q) alleging, arising out of, based upon, or attributable to the employment of any individual or any employment practice, including, but not limited to, wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim;

(r) alleging, arising out of, based upon, or attributable to a **Third Party Violation**; provided, however, this exclusion shall not apply to a **Securities Claim**;

(s) alleging, arising out of, based upon, or attributable to:

    (i) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign governmental or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated;

    (ii) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, members, principal shareholders, owners or employees, or affiliates (as that term is defined in the Securities Exchange Act of 1934, including any of their officers, directors, agents, owners, partners, representatives, principal shareholders or employees) of any customers of the **Company** or any members of their family or any entity with which they are affiliated; or

**D&O COVERAGE SECTION**
© All rights reserved.

(iii)  political contributions, whether domestic or foreign; or

(t)  with respect to Coverage B(i) only:

(i)  for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

(ii)  for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

(iii)  alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the **Company** or any other **Insured** under any express contract or agreement; provided, however, this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement; or

(iv)  seeking fines or penalties or non-monetary relief against the **Company**; provided, however, that this exclusion shall not apply to any **Securities Claim**.

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 4(d), 4(e), 4(h), 4(i) and 4(t): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 5.  LIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. of the **General Terms and Conditions**:

### CRISISFUND® INSURANCE

The maximum limit of the **Insurer's** liability for all **Crisis Management Loss** arising from all **Crisis Management Events** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(b) of the Declarations as the **Crisis Management Fund**. This **Crisis Management Fund** shall be the maximum limit of the **Insurer** under this **D&O Coverage Section** for **Crisis Management Loss**, regardless of the number of **Crisis Management Events** occurring during the **Policy Period**; provided, however, the **Crisis Management Fund** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

### COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND

The maximum limit of the **Insurer's** liability for **Costs of Investigation** arising from all **Company Shareholder Derivative Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(d) of the Declarations (the "**Costs of Investigation Sublimit of Liability**"). The **Costs of Investigation Sublimit of Liability** is the maximum limit of the **Insurer** under this **D&O Coverage Section** for **Costs of Investigation** regardless of the number of such **Company Shareholder Derivative Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), or the number of **Executives** subject to such **Company Shareholder Derivative Investigations**; provided, however, that the **Costs of Investigation Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

D&O COVERAGE SECTION
© All rights reserved.

**PUNITIVE DAMAGES SUBLIMIT OF LIABILITY**

If Item 7(c) of the Declarations indicates that the **D&O Punitive Damages Sublimit of Liability** was elected, then the **D&O Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability for punitive, exemplary and multiple damages under this **D&O Coverage Section**. If Item 7(c) of the Declarations indicates that a **Shared Punitive Damages Sublimit of Liability** was elected, then the **Shared Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability under both this **D&O Coverage Section** and the **EPL Coverage Section** combined for punitive, exemplary and multiple damages. If Item 7(c) of the Declarations indicates that no sublimit of liability is applicable to punitive damages, then neither the **D&O Punitive Damages Sublimit of Liability** nor the **Shared Punitive Damages Sublimit of Liability** is applicable to punitive, exemplary and multiple damages under this **D&O Coverage Section**. The **D&O Punitive Damages Sublimit of Liability** and the **Shared Punitive Damages Sublimit of Liability**, if applicable, shall be a part of and not in addition to **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

6. **RETENTION CLAUSE**

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **D&O Coverage Section**, such Retention amount to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Act(s)**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

No Retention amount is applicable to **Crisis Management Loss** or **Non-Indemnifiable Loss**.

7. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them. Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 7; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of**

D&O COVERAGE SECTION
© All rights reserved.

**Liability** or **Shared Limit of Liability** have been exhausted.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 7, the **Insurer** nevertheless shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D&O Coverage Section** to payment of such **Loss**.

The **Insurer** shall have the right to fully and effectively associate with each and every **Insured** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Insured** agrees to provide such information as the **Insurer** may reasonably require and to give the **Insurer** full cooperation, including:

(a) cooperating with and helping the **Insurer**:

(i) in making settlements, subject to subparagraph 7(b) below;

(ii) in enforcing any legal rights the **Insured** may have against anyone who may be liable to the **Insured**;

(iii) by attending depositions, hearings and trials; and

(iv) by securing and giving evidence, and obtaining the attendance of witnesses; and

(b) taking such actions which, in such **Insured's** judgment, are deemed necessary and practicable to prevent or limit **Loss** arising from any **Wrongful Act**.

Additionally, the **Insured** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. If the **Insured** admits or assumes any liability in connection with any **Claim** without the consent of the **Insurer**, then the **Insurer** shall not have any obligation to pay **Loss** with respect to such **Claim**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this **D&O Coverage Section**. The **Insurer** shall not unreasonably withhold any consent required under this **D&O Coverage Section**, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 7, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **D&O Coverage Section**. In addition, the **Insured** shall not take any action, without the **Insurer's** written consent, which prejudices the **Insurer's** rights under this **D&O Coverage Section**.

This Clause 7 shall not be applicable to **Crisis Management Loss**.

**8. COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND COVERAGE PROVISION**

It is understood and agreed that the **Company** shall be entitled to payment under Coverage D of this **D&O Coverage Section** for reimbursement of its covered **Costs of Investigation** ninety (90) days after: (i) the **Company** has made its final decision not to bring a civil proceeding in a court of law against any of its **Executives**, and (ii) such decision has been communicated to the shareholders who made the **Derivative Demand** upon the **Company**. However, such payment shall be subject to an undertaking by the **Company**, in a form acceptable to the **Insurer**, that the **Company** shall return to the **Insurer** such payment in the event any **Company** or any shareholder of the **Company** brings a **Claim** alleging, arising out of, based upon or attributable to any **Wrongful Acts** which were the subject of the **Derivative Demand**.

© All rights reserved.

Nothing in this **D&O Coverage Section**, including Coverage D, shall be construed to afford coverage under this **D&O Coverage Section** for any **Claim** brought by the **Company** against one or more of its own **Executives**, other than **Costs of Investigation** incurred in a covered **Company Shareholder Derivative Investigation**. Payment of any **Costs of Investigation** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this policy or at law.

## 9. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS

This Clause 9 applies only to **Securities Claims**.

Affixed as Appendix A hereto and made a part of this **D&O Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Securities Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 7. of this **D&O Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Securities Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Securities Claim** is brought. In the event a **Securities Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Securities Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Securities Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Securities Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

## 10. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **D&O Coverage Section** and are to be considered as incorporated into this **D&O Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **D&O Coverage Section** shall be void *ab initio* as to any **Insured** who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **D&O Coverage Section** shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any

© All rights reserved.

**Insured** shall not be imputed to any other **Insured**.

**11. ORDER OF PAYMENTS**

In the event of **Loss** arising from any **Claim** for which payment is due under the provisions of this **D&O Coverage Section** but which **Loss**, in the aggregate, exceeds the remaining available **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section**, then the **Insurer** shall:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then with respect to whatever remaining amount of the applicable **Separate Limit of Liability** or **Shared Limit of Liability** is available after payment of such **Loss**,

(b) then pay such **Loss** for which coverage is provided under Coverage B(ii) of this **D&O Coverage Section**, and

(c) then pay such **Loss** for which coverage is provided under Coverage B(i), C or D of this **D&O Coverage Section**.

In the event of **Loss** arising from a **Claim** for which payment is due under the provisions of this **D&O Coverage Section** (including those circumstances described in the first paragraph of this Clause 11), the **Insurer** shall at the written request of the **Named Entity**:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then

(b) either pay or hold payment for such **Loss** for which coverage is provided under Coverage B, C or D of this **D&O Coverage Section**.

In the event that the **Insurer** withholds payment under Coverage B, C or D of this **D&O Coverage Section** pursuant to the above request, then the **Insurer** shall at any time in the future, at the request of the **Named Entity**, release such **Loss** payment to the **Company**, or make such **Loss** payment directly to the **Individual Insured** in the event of covered **Loss** under any **Claim** covered under this **D&O Coverage Section** pursuant to Coverage A of this **D&O Coverage Section**.

The **Financial Insolvency** of any **Company** or any **Individual Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this **D&O Coverage Section** pursuant to this Clause 11.

D&O COVERAGE SECTION
© All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, Pa.®

A capital stock company

### PrivateEdge Plus℠

### Employment Practices Liability Insurance
### ("EPL Coverage Section")

**Notice**: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this EPL Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this EPL Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

With respect to the Insuring Agreement and the Defense Provisions of this Clause 1, solely with respect to **Claims** first made during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this **EPL Coverage Section** affords the following coverage:

This **EPL Coverage Section** shall pay the **Loss** of an **Insured** arising from a **Claim** first made against such **Insured** for any **Wrongful Act**. The **Insurer** shall, in accordance with and subject to Clause 6 of this **EPL Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

### DEFENSE PROVISIONS

The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the **Insurer** the defense of a **Claim** for which coverage is provided by this **EPL Coverage Section** in accordance with Clause 6 of this **EPL Coverage Section**. Regardless of whether the defense is so tendered, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition. Selection of counsel to defend a **Designated Employment Practices Claim** shall be made in accordance with Clause 7 of this **EPL Coverage Section**.

## 2. DEFINITIONS

(a) **"Claim"** means:

  (i) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

  (ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

  (1) service of a complaint or similar pleading;

  (2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

  (3) receipt or filing of a notice of charges; or

  (iii) an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission (**"EEOC"**), or similar state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

© All rights reserved.

However, in no event shall the term **"Claim"** include any labor or grievance proceeding which is subject to a collective bargaining agreement.

(b) **"Defense Costs"** means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding compensation of any **Individual Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(c) **"Designated Employment Practices Claim"** means a **Claim**: (i) alleging discrimination or **Retaliation**; or (ii) that is certified as, or which is seeking certification as, a class action.

(d) **"EPL Punitive Damages Sublimit of Liability"** means the **EPL Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(e) **"Employee"** means any past, present or future employee, whether such employee is in a supervisory, co- worker or subordinate position or otherwise, including any part- time, volunteer, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such leased individual in the same manner as is provided to the **Company's** employees. Any other individual who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company**, shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as that provided to the **Company's** employees, pursuant to a written contract.

(f) **"Employment Practices Violation"** means any actual or alleged:

(i) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(ii) harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(iii) discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(iv) **Retaliation**;

(v) employment- related misrepresentation(s) to an **Employee** of the **Company** or applicant for employment with the **Company** or an **Outside Entity**;

(vi) employment- related libel, slander, humiliation, defamation or invasion of privacy;

(vii) wrongful failure to employ or promote;

(viii) wrongful deprivation of career opportunity with the **Company**, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(ix) wrongful discipline;

(x) failure to grant tenure; or

(xi) with respect to any of the foregoing items (i) through (x) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to  provide or enforce adequate or consistent corporate policies and procedures, or violation of  an individual's civil rights;

2

© All rights reserved.

but only if the **Employment Practices Violation** relates to an **Employee** of a **Company** or an **Outside Entity**, or applicants for employment with a **Company** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

(g) "**Executive**" means:

    (i) any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers;

    (ii) any past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (g)(i); or

    (iii) any past, present or future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

(h) "**Financial Insolvency**" means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii), as to both (i) or (ii), any equivalent events outside the United States of America.

(i) "**Foreign Jurisdiction**" means any jurisdiction, other than the United States of America or any of its territories or possessions.

(j) "**Indemnifiable Loss**" means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(k) "**Individual Insured**" means any:

    (i) **Executive** of a **Company**;

    (ii) **Employee** of a **Company**; or

    (iii) **Outside Entity Executive**.

(l) "**Insured**" means:

    (i) an **Individual Insureds**; or

    (ii) a **Company**.

(m) "**Loss**" means damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; (iv) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (v) any liability or costs incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; (vi) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (m)(i) through (m)(vi) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **EPL Coverage Section**, including, but not limited to, Exclusion 3(a) of this **EPL Coverage Section**, punitive, exemplary and multiple damages (including the multiple or

© All rights reserved.

liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). As more fully set forth in Clause 4. "PUNITIVE DAMAGES SUBLIMIT OF LIABILITY" of this **EPL Coverage Section**, coverage under this **EPL Coverage Section** for punitive, exemplary and multiple damages is subject to any applicable **EPL Punitive Damages Sublimit of Liability** or **Shared Punitive Damages Sublimit of Liability**. The enforceability of the first sentence of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

(n) "**Outside Entity**" means:

(i) any not- for- profit organization; or

(ii) any other corporation, partnership, joint venture or other organization listed by endorsement to this policy or **EPL Coverage Section**.

(o) "**Outside Entity Executive**" means any **Executive** of the **Company** serving in the capacity as director, officer, trustee or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Company**. It is understood and agreed that, in the event of a disagreement between the **Company** and an individual as to whether such individual was acting "at the specific request or direction of the **Company**," this **EPL Coverage Section** shall abide by the determination of the **Company** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** is first reported to the **Insurer** pursuant to the terms of the policy. In the event no determination is made within such period, this **EPL Coverage Section** shall apply as if the **Company** determined that such **Individual Insured** was not acting at the **Company's** specific request or direction.

(p) "**Retaliation**" means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (i) the disclosure or threat of disclosure by an **Employee** of the **Company** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (ii) the actual or attempted exercise by an **Employee** of the **Company** or an **Outside Entity** of any right that such **Employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (iii) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle- blower" law; or (iv) strikes of an **Employee** of the **Company** or an **Outside Entity**.

(q) "**Settlement Opportunity**" means an **Insurer** recommended settlement that is within the **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**, if any, and that is acceptable to the claimant.

(r) "**Shared Punitive Damages Sublimit of Liability**" means the **Shared Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(s) "**Third Party Violation**" means any actual or alleged harassment or unlawful discrimination, as described in subparagraphs 2(f)(ii) and 2(f)(iii) of the definition of **Employment Practices Violation**, or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Individual Insured** or applicant for employment with the **Company** or an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers.

(t) "**Wrongful Act**" means any actual or alleged (i) **Employment Practices Violation**, or (ii) **Third Party Violation**.

**3. EXCLUSIONS**

© All rights reserved.

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the **Insured** if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act was committed;

(b) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Acts** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **EPL Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(c) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) **EEOC** (or similar state, local or foreign agency) proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act** to that alleged in such pending or prior litigation or EEOC (or similar state, local or foreign agency) proceeding or investigation;

(d) with respect to an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if the **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **EPL Coverage Section**;

(e) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company**, or as an **Outside Entity Executive** of an **Outside Entity**;

(f) for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to, loss of use of or destruction of any tangible property;

(g) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(h) alleging, arising out of, based upon, attributable to or in any way relating to:

(i) the refusal, failure or inability of any **Insured** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered (as opposed to tort- based back pay or front pay damages for torts other than conversion);

(ii) improper payroll deductions taken by any **Insured** from any **Employee** or purported **Employee**; or

(iii) failure to provide or enforce legally required meal or rest break periods;

provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(i) alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(j) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of any **Insured** under any express contract or agreement; provided, however, this

EPL COVERAGE SECTION
Ⓒ All rights reserved.

exclusion shall not apply to:

(i) liability which would have attached in the absence of such express contract or agreement; or

(ii) **Loss** constituting **Defense Costs**;

(k) alleging, arising out of, based upon or attributable to any **Claim** brought by a securities holder of a **Company**, an **Outside Entity** or an affiliate of the **Named Entity** in their capacity as such in the form of a shareholder class, direct or derivative action on behalf of such **Company**, **Outside Entity** or affiliate.

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 3(b), 3(c), and 3(d): (i) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (ii) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 4. PUNITIVE DAMAGES SUBLIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. of the **General Terms and Conditions**:

If Item 7(c) of the Declarations indicates that the **EPL Punitive Damages Sublimit of Liability** was elected, then the **EPL Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability for punitive, exemplary and multiple damages under this **EPL Coverage Section**. If Item 7(c) of the Declarations indicates that a **Shared Punitive Damages Sublimit of Liability** was elected, then the **Shared Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability under both this **EPL Coverage Section** and the **D&O Coverage Section** combined for punitive, exemplary and multiple damages. If Item 7(c) of the Declarations indicates that no sublimit of liability is applicable to punitive damages, then neither the **EPL Punitive Damages Sublimit of Liability** nor the **Shared Punitive Damages Sublimit of Liability** is applicable to punitive, exemplary and multiple damages under this **EPL Coverage Section**. The **EPL Punitive Damages Sublimit of Liability** and the **Shared Punitive Damages Sublimit of Liability**, if applicable, shall be a part of and not in addition to **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **EPL Coverage Section** as set forth in Item 3 of the Declarations.

## 5. RETENTION CLAUSE

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **EPL Coverage Section**, such Retention amount to be borne by the **Company** or the **Insureds** and shall remain uninsured, with regard to all: (1) **Indemnifiable Loss**; or (2) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Defense Costs** and pay any other covered **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Defense Costs** and any other **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

EPL COVERAGE SECTION
© All rights reserved.

## 6. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against the **Insureds** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of the **Insureds** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 6; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**, if any, has been exhausted, or after an **Insured's** rejection of (or failure or refusal to accept within the time prescribed in this Clause 6, below) a **Settlement Opportunity**.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 6, the **Insurer** nevertheless shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, in the event and to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this **EPL Coverage Section** to payment of such **Loss**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer**, in writing, shall be recoverable as **Loss** under the terms of this **EPL Coverage Section**. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 6, shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **EPL Coverage Section**.

The **Insurer** shall have the right to effectively associate with the **Company** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. The **Company** and the **Insureds** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require.

In the event the **Insureds** do not consent to the first **Settlement Opportunity** within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity** (or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made), then, subject to the **Policy Aggregate Limit of Liability** and **Separate Limit of Liability** or **Shared Limit of Liability**, if any, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs**

EPL COVERAGE SECTION
© All rights reserved.

incurred as of the date such settlement was proposed in writing by the **Insurer** ("**Settlement Opportunity Amount**"), plus (2) eighty percent (80%) of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining twenty percent (20%) of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the **Settlement Opportunity Amount** exceeds the applicable Retention amount stated in Item 3 of the Declarations.

## 7. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED EMPLOYMENT PRACTICES CLAIMS

This Clause applies only to **Designated Employment Practices Claims**.

Affixed as Appendix B hereto and made a part of this **EPL Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Designated Employment Practices Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 6 of this **EPL Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Designated Employment Practices Claim**, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Designated Employment Practices Claim** is brought. In the event a **Designated Employment Practices Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Designated Employment Practices Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-**Panel Counsel Firm** of the **Insurer's** choice in the jurisdiction in which the **Designated Employment Practices Claim** is brought to function as "local counsel" on the **Designated Employment Practices Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Designated Employment Practices Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix B without the consent of the **Named Entity**.

## 8. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **EPL Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **EPL Coverage Section** and are to be considered as incorporated into this **EPL Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **EPL Coverage Section**

8 EPL COVERAGE SECTION
© All rights reserved.

shall be void *ab initio* as to any **Insured** who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **EPL Coverage Section** shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any **Insured** shall not be imputed to any other **Insured**.

[The balance of this page is intentionally left blank.]

EPL COVERAGE SECTION
© All rights reserved.



**National Union Fire Insurance Company of Pittsburgh, Pa.** ®

A capital stock company

# PrivateEdge Plus
### Fiduciary Liability Insurance
### ("FLI Coverage Section")

**Notice:** Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this **FLI Coverage Section**, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this **FLI Coverage Section**.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

    Subject to the other terms, conditions and limitations of this policy, this **FLI Coverage Section** affords the following coverage:

    (a) Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, this **FLI Coverage Section** shall pay the **Loss** of an **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

    (b) Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, this **FLI Coverage Section** shall:

    (i) pay the **CAP Penalties** and **Delinquent Filer Penalties**; and

    (ii) reimburse the **Voluntary Fiduciary Correction Loss**,

    of an **Insured**, subject to the **Voluntary Compliance Loss Sublimit of Liability** set forth and defined under Clause 6. "LIMIT OF LIABILITY" of this **FLI Coverage Section**; provided that the **Insured** shall select a Panel Counsel Firm as provided in Clause 8 of this **FLI Coverage Section**.

    The payment of any **Voluntary Compliance Loss** under this **FLI Coverage Section** shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

    (a) **INSURER'S DUTY TO DEFEND**

       Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

       The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after the **Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** has been exhausted.

    (b) **INSURED'S OPTION TO ASSUME DEFENSE**

       Notwithstanding the above, the **Insureds** shall have the right to assume the defense of

FLI COVERAGE SECTION
© All rights reserved.

any **Claim** made against them. This right shall be exercised in writing by the **Named Entity** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 6. of the **General Terms and Conditions**. Upon receipt of such written request, the **Insurer** shall tender the defense of the **Claim** to the **Insureds**. Once the defense has been so tendered, the **Insurer** cannot re- assume the defense of the **Claim**. The **Insurer** shall have the right to effectively associate with the **Insureds** in the defense of any **Claim**, including, but not limited to, negotiating a settlement. Provided that the **Insurer** shall be permitted to effectively associate with the **Insureds** in the defense of any **Claim**, including, but not limited, to negotiating a settlement of any **Claim**, the **Insurer**'s consent to settlements, stipulated judgments and **Defense Costs** shall not be unreasonably withheld.

(c) **GENERAL PROVISIONS (applicable to both 2(a) and 2(b) above)**

The **Insurer** shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this **FLI Coverage Section**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the terms and conditions of this **FLI Coverage Section**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to in writing by the **Insurer** shall be recoverable as **Loss** under the terms of this **FLI Coverage Section**.

The **Insureds** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require.

Selection of counsel to defend the **Claim** made against the **Insureds** shall be governed by Clause 8 of this **FLI Coverage Section** (if applicable).

3. **DEFINITIONS**

(a) "**Application**" means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein, any other documents submitted in connection with the underwriting of this **FLI Coverage Section** or the underwriting of any other fiduciary liability policy (or equivalent policy) issued by the **Insurer**, or any of its affiliates, of which this **FLI Coverage Section** is a renewal or replacement of in whole or part or which it succeeds in time, any public documents filed by the **Named Entity** with any federal, state, local or foreign regulatory agency, and financial statements for all **Plans**, with investment portfolios.

The Definition of **Application** set forth in the **General Terms and Conditions** shall not apply to this **FLI Coverage Section**, which is subject to the above Definition only.

(b) "**Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

(c) "**Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by **ERISA**.

(d) "**Cafeteria Plan**" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

(e) "**CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue

Service ("**IRS**") pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to correct such **Plan** defect was entered into in writing by the **Insured** with the **IRS** during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal).

(f)  "**Claim**" means:

(i)  a written demand for monetary, non-monetary or injunctive relief;

(ii)  a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

(1)  service of a complaint or similar pleading;

(2)  return of an indictment, information or similar document (in the case of a criminal proceeding); or

(3)  receipt or filing of a notice of charges;

(iii)  a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or

(iv)  a fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or similar governmental agency which is located outside of the United States.

(g)  "**Cleanup Costs**" means expenses, including, but not limited to, legal and professional fees incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

(h)  "**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

(i)  "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding compensation of **Individual Insureds**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(j)  "**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Individual Insureds** or employees of an **Insured**.

(k)  "**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor ("**DOL**") or the **IRS** under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal).

(l)  "**Dependent Care Assistance Program**" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

(m)  "**Employee Benefit Law**" means **ERISA** or any similar common or statutory law of the

3

© All rights reserved.

United States of America, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Solely with respect to subparagraph 3(kk)(2) of the Definition of **Wrongful Act** in this **FLI Coverage Section**, **Employee Benefit Law** shall also include **HIPAA Privacy Regulations** and any laws concerning unemployment insurance, Social Security, government-mandated disability benefits or similar law. Except as provided in the previous sentence, **Employee Benefit Law** shall not include any law concerning workers' compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

(n) **"ERISA"** means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), including any amendment or revision thereto.

(o) **"ESOP"** means any employee stock ownership plan as defined in **ERISA**, or any other **Plan** under which investments are made primarily in securities of or issued by (i) the **Company**, (ii) any acquired **Subsidiary**, or (iii) any parent of any acquired **Subsidiary**, or whose assets at any time within twelve (12) months prior to the inception date of this **FLI Coverage Section** were comprised of ten percent (10%) or more of securities of (i) the **Company**, (ii) any acquired **Subsidiary**, or (iii) any parent of any acquired **Subsidiary**.

(p) **"Fiduciary"** means a fiduciary as defined in an **Employee Benefit Law** (if applicable), with respect to a **Plan**, or a person or entity who exercises discretionary control as respects the management of a **Plan** or the disposition of its assets.

(q) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

(r) **"Foreign Policy"** means the **Insurer's** or any other member company of AIG Property Casualty Inc.'s ("**AIG**") standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by **AIG** to be sold within a **Foreign Jurisdiction**, that provides coverage substantially similar to the coverage afforded under this **FLI Coverage Section**. If more than one such **FLI Coverage Section** or policy exists, then **Foreign Policy** means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term **Foreign Policy** shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

(s) **"Fringe Benefit"** means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

(t) **"HIPAA Penalties"** means civil money penalties imposed upon an **Insured** for violation of **HIPAA Privacy Regulations**.

(u) **"HIPAA Privacy Regulations"** means the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto.

(v) **"Indemnifiable Loss"** means **Loss** for which the **Company** has indemnified or is permitted or required to indemnify an **Individual Insured**.

(w) **"Individual Insured"** means any:

(i) past, present or future natural person director, officer, governor, general partner, management committee member, **Pension Oversight Committee Member**, member of the board of managers or employee of a **Company** or, if applicable, of a **Plan**, and as

FLI COVERAGE SECTION
© All rights reserved.

to all of the above in his or her capacity as a **Fiduciary**, administrator or trustee of a **Plan**; or

(ii) past, present or future natural person in a position equivalent to a position listed in subparagraph (i) of this Definition in the event that the **Company** is operating in a **Foreign Jurisdiction**.

(x) "**Insured**" means:

(i) any **Individual Insured**;

(ii) any **Plan**;

(iii) the **Company**;

(iv) any **Pension Oversight Committee**; or

(v) any other person or entity in his, her or its capacity as a **Fiduciary**, administrator or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this **FLI Coverage Section**.

(y) "**Loss**" means damages, judgments (including pre and post-judgment interest on a covered judgment), settlements and **Defense Costs**; provided, however, **Loss** shall not include:

(1) civil or criminal fines or penalties imposed by law, except:

(i) to the extent set forth in Insuring Agreement 1(b) of this **FLI Coverage Section** for **Voluntary Compliance Loss**,

(ii) **UK Fines and Penalties**,

(iii) **HIPAA Penalties**, subject to the HIPAA Penalties Sublimit of Liability set forth under Clause 6. "LIMIT OF LIABILITY" of **this FLI Coverage Section**,

(iv) the five percent (5%) or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**,

(v) the twenty percent (20%) or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments;

(2) taxes or tax penalties;

(3) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**;

(4) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Individual Insured**; provided however, that **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** or loss in the actual accounts of participants in a **Plan** by reason of a change in value of the investments held by that **Plan**, including, but not limited to, the securities of the **Named Entity**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits"; or

(5) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (y)(1) through (y)(5) above of this Definition, subject to the other terms, conditions and exclusions of this **FLI Coverage Section**.

FLI COVERAGE SECTION
℗ All rights reserved.

Where permitted by law, **Loss** shall specifically include (subject to the policy's other terms, conditions and exclusions, including, but not limited to, exclusions 5(a) and 5(b) of this **FLI Coverage Section**), punitive or exemplary damages or the multiplied portion of multiplied damages imposed upon any **Insured**. The enforceability of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

**Loss** shall include **Voluntary Compliance Loss**.

(z) "**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan or excess benefit plan.

(aa) "**Pension Oversight Committee**" means any pension oversight committee duly formed by a **Trustee Company** and duly appointed to act as a trustee of the **Plan** or acting as a constructive trustee of the **Plan**.

(bb) "**Pension Oversight Committee Member**" means any duly elected or appointed member of a **Pension Oversight Committee**.

(cc) "**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

(dd) "**Plan**" means automatically any plan, fund, trust or program (including, but not limited to, any plan, fund, trust or program considered or created by the **Named Entity** during the **Policy Period**, any IRA-based Plan, **Welfare Plan**, **Cafeteria Plan**, **Dependent Care Assistance Program**, **Fringe Benefit**, **Non-qualified Plan**, or qualified **Pension Plan**), established anywhere in the world, which was, is or shall be sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of the employees or the directors and officers of the **Company**, subject to the provisions set forth below:

(1) if such Plan is a **Pension Plan**, other than an **ESOP** or **Pension Plan** described in subparagraphs (dd)(5) and (dd)6 below, then the **Named Entity** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this **FLI Coverage Section**, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal;

(2) if such **Plan** was sold, spun-off or terminated prior to the inception date of this **FLI Coverage Section** the **Named Entity** shall have provided written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this **FLI Coverage Section** and pay any required premium relating to such **Plan**, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal;

(3) if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Entity** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4) if such **Plan** is an **ESOP**, stock option plan or stock based compensation plan, this **FLI Coverage Section** shall only provide coverage for such plan upon written notice of such **Plan** to the **Insurer**, payment of any required premium, and such **Plan** has been added to the Definition of **Plan** by specific written endorsement attached to this policy;

(5) if such **Plan** is a **Pension Plan** (other than an **ESOP**) and:

(i) is acquired during the **Policy Period** as a result of the **Named Entity's** acquisition of a **Subsidiary** whose assets total less than twenty-five percent (25%) of the total consolidated assets of the **Named Entity** as of the inception date of this **FLI**

FLI COVERAGE SECTION
® All rights reserved.

**Coverage Section**; or

(ii) is acquired during the **Policy Period** and such **Plan's** assets total less than twenty-five percent (25%) of the total consolidated assets of all covered **Pension Plans** as of the inception date of this **FLI Coverage Section**;

then this **FLI Coverage Section** shall apply to such **Plan** (but solely with respect to any **Wrongful Act** occurring after the date of such acquisition). The **Named Entity** shall provide the **Insurer** with full particulars of such new **Plan** before the end of the **Policy Period**; or

(6) if such **Plan** is a **Pension Plan** (other than an **ESOP**) and:

(i) is acquired during the **Policy Period** as a result of the **Named Entity's** acquisition of a **Subsidiary** whose assets total more than twenty-five percent (25%) of the total consolidated assets of the **Named Entity** as of the inception date of this **FLI Coverage Section**; or

(ii) is acquired during the **Policy Period** and such **Plan's** assets total more than twenty-five percent (25%) of the total consolidated assets of all covered **Pension Plans** as of the inception date of this **FLI Coverage Section**,

then, this **FLI Coverage Section** shall apply to such **Plan** (but solely with respect to any **Wrongful Act** occurring after the date of such acquisition), but only upon the condition that within ninety (90) days of its acquisition, the **Named Entity** shall have provided the **Insurer** with a completed **Application** for such new **Plan** and agreed to any additional premium or amendment of the provisions of this **FLI Coverage Section** required by the **Insurer** relating to such new **Plan**. This ninety (90) day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Named Entity** and the failure to report such **Plan** within the ninety (90) day reporting period was due to inadvertent omission by the **Named Entity** and upon discovery of such **Plan**, the **Named Entity** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: the following government-mandated programs: unemployment insurance, Social Security or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this **FLI Coverage Section**; and any other plan, fund or program which is included in the Definition of **Plan** by specific written endorsement attached to this **FLI Coverage Section**.

In no event, however, shall the definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

(ee) "**Pollutants**" means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. "**Waste**" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(ff) "**UK Fines and Penalties**" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom, by the Occupational Pensions Regulatory Authority in the United Kingdom, by the Pensions Regulator in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of this **FLI Coverage Section**.

(gg) "**Trustee Company**" means a corporate trustee company that is (1) established by a **Company** formed and operating in a **Foreign Jurisdiction**, or any predecessor of such

7
FLI COVERAGE SECTION
© All rights reserved.

Company, and (2) duly appointed to act as a trustee of a **Plan** in a **Foreign Jurisdiction** and sponsored solely by such **Company**.

(hh) "**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

(ii) "**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the **DOL** Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal), provided that such compliance with the **DOL's** Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the **DOL**; provided, however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this **FLI Coverage Section** or the first policy issued by the **Insurer** to the **Named Entity** of which this **FLI Coverage Section** is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(jj) "**Welfare Plan**" means a welfare plan as defined in **Employee Benefit Law**.

(kk) "**Wrongful Act**" means:

(1) a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**;

(2) any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:

(i) counseling employees, participants and beneficiaries;

(ii) providing interpretations;

(iii) handling of records;

(iv) activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**; or

(v) complying with **HIPAA Privacy Regulations**;

or any matter claimed against an **Insured** solely by reason of his, her or its status as an administrator, but only with respect to a **Plan**; and

(3) as respects an **Individual Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or administrator of any multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Company** and such multiemployer plan is added by specific written endorsement attached to this **FLI Coverage Section**, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this **FLI Coverage Section** extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than an **Individual Insured**.

FLI COVERAGE SECTION
© All rights reserved.

**4. WORLDWIDE EXTENSION**

For **Claims** made and maintained in a **Foreign Jurisdiction** for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claims** the provisions of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to such **Insured** in the **Foreign Jurisdiction**; provided, however, this paragraph shall apply only to provisions more favorable by virtue of insuring clauses, extensions, definitions, exclusions, pre-authorized securities or other defense counsel, discovery or extended reporting period, notice and authority, dispute resolution process or order of payments provisions, if any, of the **Foreign Policy** when compared to the same or similar clauses of this **FLI Coverage Section**. This paragraph shall not apply to excess provisions or policy provisions that address non-renewal, duty to defend, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

All premiums, limits, retentions, **Loss** and other amounts under this **FLI Coverage Section** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this **FLI Coverage Section** (subject to the terms, conditions and limitations of this **FLI Coverage Section**) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer**'s obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

**5. EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to the committing of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law** by the **Insured** if any final adjudication establishes that such criminal or deliberate fraudulent act was committed;

(c) for discrimination in violation of any law; provided, however, this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this **FLI Coverage Section** is a renewal or replacement of in whole or part or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; provided, however, this exclusion shall not apply to: (1) **Defense Costs**; or (2) the portion of **Loss** that is payable as a personal obligation of an **Individual Insured**;

Ⓒ All rights reserved.

(g) alleging, arising out of, based upon or attributable to any act or omission of an **Insured** in his, her or its capacity as a **Fiduciary** or administrator of any plan, fund or program, other than a **Plan** as defined in this **FLI Coverage Section**, or by reason of his, her or its status as a **Fiduciary** or administrator of such other plan, fund or program;

(h) for bodily injury, sickness, disease, death or emotional distress of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for **Breach of Fiduciary Duty**;

(i) alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Company** did not sponsor such **Plan** or when the **Individual Insured** was not a **Fiduciary**, administrator, trustee, **Pension Oversight Committee Member**, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Company** or, if applicable, a **Plan**;

(j) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply to non- Indemnifiable **Loss** arising from a **Claim** alleging damage to a **Plan**, other than non- Indemnifiable **Loss** constituting **Cleanup Costs**;

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 5(d) and 5(e): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 6. LIMIT OF LIABILITY

The following provision shall apply in addition to the provisions of Clause 4. LIMIT OF LIABILITY of the **General Terms and Conditions**:

### VOLUNTARY COMPLIANCE LOSS SUBLIMIT OF LIABILITY

The maximum limit of the **Insurer's** liability for all **Voluntary Compliance Loss** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(e) of the Declarations ("**Voluntary Compliance Loss Sublimit of Liability**"). The **Voluntary Compliance Loss Sublimit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section**, and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

### HIPAA PENALTIES SUBLIMIT OF LIABILITY

The maximum limit of the **Insurer's** liability for all **HIPAA Penalties**, in the aggregate, shall be the amount set forth in Item 7(f) of the Declarations ("**HIPAA Penalties Sublimit of Liability**"). The **HIPAA Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section**, and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

## 7. RETENTION CLAUSE

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of

FLI COVERAGE SECTION
© All rights reserved.

the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 3 of the Declarations, such Retention amount to be borne by the **Insured** and shall remain uninsured, with regard to (1) all **Indemnifiable Loss**; and (2) **Loss** of a **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

Notwithstanding the foregoing, no Retention is applicable to **Voluntary Compliance Loss** or **HIPAA Penalties**.

## 8. PRE-AUTHORIZED DEFENSE ATTORNEYS

This Clause 8 applies only to: (1) a **Claim** brought by any government entity; (2) a request for coverage for a **Voluntary Compliance Loss**; or (3) a **Claim** brought in the form of a class or representative action or which purports to be brought as a class or representative action.

Affixed as Appendix C hereto and made a part of this **FLI Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firm(s)**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** to which this Clause 8 applies and pursuant to the terms set forth in this Clause.

In the event the **Insurer** is operating under a duty to defend pursuant to Clause 2(a) of this **FLI Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. Upon the written request of the **Named Entity**, the **Insurer** may consent to a different **Panel Counsel Firm** selected by the **Named Entity** to defend the **Insureds**, which consent shall not be unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to Clause 2(b) of this **FLI Coverage Section**, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insured**. In addition, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, the **Insured** may select a **Panel Counsel Firm** different from that selected by other **Insureds** if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the **Claim** against the **Insureds** shall not be restricted to the jurisdiction in which the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made to the specific list attached to this policy during the **Policy Period** without the consent of the **Named Entity**. At the request of the **Named Entity**, the **Insurer** may in its discretion add one or more law firms to the attached list of **Panel Counsel Firms** for the purposes of defending the **Claim** made against the **Insureds**. The list of **Panel Counsel Firms** may also be amended to add, at the sole discretion of the **Insurer**, a non-**Panel Counsel Firm** for the purpose of acting as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel Counsel Firm** will act as "lead counsel" in conducting the defense of the **Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel Firm** does not maintain an office.

## 9. WAIVER OF RECOURSE

Except for the **Insurer's** subrogation rights set forth in Clause 10 of the **General Terms and Conditions**, the **Insurer** shall have no right of recourse against an **Insured** unless required pursuant to any **Employee Benefit Law**.

It is further provided that in the event of any recovery under this Clause 9, any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

Case 2:22-cv-00748-JLB-KCD   Document 91-1   Filed 03/23/23   Page 53 of 252 PageID 1179

**10. ORDER OF PAYMENTS**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **FLI Coverage Section**, then the **Insurer** shall in all events:

(a) first, pay **Loss** for which coverage is provided under this **FLI Coverage Section** for any **Individual Insured**;

(b) second, only after payment of **Loss** has been made pursuant to Clause 10(a) above with respect to whatever remaining amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** is available after such payment, pay the **Loss** of any covered **Plan**; and

(c) then, only after payment of **Loss** has been made pursuant to Clause 10(a) and 10(b) above, with respect to whatever remaining amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** is available after such payment, shall payment for the **Company** be made for such other **Loss** for which coverage is provided under this **FLI Coverage Section**.

[The balance of this page is intentionally left blank.]

FLI COVERAGE SECTION
© All rights reserved.



# National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

## PrivateEdge Plus℠

## Commercial Crime Insurance
("Crime Coverage Section")

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, solely with respect to this **Crime Coverage Section**, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements for which a Per Occurrence Limit of Liability is shown on the Declarations and applies to loss that the **Insured** sustains resulting directly from an **Occurrence** taking place during the Policy Period shown in the Declarations, except as provided in Condition 6(a)(xv) or 6(a)(xvi), which is **Discovered** by the **Insured** during the Policy Period shown in the Declarations or during the period of time provided in Condition 6(a)(x):

### A. EMPLOYEE THEFT

The **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

### B. FORGERY OR ALTERATION

(i) The **Insurer** will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders to pay a sum certain in **Money** that are:

(1) made or drawn by or drawn upon the **Insured**; or

(2) made or drawn by one acting as the **Insured's** agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

(ii) If the **Insured** is sued for refusing to pay any instrument covered in Insuring Agreement 1.B.(i) above, on the basis that it has been forged or altered, and the **Insured** has the **Insurer's** written consent to defend against the suit, the **Insurer** will pay for any reasonable legal expenses that the **Insured** incurs and pays in that defense. The amount that the **Insurer** will pay is in addition to the Per Occurrence Limit of Liability applicable to this Insuring Agreement.

### C. INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES

(i) The **Insurer** will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises**:

(1) resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

(2) resulting directly from disappearance or destruction.

(ii) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting

CRIME COVERAGE SECTION
© All rights reserved.

directly from an actual or attempted **Theft** of **Money** and **Securities**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

(iii) The **Insurer** will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

D. **INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY**

(i) The **Insurer** will pay for loss of or damage to **Other Property**:

   (1) inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

   (2) inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

(ii) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** or **Safe Burglary** of **Other Property**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

(iii) The **Insurer** will pay for loss of or damage to a locked safe or vault located inside the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**.

E. **OUTSIDE THE PREMISES**

(i) The **Insurer** will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

(ii) The **Insurer** will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

F. **COMPUTER FRAUD**

The **Insurer** will pay for loss of or damage to **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

(i) to a person (other than a **Messenger**) outside those **Premises**; or

(ii) to a place outside those **Premises**.

G. **FUNDS TRANSFER FRAUD**

The **Insurer** will pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

H. **MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY**

The **Insurer** will pay for loss resulting directly from the **Insured's** having accepted in good faith, in exchange for merchandise, **Money** or services:

(i) money orders issued by any post office, express company or bank that are not paid upon presentation; or

(ii) **Counterfeit Money** of any country that is acquired during the regular course of business.

2. **DEFINITIONS**

(a) **"Banking Premises"** means the interior of that portion of any building occupied by a

banking institution or similar safe depository.

(b) **"Counterfeit Money"** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

(c) **"Custodian"** means the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

(d) **"Discover"**, **"Discovered"** or **"Discovery"** means the time when the **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime Coverage Section** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

**"Discover"**, **"Discovered"** or **"Discovery"** also means the time when the **Insured** first receives notice of an actual or potential claim in which it is alleged that the **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this **Crime Coverage Section**.

(e) **"Employee"** means:

(i) any natural person:

(1) while in the **Insured's** service and for sixty (60) days after termination of service, unless such termination is due to **Theft** or any dishonest act committed by the **Employee**;

(2) who the **Insured** compensates directly by salary, wages or commissions; and

(3) who the **Insured** has the right to direct and control while performing services for the **Insured**;

(ii) any natural person who is furnished temporarily to the **Insured**:

(1) to substitute for a permanent **Employee**, as defined in subparagraph 2(e)(i) above, who is on leave; or

(2) to meet seasonal or short-term work load conditions;

while that person is subject to the **Insured's** direction and control and is performing services for the **Insured**, excluding, however, any such person while having care and custody of property outside the **Premises**; or

(iii) any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business, but does not mean a temporary **Employee** as defined in subparagraph 2(e)(ii) above;

(iv) any natural person who is:

(1) a trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any **Employee Benefit Plan**; and

(2) the **Insured's Manager** while that person is handling **Money** and **Securities** or **Other Property** of any **Employee Benefit Plan**.

(v) any natural person who is a former **Employee**, partner, **Member**, **Manager**, director or trustee retained as a consultant while performing services for the **Insured**;

(vi) any natural person who is a guest student or intern pursuing studies or duties;

(vii) any **Employee** of an entity merged or consolidated with the **Insured** prior to the

CRIME COVERAGE SECTION
© All rights reserved.

effective date of this **Crime Coverage Section**;

(viii) any of the **Insured's Managers**, directors, trustees or non-compensated officers while:

(1) performing acts within the scope of the usual duties of an **Employee**; or

(2) acting as a member of any committee duly elected or appointed by resolution of the **Insured's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on the **Insured's** behalf; or

(ix) any non-compensated natural person other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**.

*"Employee"* does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in this Paragraph (e).

(f) **"Employee Benefit Plan"** means any welfare or pension benefit plan shown by Endorsement attached to this policy that the **Insured** sponsors and that is subject to the Employee Retirement Income Security Act of 1974 (**"ERISA"**) and any amendments thereto.

(g) *"Forgery"* means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(h) *"Fraudulent Instruction"* means:

(i) an electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Insured**, but which was, in fact, fraudulently transmitted by someone else without the **Insured's** knowledge or consent;

(ii) a written instruction (other than those described in Insuring Agreement 1.B.) issued by the **Insured**, which was forged or altered by someone other than the **Insured** without the **Insured's** knowledge or consent, or which purports to have been issued by the **Insured**, but was, in fact, fraudulently issued without the **Insured's** knowledge or consent; or

(iii) an electronic, computer, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured** which purports to have been transmitted by an **Employee** but which was, in fact, fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge or consent.

(i) **"Funds"** means **Money** and/or **Securities** in a **Transfer Account**.

(j) **"Insured"** means the **Named Entity**.

(k) **"Manager"** means a person serving in a directorial capacity for a limited liability company.

(l) **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

(m) **"Messenger"** means the **Insured**, or a relative of the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**.

(n) **"Money"** means:

(i) currency, coins and bank notes in current use and having a face value; and

(ii) travelers checks, register checks and money orders held for sale to the public.

(o) *"Occurrence"* means:

CRIME COVERAGE SECTION
© All rights reserved.

(i) as respects Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section**:

(1) an individual act;

(2) the combined total of all separate acts whether or not related; or

(3) series of acts whether or not related;

committed by the same **Employee** acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

(ii) as respects Insuring Agreement 1.B., "FORGERY OR ALTERATION," of this **Crime Coverage Section**:

(1) an individual act;

(2) the combined total of all separate acts whether or not related; or

(3) a series of acts whether or not related;

committed by the same person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

(iii) as respects all other Insuring Agreements of this **Crime Coverage Section**:

(1) an individual act or event;

(2) the combined total of all separate acts or events whether or not related; or

(3) a series of acts or events whether or not related;

committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).

(p) **"Other Property"** means any tangible property other than **Money** and **Securities** that has intrinsic value. **Other Property** does not include intangible property, including, but not limited to, computer programs, electronic data or any other property excluded under this **Crime Coverage Section**.

(q) **"Pollution"** means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, soot, mold, spores, fungi, germs, fumes, acids, alkalis, chemicals and **Waste**. **Waste** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(r) **"Premises"** means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

(s) **"Robbery"** means the unlawful taking of property from the care and custody of a person by one who has:

(i) caused or threatened to cause that person bodily harm; or

(ii) committed an obviously unlawful act witnessed by that person.

(t) **"Safe Burglary"** means the unlawful taking of:

(i) property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

(ii) a safe or vault from inside the **Premises**.

CRIME COVERAGE SECTION
© All rights reserved.

(u) "**Securities**" means negotiable and nonnegotiable instruments or contracts representing either **Money** or property and includes:

    (i) chips issued by the **Insured**, tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    (ii) evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**;

but does not include **Money**.

(v) "**Theft**" means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**. Solely with respect to Insuring Agreement 1.A., **Theft** shall also mean forgery.

(w) "**Transfer Account**" means an account maintained by the **Insured** at a financial institution from which the **Insured** can initiate the transfer, payment or delivery of **Funds**:

    (i) by means of electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

    (ii) by means of written instructions (other than those described in Insuring Agreement 1.B.) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

(x) "**Watchperson**" means any person the **Insured** retains specifically to have care and custody of property inside the **Premises** and who has no other duties.

## 3. EXCLUSIONS

This **Crime Coverage Section** does not apply to:

(a) Acts Committed By The Insured, The Insured's Partners Or The Insured's Members Loss resulting from **Theft** or any other dishonest act committed by:

    (i) the **Insured**; or

    (ii) any of the **Insured's** partners or **Members**;

whether acting alone or in collusion with other persons.

(b) Acts Of Employees Learned Of By The Insured Prior To The Policy Period

Loss caused by an **Employee** if the **Employee** had also committed **Theft** or any other dishonest act prior to the effective date of this **Crime Coverage Section** and the **Insured** or any of the **Insured's** partners, **Members**, **Managers**, officers, directors or trustees, not in collusion with the **Employee**, learned of that **Theft** or dishonest act prior to the Policy Period shown in the Declarations.

(c) Acts Of Employees, Managers, Directors, Trustees Or Representatives

Loss resulting from **Theft** or any other dishonest act committed by any of the **Insured's Employees**, **Managers**, directors, trustees or authorized representatives:

    (i) whether acting alone or in collusion with other persons; or

    (ii) while performing services for the **Insured** or otherwise; except when covered under Insuring Agreement 1.A. of this **Crime Coverage Section**.

(d) Confidential Information

Loss resulting from:

    (i) the unauthorized disclosure of the **Insured's** confidential information including, but not

© All rights reserved.

limited to, patents, trade secrets, processing methods or customer lists; or

(ii) the unauthorized use or disclosure of confidential information of another person or entity which is held by the **Insured** including, but not limited to, financial information, personal information, credit card information, identification information or similar non- public information.

(e) Governmental Action

Loss resulting from seizure or destruction of property by order of governmental authority.

(f) Indirect Loss

Loss that is an indirect result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

(g) Legal Fees, Costs And Expenses

Fees, costs and expenses incurred by the **Insured** which are related to any legal action, except when covered under Insuring Agreement 1.B.

(h) Nuclear Hazard

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

(i) Pollution

Loss or damage caused by or resulting from **Pollution**.

(j) War and Military Action

Loss or damage resulting from:

(i) war, including undeclared or civil war;

(ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(iii) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(k) Automatic Teller Machines:

Loss of **Money** and **Securities** contained in any automatic teller machine ("**ATM**") or while being transported to or from any **ATM**. Such loss is excluded regardless of the cause, event, act, omission or failure which contributes to the loss, including, but not limited to, (i) any dishonesty, theft, disappearance, destruction, forgery, alternation, robbery or computer fraud by any person (whether or not an **Employee**) acting alone or in collusion with other persons, or (ii) any actual or alleged failure, malfunction or inadequacy of the **ATM**.

In all events, coverage under this **Crime Coverage Section** does not apply to the loss of

© All rights reserved.

or damage to any **ATM**.

Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section** does not apply to:

(a) Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i)  an inventory computation; or

(ii)  a profit and loss computation.

However, where the **Insured** establishes wholly apart from such computations that the **Insured** has sustained a loss, then the **Insured** may offer the **Insured's** inventory records and actual physical count of inventory in support of the amount of loss claimed.

(b) Trading

Loss resulting directly or indirectly from trading, whether in the **Insured's** name or in a genuine or fictitious account.

(c) Warehouse Receipts

Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

Insuring Agreements 1.C., "INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES," 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES," of this **Crime Coverage Section** do not apply to:

(a) Accounting Or Arithmetical Errors Or Omissions

Loss resulting from accounting or arithmetical errors or omissions.

(b) Exchanges Or Purchases

Loss resulting from the giving or surrendering of property in any exchange or purchase.

(c) Fire

Loss resulting from fire, however caused, except:

(i)  loss from damage to a safe or vault; and

(ii)  loss of or damage to **Money** and **Securities**.

(d) Money Operated Devices Loss of property contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

(e) Motor Vehicles Or Equipment And Accessories

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

(f) Transfer Or Surrender Of Property

Loss of or damage to property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:

(i)  on the basis of unauthorized instructions;

(ii)  as a result of a threat to do bodily harm to any person;

(iii)  as a result of a threat to do damage to any property;

CRIME COVERAGE SECTION
© All rights reserved.

(iv) as a result of a threat to introduce a denial of service attack into the **Insured's** computer system;

(v) as a result of a threat to introduce a virus or other malicious instruction into the **Insured's** computer system which is designed to damage, destroy or corrupt data or computer programs stored within the **Insured's** computer system;

(vi) as a result of a threat to contaminate, pollute or render substandard the **Insured's** products or goods; or

(vii) as a result of a threat to disseminate, divulge or utilize:

(a) the **Insured's** confidential information; or

(b) weaknesses in the source code within the **Insured's** computer system.

Provided, however, this Exclusion does not apply under Insuring Agreement 1.E. of this **Crime Coverage Section** to loss of **Money**, **Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger** if the **Insured**:

(1) had no knowledge of any threat at the time the conveyance began; or

(2) had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

(g) Vandalism

Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

(h) Voluntary Parting Of Title To Or Possession Of Property

Loss resulting from the **Insured**, or anyone acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

Insuring Agreement 1.F., "COMPUTER FRAUD," of this **Crime Coverage Section** does not apply to:

(a) Credit Card Transactions

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored- value or other cards or the information contained on such cards.

(b) Computer losses due to:

(i) loss of computer time or use;

(ii) unintentional errors or omissions; or

(iii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

(c) Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i) an inventory computation; or

(ii) a profit and loss computation.

Insuring Agreement 1.G., "FUNDS TRANSFER FRAUD," of this **Crime Coverage Section** does not apply to:

(a) Computer Fraud

CRIME COVERAGE SECTION
© All rights reserved.

Loss resulting from the use of any computer to fraudulently cause a transfer of **Other Property**.

(b) Loss due to:

(i) unintentional errors or omissions; or

(ii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

## 4. PER OCCURRENCE LIMIT OF LIABILITY

The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** is the applicable Per Occurrence Limit of Liability shown in Item 5 of the Declarations.

If any loss is covered under more than one Insuring Agreement or Coverage of this **Crime Coverage Section**, the most the **Insurer** will pay for such loss shall not exceed the largest Per Occurrence Limit of Liability available under any one of those Insuring Agreements or Coverages.

## 5. DEDUCTIBLE

The **Insurer** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the applicable Deductible Amount shown in Item 5. of the Declarations. The **Insurer** will then pay the amount of loss in excess of the Deductible Amount, up to the applicable Per Occurrence Limit of Liability.

## 6. CONDITIONS

(a) CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION:

(i) ADDITIONAL PREMISES OR EMPLOYEES

If, while this **Crime Coverage Section** is in force, the **Insured** establishes any additional **Premises** or hire additional **Employees**, other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this **Crime Coverage Section**. Notice to the **Insurer** of an increase in the number of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

(ii) CANCELLATION OF COVERAGE SECTION

(1) The **Named Entity** shown in the Declarations may cancel this **Crime Coverage Section** by mailing or delivering to the **Insurer** advance written notice of cancellation.

(2) The **Insurer** may cancel this **Crime Coverage Section** by mailing or delivering to the **Named Entity** written notice of cancellation at least:

(a) ten (10) days before the effective date of cancellation if the **Insurer** cancels for nonpayment of premium; or

(b) sixty (60) days before the effective date of cancellation if the **Insurer** cancels for any other reason.

(3) The **Insurer** will mail or deliver the **Insurer's** notice to the **Named Entity's** last mailing address known to the **Insurer**.

(4) Notice of cancellation of this **Crime Coverage Section** will state the effective date of cancellation. The Policy Period applicable to this **Crime Coverage Section** will end on that date.

CRIME COVERAGE SECTION
© All rights reserved.

(5) If this **Crime Coverage Section** is cancelled, the **Insurer** will send the **Named Entity** any premium refund due. If the **Insurer** cancels, the refund will be pro rata. If the **Named Entity** cancels, the refund may be less than pro rata. The cancellation will be effective even if the **Insurer** has not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

(iii) CHANGES

This **Crime Coverage Section** contains all the agreements between the **Insured** and the **Insurer** concerning the insurance afforded. The **Named Entity** shown in the Declarations is authorized to make changes in the terms of this **Crime Coverage Section** with the **Insurer's** consent. This **Crime Coverage Section's** terms can be amended or waived only by endorsement issued by the **Insurer** and made a part of this **Crime Coverage Section**.

(iv) CONCEALMENT, MISREPRESENTATION OR FRAUD

This **Crime Coverage Section** is void in any case of fraud by the **Insured** as it relates to this policy at any time. This **Crime Coverage Section** is also void if the **Named Entity** or any other **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

(1) this **Crime Coverage Section**;

(2) the property covered under this **Crime Coverage Section**;

(3) the **Insured's** interest in the property covered under this **Crime Coverage Section**; or

(4) a claim under this **Crime Coverage Section**.

(v) CONSOLIDATION - MERGER OR ACQUISITION

If the **Insured** consolidates or merges with, or purchases or acquires the assets or liabilities of, another entity:

The **Insured** must give the **Insurer** written notice as soon as possible and obtain the **Insurer's** written consent to extend the coverage provided by this **Crime Coverage Section** to such consolidated or merged entity or such purchased or acquired assets or liabilities. If such consolidation, merger or purchase or acquisition of assets or liabilities increases the **Insured's** total assets by more than five percent (5%), the **Insurer** may condition the **Insurer's** consent by requiring payment of an additional premium; but for the first ninety (90) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this **Crime Coverage Section** shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all **Occurrences** causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

(vi) COOPERATION

The **Insured** must cooperate with the **Insurer** in all matters pertaining to this **Crime Coverage Section** as stated in its terms and conditions.

(vii) DUTIES IN THE EVENT OF LOSS

(1) After the **Insured Discovers** a loss or a situation that may result in loss of or damage to **Money**, **Securities** or **Other Property** the **Insured** must:

(a) Notify the **Insurer** as soon as possible, but no later than sixty (60) days after

© All rights reserved.

**Discovery** of a loss or a situation that may result in loss of or damages to **Money**, **Securities** or **Other Property**. If the **Insured** has reason to believe that any loss (except for loss covered under Insuring Agreement 1.A. or 1.B.) involves a violation of law, the **Insured** must also notify the local law enforcement authorities.

(b) Submit to examination under oath at the **Insured's** request and give the **Insurer** a signed statement of the **Insured's** answers.

(c) Produce for the **Insured's** examination all pertinent records.

(d) Give the **Insurer** a detailed, sworn proof of loss within one hundred and twenty (120) days of the discovery of a loss or a situation that may result in loss of or damages to **Money**, **Securities** or **Other Property**, provided, however, that such proof of loss shall not be required solely in the event the **Insured** elects to have an independent Investigative Specialist investigate the facts and determine the quantum of loss pursuant to Condition 6(a)(vii)(2) and such report is issued pursuant to the terms and conditions of that clause.

(e) Cooperate with the **Insurer** in the investigation and settlement of any claim.

(2) The Fidelity Research & Investigative Settlement Clause (FRISC)

The **Insured** may, with respect to such loss or situation that may result in loss or damage to **Money**, **Securities** or **Other Property**, elect to have an independent Investigative Specialist investigate the facts and determine the quantum of loss. The **Insured** and the **Insurer** shall jointly task and budget the Investigative Specialist regarding the scope and cost of the investigation to be performed. The final report issued by the Investigative Specialist will be definitive as respects the facts and the quantum of loss and shall be provided to both the **Insured** and the **Insurer**. After a joint review of the investigative report, if the **Insured** and the **Insurer** cannot agree upon the settlement of loss, then the **Insurer**, at the **Insured's** request, shall submit the dispute to arbitration, pursuant to the provisions of Clause 14. "DISPUTE RESOLUTION PROCESS" of the **General Terms and Conditions**. The **Insured** shall select an Investigative Specialist from the list of Investigative Specialists affixed as Appendix E and made part of this **Crime Coverage Section** located in the same jurisdiction in which the loss or situation that may result in loss or damage to **Money**, **Securities** or **Other Property** occurred. In the event such loss or situation that may result in loss or damage to **Money**, **Securities** or **Other Property** occurred in a jurisdiction not included on the list, the **Insured** shall select an Investigative Specialist in the listed jurisdiction which is the nearest geographic jurisdiction to the jurisdiction in which the loss or situation occurred or where the corporate headquarters of the **Insured** is located. No changes shall be made during the Policy Period to the list of Investigative Specialists attached as Appendix E unless the amendments are at the **Insured's** request.

The **Insured** shall notify the **Insurer** in writing of the above election to have an independent Investigative Specialist investigate the facts and determine the quantum of loss within thirty (30) days from the date on which the **Insured** first notifies the **Insurer** pursuant to Condition 6(a)(vii)(1). Notwithstanding subparagraph (iii) of the Exclusion entitled "Indirect Loss", all fees, costs and expenses of the investigation, including any fee charged by the Investigative Specialist, shall be paid as follows: fifty percent (50%) of such fees, costs and expenses shall be paid by the **Insured** and fifty percent (50%) shall be paid out of the applicable Per Occurrence Limit of Liability specified in Item 5 of the Declarations. No Deductible Amount shall apply to the fees, costs and expenses of the independent

© All rights reserved.

investigation, including any fee charged by the Investigative Specialist.

In addition, whether or not the **Insured** elects to have an independent Investigative Specialist investigate the facts and determine the quantum of loss pursuant to the above terms and conditions, upon the Insurer's request, the **Insured** shall submit to examination by the **Insurer**, subscribe the same, under oath if required, give the **Insurer** a signed statement of the **Insured's** answers, and produce for the **Insurer's** examination all pertinent records, all at such reasonable times and places as the **Insurer** shall designate, and shall cooperate with the **Insurer** in all matters pertaining to loss or claims with respect thereto.

(viii)   EMPLOYMENT BENEFIT PLAN

(1)   The **Employee Benefit Plans** shown by Endorsement attached to this **Crime Coverage Section** (hereafter referred to as **Plan**) are included as **Insureds** under Insuring Agreement 1.A.

(2)   If any **Plan** is **insured** jointly with any other entity under this policy, the **Insured** or the Plan Administrator must select a Per Occurrence Limit of Liability for Insuring Agreement 1.A. that is sufficient to provide a Per Occurrence Limit of Liability for each **Plan** that is at least equal to that required if each **Plan** were separately insured.

(3)   With respect to loss sustained or **Discovered** by any such **Plan**, Insuring Agreement 1.A. is replaced by the following:

The **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from fraudulent or dishonest acts committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

(4)   If the **Named Entity** is an entity other than a **Plan**, any payment the Insurer makes for loss sustained by any **Plan** will be made to the **Plan** sustaining the loss.

(5)   If two or more **Plans** are **insured** under this **Crime Coverage Section**, any payment the **Insurer** makes for loss:

(a)   sustained by two or more **Plans**; or

(b)   of commingled **Money**, **Securities** or **Other Property** of two or more **Plans**;

resulting directly from an **Occurrence** will be made to each **Plan** sustaining loss by prorating the total applicable Per Occurrence Limit of Liability of all **Plans** based upon the proportion that the amount of loss for each **Plan** bears to the total amount of loss for all **Plans** sustaining loss.

(6)   The Deductible Amount applicable to Insuring Agreement 1.A. does not apply to loss sustained by any **Plan**.

(ix)   EXAMINATION OF THE INSURED'S BOOKS AND RECORDS

The **Insurer** may examine and audit the **Insured's** books and records as they relate to this **Crime Coverage Section** at any time during the Policy Period and up to three (3) years afterward.

(x)   EXTENDED PERIOD TO DISCOVER LOSS

The **Insurer** will pay for loss that the **Insured** sustained prior to the effective date of cancellation of this **Crime Coverage Section**, which is **Discovered** by the **Insured**:

(1)   No later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date

© All rights reserved.

of any other insurance obtained by the **insured**, whether from the **insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(2) No later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

(xi) INSPECTION AND SURVEYS

(1) The **Insurer** has the right to:

(a) make inspections and surveys at any time;

(b) give the **Insured** reports on the conditions the **Insurer** finds; and

(c) recommend changes.

(2) The **Insurer** is not obligated to make any inspections, surveys, reports or recommendations and any such actions the **Insurer** does undertake relate only to insurability and the premiums to be charged. The **Insurer** does not make safety inspections. The **Insurer** does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And the **Insurer** does not warrant that conditions:

(A) are safe or healthful; or

(B) comply with laws, regulations, codes or standards.

(3) Conditions 6(a)(xi)(1) and 6(a)(xi)(2) above apply not only to the **Insurer**, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

(xii) JOINT INSURED

(1) If any additional **Insured** is added by Endorsement to this **Crime Coverage Section**, the **Named Entity** set forth in the Declarations will act for itself and for every other **Insured** for all purposes of this **Crime Coverage Section** (hereinafter "first **Named Entity**"). If the first **Named Entity** ceases to be covered, then the next **Named Entity** as set forth in such Endorsement will become the first **Named Entity**.

(2) If any **Insured**, or partner, **Member** or officer of that **Insured** has knowledge of any information relevant to this **Crime Coverage Section**, that knowledge is considered knowledge of every **Insured**.

(3) An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

(4) If this **Crime Coverage Section** or any of its coverages is cancelled as to any **Insured**, loss sustained by that **Insured** is covered only if it is **Discovered** by the **Insured**:

(a) no later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date;

(b) no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

(5) The **Insurer** will not pay more for loss sustained by more than one **Insured** than the amount the **Insurer** would pay if all such loss had been sustained by one

CRIME COVERAGE SECTION
© All rights reserved.

**Insured**.

(6) Payment by the **Insurer** to the first **Named Entity** for loss sustained by any **Insured**, other than an **Employee Benefit Plan**, shall fully release the **Insurer** on account of such loss.

(xiii) LEGAL ACTION AGAINST US

The **Insured** may not bring any legal action against the **Insurer** involving loss:

(1) unless the **Insured** has complied with all the terms of this **Crime Coverage Section** and policy;

(2) until ninety (90) days after the **Insured** has filed proof of loss with the **Insurer** or 90 days after the Investigative Specialist has submitted the report; and

(3) unless brought within two (2) years from the date the **Insured Discovered** the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

(xiv) LIBERALIZATION

If the **Insurer** adopts any revision that would broaden the coverage under this **Crime Coverage Section** without additional premium within forty- five (45) days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this **Crime Coverage Section**.

(xv) LOSS SUSTAINED DURING THE PRIOR INSURANCE ISSUED BY THE INSURER OR ANY AFFILIATE

(1) Loss Sustained Partly During This Policy And Partly During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place:

(a) partly during the Policy Period shown in the Declarations; and

(b) partly during any Policy Period of any prior cancelled insurance that the Insurer or any affiliate issued to the **Insured** or any predecessor in interest;

and this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance, the **Insurer** will first settle the amount of loss that the **Insured** sustained during this Policy Period. The **Insurer** will then settle the remaining amount of loss that the **Insured** sustained during any Policy Period of the prior insurance.

(2) Loss Sustained Entirely During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place entirely during any Policy Period of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Insured** or any predecessor in interest, the **Insurer** will pay for the loss, provided:

(a) this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance; and

(b) the loss would have been covered under this **Crime Coverage Section** had it been in effect at the time of the **Occurrence**.

The **Insurer** will first settle the amount of loss that the **Insured** sustained during the most recent prior insurance. The **Insurer** will then settle any remaining amount

© All rights reserved.

of loss that the **Insured** sustained during any Policy Period of any other prior insurance.

(3) In settling loss subject to this Condition:

    (a) The most the **Insurer** will pay for the entire loss is the highest single Per Occurrence Limit of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Section** or was written under the prior insurance issued by the **Insurer**.

    (b) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this **Crime Coverage Section**. If no loss was sustained under this **Crime Coverage Section**, the **Insurer** will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this **Crime Coverage Section**, or the most recent prior insurance, the **Insurer** will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

The **Insurer** will not apply any other Deductible Amount that may have been applicable to the loss.

Notwithstanding any of the above provisions of this Condition 6(a) (xv),no payment made for lossunder either this Policy Period or any prior Policy Period shall exceed(i) the amount of the loss sustained during the respective Policy Period; and/or (ii) thePer Occurrence Limit of Liability of the respective Policy Period.

(xvi) LOSS SUSTAINED DURING PRIOR INSURANCE NOT ISSUED BY THE INSURER OR ANY AFFILIATE

(1) If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place during the Policy Period of any prior cancelled insurance that was issued to the **Insured** or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, the **Insurer** will pay for the loss under this **Crime Coverage Section**, provided:

    (a) this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance; and

    (b) the loss would have been covered under this **Crime Coverage Section** had it been in effect at the time of the **Occurrence**.

(2) In settling loss subject to this Condition:

    (a) The most the **Insurer** will pay for the entire loss is the lesser of the Limits of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Section** or was written under the prior cancelled insurance.

    (b) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

(3) The insurance provided under this Condition is subject to the following:

    (a) If loss covered under this Condition is also partially covered under Condition 6(a)(xv), the amount recoverable under this Condition is part of, not in addition to, the amount recoverable under Condition 6(a)(xv).

CRIME COVERAGE SECTION
© All rights reserved.

(b) For loss covered under this Condition that is not subject to Condition 6(a)(xvi)(3)(a) above, the amount recoverable under this Condition is part of, not in addition to, the Per Occurrence Limit of Liability applicable to the loss covered under this **Crime Coverage Section** and is limited to the lesser of the amount recoverable under:

    (a) this **Crime Coverage Section** as of its effective date; or

    (b) the prior cancelled insurance had it remained in effect.

(xvii) OTHER INSURANCE

If other valid and collectible insurance is available to the **Insured** for loss covered under this **Crime Coverage Section**, our obligations are limited as follows:

(1) Primary Insurance

When this policy is written as primary insurance, and:

(a) The **Insured** has other insurance subject to the same terms and conditions as this **Crime Coverage Section**, the **Insurer** will pay the **Insurer's** share of the covered loss. The **Insurer's** share is the proportion that the applicable Per Occurrence Limit of Liability shown in Item 5 of the Declarations bears to the total limit of all insurance covering the same loss.

(b) The **Insured** has other insurance covering the same loss other than that described in Condition 6(a)(xvii)(1)(A) above, the Insurer will only pay for the amount of loss that exceeds:

    (i) the Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not; or

    (ii) the Deductible Amount shown in the Declarations;

whichever is greater. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Section**.

(2) Excess Insurance

(a) When this **Crime Coverage Section** is written excess over other insurance, the **Insurer** will only pay for the amount of loss that exceeds the Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Section** and policy.

(b) However, if loss covered under this **Crime Coverage Section** is subject to a Deductible, the **Insurer** will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

(xviii) OWNERSHIP OF PROPERTY; INTERESTS COVERED

The property covered under this **Crime Coverage Section** is limited to property:

(1) that the **Insured** owns or leases; or

(2) that the **Insured** holds for others whether or not the **Insured** is legally liable for the loss of such property.

However, this **Crime Coverage Section** is for the **Insured's** benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this **Crime Coverage Section** must be presented by the **Insured**.

© All rights reserved.

(xix) PREMIUMS

The first **Named Entity** shown in the Declarations:

(1) is responsible for the payment of all premiums; and

(2) will be the payee for any return premiums the **Insurer** pays.

(xx) RECORDS

The **Insured** must keep records of all property covered under this **Crime Coverage Section** so the **Insurer** can verify the amount of any loss.

(xxi) RECOVERIES

(1) Any recoveries, whether effected before or after any payment under this **Crime Coverage Section**, whether made by the **Insurer** or the **Insured**, shall be applied net of the expense of such recovery:

(a) First, to the **Insured** in satisfaction of the **Insured's** covered loss in excess of the amount paid under this **Crime Coverage Section**;

(b) Second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Insured's** claim;

(c) Third, to the **Insured** in satisfaction of any Deductible Amount; and

(d) Fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Coverage Section**.

(2) Recoveries do not include any recovery:

(a) from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

(b) of original **Securities** after duplicates of them have been issued.

(xxii) TERRITORY

This **Crime Coverage Section** covers loss that the **Insured** sustains resulting directly from an **Occurrence** taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

(xxiii) TRANSFER OF THE INSURED'S RIGHTS AND DUTIES UNDER THIS CRIME COVERAGE SECTION

(1) The **Insured's** rights and duties under this **Crime Coverage Section** may not be transferred without the **Insurer's** written consent except in the case of death of an individual **Named Entity**.

(2) If the **Insured** dies, the **Insured's** rights and duties will be transferred to the **Insured's** legal representative but only while acting within the scope of duties as the deceased **Insured's** legal representative. Until the **Insured's** legal representative is appointed, anyone having temporary custody of the **Insured's** property will have the **Insured's** rights and duties but only with respect to that property.

(xxiv) TRANSFER OF THE INSURED'S RIGHTS OF RECOVERY AGAINST OTHERS TO THE INSURER

The **Insured** must transfer to the **Insurer** all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the **Insurer** has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

CRIME COVERAGE SECTION
© All rights reserved.

**(xxv)  VALUATION - SETTLEMENT**

**(1)** The value of any loss for purposes of coverage under this **Crime Coverage Section** shall be determined as follows:

**(a)** Loss of **Money** but only up to and including its face value. The **Insurer** will, at the **Insured's** option, pay for loss of **Money** issued by any country other than the United States of America:

**(i)** at face value in the **Money** issued by that country; or

**(ii)** in the United States of America dollar equivalent determined by the rate of *The Wall Street Journal* exchange published in on the day the loss was **Discovered**.

**(b)** Loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**. The **Insurer** may, at the **Insurer's** option:

**(i)** pay the market value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the **Insurer** all the **Insured's** rights, title and interest in and to those **Securities**; or

**(ii)** pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

**(1)** market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

**(2)** the Per Occurrence Limit of Liability applicable to the **Securities**.

**(c)** Loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, the **Insurer** will not pay more than the least of the following:

**(i)** the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

**(ii)** the amount the **Insured** actually spend that is necessary to repair or replace the lost or damaged property; or

**(iii)** the Per Occurrence Limit of Insurance applicable to the lost or damaged property.

With regard to subparagraphs (i) through (iii) above, the **Insurer** will not pay on a replacement cost basis for any loss or damage:

**(i)** until the lost or damaged property is actually repaired or replaced; and

**(ii)** unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the **Insurer** will pay on an actual cash value basis.

**(2)** The **Insurer** will, at the **Insured's** option, settle loss or damage to property other than **Money**:

**(a)** in the **Money** of the country in which the loss or damage occurred; or

CRIME COVERAGE SECTION
© All rights reserved.

    (b) in the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange *The Wall Street Journal* published in on the day the loss was **Discovered**.

    (3) Any property that the **Insurer** pays for or replaces becomes the **Insurer's** property.

(b) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.A., "EMPLOYEE THEFT," OF THIS CRIME COVERAGE SECTION:

  (i)  TERMINATION AS TO ANY EMPLOYEE

    Insuring Agreement 1.A. terminates as to any **Employee**:

    (1) As soon as:

      (a) the **Insured**; or

      (b) any of the **Insured's** partners, **Members**, **Managers**, officers, directors, or trustees not in collusion with the **Employee**;

      learn of **Theft** or any other dishonest act committed by the **Employee** whether before or after becoming employed by the **Insured**; or

    (2) On the date specified in a notice mailed to the first **Named Entity**. That date will be at least sixty (60) days after the date of mailing.

    The **Insurer** will mail or deliver the **Insurer's** notice to the first **Named Entity's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

  (ii)  TERRITORY

    The **Insurer** will pay for loss caused by any **Employee** while temporarily outside the territory specified in Condition 6(a)(xxii) for a period of not more than ninety (90) consecutive days.

(c) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.B., "FORGERY OR ALTERATION," OF THIS CRIME COVERAGE SECTION:

  (i)  DEDUCTIBLE AMOUNT

    The Deductible Amount does not apply to legal expenses paid under Insuring Agreement 1.B.

  (ii)  MECHANICAL SIGNATURES

    The **Insurer** will treat signatures that are produced or reproduced mechanically the same as handwritten signatures.

  (iii)  PROOF OF LOSS

    The **Insured** must include with the **Insured's** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

  (iv)  TERRITORY

    The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world. Condition 6(a)(xxii) does not apply to Insuring Agreement 1.B.

(d) CONDITIONS APPLICABLE TO INSURING AGREEMENTS 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES" OF THIS CRIME COVERAGE SECTION:

© All rights reserved.

(i) ARMORED MOTOR VEHICLE COMPANIES

Under Insuring Agreement 1.E. of this **Crime Coverage Section**, the **Insurer** will only pay for the amount of loss the **Insured** cannot recover:

(1) under the **Insured's** contract with the armored motor vehicle company; and

(2) from any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

(ii) SPECIAL LIMIT OF LIABILITY FOR SPECIFIED PROPERTY

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to:

(1) precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

(e) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.F., "COMPUTER FRAUD," OF THIS CRIME COVERAGE SECTION

(i) SPECIAL LIMIT OF INSURANCE FOR SPECIFIED PROPERTY

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

(ii) TERRITORY

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world.  Condition 6(a)(xxii) does not apply to Insuring Agreement 1.F.

In witness whereof, the **Insurer** has caused this **Crime Coverage Section** to be executed on the Declarations.


[The balance of this page is intentionally left blank.]


CRIME COVERAGE SECTION

© All rights reserved.

**APPENDIX E**
**LIST OF INVESTIGATIVE SPECIALISTS/MEDIATORS AND ARBITRATORS**
**FOR F.R.I.S.C.**
**(CRIME COVERAGE SECTION ONLY)**

| Names | Address | Telephone No. | Profession |
|---|---|---|---|
| **UNITED STATES** | | | |
| Aksman & Marron, CPA | 509 Stillwells Corner Road<br>Freehold, NJ 07728<br>Attention: Eileen Marron | (732) 462-8080 | Accountants |
| Carranza & Associates | 3625 N.W. 82nd Avenue<br>Building 2, Suite 306<br>Miami, FL 33166<br>Attention: Luis O. Carranza | (305) 463-7978 | Accountants |
| Friedman LLP | 1700 Broadway<br>New York, NY 10019<br>Attention: Harry Steinmetz | (212) 842-7670 | Accountants |
| Hagen, Streiff, Newton & Oshiro LLP<br>(Various locations in US) | 1325 4th Avenue,<br>Suite 1705<br>Seattle, WA 98101<br>Attention: Mark Newton<br>and | (206) 447-3338 | Accountants |
| | 647 Putnam Pike<br>Greenville, RI 02828<br>Attention: Peter Fogarty | (401) 949-8001 | Accountants |
| Kinsel Accountancy CPA's | 215 North Marengo Avenue,<br>Suite 145<br>Pasadena, CA 91101<br>Attention: Stacy A. Kinsel | (818) 240-3300 | Accountants |
| Matson Driscoll & Damico LLP<br>(Various locations in US) | 120 Broadway<br>Suite 2830<br>New York, NY 10271<br>Attention: Martin Martinovic | (212) 943-4616 | Accountants |
| Meaden & Moore<br>(Various locations in US) | Wall Street Plaza<br>88 Pine Street<br>14th Floor<br>New York, NY 10005-1819<br>Attention: Michael Castillo | (212) 267-6500 | Accountants |
| RSM US LLP (fka McGladrey LLP)<br>(Various locations in US) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Attention: Richard J. Contorno | (312) 634-4995 | Accountants |

© All rights reserved.

| | | | |
|---|---|---|---|
| RGL Forensics<br>(Various locations in US) | 1422 Elbridge Payne Road<br>Suite 240<br>Chesterfield, MO 63017<br>Attention: Randall H. Wilson | (636) 537-5589 | Accountants |
| Studler, Doyle & Co LLC | 1444 Farnsworth Avenue<br>Suite 500<br>Aurora, IL 60505<br>Attention: D.M. Studler | (630) 820-5770 | Accountants |
| **CANADA** | | | |
| **Ontario:** | | | |
| LBC Meaden & Moore | 40 University Ave<br>Suite 1003<br>Toronto, Ontario M5J 1T1<br>Attention Phil Turner | (416) 496-1000 | Accountants |
| Matson Driscoll & Damico LLP<br>(Various locations in Canada) | 4 King Street West<br>Suite 1010<br>Toronto, ON M5H 1B6<br>Attention: Bradley J. Ebel &<br>Rehana Moosa | (416) 366-4968 | Accountants |
| **Quebec** | | | |
| LBC Meaden & Moore<br>(fka LBC Int'l Investigative Accounting)<br>(Various offices in Canada) | 1440 St. Catherine Street West<br>Suite 710<br>Montreal, Quebec  H3G 1R8<br>Attention: Alexandra Kulovics | (514) 866-5431 | Accountants |
| **British Columbia:** | | | |
| James P. Blatchford Consulting | 1311 Howe Street<br>Suite 200<br>Vancouver, BC V6Z 2P3<br>Attention: James Blatchford | (604) 691-1777 | Accountant |
| RSM US LLP (fka McGladrey LLP) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Initial Contact: Rick Contorno | (312) 634-4995 | Accountant |
| **CARIBBEAN, CENTRAL & SOUTH AMERICA** | | | |
| ASL | Insurgentes Sur 1898<br>Piso 12, Of. 1237<br>Col. Florida, Mexico D.F. 01030<br>Initial Contact: David Ledger | 44 (20) 7357-7631 | Accountants |
| Carranza & Associates | 3625 N.W. 82nd Avenue<br>Building 2, Suite 306<br>Miami, FL  33166<br>Attention: Luis O. Carranza | (305) 463-7978 | Accountants |

© All rights reserved.

| Grant Thornton | 1717 Main Street<br>Suite 1500<br>Dallas Texas 75201<br>Attention: Susanna Franco | (214) 561-2400 | Accountants |
|---|---|---|---|
| Matson Driscoll & Damico LLP | 2500 Weston Road<br>Suite 105<br>Weston, FL  33331<br>Attention: Marcelo Fazio | (954) 907-4353 | Accountants |
| RSM US LLP (fka McGladrey LLP) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Initial Contact:Rick Contorno | (312) 634-4995 | Accountants |
| **AFRICA, U.K., EUROPE & MIDDLE EAST** | | | |
| ASL<br>(locations in London & Dubai) | 31 Bury Street<br>London, UK EC3A 5AG<br>Attention: David Ledger | 44 (20) 7357-7631 | Adjusters &<br>Accountants |
| Crawford & Company Adjusters (UK) Limited | Trinity Court<br>42 Trinity Square<br>London, UK EC3N 4TH<br>Attention: Paul Handy | 44 (20) 7625-4000 | Investigators |
| Meaden & Moore International<br>(fka LBC Int'l Investigative Accounting)<br>(offices in London and Paris) | Lloyds Avenue House<br>6 Lloyds Avenue<br>London, UK EC3N 3AX<br>Attention: Oliver Tiemann | 44 (20) 7680-1131 | Accountants |
| Grant Thornton<br>(forensic accountants in the UK) | 1717 Main Street<br>Suite 1500<br>Dallas Texas 75201<br>Attention: Susanna Franco | (214) 561-2400 | Accountants |
| Matson Driscoll & Damico LLP<br>(Offices in London and Dubai) | Marlow House-1A Lloyds<br>Avenue<br>London, UK EC3N 3AA<br>Initial Contact:<br>Martin Martinovic<br>(New York, NY) | (212) 943-4616 | Accountants |
| RGL Forensics<br>(forensic accountants in the UK and Germany) | 8th floor, Dashwood<br>69 Old Broad Street<br>London, UK EC2M 1SQ GB<br>Attention: Anthony Levitt | 44 (20) 7065-7900 | Accountants |
| RSM US LLP (fka McGladrey LLP) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Initial Contact: Rick Contorno | (312) 634-4995 | Accountants |

© All rights reserved.

| **ASIA, AUSTRALIA & JAPAN** | | | |
|---|---|---|---|
| RGL Forensics | Level 39, 2 Park Street<br>Sydney, NSW 2000 Australia<br>Attention Kimberly Dailey | 61 (02) 9268-0711 | Accountants |
| Crawford & Company THG Trinity Court | 42 Trinity Square<br>London, UK EC3N 4TH<br>Attention: Paul Handy | 44 (20) 7625-4000 | Investigators |
| Kroll<br>(forensic accountants in Shanghai) | Suite 1600<br>1628 JFK Boulevard<br>Philadelphia, PA 19103<br>Attention: John Slavik | (215) 568-8313 | Accountants |
| Grant Thornton<br>(forensic accountants in Australia) | 1717 Main Street<br>Suite 1500<br>Dallas Texas 75201<br>Attention: Susana Franco | (214) 561-2300 | Accountants |
| Matson Driscoll & Damico LLP<br>(Offices in Hong Kong, Tokyo, Singapore, Bangkok, Sydney and Auckland) | Level 10 Challis house<br>4 Martin Place<br>Sydney, NSW 2000<br>Initial Contact:  Martin Martinovic (New York, NY) | (212) 943-4616 | Accountants |
| RGL Forensics<br>(forensic accountants in Australia, Japan and Singapore) | Level 16, Bligh Chambers<br>25 Bligh Street<br>Sydney, NSW 2000<br>Attention: Ryan Carruth | 61 2 8488 6000 | Accountants |
| RSM US LLP (fka McGladrey LLP) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Initial Contact: Rick Contorno | (312) 634-4995 | Accountants |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website and click on the "Directors & Officers (Securities Claims)" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Revised (6/08)                    © All rights reserved.

**APPENDIX B**
**EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL**

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Public and Private Companies (Employment Practices Liability)" link and then select the applicable Panel Counsel Directory, either the "4-97 Monoline/Public Companies" link or the "Private Edge" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Revised (6/08)                        © All rights reserved.

**APPENDIX C**
**EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY**
**PANEL COUNSEL LIST**

In consideration of the premium charged, it is understood and agreed as follows:  The information in our Panel Counsel lists/appendices is now accessible through our online Panel Counsel Directory at AIG Panel Counsel Directory  http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Fiduciary Liability (ERISA and Non-ERISA)" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**POLICYHOLDER NOTICE**
**REGARDING**
**E- DISCOVERY CONSULTANT SERVICES**

You are hereby notified that the Insureds under the attached policy are entitled to retain the services of a pre- approved E- Consultant Firm from the E- DISCOVERY CONSULTING FIRMS listed below at the rates negotiated by the Insurer for any Claim covered under the policy in which E- Discovery is required or becomes necessary.

For the purpose of the E- Discovery Consultant Services discussed in this notice, the following definitions shall apply:

(a)     "E- Consultant Firm" means any E- DISCOVERY CONSULTING FIRMS listed below. Any "E- Consultant Firm" may be hired by an Insured to perform E- Discovery Consultant Services without further approval by the Insurer.

(b)     "E- Discovery" means the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information.

(c)     "E- Discovery Loss" means the reasonable and necessary consulting fees for the E- Discovery Consultant Services provided solely to the Insured(s) by an E- Consultant Firm.

Provided, however, E- Discovery Loss shall not include any costs of discovery other than E- Discovery Loss.

(d)     "E- Discovery Consultant Services" means solely the following services performed by an E- Consultant Firm:

1.     assisting the Insured with managing and minimizing the internal and external costs associated with E- Discovery;

2.     assisting the Insured in developing or formulating an E- Discovery strategy which shall include interviewing qualified and cost effective E- Discovery vendors;

3.     serving as project manager, advisor and/or consultant to the Insured, defense counsel and the Insurer in executing and monitoring the E- Discovery strategy; and

4.     such other services provided by the E- Consultant Firm that the Insured, Insurer and E- Consultant Firm agree are reasonable and necessary given the circumstances of the Securities Claim.

PLEASE NOTE: The Insurer shall only be liable for the amount of E- Discovery Loss arising from a Claim (with the exception of a Securities Claim) under the attached policy that is in excess of the applicable Retention amounts stated in Item 4 of the Declarations. The E- DISCOVERY CONSULTANT SERVICES COVERAGE provided for Securities Claims shall be governed by the terms, conditions and exclusions set forth in the attached policy. In all events, the Insurer shall not waive any of the Insurer's rights under this policy or at law.

E- DISCOVERY CONSULTING FIRMS

The list of approved E- Consultant Firms is accessible through our online directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online E- Consultant Firm Directory, please go to the website and click on the "**e- Consultant Panel Members**" link.

References in this policy to the list of E- Consultant Firms or related appendices are deemed amended to refer to the applicable online E- Consultant Firm Directory at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

© All rights reserved.

**APPENDIX D**
**CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION**

I.  **DEFINITIONS**

(a)  "**Crisis Management Event**" means one of the following events which, in the good faith opinion of the **Company**, did cause or is reasonably likely to cause a **Material Effect**:

1.  Management Crisis:
    The death, incapacity or criminal indictment of any **Executive** of the **Company**, or any **Employee** on whom the **Company** maintains key person life insurance.

2.  Employee Layoffs:
    The public announcement of layoffs of **Employees** of the Company.

3.  Debt Default:
    The public announcement that the **Company** had defaulted or intends to default on its debt.

4.  Bankruptcy:
    The public announcement that the **Company** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Company**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

5.  Mass Tort:
    The public announcement or accusation that a **Company** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

6.  Regulatory Crisis:
    The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against a **Company**.

The descriptions in the headings of the **Crisis Management Events** are solely for convenience and form no part of the terms and conditions of coverage.

A **Crisis Management Event** shall first commence when the **Company** or any of its **Executives** shall first become aware of the event during the **Policy Period** and shall conclude at the earliest of the time when the **Crisis Management Firm** advises the **Company** that the crisis no longer exists or when the **Crisis Management Fund** has been exhausted.

(b)  "**Crisis Management Firm**" means any public relations firm, crisis management firm or law firm listed below in Section III of this Appendix D.  Any "**Crisis Management Firm**" may be hired by the **Company** or its **Executives** or **Employees** to perform **Crisis Management Services** without further approval by the Insurer.

(c)  "**Crisis Management Loss**" means the following amounts incurred during the pendency of or within 90 days prior to and in anticipation of, the **Crisis Management Event**, regardless of whether a **Claim** is ever made against an Insured arising from the **Crisis Management Event** and, in the case where a

**Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

(1) amounts for which the **Company** is legally liable for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Company** arising from a **Crisis Management Event**; and

(2) amounts for which the **Company** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by **Executives**, **Employees** or agents of the **Company** or the **Crisis Management Firm**, in connection with the **Crisis Management Event**.

(d) "**Crisis Management Services**" means those services performed by a **Crisis Management Firm** in advising the **Company** or any of its **Executives** or **Employees** on minimizing potential harm to the **Company** arising from the **Crisis Management Event**, including but not limited to maintaining and restoring public confidence in the **Company**.

(e) "**Material Effect**" means the publication of unfavorable information regarding the **Company** which can reasonably be considered to lessen public confidence in the competence of the **Company**. Such publication must in occur in either:

(1) a daily newspaper of general circulation in the geographic area of the **Company**, or

(2) a radio or television news report on a **Company** received in the geographic area of the **Company**.

## II.   <u>EXCLUSIONS</u>

The term **Crisis Management Event** shall not include any event relating to:

1. any pending or prior litigation as of the **Continuity Date** for the **D&O Coverage Section** indicated in Item 3 of the Declarations;

2. any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

3. the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**, or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; or

4. the hazardous properties of nuclear materials.

## III.   <u>PRE- APPROVED CRISIS FIRMS</u>

For all **Crisis Management Events**, **Crisis Management Firm(s)** means any public relations firm listed in (1) - (8) below:

1. Abernathy MacGregor Group, Inc.
   501 Madison Avenue
   New York, New York  10022
   (212) 371- 5999
   Contacts: James T. MacGregor          (jtm@abmac.com)
                   Rhoda Barnat              (rb@abmac.com)

2.   Burson- Marsteller
     230 Park Avenue South
     New York, New York  10003- 1566
     (212) 614- 5236
     Contact:  Michael Claes                (Michael.Claes@bm.com)

3.   Kekst and Company
     437 Madison Avenue
     New York, New York  10022
     (212) 521- 4800
     Contacts: Jim Fingeroth              (Jim- Fingeroth@kekst.com)
              Lissa Perlman                (Lissa- Perlman@kekst.com)

4.   Patton Boggs, LLP
     2550 M Street, N.W.
     Washington D.C.  20037
     (202) 457- 6040
     Contact:  Thomas Boggs, Esq.           (tboggs@pattonboggs.com)

5.   Reputation Partners, LLC
     105 West Adams Street, Suite 2220
     Chicago, IL  60603- 6265
     (312) 222- 9887
     Contacts: Nick Kalm                   (nick@reputationpartners.com)
              Jane Devron                   (jane@reputationpartners.com)

6.   Robinson Lerer & Montgomery
     1345 Avenue of The Americas, 4th Floor
     New York, New York  10105
     646- 805- 2000
     Contact:  Michael Gross                (mgross@rlmnet.com)

7.   Sard Verbinnen & Co.
     630 Third Avenue, 9th Floor
     New York, New York  10017
     (212) 687- 8080
     Contacts: George Sard                 (gsard@sardverb.com)
              Paul Verbinnen                (pverbinnen@sardverb.com)

8.   Sitrick And Company
     1840 Century Park East, Suite 800
     Los Angeles, CA  90067
     (310) 788- 2850
     Contact:  Michael Sitrick              (mike sitrick@sitrick.com)

ENDORSEMENT# *1*

This endorsement, effective *12:01 am    April 26, 2019*        forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**
**AMENDATORY ENDORSEMENT**
**FLORIDA**

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS<sup>SM</sup>

 This policy is amended as follows:

1. The definition of **Loss** in the **DEFINITIONS** Clause of the **D&O**, **EPL**, **FLI** and **MPL Coverage Sections**, if purchased, is modified to the extent necessary to provide the following:

   Punitive, exemplary and multiplied damages are only insurable to the extent (1) such damages are insurable under the law of any jurisdiction other than Florida that has a substantial relationship to the **Insureds**, the **Claim**, the **Insurer**, or this policy and is most favorable to the insurability of such damages and (2) that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to the laws of any jurisdiction other than Florida.

2. The definition of **Pollutants** in the **DEFINITIONS** Clause of the **CCP, D&O** and **MPL Coverage Sections,** if purchased, is deleted in its entirety and replaced by the following:

   "**Pollutants**" means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and Waste. "Waste" includes materials to be recycled, reconditions or reclaimed.

3. The **General Terms and Conditions** and the **KRE Coverage Section**, if purchased, are modified to the extent necessary to provide the following:

   All occurrences of the term "warranties" are deleted in their entirety.

4. The second paragraph of Clause 8. **REPRESENTATIONS AND SEVERABILITY** of the **EPL Coverage Section**, if purchased, is deleted in its entirety and replaced by the following:

   The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **EPL Coverage Section** may be *ab initio* void as to any **Insured** who knew as of  the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **EPL Coverage Section** may be void *ab initio* as to an **Insured**, such aforesaid

© All rights reserved.
*END 001*

**ENDORSEMENT#** *1*    (continued)

knowledge possessed by any **Insured** shall not be imputed to any other **Insured**.

5.    Item (3) of paragraph (xiii) LEGAL ACTION AGAINST US of Clause 6. **CONDITIONS** in the **Crime Coverage Section**, if purchased, is deleted in its entirety and replaced with the following:

(3)    unless brought within five (5) years from the date the **Insured Discovered** the loss.

6.    If the **KRE Coverage Section** is purchased, Paragraph (r) Actions Against the **Insurer**, of Clause 7 **GENERAL CONDITIONS** of the **KRE Coverage Section** is modified to the extent necessary to provide the following:

A suit, action or preceding for recovery for any **Loss** under this policy must be commenced within five (5) years next after a Statement of Loss has been filed with the **Insurer** by the **Named Entity**.

7.    If the **KRE Coverage Section** is purchased, the first sentence of Paragraph (s) Choice of Law and Forum, of Clause 7. **GENERAL CONDITIONS** of the **KRE Coverage Section** is deleted in its entirety and replaced with the following:

The construction, validity and performance of this **KRE Coverage Section** shall be governed by the laws of the state indicated in item 1 of the Declarations as the mailing address for the **Named Entity**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 001*

**ENDORSEMENT# *2***

This endorsement, effective *12:01 am      April 26, 2019*          forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (ALL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A.   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

(1)   **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Company**, or discharged or dispersed therefrom; or

(2)   **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Company**; or

(3)   the furnishing by an **Insured** or the **Company** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

(4)   **Claims** for damage or other injury to the **Company** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**.

B.   (1)   which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or,

(2)   with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

**"Hazardous Properties"** include radioactive, toxic or explosive properties.

**"Nuclear Facility"** means:

(a)   any nuclear reactor;

(b)   any equipment or device designed or used for

© All rights reserved.
*END 002*

**ENDORSEMENT#** *2*     (continued)

    (1)   separating the isotopes of uranium or plutonium,

    (2)   processing or utilizing spent fuel, or

    (3)   handling, processing or packaging wastes;

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**"Nuclear Material"** means source material, special nuclear material or byproduct material.

**"Nuclear Reactor"** means any apparatus designed or used to sustain nuclear fission in a self- supporting chain reaction or to contain a critical mass of fissionable material.

**"Source Material,"** **"Special Nuclear Material,"** and **"Byproduct Material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**"Spent Fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

**"Waste"** means any waste material (1) containing by product material and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (a) or (b) thereof.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 002*

95737 (9/07)                    Page 2 of 2

**ENDORSEMENT# *3***

This endorsement, effective *12:01 am*      *April 26, 2019*          forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**FLSA AND RELATED EXCLUSIONS AMENDED**
**(D&O AND EPL COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), the policy is amended as follows:

1.    Clause 4. EXCLUSIONS of the **D&O Coverage Section** (if purchased) is amended by deleting Exclusion (o) in its entirety.

2.    Clause 3. EXCLUSIONS of the **EPL Coverage Section** (if purchased) is amended by deleting Exclusions (g) and (h) in their entirety.

3.    In Clause 4. EXCLUSIONS of the **D&O Coverage Section** (if purchased) and Clause 3. EXCLUSIONS of the **EPL Coverage Section** (if purchased), the following exclusion is added at the end thereof:

(FL-1)   for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law.

It is acknowledged that **Claims** for violation(s) of any of the responsibilities, obligations or duties imposed by "similar federal, state, local or foreign statutory law or common law," as such quoted language is used in the immediately-preceding paragraph, include, without limitation, any and all **Claims** which in whole or in part allege, arise out of, are based upon, are attributable to, or are in any way related to any of the circumstances described in any of the following:

(1)    the refusal, failure or inability of any **Insured(s)** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

(2)    improper deductions from pay taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**; or

(3)    failure to provide or enforce legally required meal or rest break periods;

© All rights reserved.
***END 003***

97629 (3/08)                        Page 1 of 2

<u>**ENDORSEMENT#**</u>  *3*     (continued)

Notwithstanding the foregoing, with respect to the **EPL Coverage Section**, this exclusion (FL- 1) shall not apply to the extent that a **Claim** is for **Retaliation**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.
***END 003***

97629 (3/08)                                Page 2 of 2

<u>ENDORSEMENT#</u>  *4*

This endorsement, effective at  *12:01 am    April 26, 2019*        forms a part of
Policy number  *01-340-76-97*
Issued to:  *ARTHREX, INC.*

By:  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AON PANEL AMENDATORY ENDORSEMENT
### (GTC, D&O, EPL, FLI and CRIME COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that the **General Terms and Conditions**, **D&O Coverage Section** (if purchased), **EPL Coverage Section** (if purchased), **FLI Coverage Section** (if purchased) and **Crime Coverage Section** (if purchased) of this policy are amended as follows:

**I.    AMENDMENTS TO THE GENERAL TERMS AND CONDITIONS**

1.   *Definition of Application Limited to Attachments from Last 12 Months*

In Clause 2. **DEFINITIONS** of the **General Terms and Conditions**, the definition of "**Application**" is amended by adding the following paragraph to the end thereof:

Notwithstanding the foregoing, the term "**Application**" shall not include any attachments to the **Application** submitted to the **Insurer** more than 12 months prior to the inception date of the policy, other than warranties.

2.   *Definition of Subsidiary Amended - 501(c)(3) Requirement Removed*

Clause 2. **DEFINITIONS** of the **General Terms and Conditions** is amended by deleting subparagraph (iii) of the Definition of "**Subsidiary**" in its entirety and replacing it with the following:

(iii)   any not-for-profit entity sponsored exclusively by a  **Company**.

3.   *Notice Provisions Amended - Risk Manager or General Counsel of Named Entity*

Clause 6(a) of the **General Terms and Conditions** is deleted in its entirety and replaced by the following:

(a)   The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** or a **Crisis Management Event** as soon as practicable after: (i) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (ii) the **Crisis Management Event** commences, but in all events a **Claim** must be reported no later than either:

(i)   anytime during the **Policy Period** or during the **Discovery Period** (if applicable); or

(ii)   within ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

4.   *Notice of Claim - Reporting by E-Mail*

© All rights reserved.

### *END 004*

**ENDORSEMENT#** *4*   (continued)

Clause 6. **NOTICE/CLAIM REPORTING PROVISIONS** of the **General Terms and Conditions** is amended to add the following paragraph to the end thereof:

(e) Email Reporting of **Claims**:  In addition to the postal address set forth for any **Notice of Claim Reporting** under this policy, such notice may also be given in writing pursuant to the policy's other terms and conditions to the **Insurer** by email at the following email address:

c-claim@aig.com

Your email must reference the policy number for this policy.  The date of the **Insurer's** receipt of the emailed notice shall constitute the date of notice.

In addition to **Notice of Claim Reporting** via email, notice may also be given to the **Insurer** by mailing such notice to: AIG Property Casualty, Financial Lines Claims, P.O. Box 25947, Shawnee Mission, KS  66225 or faxing such notice to (866) 227-1750.

Solely with respect to the coverage afforded above, the following definition shall apply:

"**Notice of Claim Reporting**" means "notice of claim/circumstance," "notice of loss" or other reference in the policy designated for reporting of claims, loss or occurrences or situations that may give rise or result in loss under this policy.

5.   *Cancellation Clause Amended - 30 Days*

Clause 7. **CANCELLATION CLAUSE** of the **General Terms and Conditions** is hereby amended by deleting the second paragraph and replacing it with the following:

This policy may be canceled by or on the behalf of the **Insurer** only in the event of non-payment of premium by the **Named Entity**.  In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified or other first class mail, at the **Named Entity's** address as stated in Item 1 of the Declarations, written notice stating when, not less than thirty (30) days thereafter, the cancellation shall be effective.  The mailing of such notice as aforesaid shall be sufficient proof of notice.  The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

6.   *Change in Control Amended - 60 Days*

In Clause 9. **CHANGE IN CONTROL OF NAMED ENTITY** of the **General Terms and Conditions**, the last sentence thereof is deleted in its entirety and replaced with the following:

The **Named Entity** shall give the **Insurer** written notice of the **Transaction** as soon as practicable, but not later than sixty (60) days after the effective date of the **Transaction**.

7.   *Dispute Resolution Process Clause Amended*

© All rights reserved.

*END 004*

Page  2  of 26

118497 (10/14)

**ENDORSEMENT# 4**   (continued)

In Clause 14. **DISPUTE RESOLUTION PROCESS** of the **General Terms and Conditions,** in the third paragraph, the words "ninety (90) days" are deleted and replaced with "sixty (60) days."

Clause 14. **DISPUTE RESOLUTION PROCESS** of the **General Terms and Conditions** is further amended by deleting the first sentence of the fourth paragraph in its entirety and replacing it with the following:

The non-binding mediation and/or any subsequent arbitration may be commenced in New York, Atlanta, Georgia, Chicago, Illinois, Denver, Colorado or in the state indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**.

8. *Allocation Clause*

The **General Terms & Conditions** is amended by adding the following clause at the end thereof:

**AC-1     ALLOCATION CLAUSE**

If a **Claim** includes both **Loss** that is covered under this policy and **Loss** that is not covered under this policy, either because the **Claim** is made against both **Insureds** and others who are not **Insureds**, or the **Claim** includes both covered allegations and allegations that are not covered under the policy, the **Insureds** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of such **Loss** between covered **Loss** and **Loss** that is not covered under the policy.  The **Insurer** shall not be liable under this policy for the portion of such amount which is allocated to non-covered **Loss**.  In the event that a determination as to the amount of **Defense Costs** to be advanced under the policy cannot be agreed to, then the **Insurer** shall advance **Defense Costs** excess of any applicable retention amount which the **Insurer** states to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

**II.   AMENDMENTS TO THE D&O COVERAGE SECTION**

1. *Definition of Loss Amended - FCPA Civil Penalties*

In Clause 2. **DEFINITIONS** of the **D&O Coverage Section**, the definition of "**Loss**" is amended by appending the following to the end thereof:

"**Loss**" shall also include, subject to the other terms, conditions and exclusions of this **D&O Coverage Section**, including, but not limited to, exclusions 4(a), 4(b) and 4(c) of this **D&O Coverage Section**, civil penalties assessed against any individual director or officer pursuant to Sections 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B).

2. *Definition of Loss Amended - Include Section 11, 12 or 15 Loss*

In Clause 2. **DEFINITIONS** of the **D&O Coverage Section**, the definition of "**Loss**," is amended by deleting subparagraph (iv) thereof in its entirety and replacing it with the following:

(iv) matters which may be deemed uninsurable under the law pursuant to which

© All rights reserved.

*END 004*

Page  3  of 26

118497 (10/14)

**ENDORSEMENT# 4**   (continued)

this policy shall be construed.  Notwithstanding the foregoing subparagraph (iv), the **Insurer** shall not assert that, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the portion of any amounts incurred by **Insureds** which is attributable to such violations constitutes uninsurable loss and shall treat that portion of all such settlements, judgments and **Defense Costs** as constituting **Loss** under this policy.

It is further understood and agreed that Clause 4. **EXCLUSIONS** of the **D&O Coverage Section** is amended by adding the following at the end thereof:

Notwithstanding anything stated in Clause 4. **EXCLUSIONS** above, Exclusions (a) and (b) shall not apply, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations.

3.  *Definition of Securities Claim Amended - Include Common Law*

Clause 2. **"DEFINITIONS"** of the **D&O Coverage Section** is amended by deleting the definition of **"Securities Claim"** in its entirety and replacing it with the following:

(z)   **"Securities Claim"** means a **Claim** made against any **Insured**:

(i)   alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:

(1) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of a **Company**; or

(2) brought by a security holder of a **Company** with respect to such security holder's interest in securities of such **Company**; or

(ii)   brought derivatively on the behalf of a **Company** by a security holder of such **Company**.

4.  *Conduct Exclusion Amended - Non-Appealable; Other than a Coverage Proceeding Initiated by Insurer*

In Clause 4. **EXCLUSIONS** of the **D&O Coverage Section**, exclusion (a), (b) and (c) are deleted in their entirety and replaced with the following:

(a)   arising out of, based upon or attributable to the gaining of any profit or advantage to which any final non-appealable adjudication in an action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy  establishes the **Insured** was not legally entitled;

(b)   arising out of, based upon or attributable to: (1) the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law if any final non-appealable adjudication in an action or proceeding other than an action or proceeding to determine

© All rights reserved.

*END 004*

Page  4  of 26

118497 (10/14)

coverage under the policy establishes that such 16(b) violation occurred; or (2) the payment to any **Insured** of any remuneration without the previous approval of the stockholders of the **Company**, once any final non-appealable adjudication in an action or proceeding other than an action or proceeding to determine coverage under the policy establishes that such payment was illegal;

(c)   arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if any final non-appealable adjudication in an action or proceeding other than an action or proceeding to determine coverage under the policy establishes that such deliberate criminal, deliberate fraudulent or dishonest act or willful violation of statute, rule or law was committed;

5.   *Severability of Exclusions - Imputation Limited to CEO and CFO of Named Entity*

In Clause 4. **EXCLUSIONS** of the **D&O Coverage Section**, the last paragraph thereof is deleted in its entirety and replaced with the following:

For the purpose of determining the applicability of the foregoing Exclusions: (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (ii) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer or chief financial officer (or equivalent positions) of the **Named Entity** shall be imputed to the **Company**.

6.   *Advancement of Loss Extension*

Clause 6. "**RETENTION CLAUSE**" of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

**6. RETENTION CLAUSE**

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **D&O Coverage Section**, such Retention amount to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Act(s)**.

If for any reason (including but not limited to **Financial Insolvency**) a **Company** fails or refuses to advance, pay or indemnify covered **Loss** of an **Individual Insured** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Individual Insured** until either (i) a **Company** has agreed to make such payments, or (ii) the Retention has been satisfied.  In no event shall any such advancement by the **Insurer** relieve any **Company** of any duty it may have to provide advancement, payment or indemnification to any **Individual Insured**.

© All rights reserved.

*END 004*

Page  5  of 26

**ENDORSEMENT# *4***   (continued)

Advancement, payment or indemnification of an **Individual Insured** by a **Company** is deemed "failed" if it has been requested by an **Individual Insured** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by a **Company** within 60 days of such request; and advancement, payment or indemnification by a **Company** is deemed "refused" if a **Company** gives a written notice of the refusal to the **Individual Insured**.  Advancement, payment or indemnification of an **Individual Insured** by a **Company** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from a **Company**.  Any payment or advancement by the **Insurer** within an applicable Retention shall apply towards the exhaustion of the **Policy Aggregate Limits of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**.

The **Company** agrees to indemnify the **Individual Insured**s and/or advance **Defense Costs** to the fullest extent permitted by law. If the **Insurer** pays under this policy any indemnification or advancement owed to any **Individual Insured**s by any **Company** within an applicable Retention, then that **Company** shall reimburse the **Insurer** for such amounts and such amounts shall become immediately due and payable as a direct obligation of the **Company** to the **Insurer**.  The failure of a **Company** to perform any of its obligations to indemnify the **Individual Insureds** and/or advance **Defense Costs** under this policy shall not impair the rights of any **Individual Insured** under this policy.

Clause 10. **"SUBROGATION"** of the **General Terms and Conditions** is amended by deleting the last paragraph thereof in its entirety.

7.   *Advancement of Defense Costs - 90 Days*

In Clause 7. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)** of the **D&O Coverage Section**, the third full paragraph is deleted in its entirety and replaced with the  following:

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 7, the **Insurer** nevertheless shall advance on a current basis, at the written request of the **Insured**, covered **Defense Costs** no later than ninety (90) days after receipt by the **Insurer** of such defense bills. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D&O Coverage Section** to payment of such **Loss**.

8.   *Claims Participation and Cooperation Clause*

Clause 7. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)** of the **D&O Coverage Section** is further amended by adding the following paragraph at the end thereof:

The failure of any **Individual Insured** to give the **Insurer** cooperation and information as required above shall not impair the rights of any other **Individual Insured** under this policy.

9.   *Representations and Severability Clause Amended - Non-Rescindable; Full Individual Severability; Top 2 Company Positions Imputed to Named Entity*

© All rights reserved.

*END 004*

118497 (10/14)

Clause 10. **REPRESENTATIONS AND SEVERABILITY** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

### 10. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete.  All such statements and representations are the basis of this **D&O Coverage Section**  and are to be considered as incorporated into this **D&O Coverage Section**.

With respect to any statements, warranties and representations contained in the **Application**, and solely with respect to the issue of whether coverage shall be afforded under this endorsement pursuant to subparagraphs (1), (2) and (3) below, no knowledge possessed by an **Individual Insured** shall be imputed to any other **Individual Insured**.  However, in the event that any of the statements, warranties or representations is not accurately and completely disclosed in the **Application** and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer,** no coverage shall be afforded for any **Claim** alleging, arising out of, based upon, attributable to or in consequence of the subject matter of any incomplete or inaccurate statements, warranties or representations under:

(1)   Clause 1. **INSURING AREEMENTS**, COVERAGE A, with respect to any **Individual Insured** who knew of such inaccurate or incomplete statements, warranties or representations;

(2)   Clause 1. **INSURING AGREEMENTS**, Coverage B(ii), with respect to any **Company** to the extent it indemnifies any **Individual Insured** referenced in (1), above; and

(3)   Clause 1. **INSURING AGREEMENTS**, Coverage B(i), with respect to any **Company** if any past or present chief executive officer or chief financial officer of the **Named Entity** knew of such inaccurate or incomplete statements, warranties or representations, whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application.**

The **Insurer** shall not be entitled under any circumstances to rescind coverage under the Policy with respect to any **Insured**, but such coverage will be subject to all other terms, conditions, and exclusions of the policy.

10.   *Order of Payments Clause Amended*

Clause 11. **ORDER OF PAYMENTS** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

### 11.  ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is due under the provisions of this **D&O Coverage Section**, then this policy shall:

© All rights reserved.

*END 004*

**ENDORSEMENT# *4***   (continued)

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then with respect to whatever remaining amount of the applicable **Separate Limit of Liability** or **Shared Limit of Liability** is available after payment of such **Loss**,

(b) then pay such **Loss** for which coverage is provided under Coverage B(ii) of this **D&O Coverage Section**, and

(c) then pay such **Loss** for which coverage is provided under Coverage B(i), C or D of this **D&O Coverage Section**.

Then once all such **Loss** is paid, pursuant, first, to subsection (a) through (c), in that order, make available such remaining **Separate Limit of Liability** or **Shared Limit of Liability** to the **Company's** then current **Executives**, subject to all of the Policy's other terms and conditions.

11. *Bankruptcy Clause Added*

The following clause is added to the end of the **D&O Coverage Section**:

**BANKRUPTCY**

Bankruptcy or insolvency of any **Company** or any **Insured(s)** shall not relieve the **Insurer** of any of its obligations hereunder.

It is further understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured(s)**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Entity** or any other **Company** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively **"Bankruptcy Law"**) then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:

(a) waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such **Bankruptcy Law**; and

(b) agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.

## III. AMENDMENTS TO THE EPL COVERAGE SECTION

1. *Definition of Employment Practices Violation Amended - Workplace Bullying*

In Clause 2. **DEFINITIONS** of the **EPL Coverage Section,** subparagraph (ii) of the definition of **"Employment Practices Violation"** is deleted in its entirety and replaced with the following:

(ii) harassment (including workplace bullying and sexual harassment whether "quid pro quo", hostile work environment or otherwise);

2. *Definition of Loss Amended - Include Plaintiffs' Attorney Fees*

© All rights reserved.

***END 004***

Page  8  of 26

In Clause 2. **DEFINITIONS** of the **EPL Coverage Section**, paragraph (m)("**Loss**") is amended by adding the following to the end thereof:

> "**Loss**" shall also include any attorney fees awarded to a prevailing plaintiff's counsel pursuant to a covered judgment against an **Insured** or which the **Insurer** has agreed to pay as part of a covered settlement of a   **Claim** against an **Insured**.

3*. Advancement of Defense Costs - 90 Days*

In Clause 6. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)** of the **EPL Coverage Section,** the third full paragraph is deleted in its entirety and replaced with the   following:

> When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 6, the **Insurer** nevertheless shall advance on a current basis, at the written request of the **Insured**, covered **Defense Costs** no later than ninety (90) days after receipt by the **Insurer** of such defense bills. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **EPL Coverage Section** to payment of such **Loss**.

4*. Representations and Severability Clause Amended*

Clause 8. **REPRESENTATIONS AND SEVERABILITY** of the **EPL Coverage Section** is deleted in its entirety and replaced with the following:

> **8.   REPRESENTATIONS AND SEVERABILITY**
>
> The **Application** shall be construed as a separate application for coverage by each **Individual Insured**. With respect to the **Application**, no knowledge possessed by any **Company** or any **Individual Insured** shall be imputed to any other **Individual Insured**.
>
> If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the **Insurer** shall have the right to void coverage under this policy, *ab initio*, with respect to:
>
> (1)   **Loss** of any **Individual Insured** who knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed; and
>
> **(2)**   **Loss** of the **Company**, if any **Individual Insured** who is or was a chief executive officer, general counsel, director of human resources or risk manager (or equivalent position) of the **Named Entity** knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.
>
> The foregoing applies even if the **Individual Insured** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

Ⓒ All rights reserved.

*END 004*

<u>ENDORSEMENT# *4*</u>   (continued)

## IV.  AMENDMENTS TO THE FLI COVERAGE SECTION

1.  *Insuring Agreements Amended*

Clause 1. INSURING AGREEMENTS of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

Coverage for **Loss** under this policy is provided solely with respect to: (i) **Claims** first made against an **Insured**; (ii) **Voluntary Compliance Losses** first ascertained by or assessed against an **Insured**; and (iii) **Pension Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy. Subject to the foregoing and the other terms, conditions, and limitations of this policy, this policy affords the following coverage:

A.  *Individual Insured Coverage*

This policy shall pay the **Loss** of any **Individual Insured** that no **Company** or **Plan** has indemnified or paid that arises from any **Claim** made against such **Individual Insured** for any **Wrongful Act** of such **Individual Insured**.

B.  *Individual Insured Indemnification Coverage*

This policy shall pay the **Loss** of a **Company** or **Plan** that arises from any **Claim** made against any **Individual Insured** for any **Wrongful Act** of such **Individual Insured**, but only to the extent that such **Company** or **Plan** has indemnified such **Loss** of, or paid such **Loss** on behalf of, the **Individual Insured**.

C.  *Company And Plan Coverage*

This policy shall pay the **Loss** of any **Company** or **Plan** arising from any **Claim** made against such **Company** or **Plan** for any **Wrongful Act** of such **Company** or **Plan** (or of any employee for whom such **Company** is legally responsible).

D.  *Voluntary Compliance Loss Coverage*

This policy shall pay any **Voluntary Compliance Loss** first ascertained by or assessed against an **Insured**, subject to the aggregate sublimit of liability set forth on the Declarations.

The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that circumstances giving rise to such **Voluntary Compliance Loss** result in a **Claim**.

E.  *Pension CrisisFund Coverage*

This policy shall pay the **Pension Crisis Loss** of a **Company** up to the **Insured's** aggregate sublimit of liability for all **Pension Crisis Loss** under the **Pension CrisisFund**$^{SM}$ set forth in the Declarations (as amended by this endorsement).

The payment of any **Pension Crisis Loss** under this policy shall not waive any

Ⓒ All rights reserved.

*END 004*

<u>ENDORSEMENT# *4*</u>   (continued)

of the **Insurer's** rights under this policy or at law, including in the event that circumstances giving rise to such **Pension Crisis Loss** result in a **Claim**.

2.   *Settlement Within Retention and Claims Cooperation*

Clause 2. DEFENSE AGREEMENT is amended by adding the following at the end thereof:

(d)   FULL SETTLEMENT WITHIN RETENTION/CONSENT WAIVED

Notwithstanding the provisions of Section 2(c) above, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding the Retention, then the **Insurer's** consent shall not be required for such disposition.

(e)   CLAIMS PARTICIPATION AND COOPERATION

Notwithstanding the provisions of Section 2(c) above, the failure of any **Insured** to give the **Insurer** cooperation and information as it may reasonably require shall not impair the rights of any **Individual Insured** under this policy.

3.   *Severability of Exclusions*

Clause 5. **EXCLUSIONS** of the **FLI Coverage** Section is amended by deleting the final paragraph thereof and replacing it with the following:

In determining whether any of the exclusions applicable to this **Coverage Section** apply, the **Wrongful Acts** of any **Insured** shall not be imputed to any other **Insured**.

4.   *Exclusions Amended*

Clause 5. EXCLUSIONS of the **FLI Coverage Section** is amended by deleting Exclusions (a), (b), (d) and (h) in their entirety and replacing them with the following:

(a)   arising out of, based upon or attributable to any profit or advantage to which the Insured was not legally entitled, if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy;

(b)   arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**, by the Insured**,** if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy;

(d)   alleging, arising out of, based upon or attributable to the facts alleged, or to the same as or a related **Wrongful Act** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any employee benefit plan fiduciary liability insurance policy in force prior to the inception date of this policy;

Ⓒ All rights reserved.

*END 004*

(h)   for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to: (a) **Defense Costs** incurred in the defense of a **Claim** for a violation of **ERISA** by an **Insured**; or (b) the coverage afforded under Extension 11.B., *Managed Care Coverage*;

Clause 5. EXCLUSIONS of the **FLI Coverage Section** is amended by deleting Exclusions (f), (g), (i) and (j) in their entirety.

5.   *Limit of Liability Amended*

Clause 6. LIMIT OF LIABILITY of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

**6.   LIMIT OF LIABILITY**

The following provisions shall apply in addition to the provisions of Clause 4. LIMIT OF LIABILITY of the **General Terms and Conditions**:

Each sublimit of liability in this **Coverage Section** is the maximum limit of the **Insurer's** liability for all **Loss** under this **Coverage Section** that is subject to that sublimit of liability.   All sublimits of liability shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability**, and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

6.   *Item 7 of Declarations Amended*

Item 7. OTHER LIMITS OF LIABILITY of the Declarations is amended by deleting subparagraphs (e) and (f) and replacing them with the following sublimits of liability:

| | |
|---|---|
| *Voluntary Compliance Loss:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *Section 502(c) Penalties:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *Pension Protection Act Penalties:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *HIPAA Penalties:* | *$1.5 million or the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *Health Care Reform Penalties:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *Section 4975 Penalties:* | *$250,000* |
| *Pension CrisisFund*[SM]*:* | *$100,000* |

©  All rights reserved.

*END 004*

118497 (10/14)                              Page 12  of 26

**ENDORSEMENT# *4*** (continued)

7. *Retention Clause Amended*

Clause 7. RETENTION CLAUSE of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

**7.   RETENTION CLAUSE**

The following provisions shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 3 of the Declarations, such amount to be borne by the **Insured** and shall remain uninsured  with regard to (1) all **Indemnifiable Loss**; and (2) **Loss** of a **Company**.  Notwithstanding the foregoing, no Retention shall be applied to the following: (i) **Non-Indemnifiable Loss**; (ii) **Pension Crisis Loss**; (iii) **Voluntary Compliance Loss**; (iv) **Section 502(c) Penalties**; (v) **Pension Protection Act Penalties**; (vi) **HIPAA Penalties**; (vii) **Health Care Reform Penalties**; (viii) **Section 4975 Penalties**, or (ix) the first $25,000 in **Defense Costs** incurred for **E-Discovery Consultant Services**.

8. *Notice/Claim Reporting Amended*

Solely with respect to the **FLI Coverage Section**, Clause 6. NOTICE/CLAIM REPORTING PROVISIONS of the General Terms and Conditions is amended by deleting subparagraphs (a), (b), (c) and (d) in their entirety and replacing them with the following:

A. *Reporting a Claim or Pension Crisis*

The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, notify the **Insurer** in writing of a **Claim** made against an **Insured** or of a **Pension Crisis** as soon as practicable after: (1) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (2) the **Pension Crisis** commences. In all such events, notification must be provided no later than:

(i)    ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable) if this policy is not renewed with the  **Insurer**; or

(ii)    two hundred and seventy (270) days after the end of the **Policy Period** or **Discovery Period** (if applicable); if the expiring policy is renewed with the **Insurer**.

B. *Reporting Voluntary Compliance Loss and Covered Penalties*

The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, notify the **Insurer** in writing of a **Voluntary Compliance Loss** or of **Covered Penalties** as soon as practicable after such **Voluntary Compliance Loss** is first ascertained by or assessed against an **Insured**, or such **Covered Penalties** are first imposed, respectively, but in all such events no later than sixty (60) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

Ⓒ All rights reserved.

*END 004*

Page 13 of 26

C.   *Notice of Circumstances*

If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9.   *Order of Payments Amended*

Clause 10. ORDER OF PAYMENTS of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

**10.   ORDER OF PAYMENTS**

If there is a **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **Coverage Section**, then the **Insurer** shall in all events:

(1)   First, pay all **Loss** covered under Insuring Agreement A. *Individual Insured Coverage*;

(2)   Second, only after payment of **Loss** has been made pursuant to subparagraph (1) above and to the extent that any amount of the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement B. *Indemnification Of Individual Insured Coverage*; and

(3)   Lastly, only after payment of **Loss** has been made pursuant to subparagraphs (1) and (2) above and to the extent that any amount of the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement C. *Company and Plan Coverage*, Insuring Agreement D. *Voluntary Compliance Loss Coverage*, and Insuring Agreement E. *Pension CrisisFund*[SM] *Coverage*.

In the event the **Insurer** withholds payment pursuant to subparagraph (2) or (3) above, then the **Insurer** shall, at such time and in such manner as set forth in instructions of the chief executive officer of the **Named Entity**, remit such payment to or on behalf of an  **Insured**.

10.   *FLI Extensions*

The following Clauses are added to the end of the  **FLI Coverage Section**:

© All rights reserved.

*END 004*

**ENDORSEMENT#** *4*    (continued)

**11. FLI EXTENSIONS**

*A.   Independent Fiduciary Fees*

**Loss** shall include reasonable and necessary fees and expenses of an independent fiduciary if such fiduciary is retained to review a proposed settlement of a covered **Claim**. **Loss** shall also include reasonable and necessary fees and expenses of any law firm hired by such independent fiduciary to facilitate a review of such proposed settlement.

*B.   Managed Care Coverage*

This policy shall pay the **Loss** of an **Insured** arising from a **Claim** made against such **Insured** alleging improper or negligent selection of a **Managed Care Services** provider or denial or delay of any benefit under a health care, pharmaceutical, vision, or dental **Plan** of an **Insured**.

*C.   LMRA Coverage*

If, and during the time that, coverage is provided under this policy, then this policy shall also pay the **Loss** of an **Insured** arising from an allegation that such **Insured** violated Section 301 of the Labor Management Relations Act ("LMRA") relating to alleged violations of collectively bargained contracts in connection with a **Plan**.

*D.   First Dollar E-Discovery Consultant Services*

For any **Claim**, no Retention shall apply to the first $25,000 in **Defense Costs** incurred for **E-Discovery Consultant Services**.

The list of pre-approved e-discovery consulting firms ("**E-Consultant Firms**") is accessible through the online directory at AIG Panel Counsel Directory Consultant Panel Members".(www-238.aig.com/default.aspx ) The list provides the **Insureds** with a choice of firms from which a selection of an **E-Consultant Firm** shall be made. Any **E-Consultant Firm** may be hired by an **Insured** to perform **E-Discovery Consultant Services** without further approval by the **Insurer**.

**12.   PROTECTIONS WHEN INDEMNIFICATION IS UNAVAILABLE**

*A.   Advancement*

If for any reason (including, but not limited to insolvency) a **Company** and the relevant **Plan** fail or refuse to advance, pay or indemnify covered **Loss** of an **Individual Insured** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Individual Insured** until either (i) a **Company** or **Plan** has agreed to make such payments, or (ii) the Retention has been satisfied. In no event shall any such advancement by the **Insurer** relieve any **Company** or any relevant **Plan** of any duty it may have to provide advancement, payment or indemnification to any **Individual Insured**.

Advancement, payment or indemnification of an **Individual Insured's**

© All rights reserved.

*END 004*

**Loss** by the **Company** or **Plan** is deemed "failed" if it has been requested by an **Individual Insured** in writing and has not: been provided; agreed to be provided; or acknowledged as an obligation by a **Company** or **Plan** within sixty (60) days of such request; and advancement, payment or indemnification by the **Company** or **Plan** is deemed "refused" if such **Company** or **Plan** gives a written notice of the refusal to the **Individual Insured**. Advancement, payment or indemnification of an **Individual Insured's Loss** by the **Company** or **Plan** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not: provided; agreed to be provided; or acknowledged by and collectible from any **Company** or **Plan**. Any payment or advancement by the **Insurer** within an applicable Retention shall apply toward the exhaustion of the **Policy Aggregate Limits of Liability**, and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

B.   *Bankruptcy And Insolvency*

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations under this policy.

In such event, the **Insurer** and each **Insured** agree to cooperate in any efforts by the **Insurer** or any **Insured** to obtain relief for the benefit of the **Individual Insureds** from any stay or injunction applicable to the distribution of the policy proceeds.

**13.   APPLICATION AND UNDERWRITING**

A.   *Application and Reliance*

The **Insurer** has relied upon the accuracy and completeness of the statements, warranties and representations contained in the **Application**. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

B.   *Individual Insured Coverage Non-Rescindable*

Under no circumstances shall the coverage provided by this policy for **Loss** under Insuring Agreement A. *Individual Insured Coverage* be deemed void, whether by rescission or otherwise, once the premium has been paid.

C.   *Severability of the Application*

The **Application** shall be construed as a separate application for coverage by each **Individual Insured**. With respect to the **Application**, knowledge possessed by any **Company** or any **Individual Insured** shall not be imputed to any other **Individual Insured**.

If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the **Insurer** shall have the right to void coverage under this policy, *ab initio*, with respect to:

© All rights reserved.

*END 004*

Page 16 of 26

**ENDORSEMENT#** *4*   (continued)

(1) **Loss** under Insuring Agreement B. *Indemnification Of Individual Insured Coverage* for the indemnification of any **Individual Insured** who knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed; and

(2) **Loss** under Insuring Agreement C. *Company and Plan Coverage* if:

(i) the person who executed the **Application**; or

(ii) any past or present chief executive officer or chief financial officer of the **Named Entity**, knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.

The foregoing applies even if the **Individual Insured** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

11. *Amend Definition of Company to Include Corporate Trustee Company*

Solely with respect to the **FLI Coverage Section**, the definition of **"Company"** in Clause 2. **DEFINITIONS** of the **General Terms and Conditions** is amended by adding the following to the end thereof:

**"Company"** shall also mean, in any **Foreign Jurisdiction**, a **Corporate Trustee Company**.

12. *Definitions Amended*

Clause 3. DEFINITIONS of the **FLI Coverage Section** is amended as follows:

(A) Definitions (c), (d), (e), (g), (h), (j), (k), (l), (o), (p), (s), (z), (aa), (bb), (cc), (gg), (ii) and (jj) are deleted in their entirety, and all references to those terms throughout the policy are deleted in their entirety.

(B) Definitions (a), (b), (f), (i), (m), (n), (w), (x), (y), (dd), (hh) and (kk) are deleted in their entirety and replaced with the following:

(a) **"Application"** means:

(1) the written statements and representations made by an **Insured** and provided to the **Insurer** during the negotiation of this policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this policy;

(2) all warranties executed by or on behalf of an **Insured** and provided to the **Insurer** in connection with the underwriting of this policy or the underwriting of any other employee benefit plan fiduciary liability policy (or equivalent) issued by the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time; and

(3) each and every public filing by or on behalf of a **Company** made with any federal, state, local or foreign regulatory agency (including, but not limited to the U.S. Securities and Exchange Commission and the U.S.

© All rights reserved.

*END 004*

**ENDORSEMENT#** *4*   (continued)

Department of Labor ("DOL"), CPA-audited financial statements for all **Plans**, with investment portfolios, Form 5500's and any attachments thereto for all **Plans**, any financial information in such filings, and any certifications relating to the accuracy of the foregoing), provided that such public filing was filed during the twelve (12) month period immediately preceding the inception of the **Policy Period**.

(b)   **"Benefits"** means any obligation under a **Plan** to a **Plan** participant or beneficiary that is a payment of money or property; or any privilege, right, option or perquisite.

(f)   **"Claim"** means:

(1)   a written demand for monetary, non-monetary or injunctive relief, other than an initial application for benefits;

(2)   a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

(i)   service of a complaint or similar pleading (in the case of a civil proceeding);

(ii)   return of an indictment, information or similar document (in the case of a criminal proceeding); or

(iii) receipt or filing of a notice of charges; or

(3)   a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject;

(4)   any fact-finding investigation, whether or not a **Wrongful Act** is alleged, by the DOL or the Pension Benefit Guaranty Corporation ("PBGC") or any similar governmental authority located outside the United States, including, but not limited to the United Kingdom's Pensions Ombudsman or Pensions Regulator; or

(5)   any written request to toll a statute of limitations which may be applicable to any Claim that may be made for any **Wrongful Act** of any **Insured**.

**"Claim"** shall include any **Securities Claim**.

(i)   **"Defense Costs"** means reasonable and necessary fees, costs, and expenses consented to by the **Insurer** (including the cost of **E-Discovery Consultant Services** and premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**.

**Defense Costs** shall not include the compensation of any **Individual Insured** or any employee of an **Insured**.

(m)   **"Employee Benefit Law"** means:

© All rights reserved.

*END 004*

118497 (10/14)

**ENDORSEMENT# _4_**   (continued)

(1) **ERISA** and any similar common or statutory law anywhere in the world (including, but not limited to the United Kingdom's Pensions Act 2004, Pensions Act 1995, and Pension Schemes Act 1993; and the Pension Benefit Standards Act, 1985 of Canada), as amended, and any rules and regulations promulgated thereunder to which a **Plan** is subject; and

(2) **HIPAA Privacy Regulations**; and solely with respect to subparagraph (2) of the definition of **Wrongful Act**, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

In no event shall **Employee Benefit Law**, other than as set forth in subparagraph (2) above, include any law other than **ERISA** which concerns workers' compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

(n) **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, including, but not limited to amendments pursuant to:

(1) COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1985);

(2) HIPAA;

(3) the Newborns' and Mothers' Health Protection Act of 1996;

(4) the Mental Health Parity Act of 1996;

(5) the Women's Health and Cancer Rights Act of 1998;

(6) the Pension Protection Act of 2006; and

**(7) Health Care Reform Law**;

and including any amendments thereto and regulations thereunder.

(w) **"Individual Insured"** means, solely with respect to a **Plan,** any past, present or future:

(1) **Executive** or employee of a **Company** or of a **Plan** in his or her **Administration** of a **Plan** or in his or her capacity as a fiduciary or trustee of a **Plan**;

(2) member of a pension committee of a **Company** in his, her, or its capacity as a fiduciary or in his, her, or its **Administration** of a **Plan**;

(3) natural person in a position equivalent to a position listed in subparagraph (1) or (2) above in the event that the **Company** is operating in a **Foreign Jurisdiction;** or

(4) former **Executive** or employee currently serving in a consulting or advisory capacity to a **Plan** if the **Company** provides indemnification to such individual in the same manner as is provided to other

© All rights reserved.

*END 004*

Page 19 of 26

118497 (10/14)

<u>ENDORSEMENT# *4*</u>   (continued)

Individual Insureds.

**"Individual Insureds"** shall not include any individual in his or her capacity as an employee of any third party, including a service provider, other than a **Corporate Trustee Company**.

(x)  **"Insured"** means any:

  (1)  **Individual Insured**;

  (2)  **Plan**;

  (3)  **Company**;

  (4)  **Plan Committee** of a **Company**, in its capacity as a fiduciary or trustee of a **Plan**, or in its **Administration** of a **Plan**; or

  (5)  **Corporate Trustee Company**.

(y)  **"Loss"** means damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), **Defense Costs**, **Voluntary Compliance Loss**, **Pension Crisis Loss** and **Covered Penalties**; however, "**Loss**" shall not include:

  (1)  civil or criminal fines or penalties other than **Covered Penalties**;

  (2)  taxes or tax penalties other than **Covered Penalties**;

  (3)  cleanup costs relating to hazardous materials, pollution or product defects;

  (4)  any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**;

  (5)  wages, tips, and commissions;

  (6)  **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Individual Insured**; provided, however, that **Loss** shall include a monetary award, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual accounts of participants in a **Plan** by reason of a change in value of the investments held by that **Plan**, including, but not limited to the securities of the **Company**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits"; and

  (7)  matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, **Loss** shall include punitive, exemplary and multiplied damages imposed upon any **Insured** (subject to this policy's

© All rights reserved.

*END 004*

Page 20 of 26

other terms, conditions, and limitations, including, but not limited to the Conduct Exclusion).  Enforceability of this paragraph shall be governed by the applicable law that most favors coverage for such penalties and punitive, exemplary, and multiplied damages.

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1) - (7) above, subject to the other terms, conditions, and exclusions of this policy

(dd)  **"Plan"** means any:

(1)  qualified or non-qualified plan, fund, trust or program, including, but not limited to any pension plan, welfare plan, health savings account plan, IRA-based plan, stock option plan, stock purchase plan, deferred compensation program, supplemental executive retirement program, top-hat plan, excess benefit plan, cafeteria plan, dependent care assistance program, fringe benefit plan or voluntary employees' beneficiary association as defined in the Internal Revenue Code of 1986, as amended ("VEBA") established anywhere in the world, which is sponsored solely by a **Company,** and with respect to a collectively bargained **Plan**, operated jointly by a **Company** and a labor organization, in each case solely for the benefit of such **Company's** current or former employees or **Directors or Officers**, and which was in existence on or before the inception of the **Policy Period**.

(2)  plan described in subparagraph (1) above acquired during the **Policy Period**.  However, if such plan is a pension plan:

(a)  acquired as a result of the **Company's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Company** as of the inception date of this policy; or

(b)  with assets that total more than 25% of the total consolidated assets of all covered pension plans as of the inception date of this policy; then this policy shall apply to such plan (solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within ninety (90) days of its acquisition, the **Named Entity** shall have provided the **Insurer** with information and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**.  The ninety (90) day reporting condition shall not apply if such new plan is not one of the five largest pension plans (by asset size) of the **Company**, if the failure to report such **Plan** within the ninety (90) day reporting period was due to inadvertent omission by the **Named Entity**, and if upon discovery of such omission the **Named Entity** notifies the **Insurer** as soon as practicable and provides any information and pays any premium required by the **Insurer** relating to such **Plan**.

(3)  plan or program described in subparagraph (1) above that was

© All rights reserved.

*END 004*

Page 21 of 26

created, considered, developed or proposed during the **Policy Period**.

The definition of **Plan** shall also include the following government-mandated programs: unemployment insurance, Social Security, or disability payments, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the definition of **Wrongful Act** in this policy.

Coverage under this policy shall not extend to a **Multiemployer Plan** itself, its contributing employer(s) or, except as set forth in subparagraph (4) of the definition of **Wrongful Act**, any fiduciary or administrator of a **Multiemployer Plan.**.

(hh) **"Voluntary Compliance Loss"** means fines, penalties, sanctions, and reasonable and necessary fees, costs or expenses related to the assessment of or correction of a **Plan's** non-compliance in accordance with any **Voluntary Compliance Program** and which are incurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

**"Voluntary Compliance Loss"** shall not include any compensation of any **Individual Insureds** or any employee of an **Insured**.

(kk) **"Wrongful Act"** means:

(1) any actual or alleged violation by an **Insured** of any of the responsibilities, obligations or duties imposed upon fiduciaries by **Employee Benefit Law** with respect to a **Plan,** including, but not limited to the actual or alleged improper selection of or inadequate monitoring of third-party service providers; or any allegation made against an **Insured** solely by reason of his, her or its actual or alleged status as a fiduciary, but only with respect to a  **Plan**;

(2) any actual or alleged act, error or omission by an **Insured** in the **Administration** of any **Plan**, including, but not limited to the actual or alleged failure to properly and timely provide COBRA notices or other required notices, the alleged failure to make timely determinations of eligibility for benefits; or any allegation made against an **Insured** solely by reason of his, her or its actual or alleged **Administration** of a **Plan**;

(3) any negligent act, error or omission by a **Company**, its **Directors or Officers** or employees in facilitating the administration of a **Multiemployer Plan**; and

(4) if a plan identified as a **Multiemployer Plan** is referenced by specific written **endorsement** attached to this policy and any required premium is paid, any matter arising out of an **Individual Insured's** actual or alleged service as a fiduciary of, or actual or alleged **Administration** of, such **Multiemployer Plan** when such service or **Administration** is at the specific written request or direction of the **Company**.

Ⓒ All rights reserved.

*END 004*

**ENDORSEMENT# *4*** (continued)

(C)   The following Definitions are added to the **FLI Coverage Section**:

"**Administration**" means, with respect to a **Plan**, counseling employees, participants, and beneficiaries; providing interpretations; handling of records; determining and calculating benefits; preparing, distributing or filing required notices or documents; or activities affecting enrollment, termination or cancellation of employees, participants, and beneficiaries under the **Plan**.

"**Corporate Trustee Company**" means any corporation formed and operating outside of the United States of America established by the **Company** and duly appointed to act as a trustee of a **Plan**.

"**Covered Penalties**" means solely in connection with a **Plan**:

(1)   the 5% or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**;

(2)   the 20% or less civil penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to a covered settlement or judgment;

(3)   the civil fines and penalties assessed against an **Insured** by either the United Kingdom's Pensions Ombudsman or the Pensions Regulator or any successor body thereto;

(4)   **Voluntary Compliance Loss** subject to the aggregate sublimit of liability set forth in the Declarations;

(5)   the civil penalties under Section 502(c) of **ERISA**, other than penalties under the Pension Protection Act, subject to the aggregate sublimit of liability set forth in the Declarations ("**Section 502(c) Penalties**");

(6)   the civil penalties under the Pension Protection Act of 2006, subject to the aggregate sublimit of liability set forth in the Declarations ("**Pension Protection Act Penalties**");

(7)   **HIPAA Penalties**, subject to the aggregate sublimit of liability set forth in the Declarations;

(8)   the civil penalties imposed under rules and regulations (including interim final rules and regulations) provided by governmental agencies (including the U.S. Department of Health and Human Services, the U.S. Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the DOL, the Office of Consumer Information and Insurance Oversight, and the Employee Benefits Security Administration), for inadvertent violations by an **Insured** of **Health Care Reform Law**, subject to the aggregate sublimit of liability set forth in the Declarations ("**Health Care Reform Penalties**"); and

(9)   the 15% or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments, subject to the aggregate sublimit of liability set forth in the Declarations ("**Section 4975 Penalties**").

"**E-Discovery**" means the development, collection, storage, organization,

© All rights reserved.

*END 004*

118497 (10/14)                         Page 23 of 26

cataloging, preservation and/or production of electronically stored information.

"**E-Discovery Consultant Services**" means solely the following services performed by an **E-Consultant Firm**:

(1) assisting the **Insured** with managing and minimizing the internal and external costs associated with **E-Discovery**;

(2) assisting the **Insured** in developing or formulating an **E-Discovery** strategy which shall include interviewing qualified and cost effective **E-Discovery** vendors;

(3) serving as project manager, advisor and/or consultant to the **Insured**, defense counsel and the **Insurer** in executing and monitoring the **E-Discovery** strategy; and

(4) such other services provided by the **E-Consultant Firm** that the **Insured**, **Insurer** and **E-Consultant Firm** agree are reasonable and necessary given the circumstances of the **Claim**.

"**Executive**" means any past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position).

"**Health Care Reform Law**" means the Patient Protection and Affordable Care Act ("PPACA") and the Health Care and Education Reconciliation Act of 2010.

"**Managed Care Services**" means the administration or management of a health care, pharmaceutical, vision or dental **Plan** utilizing cost control mechanisms, including, but not limited to utilization review, case management, disease management, pharmacy management, the use of a preferred provider medical, vision or dental network, or a health maintenance organization.

"**Multiemployer Plan**" means any multiemployer plan, as defined by **ERISA**, which is operated jointly by the **Company**, a labor organization, and one or more other employers for the benefit of the employees of the **Company** among others.

"**Pension Crisis**" has the meaning set forth in the **Pension CrisisFund**[SM] Appendix attached to this policy.

"**Pension CrisisFund**[SM]" means the aggregate sublimit of liability set forth in the Declarations (as amended by this endorsement) for all **Pension Crisis Loss** in the aggregate for all **Pension Crises** first occurring during the **Policy Period** or any applicable **Discovery Period**.

"**Pension Crisis Loss**" has the meaning set forth in the **Pension CrisisFund**[SM] Appendix attached to this policy.

"**Plan Committee**" means any employee benefit committee, including, but not

© All rights reserved.

**ENDORSEMENT# *4***   (continued)

limited to any plan investment or administration committee, that is established by a **Company** and that is comprised entirely of **Individual Insureds.**

"**Voluntary Compliance Program**" means any voluntary compliance resolution program or similar voluntary settlement program administered by the DOL, IRS, PBGC or other similar governmental authority or any similar program administered by any governmental authority located outside the United States of America, to correct any inadvertent non-compliance by a **Plan**, including, but not limited to:

(1)   Employee Plans Compliance Resolution System;

(2)   Delinquent Filer Voluntary Compliance Program;

(3)   Voluntary Fiduciary Correction Program;

(4)   Premium Compliance Evaluation Program; and

(5)   Participant Notice Voluntary Correction Program.

13.  *Affordable Care Act Coverage*

I.   The **FLI Coverage Section** is amended to include the following Clause at the end thereof:

AA.  **AFFORDABLE CARE ACT COVERAGE**

This policy shall pay the **Loss** of an **Insured** arising from a **Claim** made against such **Insured** for any **Healthcare Exchange Wrongful Act.**

II.   In Clause 3. **DEFINITIONS** of the **FLI Coverage Section**, paragraph (kk), "**Wrongful Act**," as amended herein, is further amended to include the following at the end thereof:

"**Wrongful Act**" also means any **Healthcare Exchange Wrongful Act**.

III.  As used herein, the following terms have the following meanings:

"**Healthcare Exchange**" means any public, private or government-sponsored entity set up to facilitate the purchase of health insurance in accordance with the Patient Protection and Affordable Care Act.

"**Healthcare Exchange Wrongful Act**" means any actual or alleged act, error or omission by an **Insured** in connection with insurance purchased through, or attempted to be purchased through, a **Healthcare Exchange**.

IV.  The term "**Plan**," as amended herein, is further amended to include any **Healthcare Exchange**, but no coverage shall be provided for such **Healthcare Exchange**.

V.   Solely with respect to the foregoing Affordable Care Act Coverage, in the event that the **Insured's** business is that of an insurer, insurance provider, or insurance exchange provider or marketplace, then the **Insurer** shall not be

© All rights reserved.

*END 004*

118497 (10/14)

<u>ENDORSEMENT#</u> *4*   (continued)

liable to make any payment for **Loss** in connection with such business, including but not limited to any professional services related thereto.

VI.  Further, the foregoing Affordable Care Act Coverage shall apply excess of any other valid and collectible insurance under which payment of the claim is required or actually made.  If said other insurance is provided by the **Insurer** or any other insurance company thereof (or would be provided but for the application of the retention amount or the exhaustion of the limit of liability) (herein, **"Other Policy"**), then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in part or in whole, by this policy and such **Other Policy**, shall not exceed the greater of the **Limit** of Liability set forth on the Declarations page of this policy or the limit of liability of such **Other Policy**.

**V.   AMENDMENTS TO THE CRIME COVERAGE SECTION**

1.   *Omnibus Wording*

Solely with respect to the **Crime Coverage Section**, the Item of the **DECLARATIONS** entitled **NAMED ENTITY** is amended by addition of the following:

"and any interest hereafter owned, controlled or operated by any one of those named as **Insured**, subject, however, to Clause 6. **CONDITIONS,** Paragraph a. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION, subparagraph v. CONSOLIDATION - MERGER OR ACQUISITION."

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 004*

118497 (10/14)

**ENDORSEMENT# *5***

This endorsement, effective *12:01 am*      *April 26, 2019*            forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SIDE A EXCESS LIMIT OF LIABILITY ENDORSEMENT
(EXCESS LIMIT APPLICABLE TO NON-INDEMNIFIABLE LOSS
UNDER THE D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to coverage for **Loss** provided under the **D&O Coverage Section**, the policy is hereby amended as follows:

1.   Item 7. of the Declarations is amended to include the following at the end thereof:

   (g)   **SIDE A EXCESS LIMIT OF LIABILITY:** *$1,000,000*         , excess aggregate limit of liability for all **Non-Indemnifiable Loss** solely for **Executives** of a **Company** (including **Defense Costs**) under the **D&O Coverage Section** (herein the "**Side A Excess Limit of Liability**").

2.   Clause 4. **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)** of the **General Terms And Conditions** is deleted in its entirety and replaced with the following:

   4.   **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)**

   The **Policy Aggregate Limit of Liability** is the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) under all **Coverage Sections** combined arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

   If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Each **Separate Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

   If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) arising out of all **Claims** first made

© All rights reserved.
*END 005*

**ENDORSEMENT#** *5*   (continued)

against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Each **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

The **Side A Excess Limit of Liability** stated in Item 7(g) of the Declarations, as set forth by paragraph 1. of this endorsement above, is the aggregate limit of the **Insurer's** liability under the **D&O Coverage Section** excess of: (i) any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**; and (ii) any coverage for **Loss** (whether or not **Non-Indemnifiable Loss**) under any policy of insurance specifically written as excess over any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**, for all **Non-Indemnifiable Loss** under the **D&O Coverage Section** arising out of all **Claims** first made against an **Executive** of a **Company** during the **Policy Period** or the **Discovery Period** (if applicable). The **Side A Excess Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Side A Excess Limit of Liability** for the **Policy Period**. The **Side A Excess Limit of Liability** shall be in addition to the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**.

It is agreed that the **Insurer's** liability to pay **Non-Indemnifiable Loss** shall only attach to the **Side A Excess Limit of Liability** after:

(a)   the full amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section** has been exhausted due to **Loss** paid thereunder; and

(b)   any coverage for **Loss** (whether or not **Non-Indemnifiable Loss**) under any policy of insurance specifically written as excess over any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section** has been exhausted by reason of loss(es) paid thereunder.

The **Side A Excess Limit of Liability** provided by this endorsement shall "drop down" (continue in force as primary insurance) only in the event of (a) and (b) above and shall not drop down for any other reason.

Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 6(b) or 6(c) of these **General Terms and Conditions** is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** and subject to any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**. Amounts incurred for **Defense**

© All rights reserved.
*END 005*

**ENDORSEMENT#** *5*     (continued)

      **Costs** shall be applied against the Retention.

3.    Solely for purposes of the coverage as afforded by this endorsement, "**Non-Indemnifiable Loss**" means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Executive** of a **Company** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 005*

ENDORSEMENT# *6*

This endorsement, effective at *12:01 am   April 26, 2019*      forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

## PASSPORT WORLDWIDE COVERAGE STRUCTURE
## (SPECIFIED COVERAGE SECTIONS)

### SCHEDULE OF APPLICABLE COVERAGE SECTION(S):

*D&O*

The **Insurer** and the **Named Entity** have negotiated this policy (herein, "U.S. Worldwide Policy") to provide that, where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.  The **Insurer** and the **Named Entity** have also agreed that to best effectuate application of the U.S. Worldwide Policy to **Claims** made outside the United States, certain insurance company affiliates of the **Insurer** (herein, "Foreign Insurers"; together with the **Insurer**, the "AIG Insurers") will cause to be issued policies in certain **Foreign Jurisdiction(s)** (herein, "Passport Foreign Underlyer Policies"; together with the U.S. Worldwide Policy, the "Passport Policies"), as described in the Binder attached, each of which will be subject to its own terms, conditions and exclusions. Accordingly, the **Insurer**, the **Named Entity** and the other **Insureds** agree as follows:

1. If any amounts paid to or on behalf of the any of the **Insureds** under the Passport Policies cause the aggregate amount paid on all Passport Policies to exceed the Limit of Liability of the U.S. Worldwide Policy for a single policy period (such amounts, herein, "Passport Structure Reimbursement Amounts"), then for all such Passport Structure Reimbursement Amounts, the **Named Entity** shall irrevocably and unconditionally indemnify the **Insurer** from and shall pay all such amounts to or as directed by the **Insurer** as a payment obligation directly due from the **Named Entity** as a primary obligor, within ten (10) days from the **Insurer's** written demand.

2. All amounts due from the **Named Entity** under this endorsement shall be paid in full, without dispute, set-off, defense, cross-claim or counterclaim and free and clear of any tax, duty or other type of deductions or withholdings.  If the **Named Entity** is required by law to make any deduction or withholding, then the amount due from the **Named Entity** shall be increased accordingly.

3. The courts in and for the State of New York, USA shall have exclusive jurisdiction over any disputes arising under this endorsement and the City of New York in the State of New York, USA shall be the exclusive venue. The sole remedy of the **Insurer** and the **Named Entity** for breach of the obligations in this endorsement shall be an action for breach of only those contractual obligations and appropriate relief therefore. Any breach of the obligations in this endorsement shall not be grounds for any AIG Insurer or any **Insured** to claim a breach of the policy contract, as a whole, or to alter, avoid, withhold or delay performance of, or to deny the duty to perform, any other obligations in the Passport Policies.

© All rights reserved.

*END 006*

**ENDORSEMENT#** *6*   (continued)

4. Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.

In regard solely to **Claims** brought and maintained in a **Foreign Jurisdiction** against a **Company** formed and operating in such **Foreign Jurisdiction** or an **Individual Insured** thereof for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer**, for the purpose of determining whether any **Loss** may be payable under the **Coverage Section(s)** specified in the schedule above, in addition to any loss paid under a Passport Foreign Underlyer Policy issued in that jurisdiction, shall apply to such **Claim(s)** the terms and conditions of that Passport Foreign Underlyer Policy as amended to include those terms and conditions of this policy which are more favorable to such **Insured**, and if permitted by applicable law, the **Insurer** will pay to the **Named Entity**, any additional **Loss** that is covered under the **Coverage Section(s)** specified in the schedule above solely due to the more favorable terms and conditions in the U.S. Worldwide Policy.  If no Passport Foreign Underlyer Policy was issued in that Foreign Jurisdiction, then the **Insurer** shall apply to such **Claim(s)** the terms and conditions of this policy as amended to include those which are more favorable to such **Insured** in the **Foreign Policy** (or, if there is no **Foreign Policy** registered, the **Insurer's** or any other company of American International Group, Inc.'s ("AIG") standard employment practices liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within the **Foreign Jurisdiction**) that provides coverage substantially similar to the coverage afforded under this policy.  This paragraph shall apply only to insuring clauses, extensions, definitions, exclusions, pre-authorized defense counsel, discovery or extended reporting period, notice and authority or dispute resolution process provisions of this policy and the comparable provisions of such Passport Foreign Underlyer Policy or **Foreign Policy**. and shall not apply to the non-renewal or claims made and reported provisions of such policies.  This paragraph shall not apply to excess provisions or policy provisions that address non-renewal, duty to defend, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

Whether or not Passport Foreign Underlyer Policies are issued, if any endorsements to exclude or limit coverage for specific events or litigations or any endorsements specifically stating that they will have worldwide effect are placed on this policy, then effect shall be given to such endorsements on all **Claims** worldwide and each such endorsement will be considered a term of and incorporated into each Passport Foreign Underlyer Policy and **Foreign Policy**.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

5. Solely for purposes of this endorsement, and only if a specified **Coverage Section** in the

© All rights reserved.

**END 006**

<u>**ENDORSEMENT#**</u>  *6*   (continued)

schedule above, the **EPL Coverage Section** shall include the following definitions:

**"Foreign Jurisdiction"** means any jurisdiction, other than the United States of America or any of its territories or possessions.

**"Foreign Policy"** means the **Insurer's** or any other company of American International Group, Inc.'s ("AIG") standard executive managerial liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this **EPL Coverage Section**. If more than one such policy exists, then **"Foreign Policy"** means the standard basic policy form typically offered for sale in that **Foreign Jurisdiction** for comparable risks by the **Insurer** or any other company of AIG. The term **"Foreign Policy"** shall not include any partnership managerial, pension trust or professional liability coverage.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 006*

ENDORSEMENT# *7*

This endorsement, effective at *12:01 am   April 26, 2019*     forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### ENHANCED ASSAULT EXTENSION ENDORSEMENT
### (EPL COVERAGE SECTION)

In consideration of the premium charged, the **EPL Coverage Section** is amended as follows:

The terms, conditions and exclusions contained in this endorsement shall apply only to the coverage afforded by this endorsement.

### I.  ASSAULT INSURING AGREEMENT

1. Clause 1. **INSURING AGREEMENTS** of the **EPL Coverage Section** is amended to include the following at the end thereof:

> This **EPL Coverage Section** shall pay **Loss** arising from the **Assault** of an **Individual Insured**, subject to the **Additional Aggregate Limit of Liability for Assault**.

### II.  ADDITIONAL AGGREGATE LIMIT OF LIABILITY FOR ASSAULT

1. Item 7. **OTHER LIMITS OF LIABILITY** in the Declarations is amended to include the following at the end thereof:

| | |
|---|---|
| **(g) Additional Aggregate Limit of Liability for Assault (EPL):** | $ 1,000,000 |
| **Assault Off Premises** Sublimit of Liability: | $ 250,000 |
| **Expenses** Sublimit of Liability: | $ 500,000 |
| **Defense Costs,** including judgment and settlement costs  Sublimit of Liability: | $ 500,000 |
| **Business Interruption** and **Extra Expense** Sublimit of Liability: | $ 500,000 |
| **Loss of Attraction** Sublimit of Liability: | $ 50,000 |
| **Death or Dismemberment** Sublimit of Liability: | $ 500,000 aggregate<br>$ 100,000 per person |
| **Consultant Expenses** | UNLIMITED |

2. Clause 4. **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)** of the **General Terms and Conditions** is amended to include the following at the end thereof:

> The **Additional Aggregate Limit of Liability for Assault** in Item 7(g) of the Declarations is the **Insurer's** maximum liability for all **Loss** under the **EPL Coverage Section** arising from any **Assault**. The **Additional Aggregate Limit**

©All rights reserved.

### END 007

<u>ENDORSEMENT#</u> *7*   (continued)

of Liability for Assault is a separate limit of liability that shall be in addition to, and not part of, the **Policy Aggregate Limit of Liability**, and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **EPL Coverage Section**.

Each sublimit of liability, listed below Item 7(g) of the Declarations, is the maximum limit of the **Insurer's** liability for all **Loss** under the **EPL Coverage Section** arising from any **Assault** that is subject to that sublimit of liability. All sublimits of liability shall be part of, and not in addition to, the **Additional Aggregate Limit of Liability for Assault**.

### III. NO RETENTION APPLICABLE TO ASSAULT

1. Clause 5. **RETENTION CLAUSE** of the **EPL Coverage Section** is amended to include the following sentence at the end thereof:

   No Retention amount is applicable to an **Assault**.

### IV. ASSAULT DEFINITIONS

#### A. REVISED DEFINITIONS

1. In Clause 2. **DEFINITIONS** of the **EPL Coverage Section**, the definition of **"Claim"** is amended to include the following at the end thereof:

   The term "**Claim**" shall also include any **Assault**.

2. In Clause 2. **DEFINITIONS** of the **EPL Coverage Section**, the definition of **"Individual Insured"** is amended to include the following at the end thereof:

   The term "**Individual Insured**" shall also include any student of the **Named Entity**, any **Guest**, any **Relative**, or any resident in the household of such **Individual Insured**.

3. In Clause 2. **DEFINITIONS** of the **EPL Coverage Section**, the definition of **"Loss"** is amended to include the following:

   Notwithstanding the foregoing, **Loss** means the following reasonable and necessary expenses or costs incurred by the **Company** or any **Individual Insured** directly and solely as a result of an **Assault**:

   1.   **Expenses**
   2.   **Defense Costs**, including judgment and settlement costs
   3.   **Business Interruption** and **Extra Expense**
   4.   **Loss of Attraction**
   5.   **Death or Dismemberment**
   6.   **Consultant Expenses**

#### B. NEW DEFINITIONS

©All rights reserved.

*END 007*

<u>**ENDORSEMENT#**</u> *7*   (continued)

1. Clause 2. **DEFINITIONS** of the **EPL Coverage Section** is amended to include the following definitions at the end thereof:

    A.  **"Assault"** means the physical attack upon an **Individual Insured** on the **Named Entity's Premises** or an **Assault Off Premises** which results in or could result in **Death or Dismemberment** or a **Traumatic Medical Condition**. The attack must involve the use or display of a **Lethal Weapon**.

    B.  **"Assault Off Premises"** means an **Assault** that occurs while traveling or while conducting business on behalf of or at the direction of the **Named Entity**.

    C.  **"Business Interruption Costs"** means actual loss of **Net Profit** sustained by the **Insured** plus **Extra Expense** during the **Period of Restoration** resulting directly from a necessary interruption of business at the **Premises** caused by an **Assault**.

    D.  **"Consultant Expenses"** means reasonable expenses and fees of the **Insurer's** approved security consultant or independent security consultant.

    E.  **"Death or Dismemberment"** means the death or permanent total physical disablement of an **Individual Insured** including but not limited to paralysis or loss of use of any body part during an **Assault**. **Death or Dismemberment** includes **Mutilation**.

    F.  **"Expenses"** mean reasonable and necessary costs incurred and paid by the **Named Entity** or any **Individual Insured** or as otherwise agreed by the Insurer, which costs are solely and directly a result of an **Assault** provided that such **Assault** is covered under this policy and are one or more of the following:

    1.  amounts paid by the **Named Entity** or other **Individual Insureds** as reward to an **Informant** for information relevant to any **Assault**; and

    2.  travel and accommodation costs are covered as follows:

        a.   travel costs of an **Assault** victim to join their immediate family upon their release; and
        b.   the travel costs of an **Employee** to replace the **Assault** victim; and
        c.   travel costs to evacuate, or hotel costs of an **Individual Insured** and/or **Relative** living in the same household as an **Individual Insured** who is the victim of an **Assault** covered under this **EPL Coverage Section.**

    3.  **Salary**; and

    4.  **Medical Services and Hospitalization Costs** for a period of no longer than 120 days;

©All rights reserved.

*END 007*

          

<u>ENDORSEMENT# 7</u>   (continued)

5. fees and expenses of independent forensic analysts engaged by the **Named Entity** within ninety (90) days following the conclusion of an **Assault**; and

6. personal financial loss suffered by an **Individual Insured** solely and directly as the result of the physical inability of such person(s) to attend to personal financial matters while an **Assault** victim. Coverage will include but not be limited to **Loss** which results from such persons failure to renew insurance contracts, failure to exercise stock options, failure to respond to margin or loan calls by financial institutions and failure to pay off personal loans or a mortgage; and

7. reasonable costs related to rest and rehabilitation including travel, lodging, meals and recreation of the **Assault** victim and a spouse and/or children incurred within 180 days following the conclusion of the **Assault**; and

8. fees and expenses of a qualified interpreter assisting the **Named Entity** or other **Individual Insured** in the event of an **Assault**; and

9. increased costs of security due to an **Assault** including but not limited to hiring of security guards, hiring of armored vehicles and overtime pay to existing security staff, for a period of up to forty-five (45) days, provided, however, that the **Insured's** approved security consultant or independent security consultant, has specifically recommended such security measures; and

10. **Job Retraining Costs**; and

11. fees and expenses of the **Insurer's** approved public relations consultant, Abernathy & MacGregor or another independent public relations consultant approved by the **Insurer** incurred within 90 days following the conclusion of an **Assault**, provided that the **Insurer** has given prior written consent to the use of such other public relations consultants to act on the **Named Entity's** behalf; and

12. reasonable and necessary legal fees and expenses incurred by the **Named Entity** in order to immediately respond to any **Assault**.

13. clean-up costs associated with an **Assault**, subject to a $50,000 aggregate sublimit of liability; and

14. relocation costs associated with an **Assault**, subject to a $50,000 aggregate sublimit of liability; and

15. any other reasonable costs incurred with the **Insurer's** prior written consent.

G. "**Extra Expense**" means the excess of the total cost of conducting business activities during the period necessary to sustain business operations at the location, owned or operated by the **Insured**, where the **Assault** occurred for

©All rights reserved.

*END 007*

the sole purpose of reducing **Loss**. This policy only covers those **Extra Expenses** which are over and above the cost of such activities during the same period of time had no **Assault** occurred. **Extra Expense** is calculated as the **Named Entity's** actual, reasonable and necessary expenses which the **Named Entity** incurs throughout the **Period of Restoration**, in order to continue operations following an **Assault**.

H. **"Guest"** means any person visiting the **Named Entity's Premises**, or traveling for social or business purposes with any director, officer or **Employee** of the **Named Entity.**

I. **"Job Retraining Costs"** means **Salary** of the **Assault** victim while being retrained, and costs of external training courses.

J. **"Lethal Weapon"** means a firearm, explosive device, motor vehicle, instrument, material, or any other object or substance that is capable of producing bodily harm or death. A motor vehicle, instrument, material, object or substance that is not a weapon by nature shall still qualify as a **Lethal Weapon** if it results in or could result in bodily harm or death due to the manner in which it is used.

K. **"Loss of Attraction"** means any portion of measurable reduction in revenues due to an actual **Assault** event which occurs within a one (1) mile radius of the **Named Entity's Premises**. **Loss of Attraction** shall be calculated as that portion of reduced income that the **Named Entity** would have had, within the **Period of Restoration**, had the incident not occurred. **Loss of Attraction** will also take into consideration business trends and seasonality, should they have direct impact on the **Named Entity's** revenues. Furthermore, **Loss of Attraction** will extend to cover any **Extra Expense** agreeable to the **Insurer** which are deemed necessary in order to return the **Named Entity's** revenues back to the **Named Entity's** normal course of business, had the incident not occurred.

L. **"Medical Services and Hospitalization Costs"** are costs incurred by an **Individual Insured** and paid by the **Named Entity** solely and directly as the result of an **Assault**, such costs include but are not limited to any costs for treatment by a neurologist or psychiatrist, costs for cosmetic surgery, dental, and expense of confinement for such treatment.

M. **"Mutilation"** means the permanent and total loss of a finger, toe, ear, nose, genital organ or part thereof.

N. **"Net Profit"** means profit resulting from the business of the **Named Entity** after deduction of all expenses and other charges, including depreciation, but before the deduction of any taxation chargeable on profits.

O. **"Period of Restoration"** means the period of time that begins at the time an **Assault** begins and ends on the earlier of:

©All rights reserved.

*END 007*

<u>**ENDORSEMENT#**</u> *7*   (continued)

1. the date the **Named Entity** can restore operations at the **Premises** where the **Assault** occurred to the condition that would have existed had the covered **Assault** not occurred; or
2. ninety (90) consecutive days after an **Assault**.

A six (6) hour waiting period applies to this definition.

P.   **"Premises"** means any premises occupied by the **Named Entity** as a place to conduct business whether owned, leased, rented, and/or occupied during the course of business.

Q.   **"Relative"** means a spouse, **Domestic Partner**, fiancé, fiancée, child, step-child, legally adopted child, foster child, spouse of a married child, grandchild, sister, brother, parent, parent-in-law, grandparent, or grandparent-in-law, adoptive parent, step-parent and siblings or living ancestors or descendants of any **Individual Insured**.

R.   **"Salary"** means the amount of compensation paid by the **Named Entity** to **Individual Insureds** at an annual rate including but not limited to the average bonuses, commissions, cost of living adjustments or foreign tax reimbursements an **Individual Insured** would normally receive, including contributions to pension and benefit programs at the level in effect on the date the **Assault** first occurred. **Salary** shall continue for the duration of the **Assault** or the earliest of:

1. discovery of the death of the **Individual Insured**; or
2. one hundred and twenty (120) days after **the Insurer** receives the last credible evidence that an **Individual Insured** is still alive; or
3. seventy-two (72) months after the date the **Assault** first occurred.

**Salary** shall include the amount of compensation paid by the **Named Entity**, at an annual rate, to an individual newly hired to conduct the specific duties of an **Individual Insured** who was a victim of an **Assault**. Notwithstanding the foregoing. this **Salary** will continue only until the earliest of the conditions set forth in 1.) through 3.) are satisfied.

S.   **"Traumatic Medical Condition"** means:
1. clear, identifiable, internal or external bodily injury; or
2. post-traumatic stress disorder (PTSD) sustained by a person as a result of an **Assault** which occurs as a direct or indirect result of an actual or perceived **Assault**.

## V.  EXCLUSIONS

### A.  REVISED EXCLUSIONS

Clause 3. **EXCLUSIONS** of the **EPL Coverage Section** is amended by deleting exclusion (f) in its entirety and replacing it with the following:

©All rights reserved.

*END 007*

<u>**ENDORSEMENT#**</u> *7*   (continued)

(f) for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to an **Assault**;

**B.  NEW EXCLUSIONS**

This endorsement does not apply to:

aa. **Loss** arising out of, based upon or attributable to war, whether or not declared, civil war, insurrection, rebellion or revolution, or any act or condition incident to the foregoing; or

bb. solely with respect to **Death or Dismemberment**, an **Individual Insured's** self-inflicted injury, suicide or injury or death related to such **Individual Insured's** own criminal act; or

cc. any **Individual Insured** taking part in military services or operations; or

dd. **Defense Costs**, including judgment and settlement costs, arising out of, based upon or attributable to any actual or alleged contractual liability of the **Company** or any other **Individual Insured** under any express contract or agreement.

**VI.   OTHER INSURANCE**

Clause 11. **OTHER INSURANCE** of the **General Terms & Conditions** is deleted in its entirety and replaced with the following:

11. **OTHER INSURANCE**

1.   Primary Insurance

The insurance provided by this "Enhanced Assault Extension Endorsement" shall apply as primary. Notwithstanding any applicable Retention, if the **Named Entity** has other insurance which also responds on a primary basis to all or part of a **Loss** covered under this "Enhanced Assault Extension Endorsement" then the **Insurer** shall share limits as described in paragraph (2) below.

2.   Sharing of Limits and Pyramiding of Limits

When other insurance is applicable to a **Loss** covered by this "Enhanced Assault Extension Endorsement" then the **Insurer** shall not be liable under this "Enhanced Assault Extension Endorsement" for a greater proportion of such **Loss** than the **Additional Aggregate Limit of Liability for Assault** bears to the total applicable limits of all insurance available plus any Retention.

©All rights reserved.

*END 007*

<u>**ENDORSEMENT#**</u> *7*   (continued)

If this "Enhanced Assault Extension Endorsement" and other insurance provided to the **Named Entity** by an AIG member company cover **Assault**, then the **Additional Aggregate Limit of Liability for Assault** and the limits of such member company's insurance, when combined, will not exceed the highest applicable limits available under any one of the applicable coverage(s) or policy(ies).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

© American International Group, Inc. All rights reserved.

<u>AUTHORIZED  REPRESENTATIVE</u>

©All rights reserved.

***END 007***

**ENDORSEMENT# 8**

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**SEPARATE SUBLIMIT AND RETENTION FOR CLAIMS BY SPECIFIED INDIVIDUAL(S)**

**(SPECIFIED COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. Notwithstanding anything to the contrary in the policy or any endorsement to the policy,
   with respect to any **Specified Individual Claim** (as defined below) under any **Specified
   Coverage Section**:

   A. The **Insurer** shall only be liable for **Loss** arising from such **Specified Individual Claim**
      which is in excess of the Retention amount indicated on the schedule below for the
      applicable **Coverage Section** (the "**Specified Individual Retention**"), such **Specified
      Individual Retention** to be borne by the **Company** and/or the **Insureds** and shall
      remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the
      **Company**. A single **Specified Individual Retention** shall apply to **Loss** arising from all
      **Specified Individual Claims** alleging the same **Wrongful Act** or **Related Wrongful
      Acts**.  If a **Claim** triggers coverage under more than one **Coverage Section** all of which
      are subject to a **Shared Limit of Liability**, the highest applicable Retention amount
      shall apply to such **Claim**.  If a **Claim** triggers coverage under more than one **Coverage
      Section** at least one of which is subject to a **Separate Limit of Liability**, the Retention
      applicable to **Loss** in connection with such **Claim** under any such **Coverage Section**
      subject to a **Separate Limit of Liability** shall apply separately to such **Loss**, and the
      applicable Retention for such **Coverage Section** shall not be satisfied by payments of
      **Loss** made towards the Retention required under any other **Coverage Section**; and

   B. The aggregate limit of the **Insurer's** liability for all **Loss** under any given **Coverage
      Section** arising out of all **Specified Individual Claims** is the sublimit of liability
      indicated on the schedule below for such **Coverage Section**.  Each such sublimit of
      liability shall be part of and not in addition to the **Policy Aggregate Limit of Liability**
      and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to such
      **Specified Coverage Section**.

2. As used in this endorsement, "**Specified Individual Claim**" means any **Claim** brought by or
   on behalf of any of the following individual(s):

©All rights reserved.
END 8

**ENDORSEMENT**# 8     (Continued)

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**Specified Individual(s):**

Erika Schmieding

3.  **SCHEDULE OF COVERAGE SECTIONS, SUBLIMITS AND RETENTIONS**

| COVERAGE SECTION | SUBLIMIT | RETENTION |
|---|---|---|
| D&O Coverage Section | $5,000,000 | $1,000,000 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 8

120880 (02/16)                                    2

**ENDORSEMENT#** *9*

This endorsement, effective *12:01 am     April 26, 2019*     forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**CONTINUITY DATE - EXCESS LIMITS ENDORSEMENT**
**(D&O AND EPL COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that, solely
with respect to the **D&O** and **EPL Coverage Sections**, the CONTINUITY DATES in Item 3
of the Declarations are hereby deleted in their entirety and replaced with the following:

CONTINUITY DATES:

D&O Coverage for the first  *$3,000,000*
Limit of Liability

                *January 31, 2003*

D&O Coverage for the  *$7,000,000*
in excess of the  *$3,000,000*
Limit of Liability

                *March 1, 2009*

EPL Coverage for the first  *$3,000,000*
Limit of Liability

                *January 31, 2003*

EPL Coverage for the  *$7,000,000*
in excess of the  *$3,000,000*
Limit of Liability

                *March 1, 2009*

The term Limit of Liability shall mean either the **Separate Limit of Liability** or **Shared
Limit of Liability** of each such respective **Coverage Section** as stated in the Declarations

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 009*

95755 (9/07)                              Page 1 of 1

<u>ENDORSEMENT#</u> *10*

This endorsement, effective at *12:01 am   April 26, 2019*        forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### INDIVIDUAL INSURED(S) DEFINITION AMENDED ENDORSEMENT
### (ADVISORY BOARD MEMBERS)
### (D&O AND FLI COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that coverage as is provided under the **D&O** and **FLI Coverage Sections** is extended and the Definition of "**Individual Insured**" in the **D&O** and **FLI Coverage Sections** is amended to include the members of the advisory committees of the board of directors of the **Company**, solely in their capacity as such members and with respect to the following **Continuity Date**: *01/31/2003*.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the **Company** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company**.  The **Company** hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against an **Insured**:

(1) alleging, arising out of, based upon or attributable to, as of such **Individual Insured's** respective **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, or alleging or derived from a **Related Wrongful Act** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; and

(2) alleging any **Wrongful Act** occurring prior to each individual's respective **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

**END 010**

112948 (3/14)                    Page 1 of 1

<u>ENDORSEMENT#</u> *11*

This endorsement, effective at *12:01 am   April 26, 2019*      forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

**SEVERABILITY OF THE APPLICATION ENDORSEMENT
(FULL INDIVIDUAL SEVERABILITY; TOP 2 COMPANY POSITIONS
IMPUTED TO COMPANY - NON-RESCINDABLE SIDE A)
(D&O, EPL and FLI COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1. Clause 10. **REPRESENTATIONS AND SEVERABILITY** of the **D&O Coverage Section** is hereby deleted in its entirety and replaced with the following:

    **10. SEVERABILITY**

    In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete.  All such statements and representations are the basis of this **D&O Coverage Section** and are to be considered as incorporated into this  **D&O Coverage Section**.

    The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, then this **D&O Coverage Section** shall be void *ab initio* solely with respect to any of the following **Insureds**:

    (1)     solely with respect to **Indemnifiable Loss**, any **Individual Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the application,

    (2)     a **Company**, under Clause 1. **"INSURING AGREEMENTS"**, Coverage B(ii), to the extent it indemnifies any **Individual Insured** referenced in (1), above; and

    (3)     a **Company**, under Clause 1. **"INSURING AGREEMENTS"**, Coverage B(i), if any past, present or future chief executive officer or chief financial officer (or equivalent position) of the **Company** knew as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed in the application, whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the  **Application**.

    Solely with respect to any **Non-Indemnifiable Loss** of any **Individual Insured**, the **Insurer** shall not be entitled under any circumstances to rescind coverage under this **D&O Coverage Section** with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

© All rights reserved.

*END 011*

115775 (4/15)                          Page 1 of 3

<u>ENDORSEMENT#</u> *11*   (continued)

2. It is hereby further understood and agreed that Clause 8. **REPRESENTATIONS AND SEVERABILITY** of the **EPL Coverage Section** is hereby deleted in its entirety and replaced with the following:

**8.  SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** for this **EPL Coverage Section** as being accurate and complete.  All such statements and representations are the basis of this **EPL Coverage Section** and are to be considered as incorporated into this **EPL Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, then this **EPL Coverage Section** shall be void *ab initio* solely with respect to any of the following **Insureds**:

(1) solely with respect to **Indemnifiable Loss**, any **Individual Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the application,

(2) a **Company**, to the extent it indemnifies any **Individual Insured** referenced in (1), above; and

(3) a **Company**, if any past, present or future chief executive officer or chief financial officer (or equivalent position) of the **Company** knew as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed in the application, whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

Solely with respect to any **Non-Indemnifiable Loss** of any **Individual Insured**, the **Insurer** shall not be entitled under any circumstances to rescind coverage under this **EPL Coverage Section** with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy. As used in this endorsement, **"Non-Indemnifiable Loss"** means **Loss** for which a **Company** neither indemnified nor is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

3. It is hereby further understood and agreed that the **FLI Coverage Section** of the policy is amended by adding the following Clause at the end thereof:

**(SA)-1. REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **FLI Coverage Section** as being accurate and complete. All such statements and representations

© All rights reserved.

*END 011*

**ENDORSEMENT#** *11*      (continued)

are the basis of this **FLI Coverage Section** and are to be considered as incorporated into this **FLI Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, then this **FLI Coverage Section** shall be void *ab initio* solely with respect to any of the following **Insureds**:

(1) any **Individual Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the application;

(2) any **Company** to the extent it indemnifies any **Individual Insured** referenced in subparagraph (1) above; and

(3) any **Company** if any past or present chief executive officer or chief financial officer of the **Company** knew of such inaccurate or incomplete statements, warranties or representations, whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

Solely with respect to any **Non-Indemnifiable Loss** of any **Individual Insured**, the **Insurer** shall not be entitled under any circumstances to rescind coverage under this **FLI Coverage Section** with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

As used in this endorsement, **"Non-Indemnifiable Loss"** means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 011*

115775 (4/15)                    Page 3 of 3

**ENDORSEMENT#** *12*

This endorsement, effective *12:01 am*     *April 26, 2019*     forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**STATE AMENDATORY INCONSISTENT**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.   In the event that there is an inconsistency between any: (a) state amendatory attached to this policy, or any other wording attached to this policy to comply with applicable law; and (b) any other term, condition or limitation of this policy; then, to the extent permitted by law, subject to the limitations below, the Insurer will resolve the inconsistency by applying the terms, conditions or limitations that are more favorable to the policyholder.

2.   This endorsement shall not apply to the extent that: (a) any state amendatory or other wording expressly limits coverage in order to comply with applicable law, or (b) any such amendatory or other compliance wording amends language applicable to premium. In such events, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

3.   "Policyholder" means the first Named Entity, Named Organization, Named Corporation, Named Sponsor, Named Insured or other policyholder designated in Item 1 of the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 012*

<u>ENDORSEMENT#</u> *13*

This endorsement, effective at *12:01 am   April 26, 2019*        forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name:   *PrivateEdge Plus*

### PRIOR NOTICE EXCLUSION AMENDED
### (PRIOR D&O, EPL AND FLI POLICIES ONLY)
### (D&O, EPL AND FLI COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. In Clause 4. **EXCLUSIONS** of the **D&O Coverage Section**, paragraph (d), relating to prior
   notice, is deleted in its entirety and replaced with the following:

   (d) alleging, arising out of, based upon or attributable to the facts alleged, or to the
       same or **Related Wrongful Act(s)** alleged or contained in any **Claim** which has been
       reported, or in any circumstances of which notice has been given, under any
       directors and officers liability policy of which this **D&O Coverage Section** is a
       renewal or replacement of in whole or in part or which it may succeed in time;

2. In Clause 3. **EXCLUSIONS** of the **EPL Coverage Section**, paragraph (b), relating to prior
   notice, is deleted in its entirety and replaced with the following:

   (b) alleging, arising out of, based upon or attributable to the facts alleged, or to the
       same or **Related Wrongful Act(s)** alleged or contained in any **Claim** which has been
       reported or in any circumstances of which notice has been given, under any
       employment practices liability policy of which this **EPL Coverage Section** is a
       renewal or replacement of in whole or in part;

3. In Clause 5. **EXCLUSIONS** of the **FLI Coverage Section**, paragraph (d), relating to prior
   notice, is deleted in its entirety and replaced with the following:

   (d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same
   or **Related Wrongful Act(s)** alleged or contained in any **Claim** which has been reported or in
   any circumstances of which notice has been given, under any fiduciary liability policy of
   which this **FLI Coverage Section** is a renewal or replacement of in whole or in part;


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 013*

ENDORSEMENT# *14*

This endorsement, effective at *12:01 am   April 26, 2019*        forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

**CONDUCT EXCLUSIONS AMENDED
(FINAL NON-APPEALABLE ADJUDICATION OTHER THAN A COVERAGE
PROCEEDING INITIATED BY INSURER)(ADD "DELIBERATE" BEFORE "DISHONEST ACT"
AND "CRIMINAL")(D&O, EPL & FLI COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. In Clause 4. **EXCLUSIONS** of the **D&O Coverage Section**, paragraphs (a), (b) and (c) are
   deleted in their entirety and replaced with the following:

   (a)      arising out of, based upon or attributable to the gaining of any profit or
            advantage to which any final non-appealable adjudication in an action or
            proceeding other than an action or proceeding initiated by the **Insurer** to
            determine coverage under the policy establishes the **Insured** was not legally
            entitled;

   (b)      arising out of, based upon or attributable to: (1) the purchase or sale by an
            **Insured** of securities of the **Company** within the meaning of Section16(b) of
            the Securities Exchange Act of 1934 and amendments thereto or similar
            provisions of any state statutory law if any final non-appealable adjudication
            in an action or proceeding other than an action or proceeding initiated by the
            **Insurer** to determine coverage under the policy establishes that such 16(b)
            violation occurred; or (2) the payment to any **Insured** of any remuneration
            without the previous approval of the stockholders of the **Company**, once any
            final non-appealable adjudication in an action or proceeding other than an
            action or proceeding initiated by the **Insurer** to determine coverage under the
            policy establishes that such payment is illegal;

   (c)      arising out of, based upon or attributable to the committing of any deliberate
            criminal or deliberate fraudulent act, or deliberate dishonest act or any willful
            violation of any statute, rule or law, if any final non-appealable adjudication
            in an action or proceeding other than an action or proceeding initiated by the
            **Insurer** to determine coverage under the policy establishes that such
            deliberate criminal or deliberate fraudulent act, or deliberate dishonest act or
            willful violation of any statute, rule or law, was committed;

2. In Clause 3. **EXCLUSIONS** of the **EPL Coverage Section**, paragraph (a) is deleted in its
   entirety and replaced with the following:

   (a)      arising out of, based upon or attributable to the committing of any deliberate
            criminal or deliberate fraudulent act by the **Insured**, if any final
            non-appealable adjudication in an action or proceeding other than an action
            or proceeding initiated by the **Insurer** to determine coverage under  the policy

© All rights reserved.

*END 014*

114183 (3/14)                    Page 1 of 2

<u>ENDORSEMENT#</u> *14*   (continued)

establishes that such deliberate criminal or deliberate fraudulent act was committed;

3. In Clause 5. **EXCLUSIONS** of the **FLI Coverage Section**, paragraphs (a) and (b) are deleted in their entirety and replaced with the following:

   (a)   arising out of, based upon or attributable to the gaining of any profit or advantage to which any final non-appealable adjudication in an action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy establishes the **Insured** was not legally entitled.

   (b)   arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law** by the **Insured** if any final non-appealable adjudication in an action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy establishes that such deliberate criminal or deliberate fraudulent act was committed;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 014*

ENDORSEMENT# *15*

This endorsement, effective at *12:01 am   April 26, 2019*       forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### SETTLEMENT PROVISIONS AMENDED
### (SETTLEMENT WITHIN % OF THE APPLICABLE RETENTION AMOUNT)
### (D&O AND EPL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that (i) Clause 7. "DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)" of the **D&O Coverage Section** and (ii) Clause 6. "DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)" of the **EPL Coverage Section** are each amended by adding the following paragraph at the end of each:

> Notwithstanding any of the foregoing, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one Retention amount, for an amount not exceeding Twenty-five percent (25%) of such Retention amount (inclusive of **Defense Costs**), then the **Insurer's** consent shall not be required for such disposition.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 015*

114188 (3/14)                              Page 1 of 1

**ENDORSEMENT#** 16

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**SUBROGATION CLAUSE AMENDED**

**(DELIBERATE ADDED)**
**(GENERAL TERMS AND CONDITIONS AMENDMENT)**

In consideration of the premium charged, it is hereby understood and agreed that Clause 10.
**SUBROGATION** of the General Terms and Conditions is hereby amended by deleting the first
paragraph in its entirety and replacing it with the following:

**10.    SUBROGATION**

In the event of any payment under this policy, the **Insurer** shall be subrogated to the
extent of such payment to each **Insured's** rights of recovery thereof, and each **Insured**
shall execute all papers required and shall do everything that may be necessary to secure
such rights, including the execution of such documents necessary to enable the **Insurer** to
effectively bring suit in the name of the **Insured**.  In no event, however, shall subrogation
be had against any **Individual Insured** under this policy, unless such **Individual Insured**
has been convicted of a deliberate criminal act, or been determined by a final
adjudication to have committed a deliberate dishonest or fraudulent act or willful
violation of any statute, rule or law, or determined by a final adjudication to have
obtained any profit or financial advantage to which such **Individual Insured** was not
legally entitled.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 16

116420 (10/14)                                    1

**ENDORSEMENT# 17**

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

## OTHER INSURANCE CLAUSE AMENDATORY ENDORSEMENT

### (GENERAL TERMS AND CONDITIONS)

In consideration of the premium charged, it is hereby understood and agreed that Clause 11.
**OTHER INSURANCE** of the General Terms and Conditions is amended as follows:

1.     The third paragraph is deleted in its entirety and replaced by the following:

With respect to all **Coverage Sections**, in the event of a **Claim** against an **Insured**
arising out of his or her service as an **Outside Entity Executive**, or a **Claim** against
an **Insured** for the **Insured's** liability with respect to a leased **Employee** or
independent contractor **Employee** as described in the definition of **"Employee"** in
the applicable **Coverage Section**, coverage as is afforded by this policy shall be
specifically excess of any: (i) indemnification provided by such **Outside Entity** or
leasing company;  and (ii) any other valid and collectible insurance provided to
such **Outside Entity**, leasing company or independent contractor.

2.     The last paragraph is deleted in its entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 17

114181 (03/14)                                1

**ENDORSEMENT# *18***

This endorsement, effective *12:01 am     April 26, 2019*        forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**EXTRADITION COVERAGE**
**(D&O COVERAGE SECTION)**

In consideration of the premium charged, it is understood and agreed that, solely with
respect to such coverage as is provided by the **D&O Coverage Section**, and solely where
permitted by law, the **D&O Coverage Section** is amended as follows:

1.    Clause 2. **DEFINITIONS**, paragraph (b)("**Claim**") is amended by appending the
following to the end thereof:

"**Claim**" also means any:

(a)    official request for **Extradition** of any **Individual Insured**; or

(b)    the execution of a warrant for the arrest of an **Individual Insured** where such
execution is an element of **Extradition**.

2.    Clause 2. **DEFINITIONS**, paragraph (k)("**Defense Costs**") is amended by appending
the following to the end thereof:

"**Defense Costs**" also means reasonable and necessary fees, costs and expenses
incurred through legal counsel and consented to by the **Insurer** resulting from an
**Individual Insured** lawfully:

(a)    opposing, challenging, resisting or defending against any request for or any
effort to obtain the **Extradition** of that **Individual Insured**; or

(b)    appealing any order or other grant of **Extradition** of that **Individual Insured**.

3.    Clause 2. **DEFINITIONS** is amended by appending the following to the end thereof:

"**Extradition**" means any formal process by which an **Individual Insured** located in
any country is surrendered to any other country for trial or otherwise to answer any
criminal accusation.

4.    Clause 9. **PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS** does
not apply to **Defense Costs** solely relating to **Extradition** even if the underlying
**Wrongful Acts** relate to a **Securities Claim**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 018*

**ENDORSEMENT#** *19*

This endorsement, effective *12:01 am     April 26, 2019*          forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION**
**(D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to **Loss** as may have otherwise been covered under the **D&O Coverage Section**, the **Insurer** shall not be liable to make any payment for any **Loss** in connection with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of items listed below (hereinafter **"Events"**); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way relating to any **Event(s)**:

<u>Events</u>:

1. *Infringement Litigation Concerning U.S. Patent #'S 5,601,557 And 5,645,588, Pound-In Suture Anchors And Retrobutton Respectively*

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an **Interrelated Wrongful Act** (as that term is defined below), regardless of whether or not such **Claim** involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

For the purposes of this endorsement an **"Interrelated Wrongful Act"** means: (i) any fact, circumstance, act or omission alleged in any **Event(s)** and/or (ii) any **Wrongful Act** which is a **Related Wrongful Act** to any **Wrongful Act** alleged in any **Event(s)**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 019*

<u>ENDORSEMENT#</u>   *20*

This endorsement, effective at *12:01 am   April 26, 2019*        forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

**EXCL (H) ODL 1v1 AMENDED**
**(CARVEBACKS FOR CREDITORS COMMITTEE;  DO # YRS; WHISTLEBLOWER)**
**(D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 4. EXCLUSIONS of the **D&O Coverage Section**, paragraph (h) is deleted in its entirety and replaced as follows:

(h) for any **Wrongful Act** arising out of an **Individual Insured** serving in a capacity as an **Outside Entity Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or any **Executive** thereof; or which is brought by any security holder of the **Outside Entity**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the **Outside Entity**, the **Company,** or any **Executive** of the **Outside Entity** or the **Company**; provided, however, this exclusion shall not apply to:

(i) any **Claim** brought by an **Executive** of an **Outside Entity** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** that is covered by this **D&O Coverage Section**;

(ii) in any bankruptcy proceeding by or against an **Outside Entity**, any **Claim** brought by the examiner, trustee, receiver, liquidator rehabilitator, creditors' committee (or any assignee thereof) of such **Outside Entity**;

(iii) any **Claim** brought by any past **Executive** of an **Outside Entity** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an **Outside Entity** for at least *0* years prior to such **Claim** being first made against any person;

(iv) any **Claim** brought by an **Executive** of an **Outside Entity** formed  and  operating in  a **Foreign Jurisdiction** against any **Outside Entity Executive** of such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof); or

(v) any **Executive** engaging in any protected "whistleblower" activity specified in 18 U.S.C. 1514A(a) or any other similar "whistleblower" protection provided under any state, local or foreign securities laws; provided, however, that this subparagraph (v) shall not apply where the actions of any  **Executive** includes the

⊕ All rights reserved.

***END 020***

112040 (3/14)                          Page 1 of 2

**ENDORSEMENT#** *20*   (continued)

filing of any proceeding or voluntarily testifying, voluntarily participating in or voluntarily assisting (other than de minimus assistance) in the filing or prosecution of any proceeding against an **Insured** relating to any violation of any rule or regulation of the Securities and Exchange Commission or any similar provision of any federal, state, local or foreign rule or law relating to fraud against shareholders, other than such actions in connection with a proceeding that is brought by the Securities and Exchange Commission, any similar state, local or foreign regulatory body that regulates securities, or any state, local or foreign law enforcement authority.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

**END 020**

112040 (3/14)                              Page 2 of 2

**ENDORSEMENT#** *21*

This endorsement, effective *12:01 am*     *April 26, 2019*     forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### INSURED V. INSURED EXCLUSION
### (SARBANES-OXLEY WHISTLEBLOWER; CREDITORS' COMMITTEE; D&O 3 YEARS)
### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in
Clause 4. EXCLUSIONS of the **D&O Coverage Section**, paragraph (i) is deleted in its
entirety and replaced as follows:

(i)   which is brought by or on behalf of a **Company** or any **Individual Insured**,
other than an **Employee** of a **Company**; or which is brought by any security
holder of the **Company**, whether directly or derivatively, unless such security
holder's **Claim** is instigated and continued totally independent of, and totally
without the solicitation of, or assistance of, or active participation of, or
intervention of any **Company** or any **Executive** of a **Company**; provided,
however, this exclusion shall not apply to:

   (i)   any **Claim** brought by an **Individual Insured** in the form of a cross- claim
   or third- party claim for contribution or indemnity which is part of and
   results directly from a **Claim** that is covered by this policy;

   (ii)   in any bankruptcy proceeding by or against a **Company**, any **Claim**
   brought by the examiner, trustee, receiver, liquidator, rehabilitator or
   creditors' committee (or any assignee thereof) of such **Company**;

   (iii)   any **Claim** brought by any past **Executive** of a **Company** who has not
   served as a duly elected or appointed director, officer, trustee, governor,
   management committee member, member of the management board,
   General Counsel or Risk Manager (or equivalent position) of or
   consultant for a **Company** for at least three (3) years prior to such **Claim**
   being first made against any person; or

   (iv)   any **Claim** brought by an **Executive** of a **Company** formed and operating
   in a **Foreign Jurisdiction** against such **Company** or any **Executive**
   thereof, provided that such **Claim** is brought and maintained outside the
   United States, Canada or any other common law country (including any
   territories thereof);

   (v)   any **Executive** engaging in any protected "whistleblower" activity
   specified in 18 U.S.C. 1514A(a) or any other similar "whistleblower"
   protection provided under any state, local or foreign securities laws.

   The foregoing subparagraph shall not apply where the actions of any
   **Executive** includes the filing of any proceeding or voluntarily testifying,
   voluntarily participating in or voluntarily assisting (other than de minimus
   assistance) in the filing or prosecution of any proceeding against an
   **Insured** relating to any violation of any rule or regulation of the
   Securities and Exchange Commission or any similar provision of any
   federal, state, local or foreign rule or law relating to fraud against

© All rights reserved.
*END 021*

<u>**ENDORSEMENT#**</u>  *21*   (continued)

shareholders, other than such actions in connection with a proceeding that is brought by the Securities and Exchange Commission, any similar state, local or foreign regulatory body that regulates securities, or any state, local or foreign law enforcement authority.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 021*

<u>ENDORSEMENT#</u> 22

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

### UK CORPORATE MANSLAUGHTER ACT COVERAGE FOR INDIVIDUAL INSUREDS

### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the **D&O Coverage Section** is amended as follows:

1. Clause 2. **DEFINITIONS** is amended to include the following Definitions at the end thereof:

   UK-1.   **UK Violation** means any actual or alleged violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007, United Kingdom Health and Safety at Work etc. Act of 1974, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar local or common law.

   UK-2.   **UK Violation Defense Costs** means those **Defense Costs** consented to by the **Insurer** resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** made against the **Company** or an **Individual Insured** for any **UK Violation**.

2. In Clause 1. **INSURING AGREEMENTS, COVERAGE A: INDIVIDUAL INSURED INSURANCE** is amended to include the following paragraph at the end thereof.

   **CORPORATE MANSLAUGHTER INDIVIDUAL INSURED INSURANCE**

   Solely with respect to **Non-Indemnifiable Loss**, this **D&O Coverage Section** shall pay **UK Violation Defense Costs** of an **Individual Insured** of the **Company** for any **Wrongful Act**.

3. Solely with respect to the coverage provided by this endorsement, in Clause 4. **EXCLUSIONS**, paragraph (l) is deleted in its entirety and replaced with the following:

   (l)  for:
   (i)     bodily injury, sickness, disease or death of any person; provided, however, this exclusion shall not apply to:
   (a) **Securities Claims**; or

©All rights reserved.
END 22

1

**ENDORSEMENT#** 22    (Continued)

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

> (b) **UK Violation Defense Costs**, but solely with respect to **CORPORATE MANSLAUGHTER INDIVIDUAL INSURED INSURANCE** in **COVERAGE A: INDIVIDUAL INSURED INSURANCE**; or

> (ii) damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to **Securities Claims**;

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 22

<u>**ENDORSEMENT**</u># 23

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

### EXCLUSION (Q) AMENDED

### (CARVE-BACK FOR SECURITIES CLAIMS)
### (D&O COVERAGE SECTION)

In consideration for the premium charged, it is hereby understood and agreed that in Clause
4. EXCLUSIONS of the **D&O Coverage Section**, paragraph (q) is deleted in its entirety and
replaced with the following:

(q) alleging, arising out of, based upon, attributable to the employment of any individual
or any employment practice, including, but not limited to, wrongful dismissal,
discharge or termination, discrimination, harassment, retaliation or other
employment-related claim; provided, however, that this exclusion shall not apply to
any **Securities Claim**;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 23

114184 (04/15)                                    1

<u>**ENDORSEMENT#**</u> 24

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

### EXCLUSION (T) AMENDATORY ENDORSEMENT

### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 4.
**EXCLUSIONS** of the **D&O Coverage Section**, subparagraph t(iii) is deleted in its entirety and
replaced with the following:

(iii)    alleging, arising out of, based upon or attributable to any actual or alleged
contractual liability of the **Company** under any express contract or agreement;
provided, however, this exclusion shall not apply to: (1) liability which would have
attached in the absence of such express contract or agreement; or (2) any
**Securities Claim**;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 24

114185 (04/15)                             1

<u>**ENDORSEMENT**</u># 25

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

### CLAUSE 8 AMENDED

### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 8. "COST OF INVESTIGATION FOR DERIVATIVE DEMAND COVERAGE PROVISION" of the **D&O Coverage Section**, the last paragraph thereof is deleted in its entirety and replaced with the following:

> Nothing in this Clause 8. or in Insuring Agreement D of the **D&O Coverage Section** shall be construed to afford coverage under this **D&O Coverage Section** for any **Claim** brought by the **Company** against one or more of its own **Executives**, other than **Costs of Investigation** incurred in a covered **Company Shareholder Derivative Investigation**. Payment of any **Costs of Investigation** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this policy or at law.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 25

114186 (04/15)                                    1

<u>ENDORSEMENT#</u> *26*

This endorsement, effective at *12:01 am   April 26, 2019*       forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### PRE-CLAIM INQUIRY/COSTS COVERAGE
#### (D&O Coverage Section)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1. Clause 1. **INSURING AGREEMENTS** of the **D&O Coverage Section** is amended by deleting the first paragraph and Coverages A & B in their entirety and replacing them with the following:

    **1. INSURING AGREEMENTS**

    All coverage granted for **Loss** under this policy is provided solely with respect to (i) **Claims** first made against an **Insured**; and (ii) **Pre-Claim Inquiries** first received by an **Individual Insured**, in each such event, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy. Subject to the foregoing and the other terms, conditions and limitations of this policy, this **D&O Coverage Section** affords the following coverage:

    **COVERAGE A: INDIVIDUAL INSURED INSURANCE**

    This policy shall pay the **Loss** of any **Individual Insured** arising from a:
    (i) **Claim** made against such **Individual Insured** for any **Wrongful Act** of such **Individual Insured**; and
    (ii) **Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**;

    except when and to the extent that a **Company** has indemnified such **Individual Insured**.

    **COVERAGE B: PRIVATE COMPANY INSURANCE**

    (i) *Company Liability:* This policy shall pay the **Loss** of any **Company** arising from a **Claim** made against such **Company** for any **Wrongful Act** of such **Company**.
    (ii) *Indemnification of an* **Individual Insured**:  This policy shall pay the **Loss** of a **Company** arising from a:
       (a) **Claim** made against an **Individual Insured** for any **Wrongful Act** of such **Individual Insured**; and
       (b) **Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**;
    but only to the extent that such **Company** has indemnified such **Individual Insured**.

© All rights reserved.

### *END 026*

<u>ENDORSEMENT#</u> *26*   (continued)

2. Clause 2.  **DEFINITIONS** of the **D&O Coverage Section** is amended as follows:

A. The Definition of **Defense Costs** is amended by adding the following to the end thereof:

**"Defense Costs"** shall not include **Pre-Claim Inquiry Costs**.

B. The Definition of **"Loss"** is amended to include **Pre-Claim Inquiry Costs**.

C. The following Definitions are added to the end of Clause 2.  **DEFINITIONS**:

(1) **"Enforcement Body"** means: (i) any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the SEC and any attorney general), or (ii) the enforcement unit of any securities or commodities exchange or other self-regulatory organization.

(2) **"Liberty Protection Costs"** means:
(a) reasonable and necessary fees, costs and expenses consented to by the **Insurer** and incurred by an **Individual Insured** in order for an **Individual Insured** to lawfully seek the release of the **Individual Insured** from any pre-**Claim** arrest or confinement to a (i) specified residence or (ii) secure custodial premises operated by or on behalf of any law enforcement authority; or
(b) reasonable and necessary premiums (but not collateral) consented to by the **Insurer** and incurred by an **Individual Insured** for a bond or other financial instrument to guarantee the contingent obligation of the **Individual Insured** for a specified amount required by a court that are incurred or required outside the United States of America during the **Policy Period**, if such premiums: (i) arise out of an actual or alleged **Wrongful Act**, or (ii) are incurred solely by reason of such **Individual Insured's** status as an **Executive** or **Employee** of a **Company**.

(3) **"Pre-Claim Inquiry"** means any pre-**Claim**:
(1) verifiable request for an **Individual Insured** of any **Company** (i) to appear at a meeting or interview; or (ii) produce documents that, in either case, concerns the business of that **Company** or that **Individual Insured's** insured capacities, but only if the request came from any:
(a) **Enforcement Body**; or
(b) **Company**, or, on behalf of a **Company**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Company** or that **Individual Insured's** insured capacities.
(2) arrest or confinement of an **Executive** of a **Company** to a: (i) specified residence; or (ii) secure custodial premises operated by or on behalf of an **Enforcement Body**, in connection with the business of any **Company** or an **Individual Insured's** capacity as an **Executive** or **Employee** of an **Company**.

© All rights reserved.

*END 026*

<u>**ENDORSEMENT#**</u> *26*   (continued)

> "**Pre-Claim Inquiry**" shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in a **Company's** and/or **Enforcement Body's** normal review or compliance process.

> (4) "**Pre-Claim Inquiry Costs**" means:

>> (a) with respect to a **Pre-Claim Inquiry** as described in subparagraph (1) of the definition of such term, the reasonable and necessary pre-**Claim** fees, costs and expenses consented to by the **Insurer** and incurred by an **Individual Insured** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** directed to such **Individual Insured**, including attendance at an interview or meeting requested by an **Enforcement Body**, but excluding (i) any compensation of any **Individual Insured**; and (ii) the costs of complying with any formal or informal discovery or other request seeking documents, records or electronic information in the possession or control of a **Company**, the requestor or any other third party; and

>> (b) with respect to a **Pre-Claim Inquiry** as described in subparagraph (2) of the definition of such term, **Liberty Protection Costs**.

> (5) "**Related Pre-Claim Inquiry**" means a **Pre-Claim Inquiry** involving, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were either: (1) alleged in a **Claim** made against an **Insured**; or (2) the subject of another **Pre-Claim Inquiry** received by an **Individual Insured**.

3. Clause 4.  **EXCLUSIONS** of the **D&O Coverage Section** is amended as follows:

A. Exclusion (d) is deleted in its entirety and replaced with the following:

> (d) or any **Pre-Claim Inquiry** received by any **Individual Insured**, alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related **Wrongful Acts** alleged or contained in any **Claim**, or to the facts or **Wrongful Acts** that were the subject of any **Pre-Claim Inquiry**, which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

4. Solely with respect to coverage as is afforded under the **D&O Coverage Section**, Clause 4. **LIMIT OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)** of the **General Terms and Conditions** is deleted in its entirety and replaced with the following:

**LIMIT OF LIABILITY UNDER THE D&O COVERAGE SECTION (FOR ALL LOSS - INCLUDING DEFENSE COSTS AND PRE-CLAIM INQUIRY COSTS)**

The **Policy Aggregate Limit of Liability** is the aggregate limit of the **Insurer's** liability for all **Loss** (including **Defense Costs** and **Pre-Claim Inquiry Costs**) under all **Coverage**

© All rights reserved.

<u>ENDORSEMENT#</u> *26*   (continued)

Sections combined. The **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

If **Separate Limits of Liability** are stated in Item 3 of the Declarations for the **D&O Coverage Section**, then such **Separate Limit of Liability** shall be the aggregate limit of the **Insurer's** liability for all **Loss** (including **Defense Costs** and **Pre-Claim Inquiry Costs**) under the **D&O Coverage Section**. The **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Such **Separate Limit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

If **Shared Limits of Liability** are stated in Item 3 of the Declarations for the **D&O Coverage Section**, then such **Shared Limit of Liability** shall be the aggregate limit of the **Insurer's** liability for all **Loss** (including **Defense Costs** and **Pre-Claim Inquiry Costs**) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations. The **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Such **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. Amounts incurred for **Defense Costs** shall be applied against the Retention.

5. Clause 6. **RETENTION CLAUSE** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

**RETENTION CLAUSE**

The following provisions shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

For each **Claim** and **Pre-Claim Inquiry**, the **Insurer** shall only be liable for the amount of **Loss** arising from such **Claim** or **Pre-Claim Inquiry** which is in excess of the applicable Retention amounts stated in Item 3 of the Declarations for the **D&O Coverage Section**, such Retention amount to be borne by a **Company** and/or the **Individual Insured** and remain uninsured, with regard to all **Loss** other than **Non-Indemnifiable Loss**.

A single Retention amount shall apply to **Loss** arising from (1) all **Claims** alleging the same **Wrongful Act** or Related **Wrongful Acts** or alleging a **Wrongful Act** that is the subject of a **Pre-Claim Inquiry**, and (2) all **Related Pre-Claim Inquiries**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall

© All rights reserved.

*END 026*

<u>ENDORSEMENT#</u> *26*   (continued)

commence advancing **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

No Retention amount is applicable to **Crisis Management Loss** or **Non-Indemnifiable Loss**.

6. Solely with respect to the **D&O Coverage Section**, Clause 6. **NOTICE/CLAIM REPORTING PROVISIONS** of the **General Terms and Conditions** is amended by deleting paragraph (a) thereof in its entirety and replacing it with the following:

(a) An **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this policy:

(1) give written notice to the **Insurer** of a **Claim** made against an **Insured** or a **Crisis Management Event**; or

(2) if an **Insured** elects to seek coverage for **Pre-Claim Inquiry Costs** in connection with any **Pre-Claim Inquiry**, give written notice to the **Insurer** of that **Pre-Claim Inquiry**;

as soon as practicable after (i) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim** or **Pre-Claim Inquiry**; or the Crisis Management Event commences.  In all such events, notification must be provided no later than 90 days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

7. Solely with respect to the **D&O Coverage Section**, Clause 6. **NOTICE/CLAIM REPORTING PROVISIONS** of the **General Terms and Conditions** is amended by deleting paragraph (b) thereof in its entirety and replacing it with the following:

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 6(a) above, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging a **Wrongful Act** that is a **Related Wrongful Act** to any **Wrongful Act** either alleged in the **Claim**, of which such notice has been given, shall be considered made at the time the first **Claim** was made.

If a **Pre-Claim Inquiry** was first received by an **Insured** and reported in accordance with Clause 6(a) above, then:

(1) any **Related Pre-Claim Inquiry** that is reported in accordance with Clause 6(a) above shall be deemed to be a **Pre-Claim Inquiry** first received at the time that such previously reported **Pre-Claim Inquiry** was first received by an **Individual Insured**; and

(2) any subsequent **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were the subject of another **Pre-Claim Inquiry** received by an **Insured** that is reported in accordance with Clause 6(a) above shall be deemed to be a   **Claim** first  made  at

Ⓒ All rights reserved.

*END 026*

<u>ENDORSEMENT#</u> *26*   (continued)

the time that such previously reported **Pre-Claim Inquiry** was first received by an **Insured**.

With respect to any subsequent **Related Pre-Claim Inquiry**, this policy shall not cover **Loss** incurred before such subsequent **Related Pre-Claim Inquiry** is actually received by an **Individual Insured**, and with respect to any subsequent **Claim** as described in this paragraph (b), this policy shall not cover **Loss** incurred before such subsequent **Claim** is actually made against an **Insured**.

8. Clause 7. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

7. **DEFENSE COSTS, PRE-CLAIM INQUIRY COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS AND PRE-CLAIM INQUIRY COSTS)**

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them .

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 7; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** have been exhausted.

Once the **Insurer** has received written notice of a **Claim** for which the **Insurer** has not assumed the defense or a **Pre-Claim Inquiry**, the **Insurer** nevertheless shall advance, excess of any applicable Retention, **Defense Costs** or **Pre-Claim Inquiry Costs**, respectively, on a current basis, but no later than 90 days after the **Insurer** has received itemized bills for those **Defense Costs** or **Pre-Claim Inquiry Costs**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D&O Coverage Section** to payment of such **Loss**.

© All rights reserved.

*END 026*

<u>ENDORSEMENT#</u> *26*   (continued)

The **Insurer** shall have the right to fully and effectively associate with each and every **Insured** in the defense of any **Claim** or **Pre**-**Claim Inquiry** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Insured** agrees to provide such information as the **Insurer** may reasonably require and to give the **Insurer** full cooperation, including:

(a) cooperating with and helping the **Insurer**:

(i) in making settlements, subject to subparagraph 7(b) below;

(ii) in enforcing any legal rights the **Insured** may have against anyone who may be liable to the **Insured**;

(iii) by attending depositions, hearings and trials; and

(iv) by securing and giving evidence, and obtaining the attendance of witnesses; and

(b) taking such actions which, in such **Insured's** judgment, are deemed necessary and practicable to prevent or limit **Loss** arising from any **Wrongful Act**.

Additionally, the **Insured** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. If the **Insured** admits or assumes any liability in connection with any **Claim** or **Pre-Claim Inquiry** without the consent of the **Insurer**, then the **Insurer** shall not have any obligation to pay **Loss** with respect to such **Claim** or **Pre-Claim Inquiry**. Only those settlements, stipulated judgments, **Defense Costs** and **Pre-Claim Inquiry Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this **D&O Coverage Section**. The **Insurer** shall not unreasonably withhold any consent required under this **D&O Coverage Section**, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 7, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs** or **Pre-Claim Inquiry Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **D&O Coverage Section**. In addition, the **Insured** shall not take any action, without the **Insurer's** written consent, which prejudices the **Insurer's** rights under this **D&O Coverage Section**.

This Clause 7 shall not be applicable to **Crisis Management Loss**.

9. Solely with respect to the **D&O Coverage Section**, Clause 8. **DISCOVERY CLAUSE** of the **General Terms and Conditions** is amended by deleting the first paragraph thereof in its entirety and replacing it with the following:

© All rights reserved.

*END 026*

<u>ENDORSEMENT#</u> *26*   (continued)

If the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy or any **Coverage Section**, then, solely with regard to the policy or **Coverage Section** which was canceled or nonrenewed, the **Named Entity** shall have the right, upon payment of the applicable "**Additional Premium Amount**" described below, to a period of up to six (6) years or of unlimited duration following the effective date of such cancellation or nonrenewal (herein referred to as the "**Discovery Period**"), in which to give the **Insurer** written notice of (i) **Claims** first made against an **Insured**; and (ii) **Pre-Claim Inquiries** first received by an **Individual Insured**, during said **Discovery Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by the canceled or nonrenewed policy or **Coverage Section**, as applicable. The rights contained in this Clause 8 shall terminate, however, unless written notice of such election together with the **Additional Premium Amount** due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or nonrenewal.

10. Solely with respect to the **D&O Coverage Section**, Clause 12. **NOTICE AND AUTHORITY** of the **General Terms and Conditions** is deleted in its entirety and replaced with the following:

   **15. NOTICE AND AUTHORITY**

   Except for the giving of a notice of **Claim** or **Pre-Claim Inquiry**, which shall be governed by the provisions of Clause 6 of these **General Terms and Conditions**, all notices required under this policy to be given by the **Insured** to the **Insurer** shall be given in writing to the **Insurer** at the address stated in Item 9(a) of the Declarations. It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, **Pre-Claim Inquiry** or circumstances, the giving and receiving of notice of cancellation and nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** to the **Insurer** and the exercising or declining to exercise any right to a **Discovery Period**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Ⓒ All rights reserved.

*END 026*

112314 (4/15)                    Page 8 of 8

ENDORSEMENT#   *27*

This endorsement, effective at *12:01 am   April 26, 2019*      forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *PrivateEdge Plus*

## EXECUTIVE EDGE PROTECTION SUITE EXTENSION
### (D&O Coverage Section)

This endorsement modifies insurance provided under the Private Edge Plus policy form.

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1. In Clause 2. "**DEFINITIONS**" of the **D&O Coverage Section**, the definition of "**Claim**," as amended by any other endorsement to this policy, whether such endorsement precedes or follows this endorsement in sequence, is amended by inserting the following to the end thereof:

   **Claim** also means an official request for **Extradition** of any **Individual Insured**, or the execution of a warrant for the arrest of an **Individual Insured** where such execution is an element of **Extradition**.

2. In Clause 2. "**DEFINITIONS**" of the **D&O Coverage Section**, the definition of "**Defense Costs**," as amended by any other endorsement to this policy, whether such endorsement precedes or follows this endorsement in sequence, is amended to include **Extradition Costs**.

3. In Clause 2. "**DEFINITIONS**" of the **D&O Coverage Section**, the definition of "**Loss**," as amended by any other endorsement to this policy, whether such endorsement precedes or follows this endorsement in sequence, is amended by inserting the following to the end thereof:

   **Loss** shall also mean the following items, provided that they arise out of a   **Claim**:

   (1)   **SOX 304 Costs**;

   (2) **Extradition Costs**;

   (3)   **UK Corporate Manslaughter Act Defense Costs**;

   (4)   **Personal Reputation Expenses**, subject to a $100,000 per **Executive** and a $500,000 aggregate sublimit of liability; and

   (5)   **Asset Protection Costs**, subject to a $50,000 per **Executive** and a $250,000 aggregate sublimit of liability.

4. Clause 2. "**DEFINITIONS**" of the **D&O Coverage Section** is further amended to include the following definitions:

⊚ All rights reserved.

### *END 027*

**ENDORSEMENT#** *27*

| | |
|---|---|
| **Asset Protection Costs** | means reasonable and necessary fees, costs and expenses consented to by the **Insurer** incurred by a **Executive** of a **Company** to oppose any efforts by an **Enforcement Body** to seize or otherwise enjoin the personal assets or real property of such **Executive** or to obtain the discharge or revocation of a court order entered during the **Policy Period** in any way impairing the use thereof. |
| **Enforcement Body** | means: (i) any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general), or (ii) the enforcement unit of any securities or commodities exchange or other self-regulatory organization. |
| **Extradition** | means any formal process by which an **Individual Insured** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation. |
| **Extradition Costs** | means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Individual Insured** lawfully (a) opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Individual Insured**, or (b) appealing any order or other grant of **Extradition** of that **Individual Insured**. |
| **Personal Reputation Crisis** | means any negative statement that is included in any press release or published by any print or electronic media outlet regarding a **Executive** of a **Company** made during the **Policy Period** by any individual authorized to speak on behalf of an **Enforcement Body**. |
| **Personal Reputation Expenses** | means reasonable and necessary fees, costs and expenses of a **Crisis Management Firm** (as defined in the CrisisFund® Appendix attached to this policy) retained within thirty (30) days of a **Personal Reputation Crisis** solely and exclusively by a **Executive** to mitigate the adverse effects specifically to such **Executive's** reputation from a **Personal Reputation Crisis**. "**Personal Reputation Expenses**" shall not include any fees, costs or expenses of any **Crisis Firm** incurred by a **Executive** if such **Crisis Firm** is also retained by or on behalf of a **Company**. |
| **SOX 304 Costs** | means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the premium or origination fee for a loan or bond) and incurred by the chief executive officer or chief financial officer of the **Named Entity** solely to facilitate the return of amounts required to be repaid by such Executive pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002. "**SOX 304 Costs**" do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Executive** pursuant to Section 304(a). |
| **UK Corporate Manslaughter Act Defense Costs** | means **Defense Costs** incurred by an **Individual Insured** that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against a **Company** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction. |

© All rights reserved.

**END 027**

<u>ENDORSEMENT#</u> *27*   (continued)

5. Clause 4. **"EXCLUSIONS"** of the **D&O Coverage Section**, Exclusion (l), as amended by any other endorsement to this policy, whether such endorsement precedes or follows this endorsement in sequence, is amended by inserting the following to the end thereof:

   Notwithstanding the foregoing, this exclusion shall not apply to **UK Corporate Manslaughter Act Defense Costs**.

6. Clause 7. **"DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)"** of the **D&O Coverage Section** is amended by deleting the last sentence thereof in its entirety and replacing it with the following **:**

   This Clause 7. does not apply to **Crisis Management Loss** or **Personal Reputation Expenses**.

7. Clause 9. **"PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS"** of the **D&O Coverage Section** does not apply to **Defense Costs** solely relating to **Extradition** even if the underlying **Wrongful Acts** relate to a **Securities Claim.**

8. It is further understood and agreed that the each aggregate sublimit of liability stated in this endorsement is the maximum limit of the **Insurer's** liability for all **Loss** under this policy that is subject to that aggregate sublimit of liability.  Each per **Executive** sublimit of liability stated in this endorsement is the maximum limit of the **Insurer's** liability for all **Loss** of each **Executive** under this policy that is subject to that per **Executive** sublimit of liability.  All sublimits of liability shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**.   Each per **Executive** sublimit of liability shall be part of, and not in addition to, its corresponding aggregate sublimit of liability.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 027*

<u>ENDORSEMENT#</u> *28*

This endorsement, effective at *12:01 am    April 26, 2019*       forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

**LOSS DEFINITION AMENDATORY ENDORSEMENT**
**(UK BRIBERY ACT)**
**(D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
2. **DEFINITIONS** of the **D&O Coverage Section**, paragraph (u)("**Loss**") is amended by
appending the following to the end thereof:

> Notwithstanding the foregoing, **Loss** shall also include, subject to the other terms,
> conditions and exclusions of this **D&O Coverage Section**, including, but not limited
> to, exclusions 4(a), 4(b) and 4(c) of this **D&O Coverage Section**, civil penalties
> assessed against any individual director or officer pursuant to Section 11(1)(a) of
> the United Kingdom Bribery Act of 2010, Chapter 23.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 028*

114426 (3/14)                     Page 1 of 1

**ENDORSEMENT#** *29*

This endorsement, effective *12:01 am*      *April 26, 2019*      forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**CLAIM DEFINITION AMENDED**
**(INJUNCTIVE RELIEF)**
**(D&O AND EPL COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1.  In Clause 2, "**DEFINITIONS**," of the **D&O Coverage Section**, subparagraphs 2(b)(i) and
    2(b)(ii) of the Definition of "**Claim**" are deleted in their entirety and replaced with the
    following:

    (b)  "**Claim**" means:

        (i)   a written demand for monetary, non-monetary or injunctive relief
              (including any request to toll or waive any statute of limitations);

        (ii)  a civil, criminal, administrative, regulatory or arbitration proceeding for
              monetary, non-monetary or injunctive relief which is commenced by:

            (1)  service of a complaint or similar pleading; or

            (2)  return of an indictment, information or similar document (in the case
                 of a criminal proceeding); or

            (3)  receipt or filing of a notice of charges; or

2.  In Clause 2, "**DEFINITIONS**," of the **EPL Coverage Section**, subparagraphs 2(a)(i) and
    2(a)(ii) of the definition of "Claim" are deleted in their entirety and replaced with the
    following:

    (a)  "**Claim**" means:

        (i)   a written demand for monetary, non-monetary or injunctive relief
              (including any request to toll or waive any statute of limitations);

        (ii)  a civil, criminal, administrative, regulatory or arbitration proceeding for
              monetary, non-monetary or injunctive relief which is commenced by:

            (1)  service of a complaint or similar pleading;

            (2)  return of an indictment, information or similar document (in the case
                 of a criminal proceeding); or

            (3)  receipt or filing of a notice of charges; or

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 029*

105468 (4/10)                         Page 1 of 1

<u>ENDORSEMENT#</u> *30*

This endorsement, effective *12:01 am    April 26, 2019*        forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## EMPLOYMENT EDGE EXTENSION ENDORSEMENT
### (EPL COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.    In Clause 1. "INSURING AGREEMENTS" of the **EPL Coverage Section**, the two paragraphs under the heading "INSURING AGREEMENTS" are deleted in their entirety and replaced with the following:

**INSURING AGREEMENTS**

Coverage granted for **Loss** under this policy is provided solely with respect to: (i) **Claims** first made against an **Insured**, and (ii) **Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy, except to the extent coverage is extended pursuant to Clause 6(e) of the **General Terms and Conditions** of this policy to a **Claim** first made prior to the **Policy Period**. Subject to the foregoing and the other terms, conditions and limitations of this policy, this policy affords the following coverage:

*A. Employment Practices Liability Coverage*
This **EPL Coverage Section** shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Employment Practices Violation**.

*B. Third Party Violation Coverage*
This **EPL Coverage Section** shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Third Party Violation**.

*C. Wrongful Internet Activity Coverage*
This **EPL Coverage Section** shall pay the **Loss** of a **Company** arising from any **Claim** made against such **Company** for its actual or alleged liability for any **Wrongful Internet Activity** of an **Employee**.

*D. Employment Crisisfund® Coverage*
This **EPL Coverage Section** shall pay the **Crisis Loss** of a **Company** in connection with an **Employment Practices Crisis**, a **Workplace Violence Crisis** or an **Employee Information Breach Crisis**, up to the amount of the **Employment CrisisFund**®; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

© All rights reserved.

*END 030*

**ENDORSEMENT#** *30*   (continued)

The **Insurer** shall, in accordance with and subject to Clause 6 of this **EPL Coverage Section**, advance **Defense Costs** of any **Claim** or **Employment Practices Crisis** prior to its final disposition.

2.   In Clause 2. "DEFINITIONS" of the **EPL Coverage Section**, the definition of the terms **"Claim," "Employment Practices Violation"** and **"Wrongful Act"** are deleted and replaced with the following:

**"Claim"** means:

(1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process, or any request to toll or waive the statute of any limitations;

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (a) service of a complaint or similar pleading; (b) return of an indictment, information or similar document (in the case of a criminal proceeding); or (c) receipt or filing of a notice of charges;

(3) an administrative or regulatory investigation by the **EEOC** which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an  **Insured**; or

(4) an administrative or regulatory investigation of violations of the Uniformed Services Employment and Reemployment Rights Act when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel and is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an  **Insured**.

However, in no event shall the term **"Claim"** include any labor or grievance proceeding which is subject to a collective bargaining agreement.

**"EEOC"** means the Equal Employment Opportunity Commission, or any similar state, local or foreign agency.

 **"Employment Practices Violation"** means any actual or alleged:

(i)      wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(ii)     harassment (including workplace bullying, sexual harassment whether "quid pro quo", hostile work environment or otherwise, including "same-sex" sexual harassment);

(iii)    discrimination (including, but not limited to, discrimination based upon age, gender, gender identity or expression, race, color, national origin, religion, sexual orientation or preference, genetic information, pregnancy, military status or disability);

(iv)    **Retaliation**;

(v)     employment-related misrepresentation(s) to an **Employee** of any **Company** or applicant for employment with any  **Company** or any **Outside Entity**;

Ⓒ All rights reserved.

*END 030*

**ENDORSEMENT#** *30*   (continued)

(vi)     employment-related libel, slander, humiliation, defamation or invasion of privacy;

(vii)    false arrest or false imprisonment;

(viii)   wrongful failure to employ or promote;

(ix)     wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(x)      wrongful discipline;

(xi)     failure to grant tenure; or

(xii)    with respect to any of the foregoing items (i) through (xi) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of or an applicant for employment with a **Company** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

"**Wrongful Act**" means any **Employment Practices Violation**, **Third-Party Violation** or **Wrongful Internet Activity**.

3.    In Clause 2. "DEFINITIONS" of the **EPL Coverage Section**, the definition of "**Loss**" is amended to include **Crisis Loss**.

4.    Clause 2. "DEFINITIONS" of the **EPL Coverage Section** is further amended by adding the following definitions at the end thereof:

"**Administrative Claim**" means an administrative or regulatory investigation:

(1) by the **EEOC** or similar federal, state or local agency; or

(2) of a violation of the Uniformed Services Employment and Reemployment Rights Act, when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel;

which, in either case, is commenced by the filing of a notice of charges or similar document of which notice has been given to an **Insured**.

The term "**Administrative Claim**" shall not mean or include any **Litigated Matter**.

"**Crisis**" has the meaning as defined in the Employment CrisisFund[®] Appendix attached to this policy.

"**Crisis Loss**" has the meaning as defined in the Employment CrisisFund[®] Appendix attached to this policy.

© All rights reserved.

*END 030*

**ENDORSEMENT#** *30*   (continued)

"**Employment CrisisFund**® " means in the case of all **Crisis Loss**, $25,000 for all **Crisis Loss** in the aggregate for all **Crises** first occurring during the **Policy Period** or any applicable **Discovery Period**.

"**Employment Practices Crisis**" has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

"**Employee Information Breach Crisis**" has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

"**Employment Practices Crisis**" has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

"**Litigated Matter**" means any civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (1) service of a complaint or similar pleading; or (2) return of an indictment, information or similar document (in the case of a criminal proceeding).

"**Prior AIG Policy**" means a valid and collectible policy providing substantially the same or similar coverage as is provided by this policy, issued to the **Named Entity** by the **Insurer** (or any other insurance company affiliate thereof), of which this policy is a continuous renewal.

"**Related Claim**" means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were alleged in another **Claim** made against an **Insured**.

"**Workplace Violence Crisis**" has the meaning as defined in the CrisisFund® Appendix attached to this policy.

"**Wrongful Internet Activity**" means any actual or alleged:

    (1) **Employment Practices Violation** alleged by an **Employee**; or

    (2) **Third Party Violation**,

    when committed by an **Employee** by means of the internet, including, but not limited to, social networking activities, regardless of whether such internet activity is during or after work hours or on or off the work premises. For purposes of the application of this definition, an individual shall be deemed to be an **Employee** regardless of whether such individual was acting in his or her capacity as an **Employee**.

5.    Solely with respect to **the EPL Coverage Section**, Clause 6. "**NOTICE/CLAIM REPORTING PROVISIONS**" of the General Terms and Conditions is amended by adding the following at the end thereof:

    (e) **Claims Savings Clause for Employment Practices Claims**

Ⓒ All rights reserved.

*END 030*

**ENDORSEMENT#** *30*   (continued)

1. Notwithstanding the foregoing, with respect to any **Claim** which (i) first becomes a **Litigated Matter** during the **Policy Period** or **Discovery Period** (if applicable); and (ii) is a **Related Claim** with respect to an **Administrative Claim** which was first made against an **Insured** prior to the **Policy Period**, the **Insurer** shall not deny coverage for such **Claim** based upon late notice of such **Claim** or based upon such **Claim** first being made prior to the **Policy Period**, provided that:

   (a) the **Claim** was first made against the **Insured** at a time during which the **Named Entity** was insured under a **Prior AIG Policy**;

   (b) upon the **Claim** first becoming a **Litigated Matter**, the **Claim** was reported in accordance with Clause 6(a) above; and

   (c) no **Insured** has made a monetary settlement offer to a claimant or responded to a monetary demand from or on behalf of a claimant with respect to such **Claim**.

2. Coverage under this policy for any **Claim** afforded coverage pursuant to this Clause 6(e) shall be the lesser of:

   (a) the coverage which would have been provided under this policy for such **Claim** had the **Claim** been made during the **Policy Period** and reported to the **Insurer** as required by this policy;  or

   (b) the coverage, if any, which would have been provided under the **Prior AIG Policy** for such **Claim** if the **Insured** had properly provided notice of such **Claim** in accordance with the provisions of the **Prior AIG Policy**,

   taking into account all provisions of each policy, including, without limitation, applicable limits of liability (as reduced by payments made under such policy), retentions, exclusions and other restrictions contained in each policy;

   Notwithstanding the foregoing, nothing in this Clause 6(e) shall be construed to increase the **Limit of Liability** of this policy or to provide coverage under the **Prior AIG Policy**, nor shall this Clause 6(e) ever result in providing coverage under this policy for **Loss** for which coverage is in fact provided (or would be provided but for the exhaustion of the limit of liability) under the **Prior AIG Policy**.

3. This Clause 6(c) shall not apply to any  **Claim** which:

   (a) prior to the **Policy Period** was a **Litigated Matter**; or

   (b) is a **Related Claim** with respect to a **Claim** which, prior to the Policy Period was a **Litigated Matter**.

6. The provisions of subparagraph (a) of Clause 6. "NOTICE/CLAIM REPORTING PROVISIONS" of the **General Terms and Conditions** shall apply to any **Crisis** in the same manner and effect as such provisions apply to any Claim.

© All rights reserved.

*END 030*

**ENDORSEMENT#** *30*   (continued)

7.   Clause 3. "EXCLUSIONS," Clause 5. "RETENTION CLAUSE" and Clause 6. "DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) of the **EPL Coverage Section** shall not apply to **Crisis Loss**.

8.   The maximum limit of the **Insurer's** liability under the **EPL Coverage Section** for all **Crisis Loss** arising from all **Crisis** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, is the **Employment CrisisFund**®. This **Employment CrisisFund**® shall be the maximum limit of the **Insurer** under this **EPL Coverage Section** for **Crisis Loss**, regardless of the number of **Crisis** occurring during the **Policy Period**; provided, however, the **Employment CrisisFund**® shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **EPL Coverage Section** as set forth in Item 3 of the Declarations.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 030*

<u>ENDORSEMENT#</u> *31*

This endorsement, effective at *12:01 am   April 26, 2019*      forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name:  *PrivateEdge Plus*

**EPL PAK PREMIER ENDORSEMENT**
**(Employment Practices, Loss Prevention and Risk Management Tools)**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

The **Insurer** provides the **Named Entity** with access during the **Policy Period** to EPL Pak® Premier, a suite of Employment Practices, Loss Prevention and Risk Management tools. EPL Pak® Premier is provided at no additional cost to the **Named Entity** and can be used by the **Named Entity** at its discretion during the **Policy Period**.

This preventive suite is a combination of employment related tools designed to help the **Named Entity** manage employment practices risks. EPL Pak® Premier's resources are exclusive to the **Insurer**, and provide policyholders with access to two of the nation's foremost law firms with a depth of experience in employment and workplace law: Littler Mendelson, P.C. and Jackson Lewis, P.C.

- **www.EPLRiskManager.com**. Partnering with Littler Mendelson, EPL Pak® Premier includes instant, free access, to an online Human Resource Center located at www.EPLRiskManager.com. Included within this site are a package of risk management products and resources designed to help the **Named Entity** manage the **Named Entity's** workforce and mitigate the **Named Entity's** exposure to employment-related litigation. All that is needed for access and registration to the site is the **Named Entity's** policy number.

    Materials and services available online include the following essentials:

    - **Online forms:** A collection of human resources forms, including handbooks, employment applications, checklists, performance evaluations and compliance tools, which can be customized, to ease the **Named Entity's** administrative burden.
    - **Employment Law Reference Manuals:** A complete library of employment law manuals covering topics such as discrimination, disability, harassment, background screening, arbitration agreements, I-9 compliance manual and many more documents to help mitigate the risks of these critical phases of the employment relationship.
    - **Government Forms and State Guides:** Essential employment-related forms and notices required by the federal government including state-by-state assessment of employment laws and regulations.
    - **Littler Learning Points:** A library of instructional videos addressing employment issues including responding to complaints of discrimination and harassment; severance and release agreement, to name a few.
    - **Littler GPS**™: Free access to an innovative and powerful online research tool that provides detailed information and analysis of recent legislative and regulatory developments. This comprehensive tool answers a broad range of employment law topics at the federal level and for all 50 states. The online database includes full-text content search and intuitive navigation, all tailored to the jurisdictions selected by the **Named Entity**.

◊ All rights reserved.

***END 031***

<u>ENDORSEMENT#</u> *31*   (continued)

- **Littler Law Updates:**  Keep up to date on key employment law developments impacting the **Named Entity's** business with alerts from their ASAP® Newsletters.  To subscribe, simply click the "Subscribe Now" button within the website.
- **Seminars and Webinars:**  Policyholders will be invited to attend, at no cost, access to Littler's nationwide employment laws breakfasts briefing series and designated live webinars.

- **State of the Art Enhancements.** These state-of-the-art enhancements complement EPL Pak® Premier's original package of complimentary risk management solutions from Jackson Lewis, P.C. which include:

  - **Unlimited Access**: Jackson Lewis provides a Toll-Free Risk Management Helpline **Insureds** may access to discuss general questions about workplace issues: (866) 614-0744.
  - **Legal Consultation:** A two-hour legal consultation on human resources and employment law issues, such as how specific laws impact personnel decisions and potential exposure to liability anywhere in the U.S. or Puerto Rico.  The scope of the consultation may include legal services such as discrimination issues, reductions in force, affirmative action, disability management issues and employment contracts.
  - **Employment Policies, Forms and Procedures:**  The two-hour legal consultation may also include the assistance of Jackson Lewis attorneys in adopting appropriate employment forms, policies or procedures under federal or applicable state laws (including reviewing the **Named Entity's** employee handbook or policy manual).
  - **Global Employment Law Support:**  A one hour legal consultation on human resource and employment law issues for any country where there is a member firm of L&E Global, an international alliance of independent law firms of which Jackson Lewis is a founding member.
  - **Liability Updates:** Complimentary access to the Jackson Lewis newsletter and e-updates spotlighting important workplace law news and trends. The **Named Entity** may also subscribe to receive at no-cost, alerts about significant legislative actions, judicial decisions and other changes with potential business impact.
  - **Checklists:** Self-audit and pre-termination checklists to help insureds identify vulnerabilities and safely navigate risky terrain.
  - **Special California State Training:** CA AB 1825 training, (periodically scheduled at Jackson Lewis' California offices) to assist companies with 50 or more employees in California in fulfilling their mandate (required every two years) of providing sexual harassment training for supervisors.

  EPL Pak® Premier also includes Alternative Employment Dispute Resolution Programs from EDR Systems at preferred rates. EDR Systems will assist to resolve employee disputes internally and prevent time and money in litigation. The professionals at EDR Systems have more than 50 years of combined experience in human resource management, strategic planning, change management, and employee relations. They support a wide variety of businesses of all sizes, from national, multi-unit retail operations, to single-facility manufacturers, to professional firms.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 031*

ENDORSEMENT# *32*

This endorsement, effective *12:01 am*     *April 26, 2019*          forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EMPLOYMENT CRISISFUND APPENDIX**

**I.  DEFINITIONS**

(a) **"Crisis"** means an **Employment Practices Crisis**, **Employee Information Breach Crisis** or **Workplace Violence Crisis**, as applicable.

(b) **"Employment Practices Crisis"** means an **Allegation**, **Discovery** or **Media Report** of a **Wrongful Act** (specifically including, but not limited to, a hostile work environment), which, in the good faith opinion of the **Company's** General Counsel (or equivalent position), resulted or is reasonably likely to result, in any:

   (1) civil action or compliance audit by the EEOC or any similar state agency or commission;

   (2) civil or criminal action alleging sexual harassment or conduct by an executive officer;

   (3) civil class action;

   (4) civil action involving multiple plaintiffs; or

   (5) civil action by a person alleging **Retaliation** by an **Insured** in response to such person's actions or threatened actions as a "whistleblower".

   Provided, however, that the term **Crisis** shall not include any:

   (1) revising or rewriting of personnel policies or procedures;

   (2) sensitivity or awareness training;  or

   (3) accommodations made by the **Company** pursuant to the Americans With Disabilities Act.

(c) **"Employee Information Breach Crisis"** means a failure of an **Company** to prevent unauthorized access, to or use of data containing **Employee Information**, which, in the good faith opinion of the **Company**, can reasonably be expected to lessen public confidence in the competence of the  **Company**.

(d) **"Workplace Violence Crisis"** means any intentional act involving the use of deadly force or the threat of deadly force with a deadly weapon which occurs on the **Company's** premises and involving at least one  **Employee**.

(e) **"Crisis Loss"** means:

   (1) <u>**With Respect to an Employment Practices Crisis**</u>:

      Any of the following amounts incurred during the pendency of a **Employment Practices Crisis** for which an **Company** is legally liable:

© All rights reserved.

*END 032*

<u>ENDORSEMENT#</u> *32*   (continued)

(i) the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Management Services** for an **Company**;

(ii) the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and

(iii) travel costs incurred by **Executives**, employees or agents of an **Company** or of the **Crisis Firm**, arising from or in connection with the **Employment Practices Crisis**.

(2) <u>**With Respect to an Employee Information Breach Crisis**</u>:

The reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Management Services** for an **Company**.

(3) <u>**With Respect to a Workplace Violence Crisis**</u>:

The reasonable fees and expenses, or cost of:

(i) an independent security consultant for ninety (90) days following the date the **Workplace Violence Crisis** occurs;

(ii) an independent public relations consultant for ninety (90) days following the date the **Workplace Violence Crisis** occurs; and

(iii) onsite group counseling session(s) for **Employees** conducted by an independent consultant following a **Workplace Violence Crisis**.

(f) **"Crisis Management Services"** means:

(1) <u>**With Respect to an Employment Practices Crisis**</u>:

Those services performed by an **Crisis Firm** in advising the **Company** on minimizing potential harm to the **Company** arising from the **Employment Practices Crisis**; including, but not limited to, maintaining and restoring public and employee confidence in the **Company.**

(2) <u>**With Respect to an Employee Information Breach Crisis**</u>:

Reasonable and necessary costs and expenses incurred by an **Company** for a public relations firm, **Crisis Firm** or law firm agreed to by the **Insurer** to advise the **Company** on minimizing the harm to such **Company**, including, without limitation, maintaining and restoring public confidence in the   **Company**.

(g) **"Crisis Firm"** means: means any public relations firm, crisis management firm or law firm on the list of approved firms that is accessible through the online directory at <u>http://www.aig.com/us/panelcounseldirectory</u> under the "CrisisFund®" link.   In the event the **Company** chooses to retain the services of an entity not listed, the **Company** must obtain the written consent of the **Insurer**, which shall not be unreasonably withheld.

© All rights reserved.

*END 032*

<u>**ENDORSEMENT#**</u> *32*   (continued)

(h) **"Employee Information"** means information regarding past, present of future **Employees** or applicant for employment with the **Company**, collected or stored by an **Company** for the purpose of establishing, maintaining or terminating the employment relationship.

(i) **"Allegation"** means any complaint, whether written or verbal, communicated to the **Company's** human resources department by:

(1) an individual who believes that he or she was a victim of the alleged **Wrongful Act**; or

(2) such individual's direct or indirect supervisor, if: such supervisor is an **Employee** and that supervisor's conduct is not the subject matter of the alleged   **Wrongful Act**.

(j) **"Discovery"** means either:

(1) an observation by any **Executive** or any human resources manager; or

(2) an internal investigation conducted by the **Company**, at the **Company's** own expense, which concludes that there is a reasonable basis to believe that a **Wrongful Act** has occurred.

(k) **"Media Report"** means any of the following publications or reports received in the geographic area of the **Company**: (i) a daily newspaper of general circulation; (ii) a weekly, monthly or quarterly newsletter or magazine of general circulation; (iii) a newsletter or trade publication applicable to the **Company's** industry; or (iv) a radio or television newscast.

## II. <u>EXCLUSIONS</u>

The term **Crisis** shall not include any event relating to any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 032*

108229 (5/11)                    3

ENDORSEMENT# *33*

This endorsement, effective at *12:01 am    April 26, 2019*          forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### CLAUSE 6 AMENDATORY ENDORSEMENT
### (SETTLEMENT WITHIN 50% OF THE APPLICABLE RETENTION AMOUNT)
### (EPL COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that Clause 6. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) of the **EPL Coverage Section** is amended by adding the following paragraph at the end thereof:

Notwithstanding any of the foregoing, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one Retention amount for an amount not exceeding 50% of such Retention amount (inclusive of **Defense Costs**), then the **Insurer's** consent shall not be required for such disposition.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 033*

**ENDORSEMENT#** 34

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

### INDIVIDUAL INSURED(S) DEFINITION AMENDED ENDORSEMENT

### (ADVISORY BOARD MEMBERS)
### (EPL AND FLI COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that coverage as is provided under the **EPL** and **FLI Coverage Sections** is extended and the Definition of "**Individual Insured**" in the **EPL** and **FLI Coverage Sections** is amended to include the members of the advisory committees of the board of directors of the **Company**, solely in their capacity as such members and with respect to the following **Continuity Date**: 01/31/2003.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the **Company** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company**.  The **Company** hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against an **Insured**:

    (1)    alleging, arising out of, based upon or attributable to, as of such **Individual Insured's** respective **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, or alleging or derived from a **Related Wrongful Act** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; and

    (2)    alleging any **Wrongful Act** occurring prior to each individual's respective **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 34

**ENDORSEMENT#** *35*

This endorsement, effective *12:01 am      April 26, 2019*          forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FIDUCIARY LIABILTY INSURANCE EDGE
### FOR PRIVATE EDGE PLUS
### (FLI Coverage Section)

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. Clause 1. INSURING AGREEMENTS of the **FLI Coverage Section** is deleted in its
   entirety and replaced with the following:

   Coverage for **Loss** under this policy is provided solely with respect to: (i) **Claims** first
   made against an **Insured**; (ii) **Voluntary Compliance Losses** first ascertained by or
   assessed against an **Insured**; and (iii) **Pension Crises** first occurring, in each such event,
   during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer**
   as required by this policy. **Claims** that are fact-finding investigations which do not
   allege a **Wrongful Act** and **Claims** that are **Internal Appeals** shall each be deemed first
   made when they are reported. Subject to the foregoing and the other terms, conditions,
   and limitations of this policy, this policy affords the following coverage:

   A. *Individual Insured Coverage*

      This policy shall pay the **Loss** of any **Individual Insured** that no **Company** or **Plan**
      has indemnified or paid that arises from any **Claim**:
      (1)    made against such **Individual Insured** for any **Wrongful Act** of such
             **Individual Insured**; or
      (2)    that is a fact-finding investigation which does not allege in writing a
             **Wrongful Act** or that is an **Internal Appeal**, if an **Insured** elects to give
             notice.

   B. *Individual Insured Indemnification Coverage*

      This policy shall pay the **Loss** of a **Company** or **Plan** that arises from any **Claim**:
      (1)    made against any **Individual Insured** for any **Wrongful Act** of such
             **Individual Insured**; or
      (2)    that is a fact-finding investigation which does not allege in writing a
             **Wrongful Act** or that is an **Internal Appeal**, if an **Insured** elects to give
             notice;
      but only to the extent that such **Company** or **Plan** has indemnified such **Loss** of,
      or paid such **Loss** on behalf of, the **Individual Insured**.

Ⓡ All rights reserved.

### *END 035*

ENDORSEMENT# *35* (continued)

C. *Company And Plan Coverage*

This policy shall pay the **Loss** of any **Company** or **Plan** arising from any **Claim**:

(1) made against such **Company** or **Plan** for any **Wrongful Act** of such **Company** or **Plan** (or of any employee for whom such **Company** is legally responsible); or

(2) that is a fact-finding investigation which does not allege in writing a **Wrongful Act** or that is an **Internal Appeal**, if an **Insured** elects to give notice.

D. *Voluntary Compliance Loss Coverage*

This policy shall pay any **Voluntary Compliance Loss** first ascertained by or assessed against an **Insured**, subject to the aggregate sublimit of liability set forth on the Declarations.
The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that circumstances giving rise to such **Voluntary Compliance Loss** result in a **Claim**.

E. *Pension CrisisFund Coverage*

This policy shall pay the **Pension Crisis Loss** of a **Company** up to the **Insured's** aggregate sublimit of liability for all **Pension Crisis Loss** under the **Pension CrisisFund**$^{SM}$ set forth in the Declarations (as amended by this endorsement).
The payment of any **Pension Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that circumstances giving rise to such **Pension Crisis Loss** result in a **Claim**.

2. Clause 2. DEFENSE AGREEMENT is amended by adding the following at the end thereof:

(d) FULL SETTLEMENT WITHIN RETENTION/CONSENT WAIVED

Notwithstanding the provisions of Section 2(c) above, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding the Retention, then the **Insurer's** consent shall not be required for such disposition.

(e) CLAIMS PARTICIPATION AND COOPERATION

Notwithstanding the provisions of Section 2(c) above, the failure of any **Insured** to give the **Insurer** cooperation and information as it may reasonably require shall not impair the rights of any **Individual Insured** under this policy.

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

3. Clause 5. EXCLUSIONS of the **FLI Coverage Section** is amended by deleting the final paragraph thereof and replacing it with the following:

In determining whether any of the exclusions applicable to this **Coverage Section** apply, the **Wrongful Acts** of any **Insured** shall not be imputed to any other  **Insured**.

4. Clause 5. EXCLUSIONS of the **FLI Coverage Section** is amended by deleting Exclusions (a), (b), (d) and (h) in their entirety and replacing them with the following:

   (a) arising out of, based upon or attributable to any profit or advantage to which the Insured was not legally entitled, if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy;

   (b) arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**, by the **Insured,** if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy;

   (d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same as or a related **Wrongful Act** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any employee benefit plan fiduciary liability insurance policy in force prior to the inception date of this policy;

   (h) for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to: (a) **Defense Costs** incurred in the defense of a **Claim** for a violation of **ERISA** by an **Insured**; or (b) the coverage afforded under Extension 7.C., *Managed Care Coverage*;

5. Clause 5. EXCLUSIONS of the **FLI Coverage Section** is amended by deleting Exclusions (f), (g), (i) and (j) in their entirety.

6. Clause 6. LIMIT OF LIABILITY of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

**6. LIMIT OF LIABILITY**

The following provisions shall apply in addition to the provisions of Clause 4. LIMIT OF LIABILITY of the **General Terms and Conditions**:

Ⓒ All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

Each sublimit of liability in this **Coverage Section** is the maximum limit of the **Insurer's** liability for all **Loss** under this **Coverage Section** that is subject to that sublimit of liability. All sublimits of liability shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability**, and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

7. Item 7. OTHER LIMITS OF LIABILITY of the Declarations is amended by deleting subparagraphs (e) and (f) and replacing them with the following sublimits of liability:

| | |
|---|---|
| *Voluntary Compliance Loss:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *Section 502(c) Penalties:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or **Shared Limit of Liability** , whichever is less* |
| *Pension Protection Act Penalties:* | *$250,000 or 5% of the applicable **Separate Limit of Liability**  or **Shared Limit of Liability** , whichever is less* |
| *HIPAA Penalties:* | *$1.5 million or the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, whichever is less* |
| *Health Care Reform Penalties:* | *$250,000 or 5% of the applicable **Separate Limit of Liability** or  **Shared Limit of Liability**, whichever is less* |
| *Section 4975 Penalties:* | *$250,000* |
| *Pension CrisisFund*<sup>SM</sup> *:* | *$100,000* |

8. Clause 7. RETENTION CLAUSE of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

**7. RETENTION CLAUSE**

The following provisions shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 3 of the Declarations, such amount to be borne by the **Insured** and shall remain uninsured  with regard to (1) all **Indemnifiable Loss**; and (2) **Loss** of a **Company**. Notwithstanding the foregoing, no Retention shall be applied to the following: (i) **Non-Indemnifiable Loss**; (ii) **Pension Crisis Loss**; (iii) **Voluntary Compliance Loss**; (iv) **Section 502(c) Penalties**; (v) **Pension Protection Act Penalties**; (vi) **HIPAA Penalties**; (vii) **Health Care Reform Penalties**; (viii) **Section 4975 Penalties**, or (ix) the first $25,000 in **Defense Costs** incurred for **E-Discovery Consultant Services**.

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

9.  Solely with respect to the **FLI Coverage Section**, Item 3. COVERAGE SUMMARY of the Declarations is amended by deleting the Retention amount set forth for the **FLI Coverage Section** and replacing it with the following:

   (a) **Securities Retention**:                    *$5,000*

   (b) All other **Loss** to which a Retention applies:   *$0*

10. Solely with respect to the **FLI Coverage Section**, Clause 6. NOTICE/CLAIM REPORTING PROVISIONS of the General Terms and Conditions is amended by deleting subparagraphs (a), (b), (c) and (d) in their entirety and replacing them with the following:

   *A. Reporting a Claim or Pension Crisis*

   The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, notify the **Insurer** in writing of a **Claim** made against an **Insured** or of a **Pension Crisis** as soon as practicable after: (1) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (2) the **Pension Crisis** commences.  In all such events, notification must be provided no later than:
   (i)  ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable) if this policy is not renewed with the **Insurer**; or
   (ii) two hundred and seventy (270) days after the end of the **Policy Period** or **Discovery Period** (if applicable); if the expiring policy is renewed with the **Insurer**.

   As exceptions to the foregoing notice provision the **Insureds** shall have no obligation to give notice of:
   (1) a fact-finding investigation before the earliest of the time that: (i) it becomes a **Litigated Matter**; (ii) a **Wrongful Act** is alleged in writing; or (iii) any **Insured** has incurred defense costs for which coverage is being sought; or
   (2) an **Internal Appeal** before the earliest of the time that: (i) it becomes a **Litigated Matter**; (ii) any investment loss within a **Plan** is alleged; or (iii) any **Insured** has incurred defense costs for which coverage is being sought.

   *B. Reporting Voluntary Compliance Loss and Covered Penalties*

   The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, notify the **Insurer** in writing of a **Voluntary Compliance Loss** or of **Covered Penalties** as soon as practicable after such **Voluntary Compliance Loss** is first ascertained by or assessed against an **Insured**, or such **Covered Penalties** are first imposed, respectively, but in all such events no later than sixty (60) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

© All rights reserved.

*END 035*

*C.  Relation Back to the First Reported Claim*

Solely for the purpose of establishing whether any subsequent related **Claim** was first made during the **Policy Period** or **Discovery Period** (if applicable), if during any such period a **Claim** was first made and reported in accordance with Clause 7.A. above, then a **Claim** which is subsequently made against an **Insured** and that is reported to the **Insurer** which alleges, arises out of, is based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleges any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be deemed to have been first made at the time that such previously reported **Claim** was first made.

With respect to any subsequent related **Claim**, this policy shall only cover **Loss** incurred after such subsequent related **Claim** is actually made against an **Insured**.

*D.  Relation Back to Reported Circumstances Which May Give Rise to a Claim*

If during the **Policy Period** or **Discovery Period** (if applicable) an **Insured** becomes aware of and notifies the **Insurer** in writing of circumstances that may give rise to a **Claim** being made against an **Insured** and provides details as required below, then any **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with Clause 7.A. above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period** or during the **Discovery Period** (if applicable).   Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is actually made against an **Insured**.  In order to be effective, notification of circumstances must specify the facts, circumstances, nature of the anticipated alleged **Wrongful Act** and reasons for anticipating such **Claim**, with dates, persons and entities potentially involved.

11.    Clause 10. ORDER OF PAYMENTS of the **FLI Coverage Section** is deleted in its entirety and replaced with the following:

### *10. ORDER OF PAYMENTS*

If there is a **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **Coverage Section**, then the **Insurer** shall in all events:

(1) First, pay all **Loss** covered under Insuring Agreement A. *Individual Insured Coverage*;

© All rights reserved.

### *END 035*

**ENDORSEMENT#** *35*   (continued)

(2) Second, only after payment of **Loss** has been made pursuant to subparagraph (1) above and to the extent that any amount of the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement B. *Indemnification Of Individual Insured Coverage*; and

(3) Lastly, only after payment of **Loss** has been made pursuant to subparagraphs (1) and (2) above and to the extent that any amount of the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement C. *Company and Plan Coverage*, Insuring Agreement D. *Voluntary Compliance Loss Coverage*, and Insuring Agreement E. *Pension CrisisFund*<sup>SM</sup> *Coverage*.

In the event the **Insurer** withholds payment pursuant to subparagraph (2) or (3) above, then the **Insurer** shall, at such time and in such manner as set forth in instructions of the chief executive officer of the **Named Entity**, remit such payment to or on behalf of an **Insured**.

12. The following Clauses are added to the end of the **FLI Coverage Section**:

## 11. FLI EXTENSIONS

### A. *Disproven Allegation Protection*

In the event that an allegation which triggers potential coverage under this policy is disproven, so that a **Claim** is outside the scope of coverage under this policy, the **Insurer** shall not seek recovery of amounts that it has previously paid.  Situations that would trigger this protection include, but are not limited to when it is proven that:

(1) an **Executive** or employee of the **Company** who was alleged to be a **Plan** fiduciary was not in fact a **Plan** fiduciary;

(2) an **Insured's** alleged breach of fiduciary duty was in fact a settlor act;

(3) an alleged **Plan** was not a plan or was not a covered **Plan**; or

(4) a **Company** alleged to be the sponsor of a **Plan** was not in fact the sponsor of such plan.

### B. *Independent Fiduciary Fees*

**Loss** shall include reasonable and necessary fees and expenses of an independent fiduciary if such fiduciary is retained to review a proposed settlement of a covered **Claim**.  **Loss** shall also include reasonable and necessary fees and expenses of any law firm hired by such independent fiduciary to facilitate a review of such proposed settlement.

© All rights reserved.

*END 035*

108227 (2/11)                                    7

ENDORSEMENT# *35*   (continued)

C. *Managed Care Coverage*

This policy shall pay the **Loss** of an **Insured** arising from a **Claim** made against such **Insured** alleging improper or negligent selection of a **Managed Care Services** provider or denial or delay of any benefit under a health care, pharmaceutical, vision, or dental **Plan** of an **Insured**.

D. *LMRA Coverage*

If, and during the time that, coverage is provided under this policy, then this policy shall also pay the **Loss** of an **Insured** arising from an allegation that such **Insured** violated Section 301 of the Labor Management Relations Act ("LMRA") relating to alleged violations of collectively bargained contracts in connection with a **Plan**.

E. *First Dollar E-Discovery Consultant Services*

For any **Claim**, no Retention shall apply to the first $25,000 in **Defense Costs** incurred for **E-Discovery Consultant Services**.

The list of pre-approved e-discovery consulting firms (**"E-Consultant Firms"**) is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "e-Consultant Panel Members" link.  The list provides the **Insureds** with a choice of firms from which a selection of an **E-Consultant Firm** shall be made. Any **E-Consultant Firm** may be hired by an **Insured** to perform **E-Discovery Consultant Services** without further approval by the **Insurer**.

## 12. PROTECTIONS WHEN INDEMNIFICATION IS UNAVAILABLE

A. *Advancement*

If for any reason (including, but not limited to insolvency) a **Company** and the relevant **Plan** fail or refuse to advance, pay or indemnify covered **Loss** of an **Individual Insured** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Individual Insured** until either (i) a **Company** or **Plan** has agreed to make such payments, or (ii) the Retention has been satisfied.  In no event shall any such advancement by the **Insurer** relieve any **Company** or any relevant **Plan** of any duty it may have to provide advancement, payment or indemnification to any  **Individual Insured**.

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

Advancement, payment or indemnification of an **Individual Insured's Loss** by the **Company** or **Plan** is deemed "failed" if it has been requested by an **Individual Insured** in writing and has not: been provided; agreed to be provided; or acknowledged as an obligation by a **Company** or **Plan** within sixty (60) days of such request; and advancement, payment or indemnification by the **Company** or **Plan** is deemed "refused" if such **Company** or **Plan** gives a written notice of the refusal to the **Individual Insured**. Advancement, payment or indemnification of an **Individual Insured's Loss** by the **Company** or **Plan** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not: provided; agreed to be provided; or acknowledged by and collectible from any **Company** or **Plan**. Any payment or advancement by the **Insurer** within an applicable Retention shall apply toward the exhaustion of the **Policy Aggregate Limits of Liability**, and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

B. *Bankruptcy And Insolvency*

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations under this policy.

In such event, the **Insurer** and each **Insured** agree to cooperate in any efforts by the **Insurer** or any **Insured** to obtain relief for the benefit of the **Individual Insureds** from any stay or injunction applicable to the distribution of the policy proceeds.

**13. APPLICATION AND UNDERWRITING**

A. *Application and Reliance*

The **Insurer** has relied upon the accuracy and completeness of the statements, warranties and representations contained in the **Application**. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

B. *Individual Insured Coverage Non-Rescindable*

Under no circumstances shall the coverage provided by this policy for **Loss** under Insuring Agreement A. *Individual Insured Coverage* be deemed void, whether by rescission or otherwise, once the premium has been paid.

C. *Severability of the Application*

The **Application** shall be construed as a separate application for coverage by each **Individual Insured**. With respect to the **Application**, knowledge possessed by any **Company** or any **Individual Insured** shall not be imputed to any other **Individual Insured**.

© All rights reserved.

***END 035***

108227 (2/11)                                    9

<u>ENDORSEMENT#</u> *35*  (continued)

If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the **Insurer** shall have the right to void coverage under this policy, *ab initio*, with respect to:

(1) **Loss** under Insuring Agreement B. *Indemnification Of Individual Insured Coverage* for the indemnification of any **Individual Insured** who knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed; and

(2) **Loss** under Insuring Agreement C. *Company and Plan Coverage* if:

(i) the person who executed the **Application**; or

(ii) any past or present chief executive officer or chief financial officer of the **Named Entity**,

knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.

The foregoing applies even if the **Individual Insured** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

### 14. INDEMNIFICATION BY COMPANY

The **Company** agrees to indemnify the **Individual Insured** and/or advance **Defense Costs** to the fullest extent permitted by law. If the **Insurer** pays under this **Coverage Section** any indemnification or advancement owed to any **Individual Insured** by any **Company** within an applicable Retention, then that **Company** shall reimburse the **Insurer** for such amounts and such amounts shall become immediately due and payable as a direct obligation of the **Company** to the **Insurer**.  The failure of a **Company** to perform any of its obligations to indemnify the **Individual Insureds** and/or advance **Defense Costs** under this **Coverage Section** shall not impair the rights of any **Individual Insured** under this **Coverage Section**.

13. Solely with respect to the **FLI Coverage Section**, the definition of **"Company"** in Clause 2. DEFINITIONS of the General Terms and Conditions is amended by adding the following to the end thereof:

**"Company"** shall also mean, in any **Foreign Jurisdiction**, a **Corporate Trustee Company**.

14. Clause 3. DEFINITIONS of the **FLI Coverage Section** is amended as follows:

(A) Definitions (c), (d), (e), (g), (h), (j), (k), (l), (o), (p), (s), (z), (aa), (bb), (cc), (gg), (ii) and (jj) are deleted in their entirety, and all references to those terms throughout the policy are deleted in their entirety.

© All rights reserved.

### *END 035*

**ENDORSEMENT#** *35* (continued)

(B)     Definitions (a), (b), (f), (i), (m), (n), (w), (x), (y), (dd), (hh) and (kk) are deleted in their entirety and replaced with the following:

(a) "**Application**" means:

(1) the written statements and representations made by an **Insured** and provided to the **Insurer** during the negotiation of this policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this policy;

(2) all warranties executed by or on behalf of an **Insured** and provided to the **Insurer** in connection with the underwriting of this policy or the underwriting of any other employee benefit plan fiduciary liability policy (or equivalent) issued by the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time; and

(3) each and every public filing by or on behalf of a **Company** made with any federal, state, local or foreign regulatory agency (including, but not limited to the U.S. Securities and Exchange Commission and the U.S. Department of Labor ("DOL"), CPA-audited financial statements for all **Plans**, with investment portfolios, Form 5500's and any attachments thereto for all **Plans**, any financial information in such filings, and any certifications relating to the accuracy of the foregoing), provided that such public filing was filed during the twelve (12) month period immediately preceding the inception of the **Policy Period**.

(b) "**Benefits**" means any obligation under a **Plan** to a **Plan** participant or beneficiary that is a payment of money or property; or any privilege, right, option or perquisite.

(f) "**Claim**" means:

(1) a written demand for monetary, non-monetary or injunctive relief, other than an initial application for benefits;

(2) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:
(i) service of a complaint or similar pleading (in the case of a civil proceeding);
(ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or
(iii) receipt or filing of a notice of charges; or

(3) a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject;

(4) any fact-finding investigation, whether or not a **Wrongful Act** is alleged, by the DOL or the Pension Benefit Guaranty Corporation ("PBGC") or any similar governmental authority located outside the United States, including, but not limited to the United Kingdom's Pensions Ombudsman or Pensions Regulator;

© All rights reserved.

*END 035*

108227 (2/11)                              11

**ENDORSEMENT#** *35*   (continued)

      (5) any written request to toll a statute of limitations which may be applicable to any **Claim** that may be made for any **Wrongful Act** of any **Insured**; or

      (6) any **Internal Appeal**.

"**Claim**" shall include any **Securities Claim**.

(i) "**Defense Costs**" means reasonable and necessary fees, costs, and expenses consented to by the **Insurer** (including the cost of **E-Discovery Consultant Services** and premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**.

**Defense Costs** shall not include the compensation of any **Individual Insured** or any employee of an **Insured**.

(m) "**Employee Benefit Law**" means:

      (1) **ERISA** and any similar common or statutory law anywhere in the world (including, but not limited to the United Kingdom's Pensions Act 2004, Pensions Act 1995, and Pension Schemes Act 1993; and the Pension Benefit Standards Act, 1985 of Canada), as amended, and any rules and regulations promulgated thereunder to which a **Plan** is subject; and

      (2) **HIPAA Privacy Regulations**; and solely with respect to subparagraph (2) of the definition of **Wrongful Act**, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

In no event shall **Employee Benefit Law**, other than as set forth in subparagraph (2) above, include any law other than **ERISA** which concerns workers' compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

(n) "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, including, but not limited to amendments pursuant to:

(1) COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1985);

(2) HIPAA;

(3) the Newborns' and Mothers' Health Protection Act of 1996;

(4) the Mental Health Parity Act of 1996;

(5) the Women's Health and Cancer Rights Act of 1998;

(6) the Pension Protection Act of 2006; and

(7) **Health Care Reform Law**;

and including any amendments thereto and regulations thereunder.

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*  (continued)

(w) "**Individual Insured**" means, solely with respect to a **Plan,** any past, present or future:

(1) **Executive** or employee of a **Company** or of a **Plan** in his or her **Administration** of a **Plan** or in his or her capacity as a fiduciary or trustee of a **Plan**;

(2) member of a pension committee of a **Company** in his, her, or its capacity as a fiduciary or in his, her, or its **Administration** of a **Plan**;

(3) natural person in a position equivalent to a position listed in subparagraph (1) or (2) above in the event that the **Company** is operating in a **Foreign Jurisdiction;** or

(4) former **Executive** or employee currently serving in a consulting or advisory capacity to a **Plan** if the **Company** provides indemnification to such individual in the same manner as is provided to other **Individual Insureds**.

"**Individual Insureds**" shall not include any individual in his or her capacity as an employee of any third party, including a service provider, other than a **Corporate Trustee Company**.

(x) "**Insured**" means any:
(1) **Individual Insured**:
(2) **Plan**;
(3) **Company**;
(4) **Plan Committee** of a **Company**, in its capacity as a fiduciary or trustee of a **Plan**, or in its **Administration** of a **Plan**; or
(5) **Corporate Trustee Company**.

(y) "**Loss**" means damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), **Defense Costs**, **Voluntary Compliance Loss**, **Pension Crisis Loss** and **Covered Penalties**; however, "**Loss**" shall not include:
(1) civil or criminal fines or penalties other than **Covered Penalties**;
(2) taxes or tax penalties other than **Covered Penalties**;
(3) cleanup costs relating to hazardous materials, pollution or product defects;
(4) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**;
(5) wages, tips, and commissions;
(6) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Individual Insured**; provided, however, that **Loss** shall include a monetary award, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

in the actual accounts of participants in a **Plan** by reason of a change in value of the investments held by that **Plan**, including, but not limited to the securities of the **Company**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits"; and

(7) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, **Loss** shall include punitive, exemplary and multiplied damages imposed upon any **Insured** (subject to this policy's other terms, conditions, and limitations, including, but not limited to the Conduct Exclusion).  Enforceability of this paragraph shall be governed by the applicable law that most favors coverage for such penalties and punitive, exemplary, and multiplied damages.

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1) - (7) above, subject to the other terms, conditions, and exclusions of this policy.

(dd) **"Plan"** means any:

(1) qualified or non-qualified plan, fund, trust or program, including, but not limited to any pension plan, welfare plan, health savings account plan, IRA-based plan, stock option plan, stock purchase plan, deferred compensation program, supplemental executive retirement program, top-hat plan, excess benefit plan, cafeteria plan, dependent care assistance program, fringe benefit plan or voluntary employees' beneficiary association as defined in the Internal Revenue Code of 1986, as amended ("VEBA") established anywhere in the world, which is sponsored solely by a **Company,** and with respect to a collectively bargained **Plan**, operated jointly by a **Company** and a labor organization, in each case solely for the benefit of such **Company's** current or former employees or **Directors or Officers**, and which was in existence on or before the inception of the  **Policy Period**.

(2) plan described in subparagraph (1) above acquired during the **Policy Period**.  However, if such plan is a pension plan:

(a) acquired as a result of the **Company's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Company** as of the inception date of this policy; or

(b) with assets that total more than 25% of the total consolidated assets of all covered pension plans as of the inception date of this policy;

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

then this policy shall apply to such plan (solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within ninety (90) days of its acquisition, the **Named Entity** shall have provided the **Insurer** with information and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**.  The ninety (90) day reporting condition shall not apply if such new plan is not one of the five largest pension plans (by asset size) of the **Company**, if the failure to report such **Plan** within the ninety (90) day reporting period was due to inadvertent omission by the **Named Entity**, and if upon discovery of such omission the **Named Entity** notifies the **Insurer** as soon as practicable and provides any information and pays any premium required by the **Insurer** relating to such **Plan**.

(3) plan or program described in subparagraph (1) above that was created, considered, developed or proposed during the **Policy Period**.

The definition of **Plan** shall also include the following government-mandated programs: unemployment insurance, Social Security, or disability payments, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the definition of **Wrongful Act** in this policy.

Coverage under this policy shall not extend to a **Multiemployer Plan** itself, its contributing employer(s) or, except as set forth in subparagraph (4) of the definition of **Wrongful Act**, any fiduciary or administrator of a **Multiemployer Plan.**

(hh) **"Voluntary Compliance Loss"** means fines, penalties, sanctions, and reasonable and necessary fees, costs or expenses related to the assessment of or correction of a **Plan's** non-compliance in accordance with any **Voluntary Compliance Program** and which are incurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

**"Voluntary Compliance Loss"** shall not include any compensation of any **Individual Insureds** or any employee of an **Insured**.

(kk) **"Wrongful Act"** means:

(1) any actual or alleged violation by an **Insured** of any of the responsibilities, obligations or duties imposed upon fiduciaries by **Employee Benefit Law** with respect to a **Plan,** including, but not limited to the actual or alleged improper selection of or inadequate monitoring of third-party service providers; or any allegation made against an **Insured** solely by reason of his, her or its actual or alleged status as a fiduciary, but only with respect to a **Plan**;

© All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

    (2) any actual or alleged act, error or omission by an **Insured** in the **Administration** of any **Plan**, including, but not limited to the actual or alleged failure to properly and timely provide COBRA notices or other required notices, the alleged failure to make timely determinations of eligibility for benefits; or any allegation made against an **Insured** solely by reason of his, her or its actual or alleged **Administration** of a **Plan**;

    (3) any negligent act, error or omission by a **Company**, its **Directors or Officers** or employees in facilitating the administration of a **Multiemployer Plan**; and

    (4) if a plan identified as a **Multiemployer Plan** is referenced by specific written **endorsement** attached to this policy and any required premium is paid, any matter arising out of an **Individual Insured's** actual or alleged service as a fiduciary of, or actual or alleged **Administration** of, such **Multiemployer Plan** when such service or **Administration** is at the specific written request or direction of the **Company**.

(C) The following Definitions are added to the **FLI Coverage Section**:

"**Administration**" means, with respect to a **Plan**, counseling employees, participants, and beneficiaries; providing interpretations; handling of records; determining and calculating benefits; preparing, distributing or filing required notices or documents; or activities affecting enrollment, termination or cancellation of employees, participants, and beneficiaries under the **Plan**.

"**Corporate Trustee Company**" means any corporation formed and operating outside of the United States of America established by the **Company** and duly appointed to act as a trustee of a **Plan**.

"**Covered Penalties**" means solely in connection with a **Plan:**
(1) the 5% or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**;
(2) the 20% or less civil penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to a covered settlement or judgment;
(3) the civil fines and penalties assessed against an **Insured** by either the United Kingdom's Pensions Ombudsman or the Pensions Regulator or any successor body thereto;
(4) **Voluntary Compliance Loss** subject to the aggregate sublimit of liability set forth in the Declarations;
(5) the civil penalties under Section 502(c) of **ERISA**, other than penalties under the Pension Protection Act, subject to the aggregate sublimit of liability set forth in the Declarations (" **Section 502(c) Penalties**");
(6) the civil penalties under the Pension Protection Act of 2006, subject to the aggregate sublimit of liability set forth in the Declarations ("**Pension Protection Act Penalties**");
(7) **HIPAA Penalties**, subject to the aggregate sublimit of liability set forth in the Declarations;

⊚ All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

(8) the civil penalties imposed under rules and regulations (including interim final rules and regulations) provided by governmental agencies (including the U.S. Department of Health and Human Services, the U.S. Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the DOL, the Office of Consumer Information and Insurance Oversight, and the Employee Benefits Security Administration), for inadvertent violations by an **Insured** of **Health Care Reform Law**, subject to the aggregate sublimit of liability set forth in the Declarations (" **Health Care Reform Penalties**"); and

(9) the 15% or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments, subject to the aggregate sublimit of liability set forth in the Declarations **(" Section 4975 Penalties**").

"**E-Discovery**" means the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information.

"**E-Discovery Consultant Services**" means solely the following services performed by an **E-Consultant Firm**:

(1) assisting the **Insured** with managing and minimizing the internal and external costs associated with **E-Discovery**;

(2) assisting the **Insured** in developing or formulating an **E-Discovery** strategy which shall include interviewing qualified and cost effective **E-Discovery** vendors;

(3) serving as project manager, advisor and/or consultant to the **Insured**, defense counsel and the **Insurer** in executing and monitoring the **E-Discovery** strategy; and

(4) such other services provided by the **E**-Consultant Firm that the **Insured**, **Insurer** and **E-Consultant Firm** agree are reasonable and necessary given the circumstances of the **Claim**.

"**Executive**" means any past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position).

"**Health Care Reform Law**" means the Patient Protection and Affordable Care Act ("PPACA") and the Health Care and Education Reconciliation Act of 2010.

"**Internal Appeal**" means an appeal of an adverse benefits determination by an **Insured** pursuant to the DOL's claim procedure regulation at 29 C.F.R. Section 2560.503-1(h) or similar claim procedures pursuant to applicable law.

"**Litigated Matter**" means any civil, criminal, or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (1) service of a complaint or similar pleading (in the case of a civil proceeding); or (2) return of an indictment, information or similar document (in the case of a criminal proceeding).

© All rights reserved.

*END 035*

<u>**ENDORSEMENT#**</u> *35*   (continued)

"**Managed Care Services**" means the administration or management of a health care, pharmaceutical, vision or dental **Plan** utilizing cost control mechanisms, including, but not limited to utilization review, case management, disease management, pharmacy management, the use of a preferred provider medical, vision or dental network, or a health maintenance organization.

"**Multiemployer Plan**" means any multiemployer plan, as defined by **ERISA**, which is operated jointly by the **Company**, a labor organization, and one or more other employers for the benefit of the employees of the **Company** among others.

"**Pension Crisis**" has the meaning set forth in the **Pension Crisis Fund**<sup>SM</sup> Appendix attached to this policy.

"**Pension CrisisFund**<sup>SM</sup>" means the aggregate sublimit of liability set forth in the Declarations (as amended by this endorsement) for all **Pension Crisis Loss** in the aggregate for all **Pension Crises** first occurring during the **Policy Period** or any applicable **Discovery Period**.

"**Pension Crisis Loss**" has the meaning set forth in the **Pension CrisisFund**<sup>SM</sup> Appendix attached to this policy.

"**Plan Committee**" means any employee benefit committee, including, but not limited to any plan investment or administration committee, that is established by a **Company** and that is comprised entirely of **Individual Insureds.**

"**Securities Claim**" means any **Claim** in which a plaintiff alleges a loss or seeks damages of more than the **Securities Retention** amount or $1,000,000, whichever is less, based upon a change in or challenge to the price or valuation of securities of or issued by (i) the **Company**, (ii) the parent of the **Company**, (iii) any company that is acquired in whole or in part by the **Company**, or (iv) any former parent of any company that is acquired in whole or in part by the **Company** (hereinafter (i) through (iv) collectively referred to as "Employer Securities")**,** even if such **Claim** also contains unrelated allegations.

The definition of **Securities Claim** shall not be triggered by any **Claim** in which plaintiffs allege a loss or seek damages as a result of a **Plan's** allegedly excessive fees or excessive cash holdings within an investment fund designed to hold Employer Securities as long as there is no allegation based upon a drop in the price or decrease in the valuation of the Employer Securities.

"**Securities Retention**" means the Retention applicable to **Loss** that arises out of a **Securities Claim**.

Ⓒ All rights reserved.

*END 035*

**ENDORSEMENT#** *35*   (continued)

"**Voluntary Compliance Program**" means any voluntary compliance resolution program or similar voluntary settlement program administered by the DOL, IRS, PBGC or other similar governmental authority or any similar program administered by any governmental authority located outside the United States of America, to correct any inadvertent non-compliance by a **Plan**, including, but not limited to:
(1) Employee Plans Compliance Resolution System;
(2) Delinquent Filer Voluntary Compliance Program;
(3) Voluntary Fiduciary Correction Program;
(4) Premium Compliance Evaluation Program; and
(5) Participant Notice Voluntary Correction Program.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 035*

ENDORSEMENT# *36*

This endorsement, effective *12:01 am     April 26, 2019*            forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PENSION CRISISFUND<sup>SM</sup> APPENDIX
### (To Fiduciary Liability Insurance Edge Endorsement)

## I.  DEFINITIONS

**"Pension Crisis"** means one of the following:

A.  Investment Loss in a Covered **Plan**

A loss in the total assets of a covered **Plan** of 25% or more in a thirty (30) day
period caused by investment loss or a loss in a specific **Plan** investment of 75% or
more in a thirty (30) day period, which may be alleged to have a material effect on
a covered **Plan**.

B.  Third Party Service Provider Issues

The public announcement of: (i) a **Plan's** Third Party Service Provider's fraud, arrest,
indictment, bankruptcy, layoff of employees, or (ii) a governmental or regulatory
agency's investigation into or litigation against a **Plan's** Third Party Service
Provider.

C.  Material Effect on a **Company's** Common Stock Price

An event, which in the good faith opinion of the Chief Financial Officer of a
**Company** caused or is reasonably likely to cause a **Material Effect on a Company's
Common Stock Price**:

(i)   *Negative earning or sales announcement*
The public announcement of a **Company's** past or future earnings or sales,
which is substantially less favorable than any of the following: (i) a
**Company's** prior year's earnings or sales for the same period; (ii) a
Company's prior public statements or projections regarding earnings or sales
for such period; or (iii) an outside securities analyst's published estimate of a
**Company's** earnings or sales causing **Loss** in the **Plan's** investments in
securities of or issued by (i) the **Company**, (ii) the parent of the **Company**, (iii)
any company acquired in whole or in part by the **Company**, or (iv) any former
parent of any company acquired in whole or in part by the  **Company**.

(ii)  *Mass tort*
The public announcement or accusation that a **Company** has caused the
bodily injury, sickness, disease, death or emotional distress of a group of

© All rights reserved.

### *END 036*

**ENDORSEMENT#** *36*   (continued)

persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

(iii)   *Employee layoffs or loss of key executive officer(s)*
The public announcement of layoffs of employees of a **Company**. The death or resignation of one or more key **Executives** of the **Named Entity**.

(iv)   *Write-off of assets*
The public announcement that a **Company** intends to write off a material amount of its assets.

(v)   *Debt restructuring or default*
The public announcement that a **Company** has defaulted or intends to default on its debt or intends to engage in a debt restructuring.

(vi)   *Bankruptcy*
The public announcement that a **Company** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of a **Company**; or that bankruptcy proceedings are imminent, whether voluntary or involuntary.

(vii)   *Governmental or regulatory agency litigation*
The public announcement of the commencement or threat of litigation or of governmental or regulatory agency proceedings against a **Company**.

(viii)   *Unsolicited takeover bid*
An unsolicited written offer or bid by any person or entity other than an **Insured** or any affiliate of any **Insured**, whether publicly announced or privately made to an **Executive** of a **Company**, to effect a **Transaction** of the **Named Entity**.

A **Pension Crisis** shall first commence when a **Company** or any of its **Executives** first becomes aware of such **Pension Crisis**. A **Pension Crisis** shall conclude when a **Crisis Firm** advises a **Company** that such **Pension Crisis** no longer exists, the **Named Entity** determines such **Pension Crisis** no longer exists, or when the **Pension CrisisFund**$^{SM}$ has been exhausted, whichever occurs first.

"**Crisis Firm**" means any public relations firm, crisis management firm or law firm on the list of approved firms that is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "**CrisisFund**$^{SM}$ " link. Once notice has been given of a **Pension Crisis** in accordance with Clause 6 of the General Terms and Conditions, any "**Crisis Firm**" may be hired by a **Company** to perform **Crisis Services** without further approval by the **Insurer**.

"**Pension Crisis Loss**" means the following costs, subject to the sublimit of liability in the **Pension CrisisFund**$^{SM}$ set forth in the Declarations, incurred during the pendency of a **Pension Crisis** for which a **Company** is legally liable:

© All rights reserved.

**END 036**

**ENDORSEMENT#** *36*   (continued)

(1) the reasonable and necessary fees and expenses incurred by a Crisis Firm in the performance of **Crisis Services** for a **Company**;

(2) the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and

(3) travel expenses incurred by **Executives**, **Employees** or agents of a **Company** or of the **Crisis Firm**, arising from or in connection with the **Pension Crisis**.

"**Crisis Services**" means those services performed by a **Crisis Firm** in advising an **Insured** or any employee of a **Company** on minimizing potential harm to a **Company** from the **Pension Crisis** (including, but not limited to, maintaining and restoring investor confidence in a **Company**).

"**Material Effect on a Company's Common Stock Price**" means, within a period of 24 hours, that the price per share of a **Company's** common stock shall decrease by $2.00, or 15% net of the percentage change in the Standard & Poor's Composite Index, whichever is greater.

## II.  EXCLUSIONS

The term **Pension Crisis** shall not include any event relating to any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 036*

109030 (6/11)                    3

**ENDORSEMENT#** *37*

This endorsement, effective *12:01 am      April 26, 2019*         forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SETTLOR CAPACITY AMENDATORY**
**(WRONGFUL ACT DEFINITION AMENDED)**
**(FLI COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that the
Definition of **"Wrongful Act"**, as used in the **FLI Coverage Section,** is amended to include
any actual or alleged act, error or omission by an **Insured** in a settlor capacity as respects a
**Plan**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 037*

111344 (6/12)                    Page 1 of 1

<u>**ENDORSEMENT**</u># 38

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

## CONTINUITY DATE - EXCESS LIMITS ENDORSEMENT

## (FLI COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the
**Continuity Date** applicable to the **FLI Coverage Section**, as set forth in Item 3 of the
Declarations is deleted in its entirety and replaced with the following:

     **CONTINUITY DATES** (FLI Coverage Section):

     For the first $3,000,000 Limit of Liability:     01/31/2003

     For the $7,000,000 in Excess of the first

     $3,000,000 Limit of Liability:     03/01/2009

As used in this Endorsement, the term "Limit of Liability" means either the **Separate Limit of
Liability** or the **Shared Limit of Liability** applicable to this **FLI Coverage Section** as stated in
Item 3 of the Declarations.

     ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 38

99589 (07/08)                    1

**ENDORSEMENT#** *39*

This endorsement, effective *12:01 am*     *April 26, 2019*          forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DEFENSE AGREEMENT CLAUSE 2(B) AMENDED
### (SETTLEMENT WITHIN % OF THE APPLICABLE RETENTION AMOUNT)
### (FLI COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that subsection (b) "INSURED'S OPTION TO ASSUME DEFENSE" of Clause 2. "DEFENSE CLAUSE" of the **FLI Coverage Section** is amended by adding the following paragraph at the end thereof:

Notwithstanding any of the foregoing, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one Retention amount, for an amount not exceeding *Twenty five* percent ( *25*%) of such Retention amount (inclusive of **Defense Costs**), then the **Insurer's** consent shall not be required for such disposition.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 039**

ENDORSEMENT# *40*

This endorsement, effective at *12:01 am   April 26, 2019*       forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *PrivateEdge Plus*

### AFFORDABLE CARE ACT COVERAGE
### (FLI Coverage Section)

In consideration of the additional premium of *$0*, it is hereby understood and agreed that the **FLI Coverage Section** is amended as follows:

#### I.

The **FLI Coverage Section** is amended to include the following **FLI EXTENSION** Clause at the end thereof:

AA. **FLI EXTENSION**

*Affordable Care Act Coverage*

This policy shall pay the **Loss** of an **Insured** arising from a **Claim** made against such **Insured** for any **Healthcare Exchange Wrongful Act.**

#### II.

Solely with respect to the coverage afforded under this endorsement, in Clause 3. **DEFINITIONS** of the FLI Coverage Section, paragraph (kk), "**Wrongful Act**," is amended to include the following at the end thereof:

"**Wrongful Act**" also means any **Healthcare Exchange Wrongful Act**.

#### III.

As used herein, the following terms have the following meanings:

"**Healthcare Exchange**"     means any public, private or government-sponsored entity set up to facilitate the purchase of health insurance in accordance with the Patient Protection and Affordable Care Act.

"**Healthcare Exchange
Wrongful Act**"     means any actual or alleged act, error or omission by an **Insured** in connection with insurance purchased through, or attempted to be purchased through, a **Healthcare Exchange**.

© All rights reserved.

*END 040*

<u>**ENDORSEMENT#**</u> *40*   (continued)

**IV.**

Solely with respect to the coverage afforded by this endorsement, the term **"Plan"** is amended to include any **Healthcare Exchange**, but no coverage shall be provided for such **Healthcare Exchange**.

**V.**

Solely with respect to the coverage provided by this endorsement, in the event that the **Insured's** business is that of an insurer, insurance provider, or insurance exchange provider or marketplace, then the **Insurer** shall not be liable to make any payment for **Loss** in connection with such business, including but not limited to any professional services related thereto.

**VI**.

Further, coverage as is afforded by virtue of this endorsement shall apply excess of any other valid and collectible insurance under which payment of the claim is required or actually made.  If said other insurance is provided by the **Insurer** or any other insurance company thereof (or would be provided but for the application of the retention amount or the exhaustion of the limit of liability) (herein, **"Other Policy"**), then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in part or in whole, by this policy and such **Other Policy**, shall not exceed the greater of the **Limit** of Liability set forth on the Declarations page of this policy or the limit of liability of such **Other Policy**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 040*

<u>ENDORSEMENT#</u> *41*

This endorsement, effective at *12:01 am   April 26, 2019*      forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

**CLAIM DEFINITION AMENDED**
**(FLI COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that the **FLI Coverage Section**, Clause 3. **DEFINITIONS**, is hereby amended by deleting subparagraph (i) in the Definition of **"Claim"** in its entirety and replacing it with the following:

    (i)     a written demand for monetary, non-monetary relief or injunctive relief (including any written request to toll or waive any statute of limitations);

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Ⓒ All rights reserved.

*END 041*

112030 (3/14)                    Page 1 of 1

<u>**ENDORSEMENT**</u># 42

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

### DEFINITION OF APPLICATION AMENDED

In consideration of the premium charged, it is hereby understood and agreed that Clause 3.
**DEFINITIONS** of the **FLI Coverage Section**, the definition **"Application"** is deleted in its
entirety and replaced with the following to the end thereof:

> **"Application"** means each and every signed application, any attachments to such
> applications, other materials submitted therewith or incorporated therein, any other
> documents submitted in connection with the underwriting of this **FLI Coverage
> Section** or the underwriting of any other fiduciary liability policy (or equivalent policy)
> issued by the **Insurer**, or any of its affiliates, of which this **FLI Coverage Section** is a
> renewal or replacement of in whole or part or which it succeeds in time, any public
> documents filed by the **Named Entity** with the Department of Labor, or any similar
> federal, state, local or foreign agencies, and any CPA audited financial statements,
> form 5500s for all **Plans**, with investment portfolios.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 42

114190 (03/14)                                    1

ENDORSEMENT# *43*

This endorsement, effective at *12:01 am   April 26, 2019*       forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

### INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS POLICY (WITH CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause
3. EXCLUSIONS of the **Crime Coverage Section**, the "Indirect Loss" exclusion is deleted its
entirety and replaced with the following:

Indirect or Consequential Loss

Loss that is an indirect or a consequential result of an **Occurrence** covered by this
**Crime Coverage Section** including, but not limited to, loss resulting from:

(i)   the **Insured's** inability to realize income that the **Insured** would have realized had
there been no loss of or damage to  **Money**, **Securities** or **Other Property**;

(ii)  payment of damages of any type for which the **Insured** is legally liable; provided,
however, the **Insurer** will pay compensatory damages arising directly from a loss
covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either
the existence or the  amount of loss under this **Crime Coverage Section**.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.**

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 043*

113021 (10/12)                                          Page 1 of 1

**ENDORSEMENT#** *44*

This endorsement, effective at *12:01 am*   *April 26, 2019*          forms a part of
Policy number   *01-340-76-97*
Issued to:  *ARTHREX, INC.*

By:    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PROTECTED INFORMATION EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS POLICY (WITH CRIME COVERAGE SECTION)
PRIVATE RISK PROTECTOR POLICY (WITH CRIME COVERAGE SECTION)
NOT-FOR-PROFIT RISK PROTECTOR POLICY (WITH CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that coverage under the **Crime Coverage Section** to this policy shall not apply to any loss resulting directly or indirectly from the: (a) theft, disappearance or destruction of; (b) unauthorized use or disclosure of; (c) unauthorized access to; or (d) failure to protect any:
(1) confidential or non-public; or
(2) personal or personally identifiable;
information that any person or entity has a duty to protect under any law, rule or regulation, any agreement or any industry guideline or standard.

This exclusion shall not apply to the extent that any unauthorized use or disclosure of a password enables a theft by an **Employee** of the **Insured** of money, securities or tangible property of the **Insured** or that the **Insured** is holding for a third party; provided, however, this exception shall not apply to the extent that such unauthorized use or disclosure of a password enables a theft of or disclosure of information.

### ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 044*

113010 (10/12)                          Page 1 of 1

<u>ENDORSEMENT#</u> *45*

This endorsement, effective at *12:01 am   April 26, 2019*        forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### IMPERSONATION FRAUD COVERAGE
### (CRIME COVERAGE SECTION)

It is agreed that in consideration of the additional premium of *$0*, the policy is hereby amended as follows:

1. Clause G. **Funds Transfer Fraud** is amended by adding the following to the end thereof:

   <u>Impersonation Fraud Coverage</u>

   The **Insurer** will also pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

   Notwithstanding the above requirement that the loss of **Funds** result directly from a **Fraudulent Instruction**, the **Insurer** will also pay for the loss of **Funds** resulting from the **Insured's** receipt of a **Fraudulent Instruction** from a purported **Vendor**, which advises the **Insured** that the **Vendor's** bank account information has been changed and the **Insured** suffers a loss of **Funds.**

2. Solely with respect to the **Impersonation Fraud Coverage** provided by this endorsement, Clause 2. **DEFINITIONS**, the definition of **Fraudulent Instruction** is deleted in its entirety and replaced with the following:

   "**Fraudulent Instruction**" means an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction communicated by the **Insured** or an **Employee** based upon an instruction received and relied upon by **Insured** or an **Employee** which was transmitted:

   a. by a purported director, officer, partner, member or sole proprietor of the **Insured's** or by another **Employee**-or by an individual acting in collusion with such purported director, officer, partner, member, sole proprietor or other **Employee**-but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge; or

   b. by a purported director, officer, partner, member, sole proprietor or employee of the **Insured's Vendor** or **Client**-or by an individual acting in collusion with such purported director, officer or employee-but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge; provided, however, **Fraudulent Instruction** shall not

© All rights reserved.

*END 045*

<u>ENDORSEMENT#</u> *45*   (continued)

include any such instruction transmitted by an actual director, officer, partner, member, sole proprietor or employee of the **Insured's Vendor** or **Client** who was acting in collusion with any third party in submitting such instruction.

3.   Solely for purposes of this endorsement, the following definitions are added:

**Vendor** means any person, firm, company, organization, association or other entity that provides goods or services to the **Insured** pursuant to a legitimate relationship that pre-exists the loss that is the subject of the   **Insured's** claim.

**Client** means any person, firm, company, organization, association or other entity to whom the **Insured** provides goods or services for a fee pursuant to a legitimate written contract that pre-exists the loss that is the subject of the **Insured's** claim.

4.   The **Insurer's** total liability for coverage provided by this endorsement for all loss arising from a single act or series of related acts is *$100,000* ("**Impersonation Fraud Limit**"). All amounts paid by the **Insurer** pursuant to this endorsement will be part of, and not in addition to, the applicable **Per Occurrence Limit of Liability** shown in the Declarations.

5.   Solely with respect to coverage provided by this endorsement, the applicable per occurrence Deductible Amount is *$25,000*.

6.   Solely with respect to the Fraudulently-Induced Payment Coverage provided under Section 1(b) of this endorsement, the following exclusion shall apply:

The Fraudulently-Induced Payment Coverage provided under Section 1(b) of this endorsement does not apply to any loss occurring prior to *March 31, 2017*.

7.   The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** under this endorsement is the **Impersonation Fraud Limit** shown in Section 4 above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 045*

**ENDORSEMENT# *46***

This endorsement, effective *12:01 am*     *April 26, 2019*        forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**INCLUDE DESIGNATED PERSON REQUIRED TO HAVE KNOWLEDGE OF LOSS
ENDORSEMENT
(CRIME COVERAGE SECTION ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that this
endorsement modifies insurance provided solely under the **Crime Coverage Section**, and
applies to all Insuring Agreements of that Coverage Section, as follows:

**A.    Schedule**

| Position Of Designated Person(s):<br>*Risk Manager* |
| --- |

**B.    Provisions**

1.   The introductory paragraph of Clause 1. **INSURING AGREEMENTS** is replaced
     by the following:

     Coverage is provided under the following Insuring Agreements for which a Per
     Occurrence Limit of Liability is shown in the Declarations and applies to loss
     that the **Insured** sustains resulting directly from an **Occurrence** taking place
     during the Policy Period shown in the Declarations, except as provided in
     Condition 6(a)(xv) or 6(a)(xvi), which is **Discovered** by a Designated Person
     during the Policy Period shown in the Declarations or during the period of
     time provided in the Extended Period To Discover Loss Condition 6(a)(xi):

2.   The first paragraph of Condition 6(a)(vii) DUTIES IN THE EVENT OF LOSS, is
     replaced by the following:

     (1)   After a Designated Person **Discovers** a loss or a situation that may
           result in loss of or damage to **Money**, **Securities** or **Other Property** the
           **Insured** must:

3.   Paragraph (2) of Condition 6(a)(xii) JOINT **INSURED** is replaced by the
     following:

     (2)   If any Designated Person of any Insured has knowledge of any
           information relevant to this **Crime Coverage Section**, that knowledge is
           considered knowledge of every **Insured**.

Includes copyrighted material of Insurance Services Office, Inc. with its permission
© All rights reserved.
***END 046***

96301 (10/07)                    Page 1 of 2

**ENDORSEMENT#** *46*     (continued)

4.  Paragraph (1) of Condition 6(b)(i) TERMINATION AS TO ANY EMPLOYEE is replaced by the following:

    (1)  As soon as a Designated Person not in collusion with the **Employee** learns of **Theft** or any other dishonest act committed by the **Employee** whether before or after becoming employed by the **Insured**; or

5.  Clause 2. **DEFINITIONS**, Paragraph (d) ("Discover", Discovered" or Discovery") is deleted in its entirety and replaced as follows:

    (d)  **"Discovery"**, **"Discover"** or **"Discovered"** means the time when a Designated Person first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime Coverage Section** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

    **"Discovery"**, **"Discover"** or **"Discovered"** also means the time when a Designated Person first receives notice of an actual or potential claim in which it is alleged that the **Insured** is liable to a third party under circumstances, which, if true, would constitute a loss under this **Crime Coverage Section**.

6.  Clause 2. **DEFINITIONS**, is amended by appending the following to the end thereof:

    **"Designated Person"** means:

    (1)  Any insurance risk manager;

    (2)  An **Employee** in your Human Resources Department or its equivalent;

    (3)  Any director, trustee, partner, **Member** or **Manager**;

    (4)  Any elected, appointed or otherwise titled officer;

    (5)  The highest ranking **Employee** at the **Premises** where such **Employee** performs the majority of his or her duties; or

    (6)  Any person in a position shown in the **Schedule**;

    of any **Insured**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, limitations, conditions, or provisions of the attached Policy other than the above stated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 046*

**ENDORSEMENT#** *47*

This endorsement, effective *12:01 am     April 26, 2019*     forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**PRIOR THEFT OR DISHONESTY ENDORSEMENT
(CRIME COVERAGE SECTION ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that, in the
**Crime Coverage Section**, Condition 6(b)(i) TERMINATION AS TO ANY EMPLOYEE,
subparagraph (1) is deleted in it's entirety and replacing it with the following:

(1)   As soon as:

    (i)   the **Insured**; or

    (ii)   any of the **Insured's** partners, **Members**, **Managers**, officers, directors, or
    trustees not in collusion with the **Employee**;

    learn of **Theft** or any other dishonest act committed by the **Employee**

    ▪   After becoming employed by the **Insured**; or

    ▪   Prior to becoming employed by the **Insured**, provided that such conduct
    involved loss of **Money**, **Securities** or **Other Property** valued at the amount
    specified in the schedule below or more.

**Schedule**

| |
|---|
| **Prior Theft or Dishonesty Amount:** *$25,000* |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 047*

**ENDORSEMENT#** *48*

This endorsement, effective *12:01 am*      *April 26, 2019*      forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AUTO-THRESHOLD AMENDED
### (CRIME ADVANTAGE ENDORSEMENT AMENDED)
### (CRIME COVERAGE SECTION ONLY)

In consideration of the premium charged, it is hereby understood and agreed that this endorsement modifies insurance provided under the **Crime Coverage Section** as follows:

It is agreed that in Clause **6. CONDITIONS** (a) CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION of the policy, paragraph (v) CONSOLIDATION - MERGER OR ACQUISITION is hereby deleted in its entirety and replaced with the following:

> If the **Insured** consolidates or merges with, or purchases or acquires the assets or liabilities of, another entity:
> The **Insured** must give the **Insurer** written notice and obtain the **Insurer's** written consent to extend the coverage provided by this **Crime Coverage Section** to such consolidated or merged entity or such purchased or acquired assets or liabilities. If such consolidation, merger or purchase or acquisition of assets or liabilities increases the **Insured's** total assets by more than twenty-five percent (25%), the **Insurer** may condition the **Insurer's** consent by requiring payment of an additional premium; but for the first ninety (90) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this **Crime Coverage Section** shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all **Occurrences** causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 048*

**ENDORSEMENT#** *49*

This endorsement, effective *12:01 am     April 26, 2019*          forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ADD CREDIT, DEBIT OR CHARGE CARD FORGERY ENDORSEMENT

### (SEPARATE DEDUCTIBLE)
### (CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that this endorsement modifies insurance provided under the **Crime Coverage Section**, and applies solely to Insuring Agreement B. **FORGERY OR ALTERATION**, as follows:

**A. Schedule**

| Per Occurrence Limit Of Liability | Covered Instruments |
|---|---|
| *$1,000,000* | ☒ Includes written instruments required in conjunction with any credit, debit or charge card issued to the Insured or any Employee for business purposes. |
| | ☐ Limited to written instruments required in conjunction with any credit, debit or charge card issued to the Insured or any Employee for business purposes. |

**B. Provisions**

1.    Covered Instruments either includes or is limited to, whichever is indicated as applicable in the Schedule, written instruments required in conjunction with any credit, debit or charge card issued to the **Insured** or any **Employee** for business purposes.

2.    The most we will pay in any one **Occurrence** is the applicable **Per Occurrence Limit of Liability** shown in the Schedule.

3.    The following exclusion is added to Clause 3. **EXCLUSIONS** at the end thereof:

Insuring Agreement B. **FORGERY OR ALTERATION**, of this **Crime Coverage Section** does not apply to loss arising from any credit, debit or charge card if the **Insured(s)** have not complied fully with the provisions, conditions or other terms under which the card was issued.

© All rights reserved.

### *END 049*

**ENDORSEMENT#** *49*   (continued)

Solely with respect to the coverage provided by this endorsement, any applicable deductible amount(s) stated in Item 5 of the Declarations shall be deleted in their entirety and replaced with the following:

CREDIT CARD FORGERY COVERAGE is *$5,000*

 ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 049*

<u>ENDORSEMENT#</u> *50*

This endorsement, effective at *12:01 am   April 26, 2019*       forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### OMNIBUS NAMED INSURED - INCLUDING ERISA - EXCLUDING FI AND FOREIGN ENTITY (CRIME COVERAGE SECTION)

This endorsement modifies insurance provided under the Private Edge Plus policy form.

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to **Loss** as may otherwise have been covered under the Crime Coverage Section, the Item of the **DECLARATIONS** entitled **NAMED ENTITY** is amended by addition of the following:

> "and any interest hereafter owned, controlled or operated by any one of those named as **Insured**, subject, however, to Clause 6. **CONDITIONS,** Paragraph a. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION, subparagraph v. CONSOLIDATION - MERGER OR ACQUISITION; and any **Employee Benefit Plan** sponsored by the **Insured(s)** now existing or hereafter created or acquired and required to be bonded under the Employee Retirement Income Security Act of 1974, provided, however, the **Insured's** interest shall not include (i) any **Financial Institution,** as defined herein**,** or (ii) any entity operating in a **Foreign Jurisdiction**, as defined herein, unless an endorsement providing coverage outside the United States is attached to this **Crime Coverage Section**."

As used in this endorsement, **"Financial Institution"** means any entity that is a bank (including but not limited to commercial banks and savings and loan institutions) or any entity which is a diversified financial institution (including but not limited to insurance companies, brokerage firms and investment companies).

As used in this endorsement, **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 050*

112044 (3/14)                              Page 1 of 1

ENDORSEMENT# *51*

This endorsement, effective *12:01 am*     *April 26, 2019*          forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND TERRITORIAL LIMITS ENDORSEMENT**
**(CRIME COVERAGE SECTION ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that
Condition 6(a)(xxii) TERRITORY, of the **Crime Coverage Section** is hereby amended by
adding or deleting the territory shown in the Schedule below:

**Schedule**

| Add | Delete |
|---|---|
| *WORLDWIDE* | |
| | |
| | |
| | |
| | |

No **Per Occurrence Limit of Liability** during any period will be cumulative with any other
amount applicable to the same coverage during any other period.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 051*

95870 (9/07)                    Page 1 of 1

<u>**ENDORSEMENT**</u># 52

This endorsement, effective 12:01AM Apr 26, 2019  forms a part of
policy number 01-340-76-97
issued to ARTHREX, INC.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**REVISION OF LOSS (CRIME COVERAGE SECTION ONLY)**

**(CRIME COVERAGE SECTION ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that section **6. CONDITIONS** (a) CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS, paragraph (vii) "DUTIES IN THE EVENT OF LOSS", subparagraph (1) (a) is hereby deleted in its entirely and replaced with the following:

(a) Notify the **Insurer** as soon as possible, but no later than sixty (60) days after **Discovery** of a loss or a situation that may result in loss of or damages to **Money**, **Securities** or **Other Property** over an amount of $15,000. If the **Insured** has reason to believe that any loss (except for loss covered under insuring Agreement 1.A. or 1.B.) involves a violation of law, the **Insured** must also notify the local law enforcement authorities.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
END 52

MNSCPT                                          1

**ENDORSEMENT#** *53*

This endorsement, effective *12:01 am      April 26, 2019*          forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CRIME COVERAGE SECTION AMENDED FROM
### LOSS SUSTAINED TO LOSS DISCOVERED
### (CRIME COVERAGE SECTION ONLY)

In consideration of the premium charged, it is hereby understood and agreed that the **Crime Coverage Section** is hereby amended as follows:

1. In Clause 1. **"INSURING AGREEMENTS,"** the first paragraph is deleted in its entirety and replaced with the following:

   Coverage is provided under the following Insuring Agreements for which a Per Occurrence Limit of Liability is shown on the Declarations and applies to loss that the **Insured** sustains resulting directly from an **Occurrence** taking place at any time, which is **Discovered** by the **Insured** during the Policy Period shown in the Declarations or during the period of time provided in Condition 6(a)(x):

2. Clause 6. **"CONDITIONS"**, paragraph (a) "CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS COVERAGE SECTION", subparagraph (xii) "JOINT INSURED", subsection (4) is deleted in its entirety and replaced with the following:

   (4) If this **Crime Coverage Section** or any of its coverages is cancelled as to any **Insured**, loss sustained by that **Insured** is covered only if it is **Discovered** by the **Insured**:

      (a) no later than 360 days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date;

      (b) no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

3. Clause 6. **"CONDITIONS"**, paragraph (a) "CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS COVERAGE SECTION", subparagraph (xv) "LOSS SUSTAINED DURING THE PRIOR INSURANCE ISSUED BY THE INSURER OR ANY AFFILIATE" is deleted in its entirety.

&copy; All rights reserved.

*END 053*

**ENDORSEMENT#** *53*   (continued)

4. Clause 6. "**CONDITIONS**", paragraph (a) "CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS COVERAGE SECTION", subparagraph (xvi) "LOSS SUSTAINED DURING THE PRIOR INSURANCE NOT ISSUED BY THE INSURER OR ANY AFFILIATE" is deleted in its entirety.

5. Clause 6. "**CONDITIONS**", paragraph (a) "CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS COVERAGE SECTION", subparagraph (x) "EXTENDED PERIOD TO DISCOVER LOSS" is deleted in its entirety and replaced by the following.

The **Insurer** will pay for loss that the **Insured** sustained prior to the effective date of cancellation of this **Crime Coverage Section**, which is **Discovered** by the **Insured**:

(1) No later than 360 days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(2) No later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

6. In clause 2. "**DEFINITIONS**," the definition of "**Occurrence**" is deleted in its entirety and replace with the following:
"**Occurrence**" means:

(i) as respects Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section**:

(1) an individual act;

(2) the combined total of all separate acts whether or not related; or

(3) series of acts whether or not related;

committed at any time by the same **Employee** acting alone or in collusion with other persons; or

(ii) as respects Insuring Agreement 1.B., "FORGERY OR ALTERATION," of this **Crime Coverage Section**:

(1) an individual act;

© All rights reserved.

*END 053*

<u>**ENDORSEMENT#**</u> *53*   (continued)

(2) the combined total of all separate acts whether or not related; or

(3) a series of acts whether or not related;

committed at any time by the same person acting alone or in collusion with other persons, involving one or more instruments; or

(iii)  as respects all other Insuring Agreements of this  **Crime Coverage Section**:

(1) an individual act or event;

(2) the combined total of all separate acts or events whether or not related; or

(3) a series of acts or events whether or not related;

committed at any time by the same person acting alone or in collusion with other persons, or not committed by any person.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**END 053**

**ENDORSEMENT#** *54*

This endorsement, effective *12:01 am*    *April 26, 2019*    forms a part of policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**EMPLOYEE POST TERMINATION COVERAGE ENDORSEMENT**
**(CRIME COVERAGE SECTION ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that in the **Crime Coverage Section**, Clause 2. **DEFINITIONS**, paragraph (e) ("**Employee**"), subparagraph (i)(1) is hereby deleted in its entirety and replaced with the following:

(1)   while in the Insured's service and for the first *60* days immediately after termination of service, unless such termination is due to **Theft** or any dishonest act committed by the **Employee**;

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, limitations, conditions, or provisions of the attached Policy other than the above stated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 054*

96291 (10/07)                     Page 1 of 1

<u>ENDORSEMENT#</u> *55*

This endorsement, effective at *12:01 am   April 26, 2019*          forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### INSURING AGREEMENT F COMPUTER FRAUD AMENDED
### TO INCLUDE MONEY AND SECURITIES
### (CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that Insuring Agreement F. **"COMPUTER FRAUD"** of the **Crime Coverage Section** is deleted in its entirety and replaced by the following:

**F.  COMPUTER FRAUD**

The **Insurer** will pay for loss of **Money** and **Securities** or loss of or damage to **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of **Money** or **Securities** or **Other Property** from inside the **Premises** or **Banking Premises**:

(i)  to a person (other than a **Messenger**) outside those **Premises**; or

(ii)  to a place outside those **Premises**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 055*

116726 (02/15)                    Page 1 of 1

ENDORSEMENT# *56*

This endorsement, effective at *12:01 am   April 26, 2019*          forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name:  *PrivateEdge Plus*

## FEDERAL SHARE OF COMPENSATION UNDER TRIA AND CAP ON LOSSES ENDORSEMENT

This endorsement modifies insurance provided by this Policy:

### DISCLOSURE

You should know that where coverage is provided by this Policy for losses resulting from "Certified Acts of Terrorism" (as defined by Section 102 (1) of United States Terrorism Risk Insurance Act), such losses may be partially reimbursed by the United States Government under a formula established by federal law.   However, your Policy may contain other exclusions which might affect your coverage such as, an exclusion for nuclear events.   Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from "Certified Acts of Terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion in a calendar year and if we have met our insurer deductible, we are not liable for the payment of any portion of the amount of such losses that exceeds $100 billion; and for aggregate insured losses up to $100 billion, we will only pay a pro rata share of such insured losses as determined by the Secretary of the Treasury.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 056*

**ENDORSEMENT#** *57*

This endorsement, effective *12:01 am      April 26, 2019*            forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NOTICE OF CLAIM
(REPORTING BY E-MAIL)**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.   *Email Reporting of Claims*: In addition to the postal address set forth for any Notice of Claim Reporting under this policy, such notice may also be given in writing pursuant to the policy's other terms and conditions to the Insurer by email at the following email address:

   c-claim@AIG.com

   Your email must reference the policy number for this policy. The date of the Insurer's receipt of the emailed notice shall constitute the date of notice.

   In addition to Notice of Claim Reporting via email, notice may also be given to the Insurer by mailing such notice to: AIG, Financial Lines Claims, P.O. Box 25947, Shawnee Mission, KS 66225 or faxing such notice to (866) 227-1750.

2.   *Definitions*: For this endorsement only, the following definitions shall apply:

   (a)   "Insurer" means the "Insurer," "Underwriter" or "Company" or other name specifically ascribed in this policy as the insurance company or underwriter for this policy.

   (b)   "Notice of Claim Reporting" means "notice of claim/circumstance," "notice of loss" or other reference in the policy designated for reporting of claims, loss or occurrences or situations that may give rise or result in loss under this policy.

   (c)   "Policy" means the policy, bond or other insurance product to which this endorsement is attached.

3.   This endorsement does not apply to any Kidnap & Ransom/Extortion Coverage Section, if any, provided by this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 057*

ENDORSEMENT# *58*

This endorsement, effective at *12:01 am*   *April 26, 2019*      forms a part of
Policy number *01-340-76-97*
Issued to: *ARTHREX, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *PrivateEdge Plus*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made in full compliance with enforceable United Nations economic and trade sanctions and the trade and economic sanction laws or regulations of the European Union and the United States of America, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 058*

**ENDORSEMENT#** *59*

This endorsement, effective *12:01 am     April 26, 2019*              forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 95862 | 09/07 | PRIVATEEDGE PLUS - NATIONAL UNION DEC |
| 96555 | 01/15 | TRIA DEC DISCLOSURE FORM |
| 74825 | 01/13 | FLORIDA ADDENDUM TO DECLARATIONS |
| 95726 | 09/07 | PRIVATEEDGE PLUS - GENERAL TERMS & CONDITION |
| 95727 | 09/07 | D&O COVERAGE SECTION |
| 95728 | 09/07 | EPL COVERAGE SECTION |
| 95729 | 09/07 | FLI COVERAGE SECTION |
| 95730 | 09/07 | CRIME COVERAGE SECTION |
| 112236 | 10/17 | F.R.I.S.C. LIST |
|  | 06/08 | SECURITIES CLAIM PANEL COUNSEL LIST |
|  | 06/08 | EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL |
| 99544 | 07/08 | EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY PANEL COUNSEL |
| 97886 | 04/08 | POLICYHOLDER NOTICE REGARDING E-DISCOVERY CONSULTANT SERVICES |
| 96311 | 02/08 | APPENDIX D - CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION |
| 95779 | 08/08 | FLORIDA AMENDATORY ENDORSEMENT |
| 95737 | 09/07 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (ALL COVERAGE SECTIONS) |
| 97629 | 03/08 | FLSA AND RELATED EXCLUSIONS AMENDED (D&O  AND EPL COVERAGE SECTIONS) |
| 118497 | 10/14 | AON PANEL AMENDATORY ENDORSEMENT (GTC, DO, EPL, FLI AND CRIME COVERAGE SECTIONS) |
| 99563 | 07/08 | SIDE A EXCESS LIMIT OF LIABILITY ENDORSEMENT (EXCESS LIMIT APPLICABLE TO NON-INDEMNIFIABLE LOSS UNDER THE D&O COVERAGE SECTION) |
| 112200 | 03/14 | PASSPORT WORLDWIDE COVERAGE STRUCTURE (SPECIFIED COVERAGE SECTIONS) |

Ⓒ All rights reserved.

*END 059*

**ENDORSEMENT#** *59*

This endorsement, effective *12:01 am     April 26, 2019*                    forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*


by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 130257 | 07/18 | ENHANCED ASSAULT EXTENSION ENDORSEMENT NO ADDITIONAL PREMIUM EPL COVERAGE SECTION |
| 120880 | 02/16 | SEPARATE SUBLIMIT AND RETENTION FOR CLAIMS BY SPECIFIED INDIVIDUAL(S) |
| 95755 | 09/07 | CONTINUITY DATE (EXCESS LIMITS)(D&O & EPL COVERAGE SECTION |
| 112948 | 03/14 | INDIVIDUAL INSURED(S) DEFINITION AMENDED ENDORSEMENT (ADVISORY BOARD MEMBERS)(D&O AND FLI COVERAGE SECTIONS) |
| 115775 | 04/15 | SEVERABILITY OF THE APPLICATION (TOP 2 NONRESCINDABLE SIDE A)(DO EPL AND FLI) |
| 94039 | 05/07 | STATE AMENDATORY INCONSISTENT |
| 112441 | 02/14 | PRIOR NOTICE EXCLUSION AMENDED PRIOR D&O EPL AND FLI POLICIES ONLY D&O EPL AND FLI COVERAGE SECTIONS |
| 114183 | 03/14 | CONDUCT EXCLUSIONS AMENDED FINAL NONAPPEALABLE ADJUDICATION OTHER THAN A COVERAGE PROCEEDING INITIATED BY INSURER ADD |
| 114188 | 03/14 | SETTLEMENT PROVISIONS AMENDED SETTLEMENT WITHIN  OF THE APPLICABLE RETENTION AMOUNT DO AND EPL COVERAGE SECTIONS |
| 116420 | 10/14 | SUBROGATION CLAUSE AMENDED |
| 114181 | 03/14 | OTHER INSURANCE CLAUSE AMENDATORY ENDORSEMENT |
| 105118 | 04/10 | EXTRADITION COVERAGE (D&O COVERAGE SECTION) |
| 99190 | 05/08 | SPECIFIC INVESTIGATION-CLAIM-LITIGATION-EVENT OR ACT EXCLUSION (D&O COVERAGE SECTION) |
| 112040 | 03/14 | EXCLUSION (H) ODL 1V1 AMENDED (CARVEBACKS FOR CREDITORS COMMITTEE; DO # YRS; WHISTLEBLOWER) (D&O COVERAGE SECTION) |
| 105060 | 04/10 | INSURED V. INSURED EXCLUSION (D&O) (D&OS 3 YEAR) (WHISTLEBLOWER) |
| MNSCPT |  | UK CORPORATE MANSLAUGHTER ACT COVERAGE FOR INDIVIDUAL INSUREDS |
| 114184 | 04/15 | EXCLUSION (Q) AMENDED |
| 114185 | 04/15 | EXCLUSION (T) AMENDATORY ENDORSEMENT |

©

**END 059**

**ENDORSEMENT#** *59*

This endorsement, effective *12:01 am      April 26, 2019*                forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 114186 | 04/15 | CLAUSE 8 AMENDED |
| 112314 | 04/15 | PRE-CLAIM INQUIRY/COSTS COVERAGE (D&O COVERAGE SECTION) |
| 112041 | 03/14 | EXECUTIVE EDGE PROTECTION SUITE EXTENSION |
| 114426 | 03/14 | LOSS DEFINITION AMENDATORY UK BRIBERY ACT (DO) |
| 105468 | 04/10 | CLAIM DEFINITION AMENDED (INJUNCTIVE RELIEF)(D&O & EPL COVERAGE SECTIONS) |
| 108228 | 08/12 | EMPLOYMENT EDGE EXTENSION ENDORSEMENT (EPL COVERAGE SECTION) |
| 124010 | 04/17 | EPL PAK PREMIER ENDORSEMENT (EMPLOYMENT PRACTICES, LOSS PREVENTION AND RISK MANAGEMENT TOOLS) |
| 108229 | 05/11 | EMPLOYMENT EDGE CRISIS FUND APPENDIX |
| 114505 | 03/14 | CLAUSE 6 AMENDATORY ENDORSEMENT SETTLEMWNT WITHIN 50 OF THE APPLICABLE RETENTION AMOUNT EPL COVERAGE SECTION |
| 114823 | 04/15 | INDIVIDUAL INSURED(S) DEFINITION AMENDED ENDORSEMENT |
| 108227 | 02/11 | FIDUCIARY LIABILITY INSURANCE EDGE FOR PRIVATE EDGE PLUS (FLI Coverage Section) |
| 109030 | 06/11 | PENSION CRISISFUND APPENDIX FOR FLIE ENDORSEMENT |
| 111344 | 06/12 | SETTLOR CAPACITY AMENDATORY (WRONGFUL ACT DEFINITION AMENDED (SETTLOR CAPACITY)(FLI COVERAGE SECTION) |
| 99589 | 07/08 | CONTINUITY DATE - EXCESS LIMITS ENDORSEMENT |
| 105489 | 04/10 | DEFENSE AGREEMENT CLAUSE 2(B) AMENDED (SETTLEMENT WITHIN SPECIFIED % OF RETENTION AMOUNT)(FLI) |
| 117285 | 02/14 | AFFORDABLE CARE ACT (OBAMACARE) COVERAGE ENHANCEMENT |
| 112030 | 03/14 | CLAIM DEFINITION AMENDED (FLI COVERAGE SECTION) |
| 114190 | 03/14 | DEFINITION OF APPLICATION AMENDED |
| 113021 | 10/12 | INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION |
| 113010 | 10/12 | PROTECTED INFORMATION EXCLUSION |

©

**END 059**

**ENDORSEMENT#** *59*

This endorsement, effective *12:01 am*      *April 26, 2019*                    forms a part of
policy number  *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 116957 | 01/17 | IMPERSONATION FRAUD ENDORSEMENT (CRIME COVERAGE SECTION) |
| 96301 | 10/07 | INCLUDE DESIGNATED PERSON REQUIRED TO HAVE KNOWLEDGE OF LOSS ENDORSEMENT (CRIME COVERAGE SECTION) |
| 96295 | 10/07 | PRIOR THEFT OR DISHONESTY ENDORSEMENT (CRIME COVERAGE SECTION) |
| 101491 | 05/09 | ACQUISITION THRESHOLD AMENDED (CRIME ADVANTAGE ENDORSEMENT AMENDED) (CRIME COVERAGE SECTION ONLY) |
| 106795 | 09/10 | ADD CREDIT DEBIT OR CHARGE CARD FORGERY (SEPARATE DEDUCTIBLE)(CRIME COVERAGE SECTION) |
| 112044 | 03/14 | OMNIBUS NAMED INSURED - INCLUDING ERISA - EXCLUDINGFIAND FOREIGN ENTITY (CRIME COVERAGE SECTION) |
| 95870 | 09/07 | AMEND TERRITORIAL LIMITS ENDORSEMENT (CRIME COVERAGE SECTION) |
| MNSCPT |  | REVISION OF LOSS (CRIME COVERAGE SECTION ONLY) |
| 110096 | 10/11 | CRIME COVERAGE SECTION AMENDED FROM LOSS SUSTAINED TO LOSS DISCOVERED (CRIME COVERAGE SECTION ONLY) |
| 96291 | 10/07 | EMPLOYEE POST TERMINATION COVERAGE ENDORSEMENT (CRIME COVERAGE SECTION) |
| 116726 | 02/15 | INSURING AGREEMENT F COMPUTER FRAUD AMENDED TO INCLUDE MONEY AND SECURITIES |
| 125595 | 03/17 | FEDERAL SHARE OF COMPENSATION UNDER TRIA AND CAP ON LOSSES ENDORSEMENT |
| 99758 | 08/08 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| 65572 | 06/96 | FL ADDENDUM - REPRESENTATION/WARRANTIES |

©

***END 059***

**ENDORSEMENT#** *59*

This endorsement, effective *12:01 am*     *April 26, 2019*            forms a part of
policy number   *01-340-76-97*
issued to *ARTHREX, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 059*

**ADDENDUM TO THE APPLICATION**
Representations and Warranties

The Application is hereby amended as follows:

With respect to any statements or descriptions made in connection with the application for insurance, which becomes part of the policy, all such statements or descriptions shall be deemed to be representations and not warranties.

| CrisiSolution

# Active shooter attacks: be prepared



ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Active Shooter (AS) and Marauding Terrorist Firearms Attacks (MTFAs)

The threat of AS/MTFAs is now part of our daily lives. There are many different types of perpetrators and attacks; they can and do happen anywhere, at any time and in just about any country.





Developing a response plan for such events is vital in order to have the best chance of survival.

This is because it is natural to feel fear and anxiety, and even disbelief. You may be confused and indecisive, but prompt action is imperative. Understanding the situation and being prepared to act on your instincts can build your confidence and help to keep you safe.

ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Developing situational awareness

The first element of being prepared is developing situational awareness – becoming more aware of your surroundings and identifying potential threats. This is about developing a mindset rather than a specific set of skills and anyone can do it if they have the resolve to do so.

As a starting point, you must recognize that threats do exist. If you are in denial about the potential for a threat, your chance of recognizing an emerging threat quickly enough – and avoiding it – will be very small.

You must also take responsibility for your own security. The police or authorities cannot be everywhere and stop every AS or MTFA, so people need to protect themselves.





Situational awareness also includes trusting your 'gut' or instinct. Often a person's subconscious can notice subtle signs of danger that the conscious mind has difficulty identifying. For example, have you ever had a feeling of danger without being able to put your finger on why? Ignoring such feelings can lead to serious trouble.

Practicing situational awareness requires discipline and a conscious effort to pay attention to your surroundings and instincts, even when you are busy and distracted. It's easy for even obvious danger or hostility to go unnoticed if you are distracted, so individuals need to learn to be observant while doing other things.

ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Understanding where you are most vulnerable

It is important to understand the locations in which you are potentially most vulnerable. This is not just important for avoiding armed attacks, but also other types of crime, such as muggings.

No one can remain highly alert at all times – that would create a state of paranoia. Therefore, you need to distinguish between the different levels of risk in the different places you go to.

Using a 'traffic lighting' system – where places are assigned one of three levels of risk – can be helpful for identifying when you need to be at your most vigilant, and when you can be more relaxed.



**Red areas** are places that have been attacked in the past and/or which you are unfamiliar with, such as stations, airports and other transport hubs, and shopping malls. Be very aware of everything around you and look for potential threats.

**Amber areas** are places that you are reasonably familiar with, such as places that you socialize at occasionally. Be slightly more relaxed, but remain alert and notice anything unusual.

**Green areas** are places that you are very familiar with, such as your own neighborhood or restaurants/shopping areas that you use frequently. One reason why these are lower risk is that you will know instinctively where to run/take cover.

Consider the different places that you frequent in your daily life and apply the traffic light system to them.

# Avoiding distractions

In today's modern world, we are constantly distracted. Technology in particular is a huge distraction and we are often totally unaware of our immediate surroundings, which can make us vulnerable to a wide range of threats.

**When you are in a 'red' location in particular, the following steps can help to keep you safe:**

- Never be distracted, either by personal media or activities around you.
- Wear clothing that allows you to move quickly if you have to.
- Do not wear headphones or ear buds.
- Do not read or play games on portable devices.
- Do not stay there for an extended period if there is a safer place to move to.



ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Identifying threat indicators

Threat indicators are events or activities that could indicate an armed attack/AS event is being planned or about to take place. They give you a better picture of what is happening around you and can prompt preventative actions.

Threat indicators often go unnoticed unless you are actively aware of what to look for.



## High levels of security

Security is present in every part of our daily lives and is often unnoticed and discreet. However, identifying the level of security in a given location – particularly a red location – can be a useful indicator of the level of threat.

Security measures such as control of access, physical barriers, searches and armed guards should promote confidence and peace of mind – but should also indicate that you should be more alert and prepared to act as a threat has clearly been identified.



## Suspicious behavior

Any activity or behavior that is unusual is a threat indicator.

For example:

- Individuals observing, photographing/sketching or taking notes of any security measures or staff procedures
- Unattended luggage or packages left in crowded public areas
- Clearly agitated, aggressive or chanting strangers
- Vehicles parked in restricted areas
- Any vehicle driving erratically or in a pedestrian area

Suspicious or unusual activities should be reported to security staff without delay. If there is no opportunity to report a situation or activity, move to a safe location and call the police to report the incident.

ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Visualizing potential threats and responses

Whatever situation you are in, it is useful to visualize what could happen – and what your response would be. When you are visualizing scenarios, you are constantly evolving a plan of action – which means that you are more likely to react appropriately should a real crisis occur.

**Think about:**

- What could happen – and what you would do in that situation
- How you could get out
- Where you could hide/possible safe havens
- Who could help you
- Who you could call
- What else could protect you



# During an attack

Should an attack occur, your actions will be critical to you surviving the incident.

**The following actions can help to keep you safe:**

- Recognize the danger and don't wait – move.
- Locate the nearest emergency exit and leave immediately.
- If you cannot run, take cover somewhere that will protect you from any gunfire, and observe what is going on around you.
- Try to keep the attackers at a distance.
- If you can, create obstacles between you and the attackers – for example, lock or barricade doors, draw curtains/blinds, switch off elevators and lights.
- Adopt a boxer's stance in a physical confrontation to keep your balance and stay upright.
- Use bundled clothing, luggage or chairs as protection against knife attacks.
- Keep at least one yard away from a knife attacker at all times.
- Communicate with the emergency services when safe to do so.
- Look for protective obstacles in the street if there is a vehicle ram attack, such as fire hydrants, light posts or parked cars.
- Immediately move away from any loud bang, sound of gunfire or other confrontation.
- Leave immediately if an alarm sounds or you are told to evacuate.



# www.aig.com

The information, suggestions and recommendations contained herein are for general informational purposes only. This information has been compiled from sources believed to be reliable. This information does not address every possible loss potential, law, rule, regulation, practice or procedure. No warranty, guarantee, or representation, either expressed or implied, is made as to the correctness or sufficiency of any such service. Reliance upon, or compliance with, any statement herein in no way guarantees any result, including without limitation the fulfillment of your obligations under your insurance policy or as may otherwise be required by any laws, rules or regulations. No responsibility is assumed for the discovery and/or elimination of any hazards that could cause.

American International Group, Inc. (AIG) is a leading global insurance organization. Founded in 1919, today AIG member companies provide a wide range of property casualty insurance, life insurance, retirement products, and other financial services to customers in more than 80 countries and jurisdictions. These diverse offerings include products and services that help businesses and individuals protect their assets, manage risks and provide for retirement security. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

Additional information about AIG can be found at www.aig.com | YouTube YouTube: www.youtube.com/aig | Twitter: @AIGinsurance www.twitter.com/AIGinsurance | LinkedIn: www.linkedin.com/company/aig. These references with additional information about AIG have been provided as a convenience, and the information contained on such websites is not incorporated by reference into this material.

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Products or services may not be available in all countries and jurisdictions, and coverage is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds, and insureds are therefore not protected by such funds.

© American International Group, Inc. All rights reserved.

USAL00002240 0817

| CrisiSolution

# Active shooter: Immediate Response Action Guide



ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Active Shooter Immediate Response Action Guide

The threat of active shooter (AS)/marauding terrorist firearms attacks (MTFAs) is now part of our daily lives. There are many different types of perpetrator and attack; they can and do happen anywhere, at any time and in just about any country.

Knowing how to act and what courses of action are available to you during an event is vital in order to have the best chance of survival.



2



This is because it is natural to feel fear and anxiety, and even disbelief. You may be confused and indecisive, but prompt action is imperative. Understanding the situation and being prepared to act on your instincts can build your confidence and help to keep you safe.

Within this document you will find high level guidance on three courses of action that are available to individuals who find themselves involved in an AS/MTFA incident.

They are:

**Run  |  Hide  |  Fight**

3

# Run (Evacuate)

## How to evacuate from a building/ confined space during an AS/MTFA event.

**Get out** of the building if it is safe to do so.

**Remember** that there could be more attackers at the main exits or many other people trying to use the same exit.

**Consider** using secondary exits. These may be easier to access and a shooter may not expect their use. You will likely know your building/complex better than the shooter, use this to your advantage.

**Identify** alternatives routes or safe havens/hiding places you could use should the situation change while on the move.

**Leave bags** and large personal items. Take off shoes that are difficult to run in.

**Stay low** when moving.



**Use cover** from view and ballistic protection as much as possible. Close blinds and turn off lights if this obscures the shooters view. Keep close to walls. Lock or close doors as you exit to slow the movement of a shooter (being careful not to trap other evacuees).

**Avoid** windows and long open corridors. Stay clear of escalators and elevators where you could be trapped if there is a power failure or fire.

**Warn others** while you are evacuating and call the emergency services when in a safe location.

**Do not** attempt to evacuate seriously injured individuals. Apply lifesaving assistance only if it is safe to do so.

**Run** or move quickly across open or exposed ground. It is better to go around the perimeter keeping close to walls for protection. Try and move in short sprints from one safe covered location to another.

**Look around** protective cover from an unexpected angle. For example, don't stick your head above a flat wall as that is what a shooter would expect.

**First responders.** If you encounter law enforcement while evacuating, stay out of their way and keep your hands clearly visible. Do not expect them to assist you. Offer information on the shooter if you have any.

**Stay out** and find a place that gives you cover and protection. Think about communication and assisting others who might be injured or need assistance.

ARTHREX, INC.
01-340-76-97

ARTHREX, INC.
01-340-76-97

# Hide (Lockdown)

**How to hide or go on lockdown within a building/ confined space during an AS/MTFA event.**

**Know** the best hiding places in your workplace and envisage how you would use them in an emergency.

**Study** doors and which way they open. Can they be locked or jammed shut easily?

**Recognize** what action to take in a crisis. Make sure you know the alarm for a lockdown.

**Identify** equipment and items that could help you secure and lockdown an area such as furniture.

**Test** how quickly you can effectively lockdown your area of the workplace.

**Collaborate** with colleagues on how you would lockdown and hide.

**Stay low** during a lockdown or when hiding and consider crawling to move. The shooter may blindly fire into hiding places or locked rooms and will normally aim at body height.

**Be cautious.** Do not answer to your name if you hear it being called while hiding, this could be the shooter. Only respond if you are certain that it is law enforcement.

**Think** about alternative escape routes from a hiding place, either another door or window to avoid being trapped.

**Consider** that you may need to fight if a shooter gains entry to your area.

# Fight (Defend in Place)

**How to defend yourself in a building/ confined space during an AS/MTFA event.**

**Talk** with others about how, where and when you might ambush the shooter and what you could use as weapons.

**Identify** areas that will protect you from gunfire and use them in your defense.

**Remember** the shooter will likely not expect to be attacked. Surprise is your main advantage.

**Prepare** your workplace like a battlefield or ambush site, enabling you to attack the shooter when they are most vulnerable.

**Improvise** by using anything at hand that will protect you and block/deflect/injure the shooter. Consider utilizing items like fire hoses, extinguishers, furniture, bottles, kitchen ware such as knives, etc.

**Visualize** your fight plan: where, with whom and with what. You know your workplace and the people you work with, you know where the shooter will be vulnerable, and the best places to launch an attack.

**Fight** as a coordinated group. Be assertive and aggressive. However, if the shooter gets into your defended area do not huddle together.



## www.aig.com

The information, suggestions and recommendations contained herein are for general informational purposes only. This information has been compiled from sources believed to be reliable. This information does not address every possible loss potential, law, rule, regulation, practice or procedure. No warranty, guarantee, or representation, either expressed or implied, is made as to the correctness or sufficiency of any such service. Reliance upon, or compliance with, any statement herein in no way guarantees any result, including without limitation the fulfillment of your obligations under your insurance policy or as may otherwise be required by any laws, rules or regulations. No responsibility is assumed for the discovery and/or elimination of any hazards that could cause.

American International Group, Inc. (AIG) is a leading global insurance organization. Founded in 1919, today AIG member companies provide a wide range of property casualty insurance, life insurance, retirement products, and other financial services to customers in more than 80 countries and jurisdictions. These diverse offerings include products and services that help businesses and individuals protect their assets, manage risks and provide for retirement security. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

Additional information about AIG can be found at www.aig.com | You Tube YouTube: www.youtube.com/aig | 🐦 Twitter: @AIGinsurance www.twitter.com/AIGinsurance | 🔗 LinkedIn: www.linkedin.com/company/aig. These references with additional information about AIG have been provided as a convenience, and the information contained on such websites is not incorporated by reference into this material.

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Products or services may not be available in all countries and jurisdictions, and coverage is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds, and insureds are therefore not protected by such funds.

© American International Group, Inc. All rights reserved.

USAL00002784  0318

AIG

# CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number:  *01-340-76-97*        Date: _____

Type of Coverage: D&O _____   E&O _____   Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*ARTHREX, INC.* _____

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext _____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *AON RISK SERVICES CENTRAL INC* _____

Address: *1650 MARKET STREET, SUITE 1000* _____

Address: *PHILADELPHIA, PA 19103* _____

Contact: *AMY DUNBAR* _____     Phone: _____

eMail: *amy.dunbar@aon.com* _____

Send Notice of Claims to:   AIG                          Phone:  (888) 602-5246
                            Financial Lines Claims       Fax:    (866) 227-1750
                            P.O. Box 25947               Email:  c-Claim@AIG.com
                            Shawnee Mission, KS 66225

**AIG**

# CLAIM REPORTING FORM
# FIDELITY SUPPLEMENTAL
### (Only complete this supplemental if the Claim is being reported under Fidelity Coverage)

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number:  *01-340-76-97*

Date of Discovery: ——————————— Estimated Amount of loss: ———————————

Cause of Loss: Employee Dishonesty    ———————    Computer Fraud    ———————

Funds Transfer    ———————    Robbery/Burglary    ———————

ID Theft    ———————    Forgery    ———————

Client Property    ———————    In Transit    ———————

ERISA    ———————    Credit Card Forgery    ———————

Other    ———————    if Other, describe:    ———————————————

Send Notice Of Claims To:    AIG    Phone:  (888) 602-5246
Financial Lines Claims    Fax:    (866) 227-1750
P.O. Box 25947    Email:  c-Claim@AIG.com
Shawnee Mission, KS 66225

*centralized Customer Link and Information Management*